**EXPERT REPORT OF STEVEN HORII, M.D.**

**In the Matter of DatCard Systems, Inc. v. PacsGear, Inc.**

**United States District Court For The Central District Of California**

**Case No.: SACV10-1288 DOC (VBKx)**

**[OUTSIDE COUNSEL ONLY – PURSUANT TO PROTECTIVE ORDER]**

**ABSTRACT**

I have been engaged by counsel for Defendant PACSGEAR to offer my opinions on the validity of plaintiff DatCard's patents in suit. These patents relate to the electronic transfer of medical images and recording the images onto CDs.

The patents discuss Picture Archiving and Communications Systems, commonly called PACS. PACS are systems used for the digital transmission and storage of medical images, e.g., MRI's, CT Scans, Ultrasound. PACS are the means by which images created by the device are transmitted to a database, where they can be accessed by treating physicians' workstations and copied for distribution to those who need them, such as patients and referring physicians. Typical PACS systems conform to what the patents refer to as "a standard medical imaging format." In practice, that format typically is the DICOM Standard. DICOM consists of a detailed and comprehensive set of protocols that have been adopted worldwide. I have devoted much of my career over the past three decades to the development of DICOM.

DatCard's patents claim a simple DICOM-conforming medical image storage, transfer and copy system. Nearly all its features were built into systems conforming to the DICOM Standard more than five years before the first patent was applied for. All of the features claimed were well known in the literature and in practice before DatCard's claimed inventions. For

**EXHIBIT 6**

example, before DatCard, DICOM-based systems were loading viewing programs onto CD's

along with images, so that doctors or patients could view medical images on their own

computers.  The claimed feature of an audit log to track a patient's medical images was not

merely well known, it was essentially required by HIPAA.  Similarly, the use of a timer in

medical imaging software programs to ensure that all the requested data was received was not

only well-known, the inventor testified such use was the only way to do it:

> **Q.  And the two methodologies, one sensing the port and one looking at the**
> **database, I think previously you testified that was essentially the only way to really**
> **do what you were trying to do; is that a fair representation?**
>
> A.  Yes.
>
> [Wright Dep. p. 152]

It appears to me that the patent claims represent the assembly of obvious choices from a

limited menu of pre-existing options. *In my opinion, all of the claims are either anticipated*

*and/or obvious.*

ii

**EXHIBIT 6**

# TABLE OF CONTENTS

I.      QUALIFICATIONS ................................................................................................ 1
II.     Information considered in forming opinion ........................................................ 2
III.    HISTORICAL BACKGROUND .......................................................................... 3
        A.      The Use Of Film And Film Libraries ..................................................... 3
        B.      Early Filmless Image Transmission ....................................................... 3
        C.      The DICOM Standard ............................................................................. 5
                1.      DICOM standardizes communication protocol between devices ........... 5
                2.      CD selected for the storage and exchange of DICOM images ........... 6
        D.      Proliferation Of DICOM Conforming Systems—1996 Forward ......... 7
IV.     CLAIM CONSTRUCTION AND VALIDITY OF THE '164 PATENT ............ 8
        A.      Person Of Ordinary Skill In The Art ..................................................... 8
        B.      The Architecture Of DICOM Conforming PACS Systems As  It Relates To Claim Construction ......................................................... 9
        C.      Claim Construction of the '164 Patent .................................................. 11
                1.      Claim 9 ............................................................................................... 11
                2.      Claims 10-13, 15-17. 19, 21:  No apparent construction required ....... 14
        D.      Validity Of The '164 Claims ................................................................ 15
                1.      Independent claims 9 and 15 are Anticipated by Prior Art ............... 15
                2.      All Other Claims are Obvious ............................................................ 16
                        a.      The Legal Test for Obviousness ............................................ 16
                        b.      Obviousness in light of DICOM ........................................... 17
                        c.      Obviousness from combined prior art references ................. 19
V.      CLAIM CONSTRUCTION AND INVALIDITY OF THE LATER PATENTS ............. 24
        A.      The '597 Patent .................................................................................... 24
                1.      Construction Of Claims 1 And 6 ........................................................ 24
                2.      The '597 Patent Claims are Obvious .................................................. 26
        B.      The '157 Patent .................................................................................... 27
                1.      Construction of Claims ...................................................................... 27
                2.      The '157 Claims Are Obvious ............................................................ 27
        C.      The '174 PATENT ................................................................................ 29
                1.      Claim Construction ............................................................................. 29
                2.      The '174 Patent claims are anticipated and obvious .......................... 30
        D.      The '422 Patent .................................................................................... 30
                1.      A different person of ordinary skill in the art .................................... 30
                2.      The Claims Of The '422 Patent are Obvious ..................................... 31
VI.     SECONDARY CONSIDERATIONS RELATING TO OBVIOUSNESS ............. 33

iii

**EXHIBIT 6**

## I.       QUALIFICATIONS

I am Professor of Radiology at the University of Pennsylvania School of Medicine.  My complete C.V. is attached as **Exhibit 1** to this report.

I received my M.D. from the New York University School of Medicine in 1976.  I became board-certified in diagnostic radiology in 1980 and joined the faculty at N.Y.U., where I earned the rank of Associate Professor with Tenure.

I left NYU in 1988 to become Clinical Director of the Image Management and Communications Section in the Radiology Department at Georgetown University.  My principal responsibility was as a radiologist and information technology expert for the Digital Imaging Network Systems (DINS) project.  This project was the proof-of-concept for filmless radiology in support of teleradiology and battlefield care and was funded by the United States Army Medical Research and Development Command.  The project culminated in the testing of filmless operations at Georgetown and the University of Washington and led to the development of the U.S. Army Medical Diagnostic Imaging Support (MDIS) System Request for Proposals.

In 1992, I joined the faculty at the University of Pennsylvania Medical Center as Co-Director of the Medical Informatics Group and Professor of Radiology.  Penn had been one of the early PACS pioneer institutions, developing in-house teleradiology, intensive care unit, and image management systems software.  I served as a principal investigator for the NIH-funded Program Project in Evaluation of PACS and still am the Clinical Director for the Medical Informatics Group and Modality Chief for Ultrasound.

I joined the American College of Radiology – National Electrical Manufacturers Association (ACR-NEMA) Digital Imaging and Communications in Medicine Committee shortly after it was formed in 1983.  I served as clinical co-Chairman of the ACR-NEMA,

1

**EXHIBIT 6**

subsequently re-named DICOM Standards Committee from 1987 through 1998.  During that time, I was Chairman of Working Group V (WG V) on Exchange Media from 1988 to 1996. WG V is responsible for the development of standards for exchanging DICOM images on various media.  For my work on DICOM, I was named "One of the Twenty Most Influential People in Radiology" by Diagnostic Imaging magazine in 1996.

I presented papers at most of the major conferences on PACS in the United States and abroad, including the first PACS meeting ever held (in 1982).  In 2005, I was appointed the Editor of the SIIM "Experts Hotline", an on-line information resource for SIIM members and serve as an Associate Editor of the Journal of Digital Imaging.

I have published 97 peer-reviewed papers, 87 proceedings papers, and 19 editorials and book chapters.  Most of these relate to PACS and DICOM.  I have testified as an expert once previously, namely in *General Electric Co. v. Sonosite*, Case No. 07-C-0273, Western District of Wisconsin (2007).

My hourly rate for my services in this case is  $250.

## II.    INFORMATION CONSIDERED IN FORMING OPINION

Attached as **Exhibit 2** to this report is a list of documents which I have considered, in addition to my knowledge and experience in forming my opinions.  The specific prior art references relied on to demonstrate invalidity are included therein and/or are discussed below. As the Court has yet to construe the claims, I may need to revisit certain assumptions and analysis following the Court's claim construction.

2

**EXHIBIT 6**

III.   **HISTORICAL BACKGROUND**

A.   **The Use Of Film And Film Libraries**

For close to a century, radiologists used film to capture, view, transfer and store the images.  As Dr. Harry Fischer (Fischer 1982) teaches, film libraries were established to provide films to the physicians and other personnel caring for patients.  If patients were transferred to other facilities, or if they needed their films for a second opinion, film libraries also provided the films (or copies) to patients for their patient folders.

Because the film was the sole image record of the examination unless it was copied and due to privacy concerns, means were established that paralleled the functions in a literary library.  Films had to be signed out and a record kept of the borrower, information about the images (e.g., date, content, modality), the hospital person facilitating/authorizing the check out and when they were taken.  The filmless system was broadly modeled to digitally emulate the film-based filing system.  Seshadri (1992) provides a more thorough discussion of making the transition from film jackets to digitally based systems.  (**Exhibit 6B**).

The organization of film libraries included the creation of film jackets that held a number of folders.  The jacket served as a master folder and had space on the outside to record what folders were included.  The folders themselves were typically organized by the type of image or by imaging technique and would contain subfolders if the patient had more than one of that particular imaging study along with any diagnostic reports.

B.   **Early Filmless Image Transmission**

Early digitized medical systems were designed for communication of radiological images (e.g. University of Pennsylvania system discussed in Seshadri et al article 1990) within hospitals, for the diagnosis and monitoring of a patient's condition.  These Picture Archiving and

3

**EXHIBIT 6**

Communication Systems were the early versions of the modern day PACS.  However, because such PACS were hospital-based, most physicians outside the hospital did not have electronic access to patient images.  For this reason, an early method of distributing images from PACS to non-hospital doctors was to print the images directly from the modality or other storage device on film and deliver them for viewing on the traditional lightbox.

The progress and development of digital media came from the consumer electronics industry.  Vinyl analog records were replaced by digital Compact Discs (CD).  Makers of personal computers took advantage of the large storage capacity of CDs and began to advocate for using the recordable CD for storage and distribution of digital information.  Other medical specialties that used imaging, particularly cardiology, also made the transition to digital imaging.  Conventional cardiac x-ray imaging used 35mm motion picture (cine) film, so cardiology film libraries contained many canisters of such films.

Digital imaging provided an opportunity to replace such film with electronic storage, but the cardiologist still had a requirement to view the dynamic imaging that the cine film provided.  While video recording was one solution, analog video playback did not handle changes in playback speed or direction well.  A digital media based solution was very much desired by the cardiology community.  Because systems were essentially created ad hoc at the hospital level with the assistance of large OEMs, like General Electric, Philips and Siemens, there was no uniformity between one modality and/or PACS system and another, so the benefits of universal filmless transmittal of images could not then be realized.

4

**EXHIBIT 6**

## C.      The DICOM Standard

### 1.      DICOM standardizes communication protocol between devices

In 1983, the American College of Radiology and National Electrical Manufacturers Association (ACR-NEMA) formed an interdisciplinary committee of radiologists, members from industry and computer engineering experts to develop a uniform protocol to enable completely filmless distribution of radiological images.  That effort ultimately led to the DICOM standard.

The ACR-NEMA Committee was eventually re-named Digital Imaging and Communications in Medicine (DICOM) Standards Committee to reflect participation of additional groups including non-radiology medical specialists (e.g., cardiology) and foreign professional medical societies and standards bodies.

It was a given that the standard would enable transmission, viewing, searching for and storing of images from the full gamut of image modalities throughout the networked facility. The primary images and related images, such as previous studies, would have to be readily accessible to physicians, without detrimental changes to the workflow of healthcare providers. The objective was and is a "plug and play" system.

Any DICOM-based PACS typically is composed at least of equipment that receives the DICOM images from the equipment that images patients, stores the images and maintains a database so the images can be retrieved, and workstations that display the DICOM images so that radiologists and other healthcare providers can interpret or view them.  The DICOM Standard provides infrastructure so that these components can operate irrespective of the imaging equipment manufacturer, so long as the imaging equipment conforms to DICOM.  While all the Parts of DICOM are necessary for a digital healthcare enterprise, the core parts needed are Part 3 (PS 3.3) which defines the way images and related information are formatted, Part 4 (PS 3.4)

5

**EXHIBIT 6**

which specifies the various services that are necessary to store, move, find, and retrieve the images and associated information. Other parts define the particulars of communicating DICOM images over computer networks (Parts 5, 7, and 8 (PS 3.5, PS 3.7, PS 3.8)).

Updates of DICOM are issued yearly. The Standard now consists of some 18 parts of detailed specifications. To make it easier to select and install DICOM-compliant systems, the Standard includes a part on Conformance. This part requires any manufacturers claiming conformance to DICOM to describe that conformance in a specific, standard manner.

The DICOM committee chose to enable the flow of digital information so as to replicate the pre-digital, film-based system. DICOM implementers recognized that portable media, such as CD's and DVD' were analogous to film-jackets and that inserting a CD into a computer is the equivalent of putting an x-ray onto a lightbox. This model was deliberately adopted to mimic familiar behavior of medical personnel in the pre-digital world.

### 2. CD selected for the storage and exchange of DICOM images

Before DICOM, the most widely used digital medium was magnetic tape. I was chair of the Working Group that developed a standard applicable to magnetic tape, which ACR-NEMA published in 1991. Shortly thereafter, the burgeoning use of CDs for data recording and the desire by cardiology for a cine film replacement, led to our group being tasked to generate standards for other media. The first medium for which we developed a standard was recordable CD (CD-R). This of course led to the CD being selected as a portable storage medium of choice, as spelled in the DICOM Standard, specifically Part 10.

As Dr. John Elion teaches in DICOM Media Interchange Standards for Cardiology: Initial Interoperability Demonstration (Elion 1995):

> "Selection of the exchange medium was a challenging task and a large variety of digital
> storage technologies were considered. After lengthy discussion and debate, the

**EXHIBIT 6**

recordable 5.25 inch [sic] optical compact disk (CD-R) was selected. The storage format on the CD-R is based on international standards, among them ISO 9660. The medium is similar to the CD-ROM used in popular multimedia applications."

After publication of the DICOM Standard for CD-R, the American College of Cardiology (ACC) elected to implement the standard and demonstrate it at their scientific meeting. Software to create the discs and display the contents was written by Brown University under contract with the ACC and a CD containing a set of DICOM images was created and replicated. The ACC called the discs "Digital Interchange Standards for Cardiology (DISC)". At the 1995 ACC meeting, thousands of these discs were distributed and attendees could take them to a number of participating vendors where the contents could be viewed (Elion 1995).

The next year the ACC again took the opportunity at their annual meeting to demonstrate the benefits of the DICOM standard. This 1996 version of the DISC contained various DICOM medical images from a number of studies including angiograms, ultrasound images and several nuclear studies. In that year the ACC group headed by Dr. Steven Nissen also included a public domain DICOM viewer on the CD, which enabled the recipients to review the images on any Windows based personal computer. [Nissen, Steven "Evolution of the Filmless Cardiac Angiography Suite" -- Am. J. Cardiology, August 1996, Exhibit 77, Deposition of Jack Cusma.] At approximately the same time the European Society of Cardiology created a similar CD for distribution at their Annual Meeting in Birmingham, England, which included numerous DICOM studies on a fictitious Jon Doe along with viewing software, which enabled viewing on any personal computer. [Ratib Declaration; DISC '96 Birmingham Documents.]

### D.  Proliferation Of DICOM Conforming Systems—1996 Forward

The issuance of the first DICOM Standard in 1993 jump-started the progress of digitizing the medical community worldwide. One of its main contributions is that the equipment

7

**EXHIBIT 6**

manufactured by a wide-array of companies, including imaging devices (MRI, CT, etc.), PACS themselves, CD readers/writers, workstations and storage systems all essentially speak the same language. This makes it possible to interconnect equipment from various vendors to suit particular medical imaging needs. Some of this equipment included products that coupled the DICOM query, retrieve or send functions with the Standard's selection of the CD as the preferred DICOM storage device – some of which are discussed below. The fact that the patents involved in this case list over 700 prior art references reflects the explosion of PACS related technology ushered in by DICOM.

## IV.     CLAIM CONSTRUCTION AND VALIDITY OF THE '164 PATENT

### A.      Person Of Ordinary Skill In The Art

In connection with the interpretation of the patents, I understand I am to adopt the viewpoint of a hypothetical person of ordinary skill in the art. Counsel has instructed me on the factors that courts have followed in profiling such a person include the educational level of the inventor; type of problems encountered in the art; prior art solutions to these problems; rapidity with which innovations are made; sophistication of the technology; and the educational level of active workers in the field.

The art here is the design of systems implementing the electronic transfer and copying of DICOM medical images. A person of ordinary skill would need a strong background in the architecture of information systems, and thorough familiarity with DICOM. That person would also have to understand the demands of the medical environment, e.g., confidentiality of patient information and the needs of treating and referring physicians for prompt and easy access to a wide variety of patient images and information.

8

**EXHIBIT 6**

**- 166 -**

In 2007, the Society for Imaging Informatics in Medicine (SIIM) working with the American Registry of Radiologic Technologists (ARRT) established the independent American Board of Imaging Informatics (ABII).  The ABII certifies "Imaging Informatics Professionals," called CIIP's. CIIPs have come from both the radiologic technology and computer science/information technology areas.  I was on the Committee that drafted the initial CIIP examination.

Although the CIIP program wasn't around at the time of the invention, in my opinion, the ordinary person of skill in the art would be a person with a background commensurate with that of a CIIP with five years experience in the design, use and implementation of PACS, or a radiologist or medical computer networking specialist with equivalent experience.[1]  *This profile is quite similar to that proposed by Ken Wright, the inventor, at page 233 of his deposition.*
**Exhibit 3.**

It will shorten this analysis considerably if we recognize that most of claim limitations (e.g., send, query/retrieve, record onto a CD, etc...) would be understood by the hypothetical skilled person reading the patent to be present in essentially any DICOM-conforming PACS system.

**B.      The Architecture Of DICOM Conforming PACS Systems As  It Relates To Claim Construction**

Any person of ordinary skill in the art as of the critical date would correctly understand that the basic architecture of DICOM-based systems is built into all the claims. The premise for this assumption is that all of the claims specify that the "medical image data" be "formatted in a standard medical imaging format."  See, e.g. claim 9 of the '164 patent, col. 10 ll. 42-67.  The

---

[1] As discussed below, the actual programming covered by the '422 Patent would require additional computer programming experience.

9

**EXHIBIT 6**

patent specification refers to DICOM as the format in the description of the best mode (Col. 3, ll. 55-56) and as of the critical date, there was no other "standard medical imaging format" that supported the variety of imaging methods that DICOM does and there is none today.

The essential function of DICOM is the communication of medical images. The Standard defines many elements needed for a database and also has low-level functions (Query and Retrieve) for locating a particular DICOM image on a DICOM-conformant device that stores such images (i.e., a database).[2] A key task of radiologists is to compare a current study with a prior one or a study from a different type of modality to determine, for example, if disease is getting worse or improving. Any PACS must support the operations of having a record of a patient's imaging studies and knowing where they are stored.

Even though computer systems, networks, and storage systems are fast, digital images are large in terms of digital data. A single CT examination may consist of over a thousand images. Comparing that with the prior study means displaying the current thousand images and retrieving the correct previous thousand images from storage. Without a database, an exhaustive search of a potentially huge amount of information would have to be undertaken.

Part 11 of DICOM defines Media Application Profiles. These describe how specific types of imaging studies are stored on media. These profiles define the elements needed to store DICOM images. Part 12 of DICOM defines the actual media formats and media to be used with the Application Profiles of Part 11. To completely define DICOM conformant media, an Application Profile is used with a particular medium (e.g., CD-R) and the particulars of file

---

[2] The DICOM Standard does not specifically define a database. During my tenure as Co-Chairman of the DICOM Standards Committee, I recall that there was considerable discussion regarding this idea. In the end, it was thought better not to define a database as doing so might restrict innovation or unfairly advantage a vendor who used the particular database chosen for the Standard.

**EXHIBIT 6**

organization on that medium defined in Part 12. The Standard does, however, illustrate the potential use of exchange media, essentially serving as an alternative to a DICOM network connection.

The first large-scale implementation of DICOM Parts 11 and 12 was the aforementioned work by the American College of Cardiology (Elion 1995). This embodiment combined the "Basic Cardiac X-Ray Angiographic Application Profile" of DICOM Part 11 with the "120mm CD-R Medium" specification of DICOM Part 12. This was a demonstration that the Standard could be implemented and the resulting CDs readable by multiple vendors. As discussed above, the next year the ACC included viewing software on a sample CD to enable users to view the DICOM images on any Windows-based computer.

### C. Claim Construction of the '164 Patent

#### 1. Claim 9

The first disputed claim of the earliest patent issued is claim 9 of U.S. Patent No. 7,302,164. I have numbered its five elements as follows:

"9. A system comprising:

[1] a medical image server configured to receive medical image data that is generated by a plurality of imaging modalities, the medical image data being formatted in a standard medical imaging format used by specialized computers configured for viewing medical images;

[2] a database configured to store medical image data generated by the plurality of imaging modalities;

[3] a plurality of browsing terminals configured to receive a user selection that defines selected medical image data;

[4] a search module configured to search the database for related medical image data that is related to the selected medical image data; and

[5] a production station that is configured to record all of the following onto a single, portable digital data storage device that is removable from the production station: the selected medical image data, recorded in the standard medical imaging format, the related medical image data, recorded in the standard medical imaging format, and a viewing program that is configured to allow viewing of the selected and the related medical image data that is recorded onto the data storage device on widely accessible

11

**EXHIBIT 6**

computers not specifically configured with standard medical imaging software for
viewing of medical images."

The first element calls for a server that receives digital medical image data from at least

two imaging machines ("modalities"), the data formatted according to DICOM (or some other

"standard medical imaging format"). As discussed above, Parts 3 through 8 of the DICOM

Standard specifically teach the methodology necessary for modalities to communicate with

networked devices, including sending DICOM images to servers on a PACS device, a

workstation or a CD burner. Nothing requires interpretation, except perhaps the meaning of

"specialized computers," which appears to be later defined in the claim as one "specifically

configured with standard medical imaging software for viewing of medical images." I interpret

"specialized computers" to mean computers containing DICOM viewing software.

The second element is the database for storing digitized medical image data. The person

of ordinary skill would readily understand this limitation.

The third element calls for more than one browsing terminal, whether a computer

networked to the database which stores the DICOM medical images, the terminal is capable of

receiving the user's [e.g. the physician's] selection of the medical image data such as the

patient's most recent MRI. The meaning of the element appears unambiguous.

The fourth element is a "search module" that searches the database for "related medical

image data." "Related medical image data" is not a standard term in my field, but I believe its

meaning is unambiguous from the specification. In my opinion, the term "related medical image

data" means digital medical images, to the exclusion of written materials, such as diagnostic

reports. This would be clear to the person of ordinary skill from the specification at column 2, ll.

12

**EXHIBIT 6**

38-52. There, three different categories of possible related medical image data are given, all consisting of images, and nothing else.

If there were any doubt, I believe a person of ordinary skill would understand the "related medical image data" as a generalized term for medical images, which are related to other medical images.

*"A search module configured to search the database for related medical image data that is related to the selected medical image data"* means that the system is capable of searching the same database in which it found the selected medical images for additional medical images related to the selected medical images. At the end of column 4, the specification discusses "related medical image data storage units," which it identifies as PACS 1 and PACS 2, as the source of the related medical images. This further confirms that "related medical image data" necessarily refers to DICOM medical images.

The fifth element, discussed above, is a "production station" configured to download three types of information onto a "single portable digital data storage device." The production station is referenced in the specification as a CD recording device, colloquially a CD burner or CD Robot, manufactured by Rimage Corporation. Although the claim is drawn to allow other types of portable data storage devices, such as a thumb drive or DVD, DICOM, as noted above, issued a standard for CD-R. In the context of the claim I believe the term would be understood by the person of ordinary skill as the device from which the image is downloaded onto the portable storage medium.

The three items that element 5 requires to be downloadable on the CD consist of (1) the selected medical image data, (2) related medical image data and a (3) a viewing program, configured to allow viewing of the selected and the related medical images on computers that do

13

**EXHIBIT 6**

not themselves have viewing software capable of displaying medical images. No additional special construction of this limitation is required, in my opinion.

> **2.    Claims 10-13, 15-17. 19, 21: No apparent construction required.**

Claims 10-13 depend on claim 9, each one adding a single limitation to what has already been defined.[3] Most are readily understood by persons of ordinary skill, and require no interpretation.

Independent claim 15 differs from claim 9 only in that specifies an optical disk as the storage medium onto which data is downloaded by the production station. An optical disk would be understood by a person of ordinary skill to be a CD-ROM, DVD, CD-R, magneto-optical disc (MOD) or other similar storage medium with data stored as a variation in an optical property (e.g., reflectance).

Claim 16 translates the same elements present in claim 9 into a method claim, with the addition of an unambiguous labeling feature.

Claim 17 is dependant on claim 16. It is unambiguous because its only addition is the generation of the audit trail called for in claim 12.

Claim 21 reiterates claim 16's elements, except that it specifies an optical disk as the storage medium.

---

[3] Claim 10. The system of Claim 9, further comprising a configuration data module configured to allow a user to input identifying information relating to the selected medical image data.
   Claim 11. The system of claim 10, wherein the production station is further configured to print and apply a label to the data storage medium, the label containing the identifying information.
   Claim 12. The system of Claim 9,further comprising an audit module that is configured to automatically provide an auditable trail of the selected medical image data.
   Claim 13. The system of claim 12, wherein the auditable trail of the selected medical image data includes a record of when the selected medial image data and the related medical image data were recorded onto the data storage medium."

14

**EXHIBIT 6**

### D.     Validity Of The '164 Claims

#### 1.     Independent claims 9 and 15 are Anticipated by Prior Art

I have been asked to assume that a claim is anticipated, and, therefore invalid, if a single piece of prior art discloses all elements in a claim either explicitly or inherently (i.e., necessarily or implied), so that one skilled in the art could practice the invention without undue experimentation. Prior art, I understand, includes material patented or published anywhere before January 17, 2000, or in use or on sale in the United States before that date. I also understand that an invention known or used by others in the United States qualifies as prior art if the date of the invention is prior to the invention of the asserted patent. I have also relied on counsel as it pertains to certain prior art references.

Mehta, "*Enhancing Availability of the Electronic Image Record for Patients and Caregivers During Follow-Up Care*," published in the United States in the Journal of Digital Imaging, in May, 1999 (**Exhibit 4**) covers all elements, the first four at p. 78 and the fifth at p. 79. The system described in Mehta is a DICOM-based system, includes a medical image server receiving medical images formatted in the standard imaging format used by computers configured for viewing medical images, fulfilling [1], pg. 78. It stores image data on a database generated by more than one modality, fulfilling [2], pg. 78. It works on multiple terminals configured to receive user selection of selected medical image data, fulfilling [3], pg. 78. It utilizes a search module that can search the database for selected and related images as it calls for collecting "all pertinent imaging studies for the particular patient", fulfilling [4], pg. 78 and creates a CD containing all the images and viewing software, which allows the images to be viewed on any computer, fulfilling [5], pg. 79.

15

**EXHIBIT 6**

Independent Claim 15 is identical to claim 9, except limitation [5] omits some language and add the limitation that the data storage medium to be "an optical disk." The above reference calls for an optical disk medium (Mehta p. 79) and therefore anticipates for the same reason.

### 2. All Other Claims are Obvious

#### a. The Legal Test for Obviousness

I have been advised that section 103(a) of the Patent Act states that a patent may not be obtained if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. I have been instructed by counsel that the current legal test for whether a patent claim is invalid for obviousness is described in the Supreme Court's decision in *KSR v. Teleflex*, which I have reviewed. My takeaway from *KSR* is that, while there are a number of factors that should be considered, that one should not treat them as a rigid checklist. The passage in *KSR* that is most useful, at least to me, are these:

> "When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under § 103."

More succinctly:

> "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."

It is my understanding that it is acceptable to combine prior art references if the references themselves provide a suggestion, motivation or reason to combine or if the link between the references is simple common sense.

16

**EXHIBIT 6**

### b. Obviousness in light of DICOM

The '164 patent claims consists of many elements, all of them familiar, all using known methods, all yielding predictable results.

DICOM alone calls out support for nearly all limitations of each of the claims in the '164 patent. This is evident from the Background Of The Invention Section:

> "To ease the communication of data the DICOM (Digital Imaging and Communications in Medicine) standard was developed by ACR-NEMA (American College of Radiology-National Electrical Manufacturer's Association) for communication between medical imaging devices and PACS. In addition to the examined images, patient demographics, and exam information such as patient name, patient age, exam number, exam modality, exam machine name, and exam date can also be stored and retrieved in DICOM compatible data format. A DICOM file stores patient and exam information in the header of the file, followed by the exam images. PACS store medical image data in DICOM format. " Col. 1.

The preferred embodiment identifies the sources of some components, the CD production stations from Rimage Corporation, and both the viewing program and the image server from e-Film Medical Company. These were off-the-shelf products, deployed to do exactly what they were created to do. There is nothing in the claims that yields any unexpected result.

The DICOM Standard recognized the need to search for various imaging studies. Parts 3 and 4 provide the guidance for storing, moving, finding and retrieving from systems that stored DICOM images. There was no limitation to the number of searches conducted or the quantity of databases searched. In fact it was expected: Radiologists and other medical providers have always typically needed to compare imaging studies with prior ones. Since a PACS stores all of the imaging studies (at least those from radiology in current systems) the PACS is likely to contain multiple examinations for a patient, often using different imaging techniques, done on various dates, and possibly including different anatomic areas.

17

**EXHIBIT 6**

If a patient has, say, a fractured ankle that has been repaired and I am asked to see how it is healing, I will want to compare the current ankle x-rays with the previous ones. If this same patient has had a chest x-ray in the time between the first ankle x-rays and the current ones, a database algorithm that finds the most recent previous x-ray study will retrieve the chest x-ray for comparison, not the prior ankle images. In this sense appropriate "related medical image data" can mean a prior examination of the same type and the same body part. The example patient may have had an MRI of the ankle recently, but comparing that with the prior x-ray study could be important. Hence the need for obtaining related digital images and methods for accomplishing it were well known.

A person of ordinary skill is presumed to be aware of the downloading of viewing software onto CD's as taught in numerous prior art references including without limitation DISC '96, Heartlab, Mehta, Sorna, Samari and Ratib.[4] There is nothing at all that would be unexpected about doing exactly that, so that each CD could be read by any computer.

The same is true of selecting medical image data, and calling for related medical data. DICOM, of course, supports two-way communication between the user and the medical image database, and assumes that users would need to be able to call for whatever image or images they needed. They had to be able to ask for all studies of a patient, or all done within a given period, just the most recent one, or studies of different parts of the body. A given study, say in radiology, generally consists of multiple images of the same body part. The screen shots of the user's menu in the Ratib/UCLA Article (**Exhibit 7**), for example, shows that users could order by patient studies and even series (component image sets of a study) from multiple modalities.

---

[4] Additionally, the eFilm Suite software product used by Mr. Wright, one of the inventor's in 1999, also burned DICOM images onto CDs with viewing software.

18

**EXHIBIT 6**

A cardiology-specific example is provided in the Heartlab DICOM View Study Manual, p. 20 (Heartlab 1998)(**Exhibit 8**) illustrating sources, dates, patient name, patient I.D., patient date of birth, procedure date and procedure physician. The need for these capabilities was self-evident from the practice of medicine—sometimes one needs to see a sequence of images taken over time, or multiple images from different modalities. The solution—search and selection capabilities—is obvious, merely by stating the need.

### c. Obviousness from combined prior art references

DICOM is prior art, but to the extent it does not by itself cover all the details recited in the claims – other references fill in any gaps. It is a uniform standard, and not a blueprint for putting together all the details of a complete system. For example, whether or not the production station labels the CD's is not really germane to DICOM.

In this case, finding two pieces of prior art that suggest to a person of ordinary skill that when looked at together, it would be obvious to combine them, is like finding hay in a hay stack. There are so many prior art references that it is easy to find references that fill in the commonplace details that may have not been mentioned, say, from a given patent or article. The number of possible combinations is astronomical.

Looking again at Claim 9, it appears numerous pieces of prior art disclose most of the elements listed above including Huang **(Exhibit 8A)**, Mehta, Ratib/UCLA and Heartlab.

My colleague Osman Ratib, Ph.D, worked on the design of a DICOM PACS system used at UCLA in 1999 (Ratib Declaration, described in his Declaration, and in his article published in *Medical Imaging 2000*, "PACS Design and Evaluation, Engineering and Clinical Issues.") As he explains in his declaration and related exhibits, the UCLA system essentially renders all the elements of claim 9 obvious – it searched for related medical images generated by multiple

19

**EXHIBIT 6**

modalities and burned all the images onto a CD, with viewing software which allowed the images to be viewed on any computer. [It also automatically searches another database for reports and other documents related to the medical images and burns them onto the CD.]

Heartlab is a provider of DICOM-based PACS systems with its headquarters in Rhode Island. It has sold its DICOMview® system in the United States since at least as early as 1997, (**Exhibit 8)**, Petrocelli Dep. p. 72 (**Exhibit 9**). Both the system and its 1998 User's Guide render all the elements of claim 9 obvious. As a DICOM system, it includes a medical image server receiving medical image data formatted in the standard imaging format used by computers configured for viewing medical images. **Exhibit 8**, Heartlab User's Guide p. 22, fulfilling limitation [1]. It stores image data on a database generated by more than one modality, fulfilling [2]. Ex. 8 p. 22. It works on multiple browsing terminals configured to receive user selection of selected medical image data. Ex. 8, pp. 11, and Exhibit 206 fulfilling [3]. Its search module can search the database (and other databases) for related medical images, such as earlier studies relating to the same patient. Ex. 8, pp. 22, 36, fulfilling [4], and a CD burner that loads related and selected images as well as a viewing program onto CD's, which images are viewable on computers that do not necessarily contain medical image viewing software. Ex. 8, pp. 22, 45, fulfilling limitation [5]. **Exhibit 8**.

As discussed above, searching for and combining medical data relating to other medical data is not novel and is disclosed by numerous references including those discussed immediately above, as well as DISC '96 and:

Arenson (Arenson 1987) teaches that "The user can, with a single keystroke, call up the "next image". The selection of the next image is based on rules built into the system.

20

**EXHIBIT 6**

Levin and Fielding (Levin 1990) (**Exhibit 5**) describe how image retrieval rules are established using well-established "if-then" constructions (e.g., IF study = any study, AND a prior study of the same modality is available, THEN prefetch the most recent previous study).

Seshadri (Seshadri 1990)(**Exhibit 6A**) teaches a pre-DICOM system that includes an Image Archival and Retrieval System (IARS) which is designed to attach simultaneously to a wide variety of computer systems, function well on Local Area Network (LAN) and Wide Area Network (WAN) configurations and provide "transparent coordination of volume, capacity, catalog and retrieval of all stored data, including those volumes moved off line…" The system was networked to multiple modalities and was searchable by multiple workstations. The system also provided a non-erasable audit trail. In short, the IARS supported the ability to "store multiple versions of a given image or other data and maintain a complete history of all versions" and "retrieve images and/or other related data from optical storage and transmit them to a given image device."

Seshadri (Seshadri 1992) (**Exhibit 6B**) discusses a software program that is designed so that if it notices that a user has called up Study 2, "it sends a notice to the archive" requesting the automatic transfer of older, related Study 4.

Additionally, Patent No. 5,903,889 entitled System and Method for Translating, Collecting and Archiving Patient Records, issued to de la Huerga (**Exhibit 10**) teaches the use of software in a hospital environment, which can be utilized by multiple workstations to search one or more databases for a variety of documents relating to a patient and then burn the data onto a CD. See, for example, Figures 1, 3A, Figure 4A and claim 24: "A method of collecting a group of related data records on a computer system….comprising (a) receiving a first reference to a group of related data records….(b) retrieving said group of related data records using

21

**EXHIBIT 6**

information in said first reference….and (f) storing said group of related data records…to a data

storage device." (e.g., CD).  The records relate to medical records and include pictures and

video.

Additionally, in a 1990 (Inamura 1990) article entitled "A Trial of PACS Employing

Magneto-Optical Disks" the author describes a system where "The digitized speech of the

resulted [diagnostic] interpretation are automatically written on the MOD with the medical

images…." p. 53 (**Exhibit 11**).

To the extent Mehta does not anticipate Claim 9, it, in combination with any of the

above, would render that claim obvious.  The same is true with the other anticipated claim 15.

Independent Claim 16 claims the method "for selecting and automatically recording

medical image data onto a data storage medium" and is obvious for the reasons discussed above.

The only new feature in it is "printing a label using the production station, wherein the label

includes identifying information associated with the selected medical image data, and affixing

the label to the data storage device using the production station.  Labeling of CD's is taught in

Ratib Article, (**Exhibit 7**, p. 32) and Heartlab, (**Exhibit 8**, p. 74-81), Sorna (**Exhibit 12**), Samari

(**Exhibit 15**) and Kahle col. 4 ll. 27-30, col. 7 ll. 37-42, col. 9, ll. 20-33.  (**Exhibit 13**).

Claim 21 is claim 16 with an optical disk, and so is rendered obvious for the reasons

discussed above.

As for the Dependant Claims:

Claim 10 entry of identifying information - is obvious based on:

-        Heartlab - which specifically allowed a user to input identifying information

         relating to the selected medical image data (Petrocelli deposition; DICOMView

         Version 1.9 User's Guide – p. 25 (Section 4.5.1)(**Exhibit 8**)

22

**EXHIBIT 6**

**- 180 -**

-     Sutherland – Col 7 ll. 7-12 (**Exhibit 14**).

Claim 11 - printing and affixing labels to the CD's is obvious based on:

    Heartlab – for at least one of its customers, Heartlab acquired a Rimage high volume CD burner, wrote software to communicate between the DICOMView workstation and the Rimage unit, allowing the Rimage unit to print patient and study related information on to the label.

    Ratib/UCLA – page 31 of the Article shows a sample CD with patient and study information on the label. (**Exhibit 7**)

    VEPRO 2000 – p. 21 (PG008842)

    Sorna product offering (**Exhibit 12**)

    Samari (**Exhibit 15**)

    Kahle Col. 4 ll. 27-30 and Col. 7 ll. 37-42, Col. 9 ll. 20-33 (Figure 2) (**Exhibit 13**)

Claim 12 audit module configured to automatically provide an auditable trail of the selected medical image data is obvious based on:

Samari-Kermani including Abstract, ¶ 8, ¶ 63 (**Exhibit 15**)

(See additional discussion below regarding '157 Patent)


Claim 13/17- audit trail of when images were recorded on the CD is obvious based on:

Samari-Kermani including Abstract, ¶ 8, ¶ 63 (**Exhibit 15**)

(See additional discussion below regarding '157 Patent)

Any person of skill in the art as well as many others working in a hospital or imaging center would know that HIPAA and other document tracking obligations mandate record keeping, that patient lists are useful in conducting a search, that users should be able to enter

**EXHIBIT 6**

information on their patients, and labeling CD's is a better idea than putting unlabeled CD's in a computer to find out to whom they pertain. Whether to generate labels when image data is loaded on CD's using a Rimage unit or to hand-write the filing information on a blank label of a CD is simply a design choice.

## V.    CLAIM CONSTRUCTION AND INVALIDITY OF THE LATER PATENTS

### A.    The '597 Patent

#### 1.    Construction Of Claims 1 And 6

The vocabulary of claim 1 of the '597 patent[5] (issued in 2010) is largely the same as in the '164 patent. Claim 1 introduces three new terms: (1) the term "automatically" in connection with searching and retrieving data, and (2) use in some limitations of the seemingly more general term "medical data" instead of "medical imaging data," in describing what is searched for and retrieved and (3) searching two databases.

"Automatically" and "medical data" are neither specifically defined in the claims, nor do they have a well-defined meaning in the art.

---

[5] "1. A computer-implemented method for automatically generating a portable computer-readable medium containing medical data related to a patient, comprising:
   [1]receiving, via computer-implemented interface a request for medical data related to the patient;
   [2]automatically searching a first computer database via a first database interface for a first set of medical imaging data related to the patient based on the received request;
   [3]automatically retrieving the first set of medical imaging data related to the patient;
   [4]automatically searching, based on the received request, a second computer database via a second database interface for *additional medical data* also related to the patient, wherein the second interface is different from the first interface;
   [5]automatically receiving the additional *related medical data;* and
   [6]automatically generating a portable computer-readable medium, at a production station, containing the first set *of medical imaging data* related to the patient and the *additional related medical data,* wherein the first set of medical imaging data is formatted in a standard medical imaging format used by a computer configured for *viewing the medical imaging data.*

24

**EXHIBIT 6**

The specification at col. 4, l. 44 to col. 5, l. 19, discusses the option of setting a PACS so that when the user requests image data from a first database, that request will automatically trigger transmittal of related image data from a second database. That is, a user who requests image data on one database will receive image data from a second database, possibly an archive database that is related to what was actually requested.

We know from the image input devices (modalities) listed on the left side of the matrix in Figure 2 that the second database includes other ("related") medical *image* data. The claim also requires the image data on one database to be formatted in the standard format (DICOM), without placing any limitation on the formatting of the data in the second database. Again, we know that the second database may but is not required to store images in DICOM format.

The major problem with construing the second database to allow for copying of written data, such as medical diagnoses, is that the system disclosed in the specification describes the information to be recorded on CD as consisting of image data[6] and not diagnostic text reports or other non-image data. In addition to the input devices shown in the Figure 2 matrix, the image server (Figure 1, 200) shows inputs only from image-producing devices.[7] Figures 3 and 5 also refer (Figure 3; 122, 134, 143; Figure 5; 180, 182, 184, 190) to image data and related image data only.

Additionally, Mr. Wright testified that the eFilm Medical viewing software, which was copied onto CD's, ('164 Patent col. 4, ll. 33-34) only reads and displays images and cannot open

---

[6] Although it does not appear to be relevant here, DICOM does provide for some identifying text to be included in a Standard DICOM data set (as DICOM image plus "header" information) with certain elements to be necessarily defined to contain text (e.g., "patient name").

[7] Figure 1 shows an Image Scanner (500) which is described as an image producing device in the specification as it only teaches that it scans and transfers "medical image data stored on film".

**EXHIBIT 6**

text files. Wright Dep. p. 156. As discussed above, all of the diagrams in the patent clearly specify generation, storage, transmittal, copying and viewing only of images.

Claim 6 uses the terms *"related medical data"* and *"related medical image data"* interchangeably. In light of the specification and the above discussion, it appears that "related medical data" means related medical images. [Otherwise, I don't believe that the specification enables a person of ordinary skill in the art to make a system that would search for and collect non-DICOM text reports.] Whether related medical data is construed to be medical images and text documents or just medical images, my conclusion of obviousness remains the same.

Claim 6 also inserts the unambiguous term *application server*, which does not appear to be an ambiguous term.

### 2. The '597 Patent Claims are Obvious

The system of Claim 1 and the method of Claim 6 are quite similar to the systems claimed in the '164 Patent and is obvious for essentially the same reasons. DICOM was created to enable the query and retrieving of medical images from multiple databases and to allow users to send images from a modality to another device, including a CD burner. Obviously, if different databases are being queried, different interfaces would be utilized. As a result, the prior art discussed above renders obvious the addition of a second database. In terms of all the steps occurring automatically it is not clear exactly what is meant by "automatically", however, as discussed above, DICOM and the other technological advances in the 1990s were designed to automate the search and retrieve process to facilitate the creation of CDs. CD burners, including the Rimage units, were designed to automate the production of CDs. Computers, networks and workstations were designed to automate tasks and the communication between devices. It would have been obvious to automate the system of searching for, retrieving and/or sending medical

26

**EXHIBIT 6**

**- 184 -**

images and related images to a CD burner in order to create a CD with those images and viewing software. Heartlab (Ex. 8), Ratib/UCLA (Ex. 7), Seshadri (1992) (Ex. 6B), de la Huerga (Ex. 10), DISC '96, Sorna (Ex. 12) and Samari are some examples of prior art references demonstrating this process multiple databases and/or the related automated support.

### B. The '157 Patent

#### 1. Construction of Claims

The asserted claims in the '157 Patent for the most part use the language discussed above and therefore need not be discussed again. As for the additional language it appears to be straightforward and unambiguous.

#### 2. The '157 Claims Are Obvious

The claims of the '157 patent focus almost entirely on tracking information related to patient images which are burned onto a CD. For example, independent claims 1 and 7 require the tracked audit data to include an identification specific to the CD, the identification of the person requesting the DICOM medical images and the patient's name. The asserted dependent claims 3, 6, 9 and 12 essentially specify additional tracked data, including the date and time and the number associated with the CD.

Tracking medical images has been around since the first radiology reports were established. Back when we were using film, it was very important to keep track of the film so the hospitals would have logs that would track information relating to the image(s) being distributed including without limitation the patient's name, information about the images (e.g., date, modality, subject matter), the date/time the film was checked out, the borrower of film and the hospital staff member who was disbursing the image(s) ["Film Disbursement Log"]. I have read portions of Chet LaGuardia's transcript (one of the inventors of the asserted patents) and see

27

**EXHIBIT 6**

that he concurs that these types of logs were kept at all the hospitals where he worked over the last 20 years.  [**Exhibit 16**, LaGuardia Dep., pp. 54-58]  As he stated, the reasons that these logs were kept were for tracking purposes and for legal reasons (i.e., to protect the patient's medical privacy).  As a trainee in radiology (1976-79), I recall looking through such logs to locate films I needed for comparison with a new examination.  See also Seshadri (1990).

In the late 1990's a new regulation was being promulgated for the medical community in connection with the privacy rights of patients – the Health Insurance Portability and Accountability Act or HIPAA.  [Literature discussing HIPAA and its impact include the testimony of Donna Shalala, Secretary of Health and Human Services before the Senate Committee on Labor & Human Resources and a December 2000 presentation prepared for the American Hospital Association Numbered PG024592-PG024604].

HIPAA created significant obligations on medical care facilities relating to the distribution of patient's medical records.  As Mr. Petrocelli of Heartlab testified, in the 1999/2000 time period hospitals required vendors to provide appropriate tools, so they could be compliant with the HIPAA mandate.  He testified that hospitals needed to keep a log of basically who, what, where, when and by whom regarding all disbursed medical records – e.g., CDs containing medical images.  [Ex. 9, Petrocelli Dep., pp. 84-86].  Similarly, DatCard's sales material also discusses the relationship between the audit trail maintained by its product and HIPAA compliancy.  [Ex. 19 to the Wright Deposition]

The need for including an audit log in medical software was well known at least as far back as 1998 based on the Health and Human Services document 45 CFR part 142 (45 CFR 142, **1998**) which states, "We expect that the capability of keeping audit trails will become standard in

28

**EXHIBIT 6**

all health care software in the near future, spurred on by the health information privacy debates in the Congress and elsewhere" (p. 43255)(**Exhibit 17**).

Electronically keeping track of the who, what, where, when and by whom relating to CDs is nothing new – for example, U.S. Patent No. 6,496,744 issued to David Cook discloses a system keeping an audit log relating to burned CD's:

> "During the manufacturing process, one or more "events" are tracked and recorded including without limitation, the time at which the completed "image" is assembled from the disk farm, ....Such information (or any components thereof) is then made available to the management subsystem."

> "Management system also includes appropriate database or other storage facilities for maintaining transaction information, including without limitation, the identity of each customer accessing the service, the customer's identifying information (e.g., name, address, social security number, credit card information and validation information, personal identification number ("PIN") or other security information), historical information about past purchases or inquires, playlists for CD-ROMs previously purchased, favorites list, and the like." Col. 6 ll. 38-49; Col. 9 l. 65 - Col. 10 l. 14).

> "The CD-ROM burner....preferably includes a bar code or similar identifier generator that prints out a "bar code" or other identifier uniquely identifying the particular product (e.g., by order number, shipping method, job number, batch number or the like.)" Col. 10, ll. 34-39.

In light of the historical use of logs in radiology, HIPAA, DICOM and the movement towards an electronic/digital environ, it would have been obvious to one skilled in the art to create an electronic version of the Film Disbursement Log to track the digitally created CDs.

### C.     The '174 PATENT

#### 1.     Claim Construction

The primary difference between the independent claims of the '174 Patent and independent claims of the '164 Patent is that the '174 Patent claims are broader and only require "one or more modalities" whereas the claims of the '164 Patent require a plurality of modalities and the element relating to the search of the database for related data happens "automatically."

29

**EXHIBIT 6**

**- 187 -**

The independent claims of the '174 Patent also use the term "related data" instead of "related
medical image data". Although Claim 5 of the '174 Patent uses the term "related medical image
data" interchangeably with "related data". For the reasons discussed above in connection with
the '597 Patent, the specification suggests that Claim 5 is correct, in that related data does mean
related medical image data.

### 2.      The '174 Patent claims are anticipated and obvious

The claims here are quite similar to the claims in the '164 and '597 patents and are
anticipated (Claims 1 and 8) or rendered obvious for the same reasons.

### D.      The '422 Patent

### 1.      A different person of ordinary skill in the art

Unlike the other patents, the '422 Patent focuses on the inner workings of the underlying
software program. All the claims relate to the inclusion of a "timer" to determine whether all the
data has been received and is ready to copy onto a CD. The claims here also use the following
new terms: timeout period, timestamp, timer and timeout interval, which are not well defined in
the specification. Although the person of ordinary skill in the art I have posited would recognize
the need for a timer, that person would not necessarily be sufficiently knowledgeable on the
technical side of computer programming to fully understand the programming issues raised by
the '422 patent. On the other hand, at the programming level, relatively little knowledge on the
medical side is required to understand the lion's share of the '422 claims. I understand that
PACSGEAR has retained a computer consultant, Mr. Jestice, to evaluate this patent, from the
point of view of a person of ordinary skill in the field of "computer programming, database
programming and storage devices." I agree with Mr. Jestice's assessment.

30

**EXHIBIT 6**

Nevertheless, I have been asked to review the '422 patent based on the assumption that the person with ordinary skill is the same as I have defined for the other patents.

To the extent the claims here use many of the same terms as those discussed above, the same construction is appropriate. While the precise meaning of the timeout-timer and related terms would be better understood by one with more experience in software programming, a person of ordinary skill as I have defined it, would recognize the need for timeout methodologies in this application.

### 2.     The Claims Of The '422 Patent are Obvious

Claim 1 claims a method for:

> *"automatically producing medical image data and related data on an optical storage medium upon expiration of a timeout period, the method comprising:*
> *[1] "detecting whether a server has changed within a timeout period after receiving medical image data or related data from a modality and resetting the timeout period when the change is detected; and*
> *[2] automatically producing an optical storage medium comprising selected medical image data and related data from the server based on when the timeout period has expired and recording on the optical storage medium program code that, when executed, allows viewing of the selected medical image data, wherein the medical image data is formatted in a standard medical imaging format used by a computer configured for viewing the medical image data.*

It would have been obvious to one skilled in the art that when receiving DICOM images from a database that one must know that all the data has been received prior to burning the images on to a CD.

I know that timers are used to in connection with determining whether a task has been completed. In this case, the task is ensuring that all the data is received before burning the data onto a CD. Setting a timer to have the system check and recheck the database to see if it has changed after a given period of time is one obvious way to ensure that all the data has been received. Similarly, one could design the system to check the "pipe" entering the database,

31

**EXHIBIT 6**

through which the image data travels, to again ensure that all the data has been received. If after a pre-selected amount of time, which can be shortened or lengthened depending on the situation, the database hasn't changed or there is no more data flowing through the pipe, the system will assume the task (i.e., receipt of all data) is complete and will go to the next task – burning the image data onto a CD. In circumstances like this, where you are not sure how much data is going to be received, use of a timer is the obvious practical solution.

Examples of prior art which discuss the use of a timer to ensure a task is complete, include Samari-Kermani (**Exhibit 15**), Mason (**Exhibit 18**) and Murray (**Exhibit 19**).

The DICOM Standard also utilizes a timer for a similar purpose, namely to determine whether a task has been completed during a certain time period. Part 8 of the Standard, specifically section 9.1.5, references a timer (referred to as the Artim Timer), which is essentially designed to manage the Request, Reject and Release of associations. For example, whether a port connection has occurred during the time interval. The Standard states that the timer is configurable to address a wide-range of network configurations. (**Exhibit 20**).

Claim 8:

> *A system for automatically producing medical images on an optical storage medium, the system comprising:*
> *a database configured to receive one or more medical images from at least one modality;*
> *an application server coupled to the database and configured to create a timestamp when the application server detects a change in the database, thereby initiating a timer;*
> *wherein the timer resets when the application server detects an additional change in the database before a timeout interval, measured from the timestamp, elapses; and*
> *wherein the timer times out when the application server detects no additional change in the database after the timeout interval, measured from the timestamp, elapses;*
> *and a production station coupled to the application server and configured to automatically produce an optical storage medium comprising one or more selected medical images from the database based on when the timer times out, wherein the medical image data is formatted in a standard medical imaging format used by a computer configured for viewing the medical image data.*

32

**EXHIBIT 6**

The elements of Claim 8 are similar to Claim 1. Although Claim 8 focuses on a change in the database as opposed to detecting whether a server has changed – the use of a timer to determine whether a task is complete and then to automatically move on to the next task would have been obvious to one skilled in the art at the time of the alleged invention, for the reasons discussed above.

Claims 2, 3 and 6 depend from Claim 1 and are identical to claims 9, 10 and 13, which depend from Claim 8. All of such dependant claims are rendered obvious in light of the above discussions and those involving previous claims.

## VI.    SECONDARY CONSIDERATIONS RELATING TO OBVIOUSNESS

It is my understanding that in addition to conducting the traditional obviousness analysis, the Courts also consider what are known as "secondary considerations." I am informed that secondary considerations include (i) the inventions commercial success, (ii) long felt but unresolved needs, (iii) failure of others, (iv) skepticism by experts (v) praise by others, (vi) teaching away by others, (vii) recognition of a problem, (viii) copying of the invention by competitors and (ix) other relevant factors.

It's my understanding that in the first two years that DatCard sold its product (2001-02), it sold less than 130 units. At that time there were likely in excess of 5,000 medical facilities that would have been in the target market for such products. I wouldn't consider such limited sales a commercial success. In light of the history and prior art references discussed above, the claimed invention was well known to those skilled in the art and therefore did not satisfy a long felt but unresolved need. I am not aware of any failures by others – to the contrary it appears that many

33

**EXHIBIT 6**

people were doing what was covered in the patent, before the patentee. I am not aware of any skepticism by experts or praise or teaching away by others. The "problem" was previously known and addressed by others, as shown in the prior art references. Copying of the invention by others does not appear to be an issue either in light of the prior art references and products used or offered prior to the 2000 timeframe concerning CDs with medical images and viewing software, (e.g, Sorna, DISC '96, Heartlab, Ratib/UCLA, VEPRO, Mayo Clinic, etc....).

I have prepared this Expert Report at the request of PACSGear's counsel and if called to testify as to its contents, I can and would testify truthfully about its contents and the conclusions I have reached.

Dated: November 1, 2011

Steven C. Horii

34

**EXHIBIT 6**