## UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA SOUTHERN DIVISION

Before the Honorable David O. Carter

**In the Matter of:**

DATACARD SYSTEMS IN., v. PACSGEAR INC.

Civil Action No. SACV10-1288 DOC (VBKx)

# EXPERT REPORT OF MR. IAN JESTICE FOR U.S. PATENT NO. 7,801,422
# ON THE INVALIDITY OF THE ASSERTED CLAIMS OF THE '422 PATENT

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO THE PROTECTIVE ORDER*

**EXHIBIT 7**

## I.    INTRODUCTION.

1.    I, Ian Jestice, reside at 2004 Trout Gulch Road, Aptos, CA 95003. I am a citizen of the United States. I am an independent consultant in the areas of storage systems and other fields. I am over eighteen years of age and I am competent to testify as to the matters set forth herein if I am called upon to do so.

2.    I have been retained by PACSGEAR , Inc. ("Pacsgear") as an expert in this case at my normal hourly rate of $300 per hour. No part of my compensation is dependent upon the outcome of this case or any issue in it.

3.    I have prepared this Expert Report at the request of Pacsgear and its counsel. If called to testify as to the contents of this Expert Report, I can and would testify truthfully about its contents. This Expert Report provides my opinion on whether the U.S. Patents No. 7,801,422 (the '422 patent) is invalid, and describes other related testimony that I may present.

4.    In forming my opinions I have relied on my knowledge and experience in computer systems, computer software, computer hardware and databases and on the documents and information listed below. I may also review other materials throughout this case, including reports and testimony from any experts retained by Respondents and any other documents or testimony that emerges in the case. Those materials may affect my opinions in this matter.

5.    I reserve the right to modify and supplement my analysis and conclusions set forth herein based upon any additional fact discovery performed by the parties or in response to any reports by experts for Respondents. I also reserve the right to modify and supplement my analysis and conclusions set forth herein based upon any change to any of the applicable legal standards explained to me by Pacsgear's counsel. I further reserve the right to modify and supplement my analysis and conclusions set forth herein based upon the claim constructions for the '422 patent.

1

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO THE
PROTECTIVE ORDER*

**EXHIBIT 7**

6.    I have considered the '422 patent for the purposes of providing my expert opinion. The '422 patent covers aspects of computer software, databases and storage devices with which I am familiar, due to my background, training and experience. The '422 patent relates to computer software, databases and storage devices. Because of my background, training and experience, I am qualified as an expert in the technical areas relevant to the '422 patent.

## II.    QUALIFICATIONS.

7.    I am currently a software and hardware computer consultant.

8.    I have over 40 years of experience in the area of computer technology and telecommunications, specializing in file systems, data storage, databases and computer interfaces. I have worked for IBM in Europe, Canada, and the U.S. to help develop and support computer hardware and software. I have worked for Hitachi Data Systems in Japan and the U.S. My work for Hitachi dealt with software, disk drives, and computer systems. I have also worked for Amdahl/Fujitsu in its storage products division, where I wrote software, firmware, and drivers for its disk and tape products.

9.    I co-founded Zadian Technologies, a company that produced test equipment and test software for storage devices, including disk drives, optical "juke boxes," tape drives, tape libraries, and RAID storage. The Zadian products performed both manufacturing tests and design verification. I managed the groups that created software to support and track the testing and manufacturing of storage devices. I was responsible for advising our customers how to use the Zadian products in their design and manufacturing processes. Zadian Technologies was bought by Xyratex, a contract manufacturer of storage devices and test equipment.

10.    I received the equivalent of a B.S. degree in Computer Science and Telecommunications from the City & Guilds of London Institute in the United Kingdom.

2

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO THE PROTECTIVE ORDER*

**EXHIBIT 7**

11.     My current CV is attached hereto as **Exhibit 1**. A list of my previous Expert Witness assignments is attached hereto as **Exhibit 2**.

## III.    INFORMATION CONSIDERED IN FORMING OPINION.

12.     Attached as **Exhibit 3** to this Expert Report is a list of documents that I have considered, in addition to my knowledge and experience noted above, in forming my opinions and analysis set forth in this Report.

13.     In addition, I have relied upon my personal knowledge and experience as an engineer, including my work in the field of file systems, databases and CDROM devices.

14.     In addition to the items in Exhibit 3, I expect to use exemplary evidence, as identified above and elsewhere in this Report, to present my opinions as set forth in this Report. For example, I may combine the evidence into tutorials, graphics, animations, or like presentations, and I may demonstrate the operation of the products referenced herein.

## IV.    MATERIALS AND LEGAL STANDARDS.

### A. Materials Considered

15.     In forming my the opinions presented here, I have considered the '422 patent [**Exhibit 4**] and its file history, the documents listed in Exhibit 3, and those additional materials cited within this report.

16.     In addition, I have relied on my education, training and experience in the relevant technology, my knowledge of the relevant literature and may rely on technical encyclopedias and dictionaries if necessary. I may also rely on any further evidence to be produced in this case.

17.     I have been instructed by counsel on the law regarding claim construction and invalidity of a patent. My instructions and understanding are summarized below.

3
*CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO THE PROTECTIVE ORDER*

**EXHIBIT 7**

**B. Claim Construction**

18.　I have been instructed by counsel on the law regarding the invalidity of a patent, and I understand that the first step in determining the validity of a patent is claim construction.

19.　I understand that the claims of a patent define the purported invention. I understand that the purpose of claim construction is to understand how one skilled in the art would have understood the claim terms at the time of the purported invention.

20.　I understand that, in construing a claim term, one looks primarily to the intrinsic patent evidence, including the words of the claims themselves, the remainder of the patent specification, and the prosecution history.

21.　I understand that extrinsic evidence, which is evidence external to the patent and prosecution history, may also be useful in interpreting patent claims when intrinsic evidence itself is insufficient.

**C. Level of Ordinary Skill in the Art**

22.　My understanding is that the claims of a patent are to be read and understood as if by one of ordinary skill in the art, "skill in the art" referring to a level of expertise in the subject matter of the patent. I consider the arts relevant to the '422 patent to be that of computer programming, database programming and storage devices. A person of ordinary skill in the relevant art of the '422 patent would have had a Bachelor's Degree in Electrical Engineering or Computer Science with around 2-5 years of industry experience with programming, databases and storage devices.

23.　I have been instructed, and it is my understanding, that when construing (interpreting) the language of a claim, one must consider the intrinsic patent evidence, including

4

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO THE PROTECTIVE ORDER*

**EXHIBIT 7**

the plain language of the claims, the patent specification, and the prosecution history. I have also been instructed that the words of the claim are generally given their ordinary meaning to persons skilled in the art, unless the patent specification or the prosecution history clearly states a different meaning. I understand extrinsic evidence, which is evidence external to the patent and prosecution history, may also be useful in interpreting patent claims when intrinsic evidence itself is insufficient. I further understand that claim construction is a matter of law.

24. Since there has as yet been no determination by the courts as to the meaning of any terms that are or may be disputed, I am interpreting the claims and terms as one of ordinary skill in the art at the time of the invention would have understood them,. To the extent that my interpretation differs, appears to differ, or may differ from that of the Complainant in this case, I have provided my claim construction below. To the extent that the court specifies interpretations different to mine, I reserve the right to modify my analysis and opinions accordingly.

### D. Invalidity

#### 1. What constitutes Prior Art

25. I understand that a patent or other publication must first qualify as prior art before it can be used to invalidate a patent claim. I understand that a U.S. or foreign patent qualifies as prior art to an asserted patent under 35 U.S.C. §102(a) and hence, may anticipate the asserted patent if the date of issuance of the patent is prior to the invention of the asserted patent. I further understand that a printed publication, such as an article published in a magazine or trade publication, qualifies as prior art to an asserted patent under 35 U.S.C. §102(a) if the date of the publication is prior to the invention of the asserted patent.

5
*CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO THE PROTECTIVE ORDER*

**EXHIBIT 7**

26.     I understand that an invention known or used by others in the United States qualifies as prior art to an asserted patent under 35 U.S.C. §102(a) and, hence, may anticipate the asserted patent if the date of the invention is prior to the invention of the asserted patent.

27.     I understand that a U.S. or foreign patent qualifies as prior art to an asserted patent under 35 U.S.C. §102(b) and, hence may anticipate the asserted patent if the date of the issuance of the patent is more than one year before the filing date of the asserted patent. I further understand that a printed publication, such as an article published in a magazine or trade publication, constitutes prior art to an asserted patent under 35 U.S.C. §102(b) if the publication occurs more than one year before the filing date of the asserted patent.

28.     I understand that an invention on-sale or in public use in the United States qualifies as prior art to an asserted patent under 35 U.S.C. §102(b) and, hence, may anticipate the asserted patent if the date that the invention was on-sale or in use is more than one year before the filing date of the asserted patent.

29.     I understand that a U.S. patent qualifies as prior art to the asserted patent under 35 U.S.C. §102(e) if the application for that patent was filed in the United States before the invention of the asserted patent.

30.     I understand that subject matter derived from another qualifies as prior art to the asserted patent under 35 U.S.C. §102(f) and, hence may anticipate the asserted patent.

31.     I understand that documents and materials that qualify as prior art can be used to invalidate a patent claim as anticipated under 35 U.S.C. §102 or as obvious under 35 U.S.C. §103.

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO THE PROTECTIVE ORDER*

**EXHIBIT 7**

## 2. **Anticipation**

32. I understand that, once the claims have been properly construed, the second step in determining anticipation of the patent claim requires a comparison of the claim language to the prior art on a limitation by limitation basis.

33. I understand that a prior art reference "anticipates" an asserted claim, and thus renders the claim invalid, if all the elements of the claim are disclosed in that prior art reference, either explicitly or inherently (i.e., necessarily or implied), so that one skilled in the art could practice the claimed invention without undue experimentation. I understand that anticipation must be proven by clear and convincing evidence.

## 3. **Obviousness**

34. I have been instructed by counsel on the law regarding obviousness and understand that even if a patent is not anticipated, it is still invalid if the differences between the claimed subject matter and the prior art are such that the subject matter as a whole, would have been obvious at the time of the invention was made to a person of ordinary skill in the pertinent art.

35. I understand that a person of ordinary skill in the art at the time of the invention provides a reference point from which the prior art and claimed invention should be viewed. This reference point prevents one from using his or her own insight or hindsight in deciding whether a claim is obvious.

36. I also understand than an obviousness determination includes consideration of various factors such as:

7
*CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO THE PROTECTIVE ORDER*

**EXHIBIT 7**

    **a.** The scope and content of the prior art.

    **b.** The differences between the prior art and the claims at issue

    **c.** The level of ordinary skill in the pertinent art, and

    **d.** The existence of secondary considerations such as commercial

success, long felt but unresolved needs, failure of others etc.

37. I understand than an obviousness evaluation can be based on a combination of multiple prior references. I understand that a proper obviousness analysis generally requires a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements or multiple prior art references in the way that claimed new invention does. Sometimes the prior art references themselves may provide a suggestion, motivation, or reason to combine, but other times the nexus of linking two or more prior art references is simple common sense. Oftentimes market demand, rather than scientific literature, drives innovation, and one can rely upon the inferences and creative steps that a person of ordinary skill in the art would employ facing the same problem the inventor faces.

38. In sum, my understanding is that prior art teachings are properly combined where a person of ordinary skill in the art, having the understanding and knowledge reflected in the prior art and motivated by the general problem facing the inventor, would have been led to make the combination of elements recited in the claims. Under this analysis, the prior art references themselves, or any need or problem known in the field of endeavor at the time of the invention, can provide a reason for combining the elements or multiple prior art references in the claimed manner. I have been informed and understand that the obviousness analysis requires a comparison of the properly construed claim language to the prior art on a limitation by limitation basis.

8

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO THE*
*PROTECTIVE ORDER*

**EXHIBIT 7**

39.     I understand that obviousness must be proven by clear and convincing evidence. I also understand that practical and common sense considerations should guide a proper obviousness analysis, because familiar items may have obvious uses beyond their primary purposes. A person of ordinary skill in the art looking to overcome a problem will often be able to fit the teachings of multiple publications together like pieces of a puzzle.

40.     I understand that a particular combination may be proven obvious merely by showing that it was obvious to try the combination. For example, when there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp because the result is likely the product not of innovation but of ordinary skill and common sense.

41.     The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predicable results. When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, §103 likely bars its patentability.

42.     It is further my understanding that a proper obviousness analysis focuses on what was known or obvious to a person of ordinary skill in the art, not just the patentee. Accordingly, I understand that any need or problem known in the field of endeavor at the time of the invention and addressed by the patent can provide a reason for combining the elements in the manner claimed.

9

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO THE PROTECTIVE ORDER*

**EXHIBIT 7**

### 4. Written Description

43.     I understand that a patent is invalid for lack of written description under 35 U.S.C. §112, ¶ 1, if the specification does not convey to a person of ordinary skill in the art that the inventor had possession of the subject matter of the claims at the time of the invention.

### 44. Enablement

45.     I understand that a patent is invalid under §112, ¶ 1, if the specification does not enable a person of ordinary skill in the art to make or carry out the claimed invention without undue experimentation.

## V.     TECHNOLOGY OVERVIEW.

46.     In this section, I briefly present some relevant technical background and some common industry terms.

47.     Computer programs are sequences of instructions. The computer itself is an electronic machine that generally executes these instructions in sequence. Computer instructions are generally organized in separate routines known as functions or subroutines. Some functions, that are designed to operate when an out of sequence event occurs, are known as handlers or event handlers.

48.     The principle components of a computer include the "CPU" (Central Processing Unit), which processes the sequence of instructions, the main system memory that holds instructions and data for use by the CPU and storage devices such disks, CDROM's and tapes. There may be computer interfaces to connect to networks, media card readers, pointing devices etc.

10
*CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO THE
PROTECTIVE ORDER*

**EXHIBIT 7**

49.    Computers come in a variety of sizes from small personal computers serving a single user to large mainframe computers serving thousands of users.

50.    Inherent in all computers are timers, which have existed since the earliest of computers. The IBM Stretch 7030 computer had timers known as interval timers and time of day timers when it was shipped in 1961. [http://ed-thelen.org/comp-hist/BRL61-ibm7070.html]

51.    The IBM 360 and 370 series computers also had time of day and interval timers and were described in a NASA paper "IBM 360/75 computer time interface, C. Zandell" in 1971. [http://ntrs.larc.nasa.gov/search.jsp?N=4294780254&Ns=HarvestDate%7C1] [Exhibit Time of day and interval timers are incorporated in all modern PC's and are fundamental to the operation of computer systems. [for general background on this subject see: http://en.wikipedia.org/wiki/Time_Stamp_Counter]

52.    Timers in computers are typically implemented in the hardware of the systems. Depending on the implementation, a computer system may have one or multiple hardware timers. Modern computer systems typically run multiple concurrent applications and consequently the hardware timers become shared resources and are shared between applications by software in the operating system.

53.    Timers consist of two basic types.

    **a.** Time of day timers usually are used to maintain both date and time of day. The resolution of the time of day is usually in seconds or fractions of seconds.

    **b.** Interval timers can be either:

        **(1)** Continuously incrementing or decrementing.

        **(2)** Have an initial value set and then decrement to zero.

11

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO THE PROTECTIVE ORDER*

**EXHIBIT 7**

The resolution of these times vary with hardware implementation but can be in milliseconds, microseconds or nanoseconds. Many of the interval timers generate a signal known as an interrupt when they are decrement to zero or some configured value.

54.     The time of day (TOD) timer is used mainly when a software application needs to know that actual time and date. It is sometimes known as the Real Time Clock or RTC. The TOD timer is implemented in hardware and once set will keep time even when the computer is powered off. The TOD is actually a hardware counter that is incremented once every second. Additional software is needed to calculate the exact day, month and year. The PC uses 1/1/1980 at 0:00 hours as the starting date and time for this counter, ie when it is set to zero.



The above diagram shows how a software application gets the time and date information as needed in different steps of the program. In the example above, the application at step 2 requests the time and date from the time of date hardware as a binary number, translates that value into the current date based on the number of seconds since a count of zero and uses it in the

12

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO THE PROTECTIVE ORDER*

**EXHIBIT 7**

application. The application repeats the process in step 4 but as the time of day hardware has already incremented the time, gets a later date/time combination.

55.     The interval timers can be used by software to time events that need better resolution than the TOD of one second. If a software application needs to start a task that is known to take a certain amount of time, the application would start the function and then wait for the functions completion. For example, if an application needed to display a message for a predetermined amount of time, the application would start the function and then wait for the timer to expire before moving to the next task as shown in the diagram below.



**Wait timer**

In this diagram, the software application waits for some amount of time between step 2 and step 3. In this use of the interval timer, the timer is always expected to expire or decrement to zero.

56.     The interval timers can also be used by software to implement a "time out function". This function is used when the programmer starts a function that might possibly never complete. A value representing the maximum amount of time that the application is allowed to wait is stored into the interval timer function. Additionally, a software subroutine is created as the code that will be called in the unlikely event that the timed function does not complete. This

13

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO THE
PROTECTIVE ORDER*

**EXHIBIT 7**

code is known as the "time out handler". For example when a computer program performs a read or write operation to a disk drive there is an expectation that it will complete in a finite maximum amount of time. A "time out" is created such that if the drive breaks and does not complete the task, a separate software function is called. This function might display a message to the operator and perform a retry/recovery operation.

57.        The key concept of the "time-out" function is that almost always the target operation is expected to complete before the interval timer expires or times out and the time out handler is called.  The time out function is illustrated here:



14
*CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO THE PROTECTIVE ORDER*

**EXHIBIT 7**

In this example the application at step 2 creates a timer with a specified or configurable value. The application also assigns a handler or subroutine to be executed in the unlikely event that the timer expires. In the example above, at step 3, the function is started. In step 4, the program waits for completion of the task, and when successful will continue on to step 5. Should the secondary task not complete the handler associated with the expiration of the time, will be invoked. This methodology prevents an application from hanging when a failure occurs. "Time outs" are typically used in the control of hardware, when communication over a network is used by an application or when communication with a human is required.

## VI.    SUMMARY OF OPINIONS.

58.    It is my opinion that the asserted claims of the '422 patent are invalid as set forth below:

1.    Claims 1, 6, 8 and 13 are invalid under §112, ¶ 1 for failure to meet the written description and/or enablement requirements.

2.    Claims 1, 6, 8 and 13 are invalid as being anticipated.

3.    Claims 1, 6, 8 and 13 are invalid as being obvious.

## VII.   INVALIDITY OF CLAIMS OF THE '422 PATENT

A.    **Invalidity under 35 U.S.C. §112 ¶ 1**

59.    It is my opinion that claims 1 and 8 of the '422 patent are invalid for lack of enablement. The '422 patent uses the term "timeout" four times in claim 1 and states:

*"A method of automatically producing medical image data and related data on an optical storage medium upon expiration of a **timeout** period, the method comprising: detecting whether a server has changed **within a timeout** period after receiving medical image data or related data from a modality and **resetting the timeout** period when the*

15

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO THE PROTECTIVE ORDER*

**EXHIBIT 7**

> *change is detected; and automatically producing an optical storage medium comprising selected medical image data and related data from the server based on when the **timeout** period has expired and recording on the optical storage medium program code that, when executed, allows viewing of the selected medical image data, wherein the medical image data is formatted in a standard medical imaging format used by a computer configured for viewing the medical image data."*

The term "timeout" does not appear anywhere in the remainder of the specification. Claim 1 also recites "resetting the timeout period". This phrase does not appear nor is it explained anywhere in the remainder of the specification. A "timeout", to one skilled in the art, is a term generally used to describe a method that prevents a computer program from waiting forever on a task that does not complete successfully. A computer programmer, anticipating that a task that is about to start might not complete, will use a "timeout" to define a maximum time to wait. It will also define a separate subroutine to handle the situation if the task does not complete in time. Under normal operation, the period set for the "timeout" is never reached since the task will normally complete before the expiration of the time out period.

    60.    In claim 1, the server is monitored to determine when the server has not changed for at least the full interval of the timeout period. If there is any change in the server, the timeout period is reset. The claimed process is depicted in the following flow diagram:

16
*CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO THE PROTECTIVE ORDER*

**EXHIBIT 7**



61.     As used in claim 1, the term "timeout" describes a function that is simply a delay in the computer program operation for some fixed or configurable period of time. The "timeout" period identified always expires in the program. There is also no separate subroutine or handler described or needed.

62.     As mentioned above, the remainder of the patent specification makes no mention of a "timeout". The only timing function described is with reference to figure 3, which is reproduced below:

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO THE PROTECTIVE ORDER*

**EXHIBIT 7**



In the discussion of figure 3, the '422 patent states that, upon observing a change in the image server database 202, "[t]he application server 110 then proceeds to step 128 and waits for an interval, typically 35 to 65 seconds." The patentee might argue that the disclosed waiting interval corresponds to the claimed timeout period. However, only <u>after</u> expiration of the waiting interval does the application server 110 check whether the image server database 202 <u>is still changing</u>, in step 130. This is contrary to the claimed step of "detecting whether a server <u>has changed within</u> a timeout period". In other words, the disclosed invention observes a change in the database and then waits for a period of time before looking again to see if there is further change, whereas the claimed invention looks for a change while a timer is running and resets the timer each time a change is observed until there is no observed change before the timer runs out.

63.    The process of claim 1 bears little resemblance to the process shown and described in figure 3. Accordingly, it is my opinion that the written description of the invention does not enable the claimed process and, therefore, that claim 1 of the '422 patent is invalid for lack or enablement.

64.     Dependent claims 6 and 13 requires that the timeout period be configurable.
As pointed out above, the remainder of the specification makes no mention of a "timeout
period". But even if the disclosed waiting interval of step 128 is equated to a timeout period,
there is no disclosure related to making the waiting interval configurable. The specification
merely states that the waiting interval is "typically 35 to 65 seconds".

65.     Claim 8 suffers the same defects as claim 1. Claim 8 states:

*"A system for automatically producing medical images on an optical storage medium, the
system comprising: a database configured to receive one or more medical images from at
least one modality; an application server coupled to the database and configured to
create a timestamp when the application server detects a change in the database, thereby
initiating a **timer**, wherein the **timer** resets when the application server detects an
additional change in the database before a **timeout interval**, measured from the
timestamp, elapses; and wherein the **timer** times out when the application server detects
no additional change in the database after the **timeout interval**, measured from the
timestamp, elapses; and a production station coupled to the application server and
configured to automatically produce an optical storage medium comprising one or more
selected medical images from the database based on when the **timer** times out, wherein
the medical image data is formatted in a standard medical imaging format used by a
computer configured for viewing the medical image data."*

Claim 8 is directed to a system with claim elements that generally parallel those of the method
claim 1. Claim 8 recites a "timer". This term does not appear anywhere in the remainder of the
specification. Claim 8 also recites a "timeout interval". This term also does not appear anywhere
in the remainder of the specification.

66.     Claim 8 further recites that "the timer resets when the application server
detects an additional change in the database before a timeout period . . . elapses". The patentee

19
*CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO THE
PROTECTIVE ORDER*

**EXHIBIT 7**

might argue that the disclosed waiting interval corresponds to the claimed timeout period of the timer. However, only <u>after</u> the waiting interval does the application server 110 check whether the image server database 202 is still changing, in step 130. Thus, the application server cannot detect a change in the database <u>before</u> the waiting interval elapses, as claimed.

67.     The system of claim 8 bears little resemblance to the system illustrated and described in the remainder of the specification. Accordingly, it is my opinion that the written description of the invention does not enable the claimed system and, therefore, that claim 8 of the '422 patent is invalid for lack or enablement.

B.          **Invalidity under 35 U.S.C. §§102 and 103,**

68.     It is my opinion that the use of a timer as claimed in the '422 patent was known or would have been obvious to a person of ordinary skill at the time of the invention. Timers have been part of all computer systems from the very earliest of computers. Every programming language has the concept of time outs and timers. In particular, it was well known at the time of the purported invention to insure the integrity of incoming data by waiting for the data to "settle", i.e., by waiting to retrieve data for some period of time after an observed change in the data to be sure that the data did not continue to change as it was transferred.

69.     The use of a timer to delay a program while waiting for changes or a user to complete an operation is fundamental to computer programming. There are numerous examples of configurable delay timers used for this purpose. A search on the Internet for documents or publications reveals many implementations and descriptions of both time outs and timer functions. Computer applications would not function without the use of multiple timer operations.

20
*CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO THE PROTECTIVE ORDER*

**EXHIBIT 7**

70.        The IBM Stretch 7030 computer had timers known as interval timers and time of day timers when it was shipped in 1961. [http://ed-thelen.org/comp-hist/BRL61-ibm7070.html] This article describes two hardware components of the IBM 7030 computers, an "interval timer through interrupt" and an "Elapsed Time clock". The interval timer is a hardware function that can be loaded with a value and will then decrement to zero and at which time it will interrupt the program running. This is a classic way to implement a timer function that will cause a program to wait for some time period such as described in the description section of the '422 patent. The interval timer was also used to implement a "timeout" function that would prevent a program hanging on an event that potentially may not occur. In this case a separate software routine would be written to handle resetting the interval timer value if and when the event occurred prior to the expiration of the specified time. The "Elapsed Time Clock" was a hardware component that incremented every second and was used to drive the actual time, day, date, month and year.

71.        The IBM 360 and 370 mainframe series computers had time of day and interval timers and were described in a NASA paper "IBM 360/75 computer time interface, C. Zandell" in 1971. [**Exhibit 5**]  This article describes in detail how the Time of Day clock and the interval time operated in the IBM 360/75 computer systems.  The Time of Day clock in the IBM 360 systems consisted of a 64 bit register, which was incremented every 10 micro seconds or 1000000 times per second. It could interrupt the running program every second. The interval timer was a 32 bit register that was decremented every 10 microseconds and generated an interrupt when it reached zero. This interval timer was used to implement a timer function that will cause a program to wait for some time period such as described in the description section of the '422 patent.  The interval timer was also used to implement a "timeout" function that would

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO THE PROTECTIVE ORDER*

**EXHIBIT 7**

prevent a program hanging on an event that potentially may not occur. In this case a separate software routine would be written to handle resetting the interval timer value if and when the event occurred before the specified time had expired. Such timers were frequently used during storage read or write operations and when a pause or delay was required within a computer program while waiting for some event.

72.     "Timers" were described in "Microsoft Visual Basic – Programming for Windows version 4.0, P936" in the "Time Event" and "Timer Function" published in 1995. This section describes the "Timer Event". In the remarks of this routine it is described as "the timer waits for the period specified in the Interval Property". This use of the time matches the timer in the description of the '422 patent. [**Exhibit 6**]

73.     "Timers" were described in "The C Toolbox – Williams James Hunt, P318 ISBN 0-201-1111-X" published in 1985. In this section, Hunt describes a timer function that can be used to get elapsed time between two events. This can be used to create the timer described in the description section of the '422 patent.

74.     Lanlock software product was sold in the USA in 1995 and incorporated a database that was polled on a configurable timed basis for changes. The polling was done on a configurable time basis in the same way as described in the description section of the '422 patent. The program consisted of two distinct parts. The first part maintained a database of PC's including their locations, and their address on the network. The second part used this database to query the status of each PC. A configurable time set the period of querying the database and when the status should be checked. Another timer was used to decide if the database had

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO THE PROTECTIVE ORDER*

**EXHIBIT 7**

changed. An article on this product was published, "PCs at Peace", Security Works magazine (December 1997). The product was sold using a website http://www.lanlock.com.

75.    US Patent 5,668,998 (Mason et al.) from April 1997 titled "Application framework of objects for the provision of DICOM services" [**Exhibit 7**] describes the following:

> "*The association management subsystem accounts for the asynchronous nature of opening an association. The association management subsystem does not attempt to reopen a new association when another association is already opened to a particular destination. Destinations are considered "down" which frequently reject request or are closed, due to an unexpected close of a connection. A destination can be considered "up" due to a time lapse or by an application request. Associations that have not been frequently used can be shutdown due to the occurrence of a send- or receive-idle time-out. An idle time-out occurs when there are no outstanding transactions on an association and a specified period of time has expired since a message was sent to or received from the association.*"

This describes the waiting for the completion of transaction using waiting for a period of time since the last request was sent or received, which is the same operation described in claim #1 and #8 of the '422 patent.

76.    US Patent 5,721,891 (Murray et al.) from February 24, 1998 titled "Detection of N Length bit serial communication stream" [**Exhibit 8**] describes the use of timers and to determine if all data has been received during the transmission of data during a communication operation. A timer is used to wait for a period of time before checking the received data. This invention operates in the same way that the timer described in the '422 patent.

77.    It is my opinion that the extensive prior art teachings summarized above related to timers, including configurable timers, in the field of data processing, when combined

23

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO THE PROTECTIVE ORDER*

**EXHIBIT 7**

with the prior art teachings related to medical imaging systems, would have made the subject

matter of claims 1, 6 and 8 and 13 of the '422 patent obvious to a person skilled in the relevant

art.

78.     US Patent 7,965,408 (Samari) having a priority date of May 19, 2000 and

titled "Medical data recording system" [**Exhibit 9**] constitutes describes multiple uses of timers

including:

> "*a timer detects a pause in a data stream to select the end of the data transmitted to the
> computer for each job.*"

This patent also includes descriptions of configurable timer in:

> "*Timer.sub.--1 60 is programmed to check if an end-of-patient-data timeout (MaxTime)
> 65 has occurred. The value for Timer.sub.--1 60 is defined in the FilmX.ini file and is
> hence user configurable. Default time for Timer.sub.--1 60 is 1 (one) second. Max Time
> 65 is also user configurable via FilmX.ini and is set to 30 seconds for default. The system
> will not allow that time to be set less than 10 seconds".*

The function of this timer is to wait until there is no change to the patient data, which is the

purpose of the timer described in the '422 patent.

78.     The Samari patent also includes descriptions of a method and system for

automatically producing medical image data and related data on an optical storage medium. I

have been advised by counsel that based on the file history of the '422 patent, the patentee

admitted that the published application resulting in the Samari patent constitutes prior art and

disclosed all of the elements of claims 1 and 8, other than the elements specifically related to the

"timeout" and "timer". It is my opinion that the Samari patent also teaches these elements for

the reasons discussed above and that, therefore, claims 1 and 8, as well as dependent claims 6

and 13, are anticipated by Samari.

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO THE
PROTECTIVE ORDER*

**EXHIBIT 7**

## VII. OPINIONS ON CLAIM CONSTRUCTION

79.     The Court has not construed the claim language of the '422 patent.

10/31/2011

Dated: _____

_____

Ian Jestice

*CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO THE PROTECTIVE ORDER*

**EXHIBIT 7**