Craig S. Summers (SBN 108,688)
craig.summers@kmob.com
Paul A. Stewart (SBN 153,467)
paul.stewart@kmob.com
Brian C. Claassen (SBN 253,627)
brian.claassen@kmob.com
Bridget A. Smith (SBN 253,548)
bridget.smith@kmob.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, 14th Floor
Irvine, CA 92614
Telephone: (949) 760-0404
Facsimile:  (949) 760-9502

Attorneys for Plaintiff/Counterdefendant
**DATCARD SYSTEMS, INC.**

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| DATCARD SYSTEMS, INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>PACSGEAR, INC., a California corporation,<br><br>Defendant.<br><br>_____<br><br>AND RELATED COUNTERCLAIM<br>_____ | Civil Action No.<br>SACV10-1288 DOC (VBKx)<br><br>**DECLARATION OF DR. ALAN ROWBERG, M.D. IN SUPPORT OF DATCARD SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT THAT U.S. PATENTS 7,302,164, 7,783,174, 7,729,597 AND 7,734,157 ARE NOT INVALID UNDER 35 U.S.C. § 102**<br><br>Date:   February 13, 2012<br>Time:   8:30 a.m.<br>Ctrm:   9D<br><br>The Honorable David O. Carter |

1    I, Dr. Alan Rowberg, M.D., have personal knowledge of the matters set

2    forth herein, or where indicated, based on my good faith belief and

3    understanding, and if called upon to testify, I could and would competently

4    testify as follows:

5    1.    I have been retained as a technical expert for DataCard Systems,

6    Inc. ("DatCard") in its lawsuit against Pacsgear, Inc. ("Pacsgear") for

7    infringement of Datcard's U.S. Patent Nos. 7,302,164 ("the '164 patent");

8    7,729,597 ("the '597 patent"); 7,783,174 ("the '174 patent"); 7,734,157 ("the

9    '157 patent"); and 7,801,422 ("the '422 patent") (collectively, the "Asserted

10   Patents").

11   2.    Attached hereto as Exhibit 11 is a true and correct copy of my

12   December 5, 2011 Rebuttal Expert Report.  My report sets forth my opinions

13   regarding the validity of the Asserted Patents and the bases therefore.

14   3.    My background and qualifications are described in Exhibit A of my

15   Initial Expert Report, a copy of which was filed on January 13, 2012.

16   4.    I reaffirm under penalty of perjury that my Rebuttal Expert Report,

17   Exhibit 11, truly and accurately sets forth my opinions regarding the validity of

18   the Asserted Patents and the bases for those opinions.  I hereby adopt and

19   incorporate the entirety of my Rebuttal Expert Report as if set forth fully in this

20   Declaration.

21   I declare under penalty of perjury under the laws of the United States of

22   America that the foregoing is true and correct.

23   Executed this _13_ day of January, 2012, in _Shoreline, WA_ .

24

25   _____

26   Alan Rowberg

27

28

1  Craig S. Summers (SBN 108,688)
   craig.summers@kmob.com
2  Paul A. Stewart (SBN 153,467)
   paul.stewart@kmob.com
3  Brian C. Claassen (SBN 253,627)
   brian.claassen@kmob.com
4  Bridget A. Smith (SBN 253,548)
   bridget.smith@kmob.com
5  **KNOBBE, MARTENS, OLSON & BEAR, LLP**
   2040 Main Street, 14th Floor
6  Irvine, CA 92614
   Telephone: (949) 760-0404
7  Facsimile:  (949) 760-9502

8  Attorneys for Plaintiff
   **DATCARD SYSTEMS, INC.**
9

10            IN THE UNITED STATES DISTRICT COURT

11         FOR THE CENTRAL DISTRICT OF CALIFORNIA

12                   SOUTHERN DIVISION

13

14  DATCARD SYSTEMS, INC., a          ) Civil Action No.
15  California corporation,            ) SACV10-1288 DOC (VBKx)
                                       )
16            Plaintiff,               )
                                       ) **REBUTTAL EXPERT REPORT**
17       v.                            ) **OF DR. ALAN ROWBERG, M.D.**
                                       )
18  PACSGEAR, INC., a California       )
    corporation,                       )
19                                     )
20            Defendant.               )
    _____       )
21  AND RELATED COUNTERCLAIM          )
22

23        **CONFIDENTIAL ATTORNEYS' EYES ONLY**

24        **INFORMATION ON PAGES 66, 77, 78**

25

26

27

28

**EXHIBIT 11**

## I.  INTRODUCTION AND BACKGROUND

I have been retained by DatCard Systems, Inc. as an expert in this case.  I previously submitted an Initial Expert Report ("Initial Report") on November 1, 2011 regarding infringement of U.S. Patent No. 7,302,164 ("the '164 patent"), U.S. Patent No. 7,729,597 ("the '597 patent"), U.S. Patent No. 7,783,174 ("the '174 patent"), U.S. Patent No. 7,734,157 ("the '157 patent"), and U.S. Patent No. 7,801,422 ("the '422 patent"), and other matters.  I have been asked to evaluate and respond to the opinions expressed in the initial reports of Steven Horii and Ian Jestice, both dated November 1, 2011.

## II.  BACKGROUND AND QUALIFICATIONS

My background and qualifications are described in my Initial Report, which I incorporate in full by this reference.

## III.  INFORMATION AND MATERIALS CONSIDERED

In preparing this report, I have considered Dr. Horii's report and Mr. Jestice's report, all exhibits to and materials considered in Dr. Horii's report and Mr. Jestice's report, the materials specifically referenced in my Initial Report and listed in Exhibit B of my Initial Report, the materials specifically referenced in this report, and the materials listed in Exhibit A of this report.

## IV.  SUMMARY OF EXPECTED TESTIMONY AND OPINIONS

I expect to provide rebuttal testimony at trial in response to the opinions expressed by Dr. Horii and Mr. Jestice.  In particular, I expect to testify at trial concerning the following:

- Dr. Horii opines that claims 9 and 15 of the '164 patent and claims 1 and 8 of the '174 patent anticipated by Mehta and, therefore, invalid.  I disagree.  Based on my analysis of Mehta, it is my opinion that Mehta does not anticipate either of these claims.

- Dr. Horii further opines that all other asserted claims are invalid for obviousness in light of several references.  Again, I disagree.  It is my opinion

that none of the references Dr. Horii cites, either alone or in combination with any other reference or references, renders obvious any of the asserted claims.

- Mr. Jestice opines on the validity of the '422 patent. I have reviewed his report and disagree with his conclusions regarding the validity of the '422 patent. I understand that DatCard has retained Mr. Jack Goldberg to review and specifically opine on Mr. Jestice's analysis. I have read Mr. Goldberg's report and understand it. I agree with Mr. Goldberg's analysis.

- It is my opinion that certain objective evidence of non-obviousness, including commercial success, solving a long-felt need, and copying, further support a conclusion that the asserted claims would not have been obvious.

- Finally, it is my opinion that the DatCard Pacscube medical disc publisher practices the Asserted Patents.

Moreover, at trial, I may testify about matters: (1) raised on direct or cross-examination at trial; (2) necessary to rebut any matters that the Court allows Pacsgear to introduce or rely upon; or (3) otherwise raised at trial by counsel or the Court in relation to matters in my report. In addition to the items identified above, my testimony may also be based, in part, upon the trial testimony of fact witnesses and other expert witnesses. I expect to use demonstratives to explain the opinions set forth in my report.

## V. APPLICABLE LEGAL PRINCIPLES

### A.   Presumption of validity and burdens of proof and production

United States patents are presumed to be valid. A party challenging the validity of a United States patent bears the burden of proving invalidity by clear and convincing evidence. The clear and convincing burden is a higher burden than a preponderance of the evidence but less than beyond a reasonable doubt. When the prior art relied upon to prove invalidity was already considered by the U.S. Patent and Trademark Office ("Patent Office") during prosecution of the application, the heavy burden of establishing invalidity by clear and convincing

1  evidence is more difficult to carry.  In evaluating the validity of a United States

2  patent, each claim is to be evaluated independently.

3  **B.    Anticipation**

4       It is my understanding that a patent claim is invalid under 35 U.S.C.

5  § 102 as being anticipated only if each and every element of the claimed

6  invention is disclosed either expressly or inherently in a single prior art

7  reference or embodied in a single prior art device or practice.  There must be no

8  difference between the claimed invention and the disclosure in the prior art

9  reference, as viewed by a person of ordinary skill in the field of the invention.

10      I also understand that to anticipate a claim, the prior art must be enabling;

11  that is, it must enable one of ordinary skill in the art to make the invention

12  without undue experimentation.  I have been informed that an analysis of

13  "undue experimentation" examines factors such as (1) the quantity of "undue

14  experimentation"; (2) the amount of direction or guidance present; (3) the

15  presence or absence of working examples; (4) the nature of the invention; (5)

16  the state of the prior art; (6) the relative skill of those in the art; (7) the

17  predictability or unpredictability of the art; and (8) the breadth of the claims.

18  **C.    Obviousness**

19      It is also my understanding that a patent claim is invalid under 35 U.S.C.

20  § 103 as being obvious only if the differences between the claimed invention

21  and the prior art are such that the subject matter as a whole would have been

22  obvious to a person of ordinary skill in that art at the time of the invention.  I am

23  further informed that an obviousness analysis requires consideration of four

24  factors: (1) the scope and content of the prior art relied upon to challenge

25  patentability; (2) the differences between the prior art and the claimed

26  invention; (3) the level of ordinary skill in the art at the time of the invention;

27  and (4) any objective evidence of non-obviousness, such as commercial success,

28  solving a long-felt need, copying, and other indicia.

-4-

1    A claim is not proved obvious merely by demonstrating that each of the
2    individual claim elements was independently known in the prior art.  Most, if
3    not all, inventions rely on building blocks long since uncovered, and claimed
4    discoveries almost of necessity will likely be combinations of what is already
5    known.  Thus, it is my further understanding that, when a combination of prior
6    art references is relied upon to allege that a claimed invention would have been
7    obvious, it is important to identify whether a reason existed at the time of the
8    invention that would have prompted a person of ordinary skill in the art in the
9    relevant field to combine the known prior art elements in the way the claimed
10   invention does.  Additionally, when a reference "teaches away" from a claimed
11   feature in an invention, then the reference is not available for the purposes of
12   forming an obviousness combination.

13   In assessing obviousness, I understand that one must consider the
14   distortion caused by hindsight bias, guard against slipping into the use of
15   hindsight, be cautious of arguments that rely upon after-the-fact reasoning, and
16   avoid the temptation to use the claimed invention as a roadmap to piece together
17   isolated disclosures in the prior art.

18   I also understand that, in order to render a claimed apparatus or method
19   obvious, the cited prior art as a whole must enable one skilled in the art to
20   practice the apparatus or method without undue experimentation.

21   **VI.  OPINIONS AND BASES AND REASONS THEREFOR**

22   **A.    The level of ordinary skill in the art**

23   Dr. Horii opines that one of ordinary skill in the art would be a person
24   with a background commensurate with that of a Certified Imaging Informatics
25   Professional (CIIP) with five years' experience in the design, use, and
26   implementation of PACS, or a radiologist or medical computer networking
27   specialist with equivalent experience.  (Horii Rpt. at 9.)

28

-5-

1    Dr. Horii provides no support for this opinion.  Nor does he explain what
2    led him to arrive at the opinon.

3    I believe that Dr. Horii's opinion is too restrictive.  As Dr. Horii points
4    out, the CIIP credential was not available around the year 2000, at the time of
5    the '164 patent.  This credential was not instituted until 2007.  Moreover, in my
6    experience, the CIIP credential is presently the highest available in this field.
7    Therefore, I believe that a person practicing in this field around the year 2000
8    having a background commensurate with that of a CIIP and having five years'
9    experience would be considered a person of extraordinary skill in the art, not a
10   person of ordinary skill in the art.

11   As stated in my Initial Report, it is my understanding that the legal
12   definition of a "person of ordinary skill in the art" is a hypothetical person of
13   ordinary skill in the relevant field at the time of the claimed invention.   In
14   determining the level of ordinary skill in the art, I understand that several factors
15   may be considered, including the educational level of the inventors, the types of
16   problems encountered in the art, the prior art solutions to those problems, the
17   rapidity with which innovations are made in the relevant technology, the
18   sophistication of the technology, and the educational level of active workers in
19   the field.

20   Moreover, as I explained in my Initial Report, based on the materials and
21   information I have reviewed, and based on my extensive experience working
22   with people in the relevant technical areas at the relevant time period, a person
23   of ordinary skill in the art, for purposes of my opinions in this report, would
24   have a Bachelor's Degree in science or engineering, with approximately one
25   year of pertinent work experience.   Alternatively, a person could acquire
26   ordinary skill in the art without a Bachelor's Degree with sufficient pertinent
27   work experience.   In my estimation, three years of pertinent work experience
28

-6-

would give a person sufficient knowledge and skill to have ordinary skill in the art.

**B.    The '164 patent is not invalid**

Dr. Horii opines that various asserted claims of the '164 patent are invalid for anticipation and/or obviousness in light of several references.

With few exceptions, Dr. Horii failed to analyze the actual claim language of the '164 patent in relation to the prior art.  Instead of addressing the actual claim language, he incorrectly paraphrases and generalizes the claims.  Furthermore, his "analysis" of the prior art frequently consists simply of a bare citation to a page number in a cited reference.  Very often, Dr. Horii omits even the page number, leaving me to guess at how he is applying the reference to the claim.  It is difficult to understand and respond to these types of arguments, because there are few facts or logical inferences to address.  Similarly, it is difficult to comment with specifics when so few specifics have been provided.  Nevertheless, I have responded to his opinions to the best of my ability.

Based on my analysis of the '164 patent claim terms and my analysis of the documents Dr. Horii relies upon, it is my opinion that Dr. Horii has not shown that any single reference anticipates any of the asserted claims of the '164 patent.   Moreover, it is my opinion that his cited combinations of references would not have rendered obvious any of the asserted claims of the '164 patent.

**1.    Claim construction of the '164 patent**

Dr. Horii opines that "the term 'related medical image data' means digital medical images, to the exclusion of written materials, such as diagnostic reports."  (Horii Rpt. at 12.)  I disagree with this construction because it is too narrow and does not take into account the teachings in the '164 patent specification.

In fact, Dr. Horii's own report demonstrates the incorrect nature of his

-7-

1    construction of "related medical image data."  For example, Dr. Horii opines

2    that the Ratib article shows searching for related medical image data because the

3    Ratib system allegedly "also automatically searches another database for reports

4    and other documents related to the medical images and burns them onto the

5    CD." (Horii Rpt. at 20.)  He also opines that "searching for and combining

6    medical data relating to other medical data is not novel" and is disclosed by

7    Inamura, which Dr. Horii says "describes a system where 'The digitized speech

8    of the resulted [diagnostic] interpretation are automatically written on the MOD

9    with the medical images . . . .'"  (Horii Rpt. at 20, 22, citing Inamura at

10   PG025986, alterations in original.)   Dr. Horii's opinion that the proper

11   construction of related medical image data excludes searching for diagnostic

12   reports is inconsistent with his other opinions that the Ratib article and Inamura

13   invalidate the claims because they allegedly disclose searching for diagnostic

14   reports and digitized speech reports.

15        I believe that the term "related medical image data," in the context of the

16   claims, is clear and unambiguous.  Independent claims 9, 15, 16, and 21 state

17   that "related medical image data" is "related to the selected medical image

18   data."  This definition is wholly consistent with the '164 patent specification and

19   file history.  For instance, the specification makes it clear that related medical

20   image data broadly encompasses not only medical images but also "medical

21   exam data" and states that "[o]ne embodiment of the claimed system allows for

22   searching medical exam data that are related and placing such data on the same

23   CD." ('164 patent at 2:6–9.) Other portions of the specification similarly discuss

24   the search module and searching for related medical image data that is related to

25   the selected medical image data in general terms.  (*E.g.*, '164 patent at 8:26–59.)

26   Nothing in the file history is inconsistent with related medical image data being

27   text or images that are related to the selected medical image data.  Thus, in my

28   opinion, related medical image data is, as the claims state, data that is related to

-8-

1  the selected medical image data.

2  Dr. Horii opines that the "production station" recited in each of the

3  asserted claims of the '164 patent is "the device from which the image is

4  downloaded onto the portable storage medium." I believe that this construction

5  is incorrect.  The meaning of the term "production station" is not clear and

6  unambiguous from the claims alone.  Furthermore, during the relevant time

7  period, it was not a term of art that people working in the field of the invention

8  commonly used.  Therefore, I have turned to the specification to understand

9  what the inventors meant by "production station."  The '164 patent states: "The

10  CD production stations 300A, 300B, and 300C in the preferred embodiment are

11  produced by Rimage Corporation in Edina, Minn.  Details about the Rimage CD

12  production stations can be found in U.S. Pat. Nos. 5,542,768, 5,734,629,

13  5,914,918, 5,946,276, and 6,041,703, which are incorporated herein by

14  reference in their entirety."  ('164 patent at 4:34–39.)  Each of the CD

15  production stations disclosed in the Rimage patents is a robotic disc burner.

16  Accordingly, in my opinion, a person of ordinary skill in the art would

17  understand a production station to be a robotic disc burner.

18  ## 2.   <u>Claims 9 and 15 are not anticipated by Mehta</u>

19  Dr. Horii opines that independent claims 9 and 15 are anticipated by

20  Mehta. (Horii Rpt. at 15.)  I disagree with this opinion.

21  At the outset, he states that he has "been asked to assume that a claim is

22  anticipated, and, therefore invalid, if a single piece of prior art discloses all

23  elements in a claim either explicitly or inherently (i.e., necessarily or implied),

24  so that one skilled in the art could practice the invention without undue

25  experimentation." (Horii Rpt. at 15.) However, Dr. Horii does not analyze all

26  elements of claims 9 and 15, as instructed. Instead, he incorrectly paraphrases

27  the claim elements and provides only general page citations to Mehta to support

28  his conclusion that Mehta shows the paraphrased elements, with little

-9-

1   explanation or analysis.  I disagree with Dr. Horii's conclusory and unsupported

2   opinion that Mehta anticipates in claims 9 and 15.

3       As explained below, in my opinion, Mehta does not anticipate claims 9

4   and 15 of the '164 patent because Mehta fails to disclose at least (1) "a plurality

5   of browsing terminals configured to receive a user selection that defines selected

6   medical image data"; (2) "a search module configured to search the database for

7   related medical image data that is related to the selected medical image data";

8   and (3) "a production station that is configured to record all of the following

9   onto a single, portable data storage medium" (or "onto a data storage medium,

10  wherein the storage medium is an optical disk"): "the selected medical image

11  data, recorded in the standard medical imaging format, the related medical

12  image data, recorded in the standard medical imaging format, and a viewing

13  program that is configured to allow viewing of the selected and the related

14  medical image data that is recorded onto the data storage medium on widely

15  accessible computers not specifically configured with standard medical imaging

16  software for viewing of medical images."

17      The file history of the '164 patent reexamination supports my opinion,

18  because the Patent Office has already allowed the claims over Mehta.  (*See*

19  *generally* File history of '164 reexam, in which the third party requester

20  provided a detailed explanation of Mehta to the Patent Office, and *see*

21  *specifically* File history of '164 reexam at DAT106199, acknowledging Mehta

22  considered during reexamination.)

23              a.   **Mehta fails to disclose the element "a plurality of**

24                   **browsing terminals configured to receive a user selection**

25                   **that defines selected medical image data"**

26      Dr. Horii contends that "the system described in Mehta . . . works on

27  multiple terminals configured to receive user selection [sic] of selected medical

28  image data."  (Horii Rpt. at 15, citing Mehta at DAT014231.)  I believe Dr.

-10-

Horii is saying that the system in Mehta is capable of being installed and working on any terminal among a plurality of terminals.  That is not what claims 9 and 15 recite.  Claims 9 and 15 recite a system comprising a plurality of browsing terminals configured to receive a user section that defines selected medical image data.  Mehta does not disclose a system with a plurality of browsing terminals, as recited.  At best, Mehta only discloses a single browsing terminal.  (Mehta at DAT014231.)  Thus, Mehta does not disclose this claim element.

  **b.**   **Mehta fails to disclose the element "a search module configured to search the database for related medical image data that is related to the selected medical image data"**

Dr. Horii contends that "the system described in Mehta . . . utilizes a search module that can search the database for selected and related images as it calls for collecting 'all pertinent imaging studies for the particular patient' . . . ."  (Horii Rpt. at 15, citing Mehta at DAT014231.)  I disagree that this meets the claim limitation "a search module configured to search the database for related medical image data that is related to the selected medical image data."

The portion of Mehta cited by Dr. Horii discloses that "[p]atients are now able to receive a CD-ROM with copies of their radiological studies" and that "[t]his CD-ROM contains copies of all pertinent imaging studies for the particular patient . . . ."  (Mehta at DAT014232.)  When read in context, it is clear that the disclosure of "all pertinent imaging studies" merely refers to a user selection of medical image data the user *selected* to be on the CD-ROM.  Mehta expressly states that "[o]nce requested, the operator is responsible for *selecting the appropriate patient records* from the department PACS using the image library PC" and that "[u]sing custom software, *these images are recorded onto the CD-ROM* in standard DICOM format . . . ."  (Mehta at DAT014231,

-11-

1  emphases added.)  "This CD-ROM is then provided to the patient . . . ."  (Mehta

2  at DAT014232.)  For at least this reason, the disclosure of "all pertinent imaging

3  studies" does not satisfy the claim limitation requiring searching for related

4  medical image data that is related to the selected medical image data.

### c.   Mehta fails to disclose the recited "production station"

6  Dr. Horii contends that "the system described in Mehta . . . creates a CD

7  containing all the images and viewing software, which allows the images to be

8  viewed on any computer . . . ."  (Horii Rpt. at 15.)  I disagree that this satisfies

9  the claim element reciting "a production station that is configured to record all

10  of the following onto a single, portable data storage medium" (or "onto a data

11  storage medium, wherein the storage medium is an optical disk"): "the selected

12  medical image data, recorded in the standard medical imaging format, the

13  related medical image data, recorded in the standard medical imaging format,

14  and a viewing program that is configured to allow viewing of the selected and

15  the related medical image data that is recorded onto the data storage medium on

16  widely accessible computers not specifically configured with standard medical

17  imaging software for viewing of medical images."

18  Mehta discloses that selected images and an Internet web browser are

19  recorded to a CD-ROM.  (Mehta at DAT014231–32.)  As I explained in the

20  preceding section, however, Mehta does not disclose searching for related

21  medical image data that is related to selected medical image data.  Because there

22  is no related medical image data in Mehta, it is impossible for Mehta to also

23  record related medical image data onto a single, portal data storage medium or

24  optical disk in the standard medical imaging format, as required by the claim.

25  In fact, Mehta does not disclose a production station at all.  At best,

26  Mehta discloses an ordinary PC with a CD-R drive.  (Mehta at DAT014231.)

27

28

-12-

#### d.   The Patent Office allowed the claims over Mehta

I understand that the Patent Office allowed the claims of the '164 patent over Mehta during a reexamination of the '164 patent.   During that reexamination, a third party requester disclosed and cited Mehta as raising "a substantial new question of patentability" as to the '164 patent.  In fact, the third party requester even provided the Patent Office with detailed explanations and arguments as to why the claims were purportedly invalid over Mehta.  A panel of patent examiners nevertheless allowed the present claims.

For at least the reasons I discussed above, I agree with the Patent Office that Mehta does not anticipate claims 9 and 15 of the '164 patent.

### 3.   The asserted '164 patent claims would not have been obvious over the DICOM standard

Dr. Horii opines that "DICOM alone calls out support for nearly all limitations of the claims in the '164 patent." (Horii Rpt. at 17.)  Dr. Horii states that he reviewed the Supreme Court's decision in *KSR v. Teleflex*, but he inexplicably fails to follow the basic framework for assessing obviousness set out in that case.   Apparently, Dr. Horii believes that there are differences between the DICOM standard and the '164 patent claims, because he did not argue that the DICOM standard anticipated any claims of the '164 patent.  Yet, Dr. Horii has not identified any differences (or even any similarities) between the DICOM standard and the '164 patent claims.  In fact, he does not address the DICOM standard in the context of the '164 patent claims at all.  There is no discussion of any claim, or any explanation of how the DICOM standard meets any claim limitation.   To the extent that he believes there are differences between the '164 patent claims and the DICOM standard, he also fails to articulate a rationale for modifying the DICOM standard to arrive at the claimed inventions.

Complicating matters further, Dr. Horii has not identified any particular

-13-

1   document as "DICOM" or the "DICOM standard," much less provided specific

2   citations as to where this document meets, or fails to meet, the various claim

3   elements.   Needless to say, it is very difficult for me to fully respond to his

4   conclusory opinions.

5       To the extent that I can discern Dr. Horii's argument, he seems to contend

6   that DICOM generally discloses a standard medical imaging format and

7   "generally recognized the need to search for various imaging studies."  (Horii

8   Rpt. at 17.)  He further argues that "the need for obtaining related digital images

9   and methods for accomplishing it were well known," and that the '164 patent

10   discloses that "CD production stations from Rimage, and both the viewing

11   program and the image server from e-Film Medical Company" were

12   commercially available in the relevant time frame.   (Horii Rpt. at 17–18.)

13   Therefore, he concludes that the claims would have been obvious.  I disagree

14   with his reasoning and his conclusion.

15      Dr. Horii states that a person of ordinary skill in the art around the

16   year 2000 would have recognized that DICOM was a standard medical imaging

17   format and that DICOM "provide[d] guidance for storing, moving, finding and

18   retrieving from systems that stored DICOM images."  (*See* Horii Rpt. at 17.)

19   While this statement is correct, the DICOM standard is largely irrelevant to the

20   claims.   To my knowledge, the DICOM standard does not discuss, or even

21   suggest, at least a plurality of browsing terminals, searching for related medical

22   image data that is related to the selected medical image data, recording selected

23   medical image data, related medical image data, and a viewer at a production

24   station, labeling, or auditing as recited in the various '164 patent claims.  In fact,

25   Dr. Horii concedes that DICOM "is a uniform standard, and not a blueprint for

26   putting together all the details of a complete system.  For example, whether or

27   not the production station labels the CD's is not really germane to DICOM."

28   (Horii Rpt. at 19.)

-14-

1    I cannot think of a reason why a skilled artisan, with knowledge of the

2    DICOM standard, would have thought of the features claimed in the '164

3    patent, let alone combined them, in the manner recited in the claims. Nor has

4    Dr. Horii provided any reason to combine them. In fact, in a clear case of

5    impermissible hindsight reconstruction, Dr. Horii relies upon the '164 patent

6    itself as a template for piecing together a few of these missing elements from

7    some unrelated commercially-available products (namely, Rimage and eFilm).

8    He provides no motivation or reason for a person of ordinary skill in the art to

9    have acquired these commercially-available products identified in the '164

10   patent, independent of the '164 patent's teachings.

11       **4.     The asserted '164 patent claims would not have been obvious**

12           **over the DICOM standard in view of DISC'96, Heartlab,**

13           **Mehta, Sorna, Samari-Kermani, or Ratib, and further in view**

14           **of Ratib or Heartlab**

15       In the preceding section, I discussed how Dr. Horii failed to explain why

16   the '164 patent claims would have been obvious over the DICOM standard

17   taken alone. His discussion of various secondary references applied in

18   combination with the DICOM standard does not change my conclusion that the

19   '164 patent claims would not have been obvious.

20       Dr. Horii opines that a "person of ordinary skill is presumed to be aware

21   of the downloading of viewing software onto CD's as taught in numerous prior

22   art references including without limitation DISC'96, Heartlab, Mehta, Sorna,

23   Samari, and Ratib." (Horii Rpt. at 18.) He further states that, "[a]dditionally,

24   the eFilm Suite software product used by Mr. Wright, one of the inventor's [sic]

25   in 1999, also burned DICOM images onto CDs with viewing software." (Horii

26   Rpt. at 18 n.4.) Dr. Horii concludes that "[t]here is nothing at all that would be

27   unexpected about doing exactly that, so that each CD could be read by any

28   computer."

-15-

The '164 patent claims recite more than simply viewing software.  The Patent Office has already considered several of these "viewing software" references, such as Mehta (DAT013161) and Samari-Kermani (DAT013159), and has found that the unique combination of features in the '164 patent claims were new and non-obvious over these references.  In fact, the Patent Office has found the claims to be patentable over Samari-Kermani twice, once during the original prosecution and again during reexamination.

Dr. Horii further opines that there "is nothing at all that would be unexpected about . . . selecting medical image data, and calling for related medical data."  (Horii Rpt. at 18.)  The references that Dr. Horii cites simply do not support this conclusion.

Dr. Horii states that the "screen shots of the user's menu in the Ratib/UCLA Article, for example, shows [sic] that users could order by patient studies and even series (component image sets of a study) from multiple modalities."  (Horii Rpt. at 18, internal citation omitted).  The Ratib article simply shows that a user could use a user interface to select certain medical image data to store on a disc.  As discussed further in section VI.B.5 of this report, there is nothing in the Ratib article that discloses searching for related medical image data based on the selected medical image data, as claimed.

Dr. Horii also states that a "cardiology-specific example is provided in the Heartlab DICOM View Study Manual."  (Horii Rpt. at 19, citing Heartlab user's guide at PG018242.)  Again, the cited portions of Heartlab show a user interface that allows a user to select medical image data to store on a disc, but it does not show searching for related medical image data that is related to the selected medical image data, as claimed.

Thus, even though selecting medical image data was known in the art at the relevant time frame, Dr. Horii has provided no support for his conclusion that searching for related medical image data based on the selected medical

-16-

1   image data was also known.  Indeed, based on my review of the art, searching

2   for related medical image data, as claimed, was not known.

3        Finally, Dr. Horii contends that the need for "selecting medical image

4   data, and calling for related medical data" was "self-evident from the practice of

5   medicine—sometimes one needs to see a sequence of images taken over time, or

6   multiple images from different modalities.  The solution—search and selection

7   capabilities—is obvious, merely by stating the need."  (Horii Rpt. at 19.)  I

8   disagree.  Around the year 2000, various publications discussed user interfaces

9   that allowed users to select certain medical image data and burn that selected

10  medical image data to a disc.  If a user wanted image sequences or multiple

11  images from different modalities, the user could select all relevant medical

12  image data from a list on the interface and burn that data to disc.  But, I have not

13  seen any references from the relevant time frame that disclosed searching for

14  related medical image data based on the selected medical image data, along with

15  a production station configured to record both the selected medical image data

16  and the related medical image data on a disc, as claimed.  It seems likely that the

17  benefit of hindsight afforded by the '164 patent has influenced Dr. Horii's

18  opinions.

19      **5.   The asserted '164 patent claims would not have been obvious**

20           **over Ratib (article or purported public use)**

21       Dr. Horii opines that the Ratib article and the purported Ratib public use

22  "essentially render[ ]" claims 9, 16, and 21 obvious.  (Horii Rpt. at 19, 22.)  Yet

23  again, Dr. Horii does not identify the scope and content of the Ratib article or

24  purported public use, or the differences between either the Ratib article or

25  purported public use and the '164 patent claims, as required by *KSR*.

26  Furthermore, he provides no rationale for modifying the Ratib article or the

27  purported Ratib public use to arrive at the claimed inventions.

28       As to claims 9 and 15, Dr. Horii seems to reason as follows.  First, Dr.

-17-

Horii contends that the Ratib system "searched for related medical images generated by modalities and burned all the images onto a CD, with viewing software which allowed the images to be viewed on any computer." (Horii Rpt. at 19–20.)  Second, he contends that "[i]t also automatically searched another database for reports and other documents related to the medical images and burns them onto the CD." (Horii Rpt. at 19–20.)  Dr. Horii does not explain how these purported teachings play into an obviousness analysis.

Dr. Horii further contends that claims 16 and 21 claim "the method for selecting and automatically recording medical image data onto a data storage medium" and would have been "obvious for the same reasons" discussed with respect to claims 9 and 15.  (Horii Rpt. at 22.)  Dr. Horii states that the "only new feature . . . is 'printing a label using the production station, wherein the label includes identifying information associated with the selected medical image data, and affixing the label to the data storage medium using the production station.'" (Horii Rpt. at 22.)  He contends that "[l]abeling of CD's is taught in Ratib article [sic] . . . ." (Horii Rpt. at 22.)  Again, Dr. Horii does not explain how this purported teaching relates to the obviousness of the claims.

I disagree with his reasoning and his conclusory opinion.

As I explained above, the Ratib article does not disclose at least "a search module configured to search the database for related medical image data that is related to the selected medical image data," as recited in claims 9 and 15, and "searching the database for related medical image data that is related to the selected medical image data," as recited in claims 16 and 21.  At best, the Ratib article discloses a user interface that allows a user to select certain medical image data and burn that selected medical image data to a disc, like other references around that time period, including several that were previously considered by the Patent Office.  (*See* Ratib article at PG000051.)

At his recent deposition, Dr. Ratib testified that reports and letters were

-18-

1   manually located and that there was no searching by his system for related

2   reports or letters based on the selected medical images.

3       It is my opinion that the Ratib article would not have enabled one skilled

4   in the art to make the inventions of the asserted claims, including the claimed

5   search module.  For instance, Ratib merely discloses that the "system allows to

6   perform [sic] the following operations sequentially: . . . Retrieve and match

7   corresponding data documents (reports, letters, etc.)"   (Ratib article at

8   PG000050–51.)  The Ratib article does not explain what this phrase means.

9   Moreover, the Ratib article does not provide *any* direction or guidance on how

10  to make a search module that includes this feature, and there are no working

11  examples showing the claimed search module.  Dr. Ratib's recent deposition

12  testimony confirms that his system did not search for related medical image data

13  based on the selected medical image data, as recited.  Furthermore, Dr. Horii has

14  not shown any prior art that discloses, or even suggests, such a feature.  Thus, I

15  believe that making the claimed inventions would have required undue

16  experimentation based on the prior art, including the teachings of the Ratib

17  article.

18      In any event, there are still other clear differences between the Ratib

19  article and purported public use and the '164 patent claims that Dr. Horii does

20  not acknowledge.  For example, with respect to claims 9 and 15, the Ratib

21  article fails to disclose "a plurality of browsing terminals configured to receive a

22  user selection that defines selected medical image data."  The Ratib article only

23  discloses a single computer terminal.  (Ratib article at PG000051.)  The Ratib

24  article also fails to disclose "a production station that is configured to record all

25  of the following onto a single, portable data storage medium" (or "onto a data

26  storage medium, wherein the storage medium is an optical disk"): "the selected

27  medical image data, recorded in the standard medical imaging format, the

28  related medical image data, recorded in the standard medical imaging format,

-19-

1  and a viewing program that is configured to allow viewing of the selected and

2  the related medical image data that is recorded onto the data storage medium on

3  widely accessible computers not specifically configured with standard medical

4  imaging software for viewing of medical images."  In fact, the Ratib article does

5  not disclose a production station at all.

6      With respect to claims 16 and 21, the Ratib article does not disclose at

7  least (1) "recording the selected medical image data and the related medical

8  image data onto a data storage medium using a production station"; (2)

9  "recording a viewing program onto the data storage medium using the

10  production station"; and (3) "printing a label using the production station . . .

11  and affixing the label to the data storage medium using the production station."

12  Again, the Ratib article does not disclose a production station at all.  Moreover,

13  while the Ratib article discloses a CD that is labeled (Ratib article at

14  PG000052), the Ratib article does not disclose that a production station prints

15  and affixes the label to the CD.

16      In conclusion, I believe that Dr. Horii's conclusory and superficial

17  analysis, which does not address the specific language of the claims, is

18  insufficient to show that the claims of the '164 patent would have been obvious

19  over the Ratib article or the purported Ratib public use.

20      **6.     The asserted '164 patent claims would not have been obvious**

21          **over Heartlab (user's guide or product)**

22      Dr. Horii opines that "[b]oth the [Heartlab] system and its 1998 User's

23  Guide render all of the elements of claim 9 obvious."  (Horii Rpt. at 20.)  Dr.

24  Horii seems to contend that the Heartlab user's guide, alone or in combination

25  with the DICOMview Enterprise Server web page, discloses all elements of

26  claim 9.  (Horii Rpt. at 20.)  However, he incorrectly paraphrases the claim

27  elements and provides only general page citations to the Heartlab user's guide

28  and the DICOMview Enterprise Server web page to support his conclusion that

-20-

these references show the paraphrased elements, with little explanation or analysis.  Moreover, he did not properly identify the differences between the claims and the Heartlab user's guide/DICOMview Enterprise Server web page or Heartlab product or explain why, in view of those differences, the claimed invention as a whole would have been obvious over the prior art, as he was required to do under *KSR*.

With respect to claim 9, Dr. Horii contends that the Heartlab system "works on multiple browsing terminals configured to receive user selection [sic] of selected medical image data."  (Horii Rpt. at 20, citing Heartlab user's guide at PG018233 (page 11) and DICOMview Enterprise Server web page at PG024572–73 (Exhibit 206).)  I believe Dr. Horii is saying that the system in Heartlab is capable of being installed and working on any terminal.  That is not what claims 9 and 15 recite.  Claims 9 and 15 recite a system comprising a plurality of browsing terminals configured to receive a user section that defines selected medical image data.  I do not believe that the cited portions of the Heartlab user's guide or the DICOMview Enterprise Server web page disclose this element.  The Heartlab user's guide simply discloses that DICOMview software can run "on mid-range PC or PowerPC desktop systems."  (Heartlab user's guide at PG018233.)  The DICOMview Enterprise Server web page discloses a system with a "Fault tolerant Windows NT Server" and multiple "Cath-lab" stations and "ViewStations."  The DICOMview Enterprise Server web page does not disclose, or even suggest, that any of those browsing terminals are configured to receive a user selection that defines selected medical image data, as used in the context of the claims.  Thus, Dr. Horii's conclusion that the Heartlab user's guide or DICOMview Enterprise Server web page meets the "plurality of browsing terminals" element, as claimed, is unsupported.

Dr. Horii also opines that the Heartlab user's guide has a "search module" that "can search the database (and other databases) for related medical images,

-21-

such as earlier studies relating to the same patient," thus "fulfilling" the search module recited in claim 9. (Horii Rpt. at 20, citing Heartlab user's guide at PG018244 and PG018258 (pages 22 and 36).) Again, Dr. Horii paraphrases claim 9. In my opinion, the Heartlab user's guide does not disclose a search module configured to search the database for related medical image data that is related to the selected medical image data, as claimed. Instead, the cited pages simply disclose a user interface that allows a user to select desired medical image data and burn that selected medical image data to a disc, like other references around that time period, including references already considered by the Patent Office. Again, Dr. Horii's opinions are unsupported.

Dr. Horii further opines that the Heartlab user's guide has "a CD burner that loads related and selected images as well as a viewing program onto CD's, which images are viewable on computers that do not necessarily contain medical image viewing software," thus "fulfilling" the production station element recited in claim 9. (Horii Rpt. at 20, citing Heartlab user's guide at PG018244 and PG018267 (pages 22 and 45).)

The Heartlab user's guide discloses that selected images are burned to a CD, along with a program which will enable the CD to play itself back on any Windows 95/NT PC. (Heartlab user's guide at PG018267–68.) As I explained above, however, the user's guide does not disclose searching for related medical image data that is related to selected medical image data. Because there is no related medical image data in the Heartlab user's guide, it is impossible for the Heartlab user's guide to also record related medical image data onto a single, portal data storage medium or optical disk in the standard medical imaging format, as claimed. In fact, the Heartlab user's guide does not disclose a production station at all. At best, the Heartlab user's guide discloses an ordinary PC with a CD-R drive. (Heartlab user's guide at PG018233, PG018241, PG018267.)

-22-

1    With respect to claims 16 and 21, Dr. Horii states that the claimed
2    "method for selecting and automatically recording medical image data onto a
3    data storage medium" would have been "obvious for the same reasons"
4    discussed with respect to claim 9. (Horii Rpt. at 22.) Dr. Horii next states that
5    the "only new feature . . . is 'printing a label using the production station,
6    wherein the label includes identifying information associated with the selected
7    medical image data, and affixing the label to the data storage medium using the
8    production station.'" (Horii Rpt. at 22.) He then ignores this claim language
9    and contends that "[l]abeling of CD's is taught in . . . Heartlab" (Horii Rpt. at
10   22, referring to the Heartlab user's guide), as if this somehow discloses the
11   "only new feature" of the claim. Dr. Horii cites to pages 74–81 of the Heartlab
12   user's guide to support this proposition. That document only goes up to page 50
13   (Heartlab user's guide at PG018272). I could not find anything in the Heartlab
14   user's guide that disclosed labeling in the way recited in claims 16 and 21. In
15   any event, Dr. Horii does not explain how this purported teaching relates to the
16   obviousness of the claims.

17       In conclusion, I believe that Dr. Horii's superficial and conclusory
18   analysis is insufficient to show that any claims of the '164 patent would have
19   been obvious over the Heartlab user's guide or the Heartlab product.

20   **7.    The asserted '164 patent claims would not have been obvious**
21          **over Mehta in view of Arenson, Levin, Seshadri 1990, Seshadri**
22          **1992, de la Huerga, or Inamura (purportedly showing**
23          **searching for related data)**

24       Dr. Horii contends that, "[t]o the extent Mehta does not anticipate
25   Claim 9, it, in combination with any of [Arenson, Levin, Seshadri 1990,
26   Seshadri 1992, de la Huerga, and Inamura] would render the claim obvious.
27   The same is true with the other anticipated claim 15." (Horii Rpt. at 22.) Once
28   again, Dr. Horii fails to identify the differences between the claims and these

-23-

1  references, explain why the claims would have been obvious in light of these
2  differences, or provide any kind of rationale for combining the references.  At
3  most, he states that these secondary references disclose "searching for and
4  combining medical data relating to other medical data."  (Horii Rpt. at 20.)  This
5  cursory analysis greatly distorts the claim language.  I assume he refers to "a
6  search module configured to search the database for related medical image data
7  that is related to the selected medical image data."  I disagree that any of these
8  secondary references disclosed the recited search module, just as I disagreed
9  that Mehta disclosed it above.

10      Arenson has little to do with claimed invention.  Arenson discloses:

11          The software for the physician's and radiologist's [image
12          display] stations presents an alphabetic list of the current patients in
13          the MICU [medical intensive care unit].  Choosing a patient's name
14          brings up a list of the available images for that patient.  Once a
15          particular image is selected, it is displayed on the first image-
16          display monitor, which is designated the reference monitor. . . .
17          The user can, with a single keystroke, call up the "next image." The
18          selection of the next image is based on rules built into the system.
19          The automated sequencing of images is appealing to physicians
20          who prefer minimal interaction with the system when selecting a
21          view.

22  (Arenson at PG026072, internal citation omitted.)

23      In other words, Arenson is directed to image review station software that
24  allows a physician or radiologist to sequentially display all of a patient's images
25  stored on the physician's or radiologist's review station.   The software
26  apparently includes an algorithm for deciding which of these images to display
27  next, although there is no detail as to how this algorithm might work.  I do not
28  believe that this passage of Arenson, or anything else in Arenson, discloses a

-24-

1  search module configured to search the database for related medical image data

2  that is related to the selected medical image data, as claimed.  Furthermore, in

3  my opinion, Arenson does not include enough information for a person of

4  ordinary skill in the art to actually make the disclosed system, including this

5  "next image" algorithm.  In any event, Dr. Horii has provided no rationale why

6  a skilled artisan would have combined Arenson with any other reference to

7  arrive at the claimed invention.

8       Levin discloses "methods to prefetch comparison images" (*see* Levin at

9  PG026068), but not a search module in the context of the claims.  Moreover, Dr.

10  Horii provides no rationale for combining Levin with Mehta or any other

11  reference to arrive at the claimed invention.  I cannot think of any reason why a

12  person of ordinary skill in the art would have done so.

13       Seshadri 1990 discloses an Image Archive and Retrieval System (IARS)

14  that "supports the ability" to "[s]ave images and other related data onto large-

15  scale optical storage devices" and "[r]etrieve images and/or other related data

16  from optical storage and transmit them to a given image device."  (Seshadri

17  1990 at PG026037.)  In other words, Seshadri 1990 discloses copying selected

18  images (or other selected data) to optical storage and moving selected images

19  (or other selected data) from optical storage to another device.  I can discern no

20  similarities between Seshadri 1990 and the claimed invention.  It certainly does

21  not disclose, among other things, a search module configured to search the

22  database for related medical image data that is related to the selected medical

23  image data.  Moreover, Dr. Horii provides no rationale for combining Seshadri

24  1990 with Mehta or any other reference to arrive at the claimed invention.  I

25  cannot think of any reason why a person of ordinary skill in the art would have

26  done so.[1]

27  _____

28       [1] In his report, Dr. Horii also states that Seshadri 1990 "is designed to

-25-

Seshadri 1992 discloses that a "PACS data base" can "generate[ ] a comparison examination folder and send[ ] it to the appropriate display node." (Horii Rpt., Ex. 6B at 360.)  As Dr. Horii points out, if a user calls up one of the comparison images at the display node and the comparison folder does not contain "the sufficient number of comparison examinations," then a "workstation folder manager" can request a transfer of an additional comparison examination.   (Horii Rpt., Ex. 6B at 361.) I do not believe that this is a disclosure of a search module in the context of the claims.  Moreover, Dr. Horii provides no rationale for combining Seshadri 1992 with Mehta or any other reference to arrive at the claimed invention.  I cannot think of any reason why a person of ordinary skill in the art would have done so.

Dr. Horii seems to argue that de la Huerga discloses the claimed search module because de la Huerga discloses a "method of collecting a group of related data records on a computer system . . . comprising (a) receiving a first reference to a group of related data records . . . (b) retrieving said group of related data records using information in said first reference . . . and (f) storing

---

attach simultaneously to a wide variety of computer systems, function well on Local Area Network (LAN) and Wide Area Network (WAN) configurations and provide "transparent coordination of volume, capacity, catalog and retrieval of all stored data, including those volumes moved off line . . . ."  (Horii Rpt. at 21.) He further states that the "system was networked to multiple modalities and was searchable by multiple workstations" and "provided a non-erasable audit trail." (Horii Rpt. at 21.)  I disagree with his characterizations of Seshadri 1990, but I cannot respond to them as part of an obviousness analysis, because I cannot understand how – or even if – he is applying these purported teachings to the claims.

-26-

said group of related data records . . . to a data storage device." (Horii Rpt. at 21–22, quoting claim 24 (de la Huerga at PG008954) and citing Figures 1 (de la Huerga at PG008922), 3A (de la Huerga at PG008923), and 4A (de la Huerga at PG008924).)   I do not believe this is a disclosure of a search module in the context of the claims.

De la Huerga does not search for related medical image data that is related to the selected medical image data.  Rather, de la Huerga collects **all** available information for a patient (the "cumulative patient's record," de la Huerga, PG008947 at 4:65–66), regardless of whether the information is related to a selected medical image, and outputs it all to a storage device.

In fact, I do not believe that de la Huerga searches for data at all.  De la Huerga states:

> When a system user at a workstation linked to the hospital computer network equipped with the present invention submits a request for a particular patient record, the invention parses the data request for an **address root** and other pertinent information about the data record to be retrieved, which may include the time and date the record was created or last modified and a **patient ID**. Using this information incorporated in the data request and in the specification tables, the invention **modifies the existing data request into a URL or other addressing convention**, as necessary, to retrieve the data record from the appropriate database.

(De la Huerga, PG008947 at 3:44–54, emphases added.)   I understand the "addressing" language to mean that each data record to be retrieved has a fixed (unchanging) network address which is calculated and used to retrieve the data. In short, de la Huerga retrieves a specific data record known to exist at a particular address.  It does not search for related medical image data, as used in the context of the claims.

-27-

1    Furthermore, Dr. Horii provides no rationale for combining de la Huerga
2 with Mehta or any other reference to arrive at the claimed invention.  I cannot
3 think of any reason why a person of ordinary skill in the art would have done so.

4    Inamura discloses recording voice data and image data together on a
5 magneto-optical disk (MOD) drive (Inamura at PG025985), but Inamura does
6 not disclose a search module configured to search for related medical image
7 data that is related to the selected medical image data.  Rather, in Inamura,
8 image data is first recorded to a MOD.  (Inamura at PG025985.)  Then, a
9 radiologist picks up the MOD and loads it into a MOD drive for diagnosis.
10 (Inamura at PG025985.)  "His speech of interpretation is digitized by the voice
11 recording module and additionally filed to the MOD together with images
12 which were just diagnosed by him."   (Inamura at PG025985.)   I cannot
13 understand how Dr. Horii could suggest this disclosure relates, in any way, to a
14 search for related medical image data.  Furthermore, Dr. Horii provides no
15 rationale for combining Inamura with Mehta or any other reference to arrive at
16 the claimed invention.  I cannot think of any reason why a person of ordinary
17 skill in the art would have done so.

18    In conclusion, each of the references that Dr. Horii identified fails to cure
19 the deficiencies of Mehta.

20   **8.   Claims 16 and 21 would not have been obvious over any of the**
21        **combinations in § VI.B.2–.6, and further in view of Ratib,**
22        **Heartlab, Sorna, Samari-Kermani, or Kahle**

23    Dr. Horii contends that "[i]ndependent Claim 16 claims the method 'for
24 selecting and automatically recording medical image data onto a data storage
25 medium' and is obvious for the reasons discussed above. The only new feature
26 in it is 'printing a label using the production station, wherein the label includes
27 identifying information associated with the selected medical image data, and
28 affixing the label to the data storage device using the production station.

-28-

Labeling of CD's is taught in Ratib article, and Heartlab, Sorna, Samari, and Kahle." (Horii Rpt. at 22, internal citations omitted). Dr. Horii does not explain how the purported teachings of these references play into an obviousness analysis, and he does not provide a rationale for combining them with any of the references discussed above.

I have already identified several shortcomings of the Ratib article. For example, while the Ratib article may disclose a CD that is labeled, it does not disclose printing a label using a production station, wherein the label includes identifying information associated with the selected medical image data and affixing the label to the data storage medium using the production station, as recited in claims 16 and 21. Thus, the Ratib article does not cure the deficiencies of any of the combinations discussed above.

I have also discussed the Heartlab user's guide cited by Dr. Horii. I pointed out above that the Heartlab user's guide does not disclose "printing and affixing" a label as recited in claims 16 and 21. In fact, I could not find any discussion of labels in Heartlab. Thus, the Heartlab user's guide does not cure the deficiencies of any of the combinations discussed above.

Even assuming for argument's sake that Sorna and Samari-Kermani do satisfy the printing and affixing recited in claims 16 and 21, they do not cure the other deficiencies I discussed above. For example, these references do not disclose "searching the database for related medical image data that is related to the selected medical image data," as recited in claims 16 and 21. In any event, the Patent Office has already considered Samari-Kermani and found the '164 patent claims to be patentable over this reference twice, once during the original prosecution and again during reexamination.

In my opinion, Kahle and the '164 patent are not from the same field of endeavor. Kahle identifies the pertinent field of invention as follows: "The present invention provides a system and method for placing a visual label on a

-29-

1   recording medium.   In particular, the invention is directed to the individual
2   placements of a visual label on a recordable optical disk at the time that digital
3   information is recorded thereon." (Kahle at PG000158, 1:7–11.) In contrast, as
4   I stated on page 14 of my Initial Report, the pertinent field of the invention in
5   the '164 Patent is described as follows: "This invention relates to a system and
6   method for the production of medical image data on portable digital recording
7   media such as compact discs. More particularly, it relates to a system and
8   method for receiving medical image data, processing medical image data, and
9   transmitting medical image data to be recorded on a portable digital recording
10  medium." ('164 patent at 1:14–21.) I do not believe that an inventor working
11  in the field of the '164 patent would have looked to the Kahle patent for any
12  reason. It is not a DICOM device, and it would not have easily "plugged in" to
13  a DICOM system.   In short, the fields of invention and the problems they
14  address are simply too different. Thus, it appears that Dr. Horii's citation of the
15  Kahle reference was prompted by the benefit of hindsight afforded by the '164
16  patent disclosure.

17      Furthermore, even assuming for argument's sake that Kahle does satisfy
18  the printing and affixing recited in claims 16 and 21, Kahle does not cure the
19  other deficiencies I discussed above.   Kahle does not disclose any other
20  limitations in claims 16 and 21.

21      In conclusion, each of the references that Dr. Horii identified fails to cure
22  the deficiencies I discussed above.

23      **9.**     **Claims 16 and 21 would not have been obvious over any of the**
24              **combinations in § VI.B.2–.6, and further in view of common**
25              **sense knowledge that having a label is better than not having a**
26              **label**

27      Dr Horii contends that any "person of skill in the art as well as many
28  others working in a hospital or imaging center would know that . . . labeling

-30-

1  CD's is a better idea than putting unlabeled CD's in a computer to find out to

2  whom they pertain.  Whether to generate labels when image data is loaded on

3  CD's using a Rimage unit or to hand-write the filing information on a the [sic]

4  blank label of a CD is simply a design choice."  (Horii Rpt. at 23–24.)  Once

5  again, Dr. Horii does not explain how this purported "common sense"

6  understanding of the skilled artisan contributes to an obviousness analysis.

7  Moreover, these two statements are not logically connected.

8       I agree that a person skilled in art would have recognized that labeling

9  CDs is better than not labeling CDs.  That is why the vast majority of people

10 working in the field of the '164 patent during the relevant time period labeled

11 their CDs with Sharpie pens.  It does not follow that labeling CDs using a

12 Rimage unit or labeling CDs with a Sharpie pen is merely a matter of design

13 choice.  A Rimage unit is very expensive, and it is not DICOM-compliant as

14 sold off the shelf.  I understand that a significant amount of design and

15 programming, as well as FDA paperwork, is required to modify a Rimage unit

16 for use in a DICOM system.  The simpler and cheaper solution was, and is, to

17 label CDs with a Sharpie pen.  This was the solution used by most people in the

18 relevant field at the relevant time.  Dr. Horii fails to explain why Sharpies were

19 so popular if labeling, as recited in claims 16 and 21, was so obvious.

20      I believe that the combinations of elements in the methods recited in

21 claims 16 and 21 are unique and would not have been obvious to one skilled in

22 the art, regardless of whether that skilled artisan would have considered that

23 labeling CDs is a better idea than not labeling CDs.

24      **10.  <u>Claim 10 would not have been obvious over any of the</u>**

25          **<u>combinations in § VI.B.2–.6, and further in view of Heartlab or</u>**

26          **<u>Sutherland (purportedly showing the input of information</u>**

27          **<u>identifying the selected data)</u>**

28      Dr. Horii contends that "Claim 10 entry of identifying information - is

-31-

obvious based on" "Heartlab - which specifically allowed a user to input identifying information relating to the selected medical image data" and "Sutherland." (Horii Rpt. at 22–23.) Dr. Horii again improperly paraphrases claim 10 to arrive at this conclusion. Claim 10 actually recites: "The system of claim 9, further comprising a configuration data module configured to allow a user to input identifying information relating to the selected medical image data." Dr. Horii does not address the entire claim limitation. Moreover, he does not address the scope and content of the references at all. He generally cites the "Petrocelli deposition" as support for his opinion that Heartlab meets the elements of claim 10. But, there is no explanation of how any of his cited references (Petrocelli Depo., Heartlab user's guide, Sutherland) plays into an obviousness analysis.

I disagree that the Heartlab's user guide discloses the limitations of claim 10. Page 25 of the Heartlab user's guide, cited by Dr. Horii, discloses an "Edit Demographics" button that allows a user to "change the patient's name and date of birth on the destination CD. The original study will carry the original name and date of birth." (Heartlab user's guide at PG018247.) As I understand this disclosure, it teaches the skilled artisan that the button allows a user to anonymize a study before it is burned to disc, by changing the patient's name or date of birth. In other words, the entered data is changed so that it does **not** relate to the selected medical image data. Thus, in my opinion, the Heartlab user's guide actually teaches away from claim 10.

Dr. Horii's citation to the "Petrocelli deposition" is vague. That document is 101 pages long, and he does not point out where the document purportedly discloses the elements of claim 10. On pages 33 and 34 of the deposition, Robert Petrocelli discusses page 25 of the Heartlab user's guide, so I assume that Dr. Horii's general citation of the Petrocelli deposition specifically refers to pages 33 and 34 of the deposition. The deposition confirms my

understanding of the teachings of the Heartlab user's guide.  (Petrocelli Depo. at 33:19–34:7.)  Dr. Petrocelli also conjectures that "you might find some people" who used the edit demographics button to "correct an error before exporting [a disc]."  (Petrocelli Depo. at 34:8–17.)  He repeatedly emphasizes, however, that this would be considered poor practice and "sloppy."  (Petrocelli Depo. 34:18–22.)  Thus, Dr. Petrocelli's testimony confirms my opinion that the Heartlab user's guide disclosure would teach the skilled artisan to use the edit demographics button to anonymize data so that it does not relate to the selected medical image data.  The skilled artisan would not have thought to use it for another purpose.  Dr. Horii has offered no explanation to the contrary.

Finally, in my opinion, Sutherland does not disclose the configuration data module of claim 10.  Column 7, lines 7 through 12 (the passage Dr. Horii cites in supports of his opinion) state: "Next, at step 312, the operator at removable medium recording station 102 selects a patient study from a patient list and initiates a transfer of the selected patient study to a removable medium that has been inserted into the removable medium recorder drive within removable medium recording station 102. The patient study is then recorded on the removable medium at step 314."  (Sutherland at PG009150.)  I cannot understand how Dr. Horii could suggest this disclosure relates, in any way, to the recited configuration data module of claim 10.  In any event, the Patent Office has already considered Sutherland and found the '164 patent claims to be new and non-obvious over this reference twice, once during the original prosecution and again during reexamination.

Furthermore, Dr. Horii provides no rationale for combining Sutherland with any other reference to arrive at the claimed invention.  I cannot think of a reason why a person of ordinary skill in the art would have done so.

**11.    Claim 11 would not have been obvious over any of the combinations in § VI.B.2–.6, and further in view of a single**

-33-

**installation where a Heartlab product purportedly printed to a Rimage printer**

Dr. Horii improperly paraphrases claim 11 as "printing and affixing labels to the CD's."  Claim 11 actually recites: "The system of claim 10, wherein the production station is further configured to print and apply a label to the data storage medium, the label containing the identifying information."  He contends that claim 11 "is obvious" because, "for at least one of its customers, Heartlab acquired a Rimage high volume CD burner, wrote software to communicate between the DICOMView workstation and the Rimage unit, allowing the Rimage unit to print patient and study related information on to the label." (Horii Rpt. at 23.)

Although Dr. Horii provides no citation for this proposition, I presume he refers to testimony in the Petrocelli Deposition regarding a purported installation at Piedmont Hospital.  Dr. Horii cites no corroborating support for Dr. Petrocelli's testimony, and I understand that Pacsgear has not provided any.

In any event, Dr. Horii has not argued that the purported Heartlab product with a Rimage unit cures the above-described deficiencies of claims 9 and 10, from which claim 11 depends.  For example, there is nothing that suggests the Heartlab product includes a search module configured to search the database for related medical image data that is related to the selected medical image data or a production station that was configured to record such related medical image data onto a single, portable data storage medium.

12. **Claim 11 would not have been obvious over any of the combinations in § VI.B.2–.6, and further in view of Ratib, VEPRO 2000, Sorna, Samari-Kermani, or Kahle**

Dr. Horii contends that claim 11 also would have been obvious over Ratib, VEPRO 2000, Sorna, Samari-Kermani, or Kahle.  (Horii Rpt. 23.)  His analysis of these references amounts to little more than bare citations.  There is

-34-

no discussion of the scope and content of the references or the differences between the references and the claims.  He provides no rationale for combining these references with any other cited reference.  Furthermore, the analysis relates to his paraphrasing of the claim and not the actual claim.  Thus, I believe his analysis is completely deficient from an obviousness standpoint.  I will attempt to respond to his bare citations to the best of my ability.

As I explained above, the Ratib article discloses a CD that is labeled, but it does not disclose, or even suggest, a production station that is configured to print and apply a label to a data storage medium, the label containing identifying information relating to the selected medical image data and input by a user with a configuration data module.  Dr. Ratib confirmed at his deposition that his label was printed by a label printer and glued to the CD manually, and not applied by his CD burner, let alone by a production station as recited in the claims.

VEPRO 2000 discloses an optional label printer (VEPRO 2000 at PG008842) that prints a label, but the label printer is not part of a production station and, in any event, does not print and apply a label to a data storage medium.  As I understand VEPRO 2000, the labels would be applied manually.

Sorna and Samari-Kermani do not disclose a production station that is configured to print and apply a label to a data storage medium, the label containing identifying information relating to the selected medical image data and input by a user with a configuration data module.  I cannot find anything in Sorna or Samari-Kermani that discloses identifying information input by the user.

As I explained above, Kahle has nothing to do with the field of the '164 patent.  A person of ordinary skill in the art would not have looked to this reference in an obviousness analysis.  Furthermore, Kahle does not disclose a production station that is configured to print and apply a label to a data storage medium, the label containing identifying information relating to the selected

-35-

medical image data and input by a user with a configuration data module.  Kahle does not disclose medical image data or a configuration data module at all.

In conclusion, in my opinion, claim 11 would not have been obvious over any of the references cited by Dr. Horii.  Indeed, the Patent Office has already considered VEPRO 2000, Sorna, and Samari-Kermani and found the '164 patent claims to be patentable over those references.

### 13.  **Claim 12 would not have been obvious over any of the combinations in § VI.B.2–.6, and further in view of Samari-Kermani**

Referring to claim 12, Dr. Horii contends that the "audit module configured to automatically provide an auditable trail of the selected medical image data is obvious based on . . . Samari-Kermani."  (Horii Rpt. at 23, citing Samari-Kermani at PG00144 (abstract), PG000148 (¶ 0008), PG000151 (¶ 0063).)  There is no discussion of the scope and content of Samari-Kermani or the similarities or differences between that reference and claim 12.

Significantly, Dr. Horii fails to provide any rationale for combining Samari-Kermani with any other reference to arrive at the claimed invention.  I cannot think of a reason why a person of ordinary skill in the art would have done so.

Furthermore, claim 12 depends upon independent claim 9, and Samari-Kermani does not cure the deficiencies of the other cited references with respect to that claim.  For example, Samari-Kermani does not disclose a search module configured to search the database for related medical image data that is related to the selected medical image data or a production station that is configured to record such related medical image data onto a single, portable data storage medium.

In conclusion, in my opinion, claim 12 would not have been obvious over Samari-Kermani alone or in combination with the other references on which Dr.

-36-

Horii relies.  In fact, the Patent Office has already considered Samari-Kermani and found the '164 patent claims (including claim 12) to be patentable over that reference twice, once during the original prosecution and again during reexamination.

**14.    Claim 12 would not have been obvious over any of the combinations in § VI.B.2–.6, and further in view of HIPAA**

Claim 12 specifically recites: "The system of claim 9, further comprising an audit module that is configured to automatically provide an auditable trail of the selected medical image data."  Dr. Horii contends that "[a]ny person of skill in the art as well as many others working in a hospital or imaging center would know that HIPAA and other document tracking obligations mandate record keeping, that patient lists are useful in conducting a search . . . ."  (Horii Rpt. at 23.)  Dr. Horii also discusses HIPAA in more detail in his discussion of the '157 patent.  (Horii Rpt. at 28–29.)  He does not explain how this purported general "knowledge" relates to the language of claim 12 or his conclusory opinion on the obviousness of that claim.

The Health Insurance Portability and Accountability Act (HIPAA) is a federal mandate for ensuring health data security.  It obliges healthcare institutions to take measures to ensure that patient information is provided only to people who have a professional need for it.  (*See* Cao at PG026039.)  I am not aware of any specific rules relating to auditable trails of selected medical image data recorded onto portable media that are required by HIPAA.  Rather, HIPAA provides a "***conceptual framework*** for healthcare data security and integrity and sets out strict and significant federal penalties for non-compliance.  However, the guidelines as they have been released . . . ***do not mandate specific technical solutions***, rather there is a repeated emphasis on the need for scalable compliance solutions appropriate to variety [sic] of clinical scenarios covered by HIPAA language."  (Cao at PG026046, emphasis added.)

-37-

Dr. Horii contends that the "need for including an audit log in medical software was well known at least as far back as 1998 based on the Health and Human Services document 45 CFR part 142 (45 CFR 142, 1998) which states, "We expect that the capability of keeping audit trails will become standard in all health care software in the near future, spurred on by the health information privacy debates in the Congress and elsewhere." (Horii Rpt. at 28–29, citing HHS Proposed Rule at PG026005.)

This quote relied upon by Dr. Horii is taken out of context and is misleading when viewed in isolation. This document is actually commentary regarding a proposed security and electronic signature standard. (HHS Proposed Rule at PG025991.) Specifically, it relates to technical security mechanisms to guard against unauthorized access to confidential information during electronic transmission of the information over a network. (PG026005.) It has nothing to do with auditable trails of selected medical image data recorded onto portable media. In any event, I do not believe that a person of ordinary skill in the art working in the field of the invention of the '164 patent would have looked to commentary regarding a proposed regulation by the Department of Health and Human Services for guidance in solving problems in the art. It is even less likely that the skilled artisan would have looked to commentary from a field that is very different than the field of the inventions in the '164 patent.

In conclusion, in my opinion, claim 12 would not have been obvious over HIPAA and the other references on which Dr. Horii relies.

### 15. Claims 13 and 17 would not have been obvious over any of the combinations in § VI.B.2–.6, and further in view of Samari-Kermani

Claim 13 recites: "The system of claim 12, wherein the auditable trail of the selected medical image data includes a record of when the selected medical image data and the related medical image data were recorded onto the data

-38-

storage medium." Claim 17 recites: "The method of claim 16, further comprising generating an auditable trail of the selected medical image data, wherein the auditable trail includes a record of when the selected medical image data and the related medical image data were recorded onto the data storage medium."

Dr. Horii contends that claims 13 and 17 are obvious based on Samari-Kermani. (Horii Rpt. at 23, citing Samari-Kermani at PG000144 (abstract), PG000148 (¶ 0008), PG000151 (¶ 0063).) Dr. Horii offers no analysis other than this bare citation. There is no discussion of the scope and content of the reference or the differences between the reference and the claims. He provides no rationale for combining this reference with any other cited reference. Thus, I believe his analysis is completely deficient from an obviousness standpoint. I will attempt to respond to his bare citation to the best of my ability.

I disagree that Samari-Kermani discloses a record of when the selected medical image data and the related medical image data were recorded onto the data storage medium. The abstract cited by Dr. Horii states that a "database creates and updates a directory of patent [sic] files so the discs can be located and the images thereon viewed for each patient." (Samari-Kermani at PG00144.) Paragraph 0008 states that the "invention also constantly updates a database having a directory of all patient records and the discs the patient data is stored on." (Samari-Kermani at PG000148.) Finally, paragraph 00063 states that "[o]nce done, the database is updated with the patient and study information of all the patients on that CD and the CD unique serial number in Update Database step 98." (Samari-Kermani at PG000151.) None of this relates to when medical image data is recorded, much less the unique combination of elements of claims 13 and 17.

In conclusion, in my opinion, claims 13 and 17 would not have been obvious over Samari-Kermani and the other references on which Dr. Horii

1    relies.  Indeed, the Patent Office has already considered Samari-Kermani and

2    found the '164 patent claims (including claims 13 and 17) to be patentable over

3    that reference.

4    **C.    The '597 patent is not invalid**

5         Dr. Horii opines that the asserted claims of the '597 patent are invalid for

6    obviousness in light of several references.  I disagree.  Based on my analysis of

7    the proper constructions of the '597 patent claim terms and my analysis of the

8    documents Dr. Horii relies upon, it is my opinion that these references would

9    not have rendered obvious any of the asserted claims of the '597 patent.

10        **1.    Claim construction of the '597 patent**

11        Dr. Horii opines that "'[a]utomatically' and 'medical data' are neither

12   specifically defined in the claims, nor do they have a well-defined meaning in

13   the art." (Horii Rpt. at 24.)  Dr. Horii does not offer a special construction of

14   "automatically."  (*See* Horii Rpt. at 25.)  He does, however, define "related

15   medical data" to mean "related medical images."  I agree that the terms

16   "automatically" and "medical data" do not have a special, well-defined meaning

17   in the relevant art.  Rather, in my opinion, these are plain and unambiguous

18   terms that any person – skilled in the art or not – would readily understand.

19        Furthermore, with respect to "medical data," I believe that term is defined

20   in the claims, which supports my conclusion that this term is plain and

21   unambiguous.  For instance, "medical data" is defined in claims 1 and 6 as data

22   related to the patient. ('597 patent 9:28, 10:10–13, 10:16.)  "Additional medical

23   data" is defined in claims 1 and 6 as data also related to the patient. ('597 patent

24   at 9:36–37, 10:28.)  These definitions are wholly consistent with the '597 patent

25   specification and file history.  For instance, the specification makes it clear that

26   medical data broadly encompasses not only medical images but also "medical

27   exam data" and states that "[o]ne embodiment of the claimed system allows for

28   searching medical exam data that are related and placing such data on the same

-40-

CD." ('597 patent at 2:15–17.) Other portions of the specification similarly discuss medical data in general terms. (*E.g.*, '597 patent at 8:17–48.) Nothing in the file history is inconsistent with medical data being text or images that are related to a patient. Thus, in my opinion, medical data is, as the claims state, data that is related to the patient.

I assume that Dr. Horii incorporates his construction of "production station" from his discussion of the '164 patent. As I explained above, I believe that his construction is incorrect. For the reasons that I stated above when discussing claim construction for the '164 patent, it is my opinion that a person of ordinary skill in the art would understand a production station to be a robotic disc burner.

> ## 2. The asserted '597 patent claims would not have been obvious over any of the combinations in § VI.B.2–.14, and further in view of the DICOM standard (purportedly showing searching of multiple databases)

Dr. Horii devotes less than one page in his report to an "analysis" of the alleged obviousness of the '597 patent claims. He never analyzes the specific claim language or the portions of the references upon which he relies.

Dr. Horii contends that the "system of Claim 1 and the method of Claim 6 are quite similar to the systems claimed in the '164 Patent and is [sic] obvious for essentially the same reasons." (Horii Rpt. at 26.) He further states "DICOM was created to enable the query and retrieving of medical images from multiple databases and to allow users to send images from a modality to another device, including a CD burner. Obviously, if different databases are being queried, different interfaces would be utilized. As a result, the prior art discussed above renders obvious the addition of a second database." (Horii Rpt. at 26.) Dr. Horii does not identify any particular document as "DICOM," much less provide citations as to where the DICOM standard purportedly discloses the

-41-

1   claim elements.

2       To the extent that Dr Horii implies that the DICOM standard was
3   specifically created to allow users to search multiple databases and send
4   retrieved images to a CD burner, I disagree.   Put simply, DICOM is a
5   communication standard that enables two medical imaging devices to
6   communicate with each other, regardless of which companies manufactured the
7   devices.   Furthermore, simply because the DICOM standard would have
8   enabled the skilled artisan to search multiple databases, it does not follow that it
9   would have been obvious to do so in the manner set forth in the claims of the
10  '597 patent.  I see no evidence of it.  The English language, like DICOM, sets a
11  standard for communication, but that does not make every thought using the
12  English language obvious.

13      In my opinion, the DICOM standard is largely irrelevant to the '597
14  patent claims.  To my knowledge, during the relevant timeframe, the DICOM
15  standard did not discuss, or even suggest, at least "automatically searching,
16  based on the received request, a second computer database via a second
17  database interface for additional medical data also related to the patient, wherein
18  the second interface is different from the first interface" or "automatically
19  generating a portable computer-readable medium, at a production station,
20  containing the first set of medical imaging data related to the patient and the
21  additional related medical data, wherein the first set of medical imaging data is
22  formatted in a standard medical imaging format used by a computer configured
23  for viewing the medical imaging data," as recited in claim 1.  The DICOM
24  standard also did not discuss or suggest an application server configured to
25  "send a search request, based on the received request, via a second interface to
26  the second computer database for additional medical data also related to the
27  patient, wherein the second database is different from the first database" and "a
28  production station configured to generate a portable computer-readable medium

-42-

1  containing the first set of medical imaging data related to the patient and the

2  additional related medical data, wherein the medical imaging data is formatted

3  in a standard medical imaging format used by a computer configured for

4  viewing the medical imaging data," as recited in claim 6.

5      At best, to my knowledge, the DICOM standard simply discussed

6  querying a database, selecting certain data in that database, and retrieving the

7  selected data via a standardized communication protocol.

8      I cannot think of a reason why a skilled artisan, with knowledge of the

9  DICOM standard, would have thought of the claimed features, let alone

10 combined them, in the manner recited in the claims.  In fact, in a clear case of

11 impermissible hindsight reconstruction, Dr. Horii opines that "DICOM and the

12 other technological advances in the 1990s were designed to automate the search

13 and retrieve process to facilitate the creation of CDs.  CD burners, including the

14 Rimage units, were designed to automate the production of CDs."  (Horii Rpt. at

15 26.)  As I have explained above, off-the-shelf CD burners like Rimage units are

16 not DICOM-compliant.  I understand that it requires a significant amount of

17 custom software to allow a Rimage unit to work in a DICOM system.  I do not

18 believe that a person of ordinary skill in the art would have thought to use a

19 Rimage unit as part of the claimed system, independent of the '597 patent's

20 teachings.

21     Thus, it is my opinion that the asserted claims of the '597 patent would

22 not have been obvious over the DICOM standard.

23     **3.   The asserted '597 patent claims would not have been obvious**

24          **over any of the combinations in § VI.B.2–.14, and further in**

25          **view of the Heartlab user's guide, the Ratib article, Seshadri**

26          **1992, de la Huerga, DISC'96, Sorna, or Samari-Kermani**

27     Dr. Horii contends that it "would have been obvious to automate the

28 system for searching for, retrieving and/or sending medical images and related

-43-

1   images to a CD burner in order to create a CD with those images and viewing

2   software.  Heartlab, Ratib/UCLA, Seshadri (1992), de la Huerga, DISC '96,

3   Sorna and Samari are some examples of prior art references demonstrating this

4   process multiple [sic] databases and/or the related automated support."  (Horii

5   Rpt. at 26–27, internal citations omitted.)  Dr. Horii does not specify which of

6   these references purportedly shows searching of multiple databases and which

7   purportedly shows some level of automation.  Dr. Horii has also failed to

8   properly apply these references to the claim language and explain the

9   differences between the claims and the references.  He has not even provided

10  page citations.  Nevertheless, I have tried to address his contentions to the best

11  of my ability.

12      The Heartlab user's guide does not disclose at least "automatically

13  searching, based on the received request, a second computer database via a

14  second database interface for additional medical data also related to the patient,

15  wherein the second interface is different from the first interface," as recited in

16  claim 1, or an application server configured to "send a search request, based on

17  the received request, via a second interface to the second computer database for

18  additional medical data also related to the patient, wherein the second database

19  is different from the first database," as recited in claim 6.  Rather, I understand

20  the Heartlab user's guide to disclose searching a single database for data in

21  response to a received request.  (*See* Heartlab user's guide at PG018244, one

22  database selected.)  It will not automatically search, based on the received

23  request, a second computer database via a second database interface or send a

24  search request, based on the received request, via a second interface to a second

25  computer database.  Dr. Petrocelli's deposition testimony confirms my

26  understanding of the Heartlab user's guide.  (Petrocelli Depo. at 92:22–93:6,

27  "You cannot choose multiple sources on that list.")

28      Furthermore, the Heartlab user's guide does not disclose "automatically

-44-

1  generating a portable computer-readable medium, at a production station,
2  containing the first set of medical imaging data related to the patient and the
3  additional related medical data, wherein the first set of medical imaging data is
4  formatted in a standard medical imaging format used by a computer configured
5  for viewing the medical imaging data," as recited in claim 1, or "a production
6  station configured to generate a portable computer-readable medium containing
7  the first set of medical imaging data related to the patient and the additional
8  related medical data, wherein the medical imaging data is formatted in a
9  standard medical imaging format used by a computer configured for viewing the
10  medical imaging data," as recited in claim 6.  As I explained above, the user's
11  guide does not disclose searching for additional related medical data.  Because
12  there is no additional related medical data disclosed in the Heartlab user's guide,
13  it is impossible for the Heartlab user's guide to disclose these claim elements.
14  In fact, the Heartlab user's guide does not disclose a production station at all.
15  At best, the Heartlab user's guide discloses an ordinary PC with a CD-R drive.
16  (Heartlab user's guide at PG018233, PG018241, PG018267.)

17  Moreover, Dr. Horii provides no rationale for combining the Heartlab
18  user's guide with any other reference to arrive at the claimed invention.  I
19  cannot think of any reason why a person of ordinary skill in the art would have
20  done so.

21  The Ratib article does not disclose at least "automatically searching,
22  based on the received request, a second computer database via a second
23  database interface for additional medical data also related to the patient, wherein
24  the second interface is different from the first interface," as recited in claim 1, or
25  an application server configured to "send a search request, based on the received
26  request, via a second interface to the second computer database for additional
27  medical data also related to the patient, wherein the second database is different
28  from the first database," as recited in claim 6.  At best, the Ratib article

-45-

1  discloses a user interface that allows a user to select certain medical data from
2  one source at a time and burn that selected medical data to a disc, like other
3  references around that time period, including several that were previously
4  considered by the Patent Office.  (*See* Ratib article at PG000051.)

5      At his recent deposition, Dr. Ratib testified that reports and other
6  documents were manually located, and that there was no searching by his
7  system for related reports or other documents based on the selected medical
8  images.

9      It is my opinion that the Ratib article would not have enabled one skilled
10  in the art to make the inventions of the asserted claims, including the claimed
11  searching for additional medical data.  For instance, the Ratib article merely
12  discloses that the "system allows to perform [sic] the following operations
13  sequentially: . . . Retrieve and match corresponding data documents (reports,
14  letters, etc.)"   (Ratib article at PG000050–51.)   The Ratib article does not
15  explain what this phrase means.  Moreover, the Ratib article does not provide
16  **any** direction or guidance on how to make a system or application server that
17  includes this feature, and there are no working examples showing searching a
18  second computer database for additional medical data.  Furthermore, Dr. Horii
19  has not shown any prior art that discloses, or even suggests, such a feature.
20  Thus, I believe that making the recited claims would have required undue
21  experimentation based on the prior art, including the teachings of the Ratib
22  article.

23      The Ratib article also does not disclose "automatically generating a
24  portable computer-readable medium, at a production station, containing the first
25  set of medical imaging data related to the patient and the additional related
26  medical data, wherein the first set of medical imaging data is formatted in a
27  standard medical imaging format used by a computer configured for viewing the
28  medical imaging data," as recited in claim 1, or "a production station configured

-46-

1   to generate a portable computer-readable medium containing the first set of

2   medical imaging data related to the patient and the additional related medical

3   data, wherein the medical imaging data is formatted in a standard medical

4   imaging format used by a computer configured for viewing the medical imaging

5   data," as recited in claim 6.  As I explained above, the Ratib article does not

6   disclose searching for additional related medical data.  Because there is no

7   additional related medical data disclosed in the Ratib article, it is impossible for

8   the Ratib article to disclose these claim elements.  In fact, the Ratib article does

9   not disclose a production station at all.  At best, the Ratib article discloses an

10  ordinary CD burner, such as a PC with a CD-R drive.  (Ratib article at

11  PG0000050–51.)

12       Moreover, Dr. Horii provides no rationale for combining the Ratib article

13  with any other reference to arrive at the claimed invention.  I cannot think of

14  any reason why a person of ordinary skill in the art would have done so.

15       Seshadri 1992 does not disclose at least "automatically searching, based

16  on the received request, a second computer database via a second database

17  interface for additional medical data also related to the patient, wherein the

18  second interface is different from the first interface," as recited in claim 1, or an

19  application server configured to "send a search request, based on the received

20  request, via a second interface to the second computer database for additional

21  medical data also related to the patient, wherein the second database is different

22  from the first database," as recited in claim 6.  Seshadri 1992 discusses how a

23  display node interacts with a single PACS.  (Horii Rpt., Ex. 6B at 360–61.)

24  Seshadri does discuss "automatic fetch heuristics," but again, this is in the

25  context of interaction with a single PACS.  (Horii Rpt., Ex. 6B at 361.)  I do not

26  see how Seshadri 1992 possibly relates to the claim elements.

27       Furthermore, Seshadri 1992 does not disclose "automatically generating a

28  portable computer-readable medium, at a production station, containing the first

-47-

set of medical imaging data related to the patient and the additional related medical data, wherein the first set of medical imaging data is formatted in a standard medical imaging format used by a computer configured for viewing the medical imaging data," as recited in claim 1, or "a production station configured to generate a portable computer-readable medium containing the first set of medical imaging data related to the patient and the additional related medical data, wherein the medical imaging data is formatted in a standard medical imaging format used by a computer configured for viewing the medical imaging data," as recited in claim 6. I see no mention of generating portable computer-readable media in Seshadri 1992.

Moreover, Dr. Horii provides no rationale for combining Seshadri 1992 with any other reference to arrive at the claimed invention. I cannot think of any reason why a person of ordinary skill in the art would have done so.

De la Huerga does not disclose "automatically generating a portable computer-readable medium, at a production station, containing the first set of medical imaging data related to the patient and the additional related medical data, wherein the first set of medical imaging data is formatted in a standard medical imaging format used by a computer configured for viewing the medical imaging data," as recited in claim 1, or "a production station configured to generate a portable computer-readable medium containing the first set of medical imaging data related to the patient and the additional related medical data, wherein the medical imaging data is formatted in a standard medical imaging format used by a computer configured for viewing the medical imaging data," as recited in claim 6. De la Huerga does not disclose a production station at all. At best, da le Huerga discloses an ordinary PC with a CD-R drive. (De la Huerga, PG008948 at 6:58–61.)

In fact, I do not believe that de la Huerga searches for medical data at all. De la Huerga states:

-48-

1   When a system user at a workstation linked to the hospital
2   computer network equipped with the present invention submits a
3   request for a particular patient record, the invention parses the data
4   request for an ***address root*** and other pertinent information about
5   the data record to be retrieved, which may include the time and
6   date the record was created or last modified and a ***patient ID***.
7   Using this information incorporated in the data request and in the
8   specification tables, the invention ***modifies the existing data***
9   ***request into a URL or other addressing convention***, as necessary,
10   to retrieve the data record from the appropriate database.

11   (De la Huerga, PG008947 at 3:44–54, emphases added.)   I understand the
12   "addressing" language to mean that each data record to be retrieved has a fixed
13   (unchanging) network address which is calculated and used to retrieve the data.
14   In short, de la Huerga retrieves a specific data record known to exist at a
15   particular address.  It does not search for medical data, as used in the context of
16   the claims.

17   Moreover, Dr. Horii provides no rationale for combining de la Huerga
18   with any other reference to arrive at the claimed invention.  I cannot think of
19   any reason why a person of ordinary skill in the art would have done so.

20   I do not understand how Dr. Horii is applying "DISC '96."  He has not
21   even identified it by Bates number or exhibit number, much less provided
22   specific citations as applied to the claims.  To my knowledge, DISC'96 was a
23   demonstration for the exchange of images using a newly-drafted extension of
24   the DICOM standard.  The demonstration revolved around a CD-ROM disc
25   containing DICOM images and an installation file for a viewing program.
26   While the images were presented as if they were a set of examinations on one or
27   two patients, there was no information about how these images were collected,
28   and how this process could be applied by an individual facility that wished to

-49-

1   collect medical data on a patient, and then write this information onto a new
2   CD-ROM for that patient.  I do not see how this is relevant to any element of the
3   '597 patent claims.

4       Moreover, Dr. Horii provides no rationale for combining DISC'96 with
5   any other reference to arrive at the claimed invention.  I cannot think of any
6   reason why a person of ordinary skill in the art would have done so.

7       I also do not understand how Dr. Horii is applying Sorna and Samari-
8   Kermani to the '597 patent claims.

9       The Sorna ad simply states that "FilmX-1 [an automated DICOM
10  exchange station] connects to the user's DICOM network, receives the medical
11  images and burns them onto up to four CD-Rs."  (Horii Rpt., Ex. 12.)  Sorna
12  does not indicate that medical images are ever requested or that a search is
13  performed based on a request for medical image data.  The Sorna ad does not
14  even state where the medical images are received from, much less disclose the
15  databases recited in claims.  Accordingly, in my opinion, the Sorna ad does not
16  teach or suggest any limitations of the asserted claims of the '597 patent.  My
17  review of the Samari deposition confirms my opinion.

18      Samari-Kermani discloses a system with a single medical imaging device
19  communicating with a single computer and compact disc writer via a network.
20  Referring to Figure 1, Samari-Kermani states:

21          A medical imaging device 10 such as an x-ray, cat scan, magnetic
22          resonance imaging, sonogram or other device which generates
23          information for storage on a disc generates images of a patient and
24          either transmits it or stores it for later transmittal through a
25          communication network 20 such as the internet to a computer 30.
26          The computer 30 can be used to select information to be stored by
27          the compact disc writer 40 on compact discs, CDs, 42 and can
28          select what information is to be printed by printer 44 on discs 42.

-50-

1   (Samari-Kermani at PG000149 ¶ 0032.)

2        I have reproduced Figure 1 of Samari-Kermani below.



15  (Samari-Kermani at PG000145 fig.1.)

16        While Samari-Kermani may disclose that certain medical images can be

17  selected and stored to a disc, it does not indicate that a search is performed

18  based on a request for medical image data, much less multiple searches in

19  multiple databases with different interfaces.

20        Moreover, Dr. Horii provides no rationale for combining either Sorna or

21  Samari-Kermani with any other reference to arrive at the claimed invention.  I

22  cannot think of any reason why a person of ordinary skill in the art would have

23  done so.

24        In my opinion, the claims would not have been obvious over any of these

25  references.

26  **D.    The '157 patent is not invalid**

27        Dr. Horii devotes barely two pages in his report to an "analysis" of the

28  alleged obviousness of the '157 patent claims.  He never analyzes the specific

-51-

1    claim language or the portions of the references upon which he relies.

2       Dr. Horii opines "[i]n light of the historical use of logs in radiology,
3 HIPAA, DICOM and the movement towards an electronic/digital environ, it
4 would have been obvious to one skilled in the art to create an electronic version
5 of the Film Disbursement Log to track the digitally created CDs." (Horii Rpt. at
6 29.) Dr. Horii has not clearly identified any particular reference or combination
7 of references that purportedly would have rendered the '157 patent claims
8 obvious. It is unclear to me whether he is applying one, some, or all of these
9 references in combination to the '157 patent claims. In fact, he does not discuss
10 "DICOM" at all in this section on the '157 patent, so I am unsure how this
11 reference relates to his opinions. It is also unclear to me which claims he is
12 addressing with this statement.

13       He has not identified the scope and content of the prior art or addressed
14 the differences between the '157 patent claims and that prior art. In fact, he has
15 not addressed the '157 patent claims at all. Rather, he improperly addresses
16 paraphrased versions of what he believes the claims "focus almost entirely on"
17 or "essentially specify." (Horii Rpt. at 27.) Furthermore, he has not provided
18 any reasons why or how a person of ordinary skill in the art would have found
19 the claims to be obvious notwithstanding the differences. In short, Dr. Horii's
20 analysis is totally deficient under *KSR*.

21       Dr. Horii contends that the "claims of the '157 patent focus almost
22 entirely on tracking information related to patient images which are burned onto
23 a CD. For example, independent claims 1 and 7 require the tracked audit data to
24 include an identification specific to the CD, the identification of the person
25 requesting the DICOM medical images and the patient's name. The asserted
26 dependent claims 3, 6, 9, and 12 essentially specify additional tracked data,
27 including the date and time and the number associated with the CD." (Horii
28 Rpt. at 27.) I disagree that the claims "focus almost entirely on" or "essentially

1   specify" a single limitation.   In my opinion, the claims recite a unique
2   combination of features that is not disclosed in the prior art.

3       Dr. Horii first discusses the historical use of logs in radiology.  I agree
4   with Dr. Horii that, before the relevant time period, hospitals would keep track
5   of film using paper records.   However, he has not explained why the
6   combination of features in the '157 patent claims would have been obvious over
7   the historical use of logs in radiology.  For instance, nothing about these logs
8   would have suggested a computer-implemented method for generating a
9   portable computer-readable medium containing medical data for a first patient,
10  wherein the medical data for the first patient are audited based on a plurality of
11  audit records stored in an audit database, as in claim 1, or a system for
12  generating a portable computer-readable medium containing medical data for a
13  first patient, wherein the medical data for the first patient are audited based on a
14  plurality of audit records stored in an audit database, as in claim 7.  In fact, I do
15  not believe that these logs would have taught or suggested any element of any
16  claim of the '157 patent.

17      Dr. Horii next discusses HIPAA.  As I explained above in my discussion
18  of the '164 patent, HIPAA is a federal mandate for ensuring health data security.
19  It obliges healthcare institutions to take measures to ensure that patient
20  information is only provided to people who have a professional need for it.  (*See*
21  Cao at PG026039.)  I am not aware of any specific rules relating to auditable
22  trails of selected medical image data recorded onto portable media that are
23  required by HIPAA.  Rather, HIPAA provides a "***conceptual framework*** for
24  healthcare data security and integrity and sets out strict and significant federal
25  penalties for non-compliance.   However, the guidelines as they have been
26  released . . . ***do not mandate specific technical solutions***, rather there is a
27  repeated emphasis on the need for scalable compliance solutions appropriate to
28  variety [sic] of clinical scenarios covered by HIPAA language."  (Cao at

-53-

1  PG026046, emphasis added.)

2      Dr. Horii contends that the "need for including an audit log in medical
3  software was well known at least as far back as 1998 based on the Health and
4  Human Services document 45 CFR part 142 (45 CFR 142, 1998) which states,
5  "We expect that the capability of keeping audit trails will become standard in all
6  health care software in the near future, spurred on by the health information
7  privacy debates in the Congress and elsewhere." (Horii Rpt. at 28–29, citing
8  HHS Proposed Rule at PG026005.)

9      This quote relied upon by Dr. Horii is taken out of context and is
10  misleading when viewed in isolation. This document is actually commentary
11  regarding a proposed security and electronic signature standard. (HHS
12  Proposed Rule at PG025991.) It relates to technical security mechanisms to
13  guard against unauthorized access to confidential information during electronic
14  transmission of the information over a network. (HHS Proposed Rule at
15  PG026005.) It has nothing to do with audit data in the context of the '157
16  patent claims. In fact, I do not believe that this proposed standard would have
17  taught or suggested any element of any claim of the '157 patent.

18      In any event, I do not believe that a person of ordinary skill in the art
19  working in the field of the invention of the '157 patent would have looked to
20  commentary regarding a proposed regulation by the Department of Health and
21  Human Services for guidance in solving problems in the art. It is even less
22  likely that the skilled artisan would have looked commentary from a field that is
23  very different than the field of the inventions in the '157 patent.

24      Finally, Dr. Horii discusses the Cook patent. Dr. Horii contends that
25  "Cook discloses a system keeping an audit log relating to burned CD's." (Horii
26  Rpt. at 29, citing Cook, PG009094 at 6:38–49, PG009096 at 9:65–10:14, 10:34–
27  39.) Cook does not teach or suggest any limitation of any claim of the '157
28  patent. In fact, Cook does not disclose medical data at all. Rather, Cook

-54-

1   "relates generally to computer-aided product manufacture and distribution . . ."

2   in the context of musical recordings.   (Cook, PG009092 at 1:9–16.)

3   Accordingly, I do not believe that a person of ordinary skill in the art working in

4   the field of the invention of the '157 patent would have looked to Cook for

5   guidance in solving problems in the art.

6         Dr. Horii has not explained how the cited references relate to **even one**

7   limitation of the '157 patent claims, much less explained why the **combination**

8   **of features** in those claims would have been obvious over the cited references.

9   In my opinion, the claims would not have been obvious.

10   **E.     The '174 patent is not invalid**

11         Dr. Horii devotes a single sentence to an "analysis" of the alleged

12   obviousness of the '174 patent claims.   He never analyzes the specific claim

13   language or the portions of the references upon which he relies.

14         With respect to the '174 patent, Dr. Horii simply opines: "The claims here

15   are quite similar to the claims in the '164 and '597 patents and are anticipated

16   (Claims 1 and 8) or rendered obvious for the same reasons."   He provides no

17   other opinions on the '174 patent claims.

18         Because he has not set out any particular bases for anticipation or

19   obviousness, I can only respond to the extent that I responded, as set forth

20   above, to the '164 and '597 patents.   Thus, I incorporate my analysis of the '164

21   and '597 patents into this section by reference.   In my opinion, none of the

22   claims of the '174 patent is invalid for the reasons I provided above.

23   **F.     The '422 patent is not invalid**

24         Pacsgear retained both Dr. Horii and Mr. Jestice to opine on the validity

25   of the '422 patent.   I have reviewed both of their reports and disagree with their

26   conclusions regarding the validity of the '422 patent.   I understand that DatCard

27   has also retained Mr. Jack Goldberg to review and opine on Mr. Jestice's

28   analysis.   I have read Mr. Goldberg's rebuttal report and understand it.   I agree

1   with Mr. Goldberg's analysis.

2       I have been asked to review and opine on Dr. Horii's analysis regarding

3   the '422 patent.  I disagree with Dr. Horii's conclusions and with significant

4   portions of his analysis as I will set forth in the following sections.  Dr. Horii

5   renders no opinion regarding anticipation of the '422 patent.  I agree to the

6   extent this omission implies that no reference attached to Dr. Horii's report

7   anticipates any of the asserted claims of the '422 patent.  Moreover, in my

8   opinion, Dr. Horii has not shown that any reference, alone or in combination

9   with any other reference(s), renders obvious any of the asserted claims of the

10  '422 patent.  Based on my own analysis, it is my opinion that no reference cited

11  in Dr. Horii's report, either alone or in combination with any other reference(s),

12  renders obvious any of the asserted claims of the '422 patent.

13      **1.      <u>Level of ordinary skill in the art</u>**

14      Dr. Horii asserts that the level of ordinary skill in the art is different

15  for the '422 patent.  I disagree.  It is my opinion that a person of ordinary

16  skill in the relevant art of the '422 patent is no different from the level of

17  ordinary skill for the other Asserted Patents.  However, to the extent the

18  court may find that the level of ordinary skill in the art is different for the

19  '422 patent, I believe that difference would be limited to the person's

20  pertinent work experience.  My understanding is that a person of ordinary

21  skill in the art would have a Bachelor's Degree in science or engineering,

22  with approximately one year of pertinent work experience.  Alternatively, a

23  person could acquire ordinary skill in the art without a Bachelor's Degree

24  with sufficient pertinent work experience.  Further, it is my opinion that

25  pertinent work experience would include programming computer systems to

26  perform database and file manipulation operations.

27

28

## 2.   Dr. Horii's report is devoid of any analysis of the claimed elements

Based on my review of Dr. Horii's report and the exhibits thereto, I have found no analysis of each and every element of the claimed invention.  Pages 30–33 of Dr. Horii's report, which provide his analysis of the '422 patent, do not contain an analysis of even a single element of claims 1 and 8 of the '422 patent.  Instead, Dr. Horii appears to have abstractly considered four concepts:

(1)    "that when receiving DICOM images from a database that one must know that all the data has been received prior to burning images on a CD";

(2)    "the use of a timer to ensure a task is complete";

(3)    "to determine whether a task has been completed during a certain time period"; and

(4)    "the use of a timer to determine whether a task is complete and then to automatically move on to the next task".

(Horii Rpt. at 31–33.)  Dr. Horii makes no attempt to tie these abstract concepts to specific claim elements.  Instead, he block quotes all of claim 1 and all of claim 8.  In my opinion, his analysis is insufficient to show that claims 1 and 8 of the '422 patent would have been obvious.

By way of example, with respect to claim 1, Dr. Horii opines that "It would have been obvious to one skilled in the art that when receiving DICOM images from a database that one must know that all the data has been received prior to burning images on a CD."  (Horii Rpt. at 31.)  Dr. Horii's opinion regarding "one must know that all the data has been received" states one of the problems solved by the inventors of '422 patent.  This is not an analysis of the claim language.  One of the claim elements of claim 1 states "detecting whether a server has changed within a timeout period after receiving medical image data or related data from a modality and resetting the timeout period when the

-57-

1   change is detected."  Dr. Horii has no opinion regarding this claim element.  In
2   other words, Dr. Horii offers no opinion regarding the solution to that problem
3   that is presented by the '422 patent.  Dr. Horii's analysis is similarly deficient
4   with respect to the other elements of claim 1 and the elements of claim 8.

5   **3.   Dr. Horii's report fails to identify how or why he would**
6   **combine the references identified in his report**

7   Even if Dr. Horii had identified specific claim elements, which he did not,
8   he fails to show what combination of references he relies on to reach his
9   conclusion that the claims of the '422 patent would have been obvious.   It
10  appears from his analysis that he identified references that individually teach
11  one of the abstract concepts he identified.  For example, regarding claim 1, Dr.
12  Horii opines that:

13      (1)    "It would have been obvious to one skilled in the art that when
14             receiving DICOM images from a database that one must know
15             that all the data has been received prior to burning images on a
16             CD";

17      (2)    "Examples of prior art which discuss the use of a timer to
18             ensure a task is complete, include Samari-Kermani [], Mason[],
19             and Murray[]"; and

20      (3)    "The DICOM Standard also uses a timer for a similar purpose,
21             namely to determine whether a task has been completed during
22             a certain time period".

23  (Horii Rpt. at 31–32.)  This mere identification of various references does not
24  provide any insight into how a person of ordinary skill in the art might combine
25  the references to teach the claimed method.   It also fails to address the
26  motivation to combine the references.

27  Dr. Horii's analysis appears to be the type of hindsight reconstruction that
28  I have been informed is not proper.  To the extent Dr. Horii's identification is

-58-

1   related to the claims themselves, it seems to be mere identification of various

2   elements using the teaching of the '422 patent as a blueprint.   I therefore

3   disagree with his methodology and results.

4   **4.**   **Claims 1 and 8 would not have been obvious in light of**

5   **common sense**

6   Dr. Horii contends that claim 1 of the '422 patent is obvious in light of

7   common sense to one of ordinary skill in the art.   (Horii Rpt. at 31–32.)   I

8   disagree.   Dr. Horii's analysis begins – without reference to the language of

9   claim 1 – by stating "It would have been obvious to one skilled in the art that

10   when receiving DICOM images from a database that one must know that all of

11   the data has been received prior to burning the images on to [sic] a CD." (Horii

12   Rpt. at 31.)   In my opinion, by beginning his analysis at this point, Dr. Horii

13   relies on the teachings of the '422 patent to perform hindsight reconstruction of

14   the claimed elements.   For example, Dr. Horii provides no indication why a

15   person of ordinary skill would have wanted to automatically produce medical

16   image data and related data on an optical storage medium.   None of the

17   references he cites in his report regarding the '422 patent describe automatically

18   producing optical storage media.   In fact, only Samari-Kermani even discusses

19   producing optical storage media.   However, it does not teach automatically

20   producing optical storage media.

21   Dr. Horii continues his analysis by stating that he knows that timers are

22   used in connection with determining whether a task has been completed.   (Horii

23   Rpt. at 31.)   He does not explain how timers relate to the claim language.

24   Instead, he defines an abstract task of claim 1 by stating, "In this case, the task is

25   ensuring that all the data is received before burning the data onto a CD." (Horii

26   Rpt. at 31.)   Dr. Horii substitutes this self-defined task for the actual language of

27   claim 1.   He provides no guidance for how he determined the task, or how a

28   person of ordinary skill in the art at the time of the invention would have

-59-

1   conceived of this task independent of the teachings of the '422 patent.  Dr. Horii

2   concludes, "In circumstances like this, where you are not sure how much data is

3   going to be received, use of a timer is the obvious practical solution."  (Horii

4   Rpt. at 32.)   In my opinion, Dr. Horii's conclusion is based on unstated

5   assumptions that rely on the '422 patent as a blueprint.

6        Furthermore, Dr. Horii does not properly consider the element "detecting

7   whether a server has changed within a timeout period after receiving medical

8   image data or related data from a modality and resetting the timeout period

9   when the change is detected."  His substitution of the "use of a timer to ensure a

10  task is complete" does not actually analyze the claimed elements.  For example,

11  Dr. Horii fails to explain how a person of ordinary skill in the art would use a

12  timer to practice the claim limitation.

13       Based on my experience, the method of claim 1 was not obvious to one of

14  ordinary skill in the art at the time of the invention based upon common sense.

15  There were systems for producing optical storage media that were not

16  automatic.  For example, a user might search for and select data to include on a

17  CD.  The automatic production of an optical storage media as claimed in claim 1

18  was not obvious based on common sense.

19       Dr. Horii also contends that claim 8 is obvious for the reasons set forth

20  with respect to claim 1.  I disagree for at least the reasons set forth above.  In

21  addition, Dr. Horii provides no element by element analysis of the elements of

22  claim 8.  Based on my experience, the apparatus of claim 8 was not obvious to

23  one of ordinary skill in the art at the time of the invention based upon common

24  sense.

25      **5.**    <u>**Claims 1 and 8 would not have been obvious in light of Samari-**</u>

26          <u>**Kermani, Mason, or Murray**</u>

27       Dr. Horii contends that Samari-Kermani, Mason, and Murray are

28  examples of the use of a timer to ensure a task is complete.  (Horii Rpt. at 32.)  I

-60-

1    agree to the extent that each of these documents describes the use of a timer.
2    However, none of these documents teach or suggest the features claimed in
3    claims 1 and 8.

### a.    The Patent Office allowed the claims over Samari-Kermani, Mason, and Murray

6    I understand that the patentee cited Samari-Kermani, Mason, and Murray
7    to the Patent Office during prosecution of the '422 patent.  I further understand
8    that the patent examiner allowed the claims of the '422 patent over each of these
9    documents.  Based on my analysis, I agree with the Patent Office that Samari-
10   Kermani, Mason, and Murray, either alone or in combination with any other
11   reference(s) cited in the Horii report, would not have rendered the claims of the
12   '422 patent obvious.

### b.    Samari-Kermani does not teach the claimed elements

14   Samari-Kermani describes a device that receives medical images from
15   other devices, processes the images, and burns the images on CDs along with
16   medical image software.  (*See, e.g.*, Samari-Kermani at PG000148 ¶ 0010,
17   PG000149 ¶ 0032.)  Samari-Kermani includes four timers, but none of these
18   timers teach or suggest "detecting whether a server has changed within the
19   timeout period after receiving medical image data or related data from a
20   modality and resetting the timeout period when the change is detected," as
21   recited in claim 1.  Samari-Kermani also does not disclose at least the elements
22   "wherein the timer resets when the application server detects an additional
23   change in the database before a timeout interval, measured from the timestamp,
24   elapses" and "wherein the timer times out when the application server detects no
25   additional change in the database after the timeout interval, measured from the
26   timestamp, elapses" of claim 8.  Dr. Horii does not describe any references that
27   teach the elements missing from Samari-Kermani.  Therefore, in my opinion,

-61-

    EXHIBIT 11

1  Dr. Horii has not shown that Samari-Kermani, alone or in combination with any
2  other reference(s) cited in the Horii report, renders the claims of the '422 patent
3  obvious.

4  **c.** **Mason does not teach the claimed elements**

5  Mason describes a DICOM framework, including an Application
6  Programmers Interface (API) toolkit.  Based on my experience, an API toolkit
7  can be used by a software programmer to implement a DICOM interface in
8  software.  Mason describes using an idle timeout to close an association with
9  another DICOM device after a period of inactivity.   (Mason, PG015845
10  at 14:4–17.)  A DICOM association is an open channel for message exchange
11  between two DICOM devices.  Closing the association between devices ends
12  the exchange of data between the devices.  Dr. Horii provides no analysis
13  regarding how closing an association between devices teaches or suggests the
14  elements of claims 1 and 8.

15  In my opinion, Mason does not teach or suggest "detecting whether a
16  server has changed within the timeout period after receiving medical image data
17  or related data from a modality and resetting the timeout period when the
18  change is detected" or "automatically producing an optical storage medium
19  comprising selected medical image data and related data from the server based
20  on when the timeout period has expired . . ." as recited in claim 1.  Furthermore,
21  Mason does not disclose at least the elements "an application server coupled to
22  the database and configured to create a timestamp when the application server
23  detects a change in the database, thereby initiating a timer," "wherein the timer
24  resets when the application server detects an additional change in the database
25  before a timeout interval, measured from the timestamp, elapses" and "wherein
26  the timer times out when the application server detects no additional change in
27  the database after the timeout interval, measured from the timestamp, elapses"
28  of claim 8.

-62-

Dr. Horii does not describe any references that teach the elements missing from Mason.  Therefore, in my opinion, Dr. Horii has not shown that Mason, alone or in combination with any other reference(s) cited in the Horii report, renders the claims of the '422 patent obvious.

### d.   Murray does not teach the claimed elements

Murray describes transferring data between devices on a serial bit stream. (*See generally* Murray at PG008918–19.)  Murray does not teach or suggest "detecting whether a server has changed within the timeout period after receiving medical image data or related data from a modality and resetting the timeout period when the change is detected," as recited in claim 1. Furthermore, Murray does not disclose at least the elements "wherein the timer resets when the application server detects an additional change in the database before a timeout interval, measured from the timestamp, elapses" and "wherein the timer times out when the application server detects no additional change in the database after the timeout interval, measured from the timestamp, elapses" of claim 8.  Dr. Horii does not describe any references that teach the elements missing from Murray.  Therefore, in my opinion, Dr. Horii has not shown that Murray, alone or in combination with any other reference(s) cited in the Horii report, renders the claims of the '422 patent obvious.

### 6.   Claims 1 and 8 would not have been obvious in light of the DICOM standard

Dr. Horii contends that the DICOM standard uses a timer to determine whether a task has been completed during a certain time period.  (Horii Rpt. at 32.)  In support, Dr. Horii attached one page of the DICOM standard to his report.  That page has a single sentence that states, "The value of the ARTIM Timer is used to manage the Request, Reject, and Release of associations on a DICOM UL entity shall be configurable to address a wide range of network connections."  (Horrii Rpt. at Ex. 20.)  In my opinion, this disclosure is totally

-63-

1  insufficient to teach the elements of claims 1 and 8 of the '422 patent.

2      Based on my experience, this "ARTIM Timer" is very similar or identical

3  to the timer described in Mason.  It is used to manage associations between

4  devices.  Dr. Horii provides no analysis regarding how closing an association

5  between devices teaches or suggests the elements of claims 1 and 8.

6      In my opinion, the DICOM Standard does not teach or suggest "detecting

7  whether a server has changed within the timeout period after receiving medical

8  image data or related data from a modality and resetting the timeout period

9  when the change is detected" or "automatically producing an optical storage

10 medium comprising selected medical image data and related data from the

11 server based on when the timeout period has expired . . ." as recited in claim 1.

12 Furthermore, the DICOM Standard does not disclose at least the elements "an

13 application server coupled to the database and configured to create a timestamp

14 when the application server detects a change in the database, thereby initiating a

15 timer," "wherein the timer resets when the application server detects an

16 additional change in the database before a timeout interval, measured from the

17 timestamp, elapses" and "wherein the timer times out when the application

18 server detects no additional change in the database after the timeout interval,

19 measured from the timestamp, elapses" of claim 8.

20     Dr. Horii does not describe any references that teach the elements missing

21 from the DICOM Standard.  Therefore, in my opinion, Dr. Horii has not shown

22 that the DICOM Standard, alone or in combination with any other reference(s)

23 cited in the Horii report renders the claims of the '422 patent obvious.

24     **7.    The dependent claims would not have been obvious**

25     Dr. Horii contends that claims 2, 3, 6, 9, 10, and 13 "are rendered obvious

26 in light of the above discussions and those involving previous claims."  (Horii

27 Rpt. at 33.)  I disagree.  As dependent claims, I understand that these claims

28 include all of the elements of the independent claims from which they depend.

-64-

1    As I have previously discussed, Dr. Horii has failed to show that any reference
2    alone or in combination with any other references cited in the Horii report
3    renders the independent claims of the '422 patent obvious.  For at least those
4    reasons, the dependent claims also would not have been obvious.  In addition,
5    Dr. Horii provides no analysis of the additional elements of the dependent
6    claims.  In my opinion, none of the references cited in Dr. Horii's report, alone
7    or in combination, anticipate or render obvious, claims 2, 3, 6, 9, 10, and 13.

8             **VII.  OBJECTIVE EVIDENCE OF NON-OBVIOUSNESS**

9    **A.    Commercial Success and Industry Acceptance**

10             In my opinion, the claimed inventions have achieved commercial success
11   and industry acceptance.  Before the introduction of the Pacscube in late 2000,
12   nearly all hospitals and imaging centers provided images to patients and
13   physicians exclusively on film.  The very few hospitals and imaging centers
14   using digital media had only the crudest systems in place.  CDs had to be
15   manually inserted into a disc drive.  Labels were written onto the disc by hand,
16   using a Sharpie pen.  The discs contained only images, lacking the critical
17   radiological report.  And the disc could be viewed only at specialized DICOM
18   viewing stations.

19             Today, based entirely on the Pacscube and its imitators, the film-based
20   environment of the past is rapidly disappearing.  It is now routine for patients
21   and physicians to receive DICOM medical images on a CD or DVD.  The
22   unwieldy practice of carrying films from facility to facility is largely a thing of
23   the past.  And, in most cases, the discs are created automatically by a robotic
24   element, labels are automatically and professionally included on each disc,
25   radiological reports are included on the disc, and the disc may be viewed from
26   any computer.  Simply put, the Pacscube changed the technological landscape
27   for the distribution and viewing of medical images and reports.

28             Dr. Horii states that, "in the first two years that DatCard sold its product

-65-

**CONFIDENTIAL ATTORNEYS' EYES ONLY**

1  (2001-02), it sold less than 130 units.  At that time there were likely in excess of
2  5,000 medical facilities that would have been in the target market for such
3  products.  I wouldn't consider such limited sales a commercial success." (Horii
4  Rpt. at 33.)  I disagree.   The medical profession is notoriously cautious in
5  adopting new and unproven products.  Hospitals are particularly reluctant to
6  invest in costly products from start-up vendors with unproven technical support
7  and uncertain long-term viability.  When DatCard launched its flagship product,
8  the Pacscube, DatCard was a start-up company with no brand recognition.  I
9  also understand that DatCard had no marketing staff.  Despite these obstacles,
10 DatCard was still able to sell over a hundred units in a short period of time.
11 Thus, I believe that DatCard achieved significant market penetration, even in its
12 early years.

13      Dr. Horii has not explained why he believes that the 2001-02 timeframe is
14 the only relevant time period for commercial success.   I understand that
15 DatCard's recent successes are just as relevant as their early activities.  Michael
16 Wagner's report demonstrates that DatCard has expanded its sales base since
17 2001-02 and has become a target of imitators like Pacsgear.  Between 2007 and
18 2011, DatCard sold around 1,000 units.  (Wagner Rpt. at Tab B7, Schedule
19 1.2b.)  And during the 2007-11 timeframe, DatCard's market share was only
20 around 55%.  (Wagner Rpt. at Tab B7, Schedule 1.2b.)  These figures further
21 support my opinion that DatCard and its copyists have achieved commercial
22 success in the marketplace.

23      Moreover, I believe that the Pacscube's commercial success is
24 attributable to the features of the claims.  As noted below and explained in the
25 next section in more detail, the Pacscube practices the Asserted Patents.

26      For example, the Pacscube is able to search for and record radiological
27 reports to a CD or DVD.  This is a feature encompassed by at least the '164,
28 '597, and '174 patent claims.  The Pacscube is also able to form a system with a

-66-

1    plurality of browsing terminals configured to receive a user selection that
2    defines selected medical image data.  This is a feature encompassed by at least
3    the '164 and '174 patent claims.  DatCard attempted to sell a version of the
4    Pacscube that lacked the ability to search for and record radiological reports to
5    disc and that lacked the ability to interface with a plurality of browsing
6    terminals.  The product was unsuccessful and DatCard removed it from the
7    market.  This supports a conclusion that the Pacscube's commercial success is
8    attributable to the features of the claims, including the ability to search for data
9    that is related to medical images, such as radiological reports, and support for a
10   plurality of browsing terminals.

11          As another example, the Pacscube has the ability to record a viewer on a
12   removable medium, as I explained above.   This is a feature of at least the '164,
13   '174, and '422 patent claims.  A company called Codonics marketed a product
14   that did not include a viewer on the removable medium.  I understand that the
15   Codonics product has failed in the market.  This also supports a conclusion that
16   the Pacscube's commercial success is attributable to the features of the claims,
17   including the ability to record a viewing on the removable medium.

18          As yet another example, the Pacscube audits the data that it burns to disc,
19   including a disc-specific identification, an identification of the person who
20   requested the disc, and an identification of the patient whose data is on the disc.
21   This is a feature of at least the '164 and '157 patents.  As I stated in my Initial
22   Report, hospitals face serious fines from federal regulators if they improperly
23   release a patient's medical records.  The Pacscube's auditing features provide an
24   integrated solution that allows hospitals to track who is requesting patients' data
25   as discs are created.   In light of the ease with which the Pacscube allows
26   hospitals to track patients' data, I believe that Pacscube's audit feature is a
27   major factor in the Pacscube's success.

28          It is unlikely that the Pacscube's commercial success is attributable to

1   advertising, brand recognition, and similar economic commercial factors.  As I

2   mentioned above, when DatCard launched the Pacscube, DatCard was a new

3   company with no brand recognition, whatsoever.   At first, DatCard had no

4   marketing staff.  Even today, the Pacscube marketing department consists of

5   only three people.  Yet, despite DatCard's lack of brand-recognition and very

6   limited marketing resources, and despite the medical profession's caution in

7   adopting new and unproven products, the Pacscube has been a success. In my

8   opinion, this commercial success is evidence of non-obviousness.

9   **B.    Satisfaction of a Long-Felt Need**

10          In my opinion, the claimed inventions have satisfied a long-felt, but

11   unsolved, need.

12          Before the Pacscube, images were usually stored on film, and the choice

13   of a method of distribution was easy: by mailing or hand-carrying large

14   envelopes full of film, called film jackets.  As I explained in my initial report,

15   film was expensive to process and store, and there were many logistical

16   problems associated with retrieving the film jackets from storage every time

17   they were needed, keeping track of their current locations, and refilling the film

18   jackets after use.  Despite these recognized problems, hospitals stuck with the

19   film-based distribution system.

20          A few hospitals sought to address the problems associated with film by

21   manually burning studies to CD.  As I previously explained, however, these

22   systems were crude and labor intensive.  A technician had to manually load a

23   CD into a CD burner and to stand by waiting for the burner to store the desired

24   images on the CD.  Then, the technician manually wrote the patient's name and

25   other identifying information on the disc with a Sharpie pen.  In my opinion,

26   these manual CD-burning systems did not provide a satisfactory solution to the

27   long-felt problems associated with film-based systems.

28          The Pacscube changed all of this.  The Pacscube is an automated, robotic

-68-

1   system that eliminates the need for a technician to load and unload discs from a
2   CD burner. In addition, the Pacscube automatically prints a label on each disc,
3   further reducing labor costs and possible errors in the label. With the
4   introduction of the Pacscube, images and their associated radiological reports
5   could be distributed to patients and physicians on CDs and DVDs. The cost of
6   handling medical imaging exams dropped precipitously to $2 per exam.
7   Misplaced films have become a thing of the past because original films do not
8   need to be checked out to physicians or patients. In addition, patients and
9   physicians can conveniently view images on any personal computer.

10      As discussed above, the Pacscube's commercial success is evidence that
11  the Pacscube did, in fact, provide a superior solution to manual CD systems and
12  satisfied the long-felt problems associated with film-based systems.  Dr. Ratib –
13  the developer of the manual CD system described in the Ratib article – bought
14  several Pacscube systems for UCLA after he published the article.   In my
15  opinion, this is evidence that Dr. Ratib's manual CD system failed to adequately
16  satisfy the needs of UCLA and is evidence of non-obviousness.

17  **C.    <u>Copying</u>**

18      In my opinion, there is evidence that Pacsgear replicated the Pacscube,
19  which had been widely adopted prior to Pacsgear's entry into the market.
20  Pacsgear had access to the Pacscube (*see, e.g.*, Internal Pacsgear email from
21  Thomas Pickard to Chris Barnett and Abdul Khatri at PG010921, showing
22  access to Pacscube brochure) and introduced a product with features that are
23  substantially similar to the Pacscube's features.   For example, Pacsgear's
24  product included a robotic production station, just like the Pacscube did.  (*See
25  also* Email from Brian Cavanaugh at Pacsgear to Skip L. Kennedy at Kaiser
26  Permanente at PG010643, "The plan is to demonstrate CD burning to a single
27  (non-robot) CD writer at RSNA. It will be released early in 2007, followed by a
28  robot-type system for not only patient CD's, but also for backup.")

-69-

1    In my opinion, the fact that Pacsgear's engineers abandoned the single
2 (non-robot) CD writer found in the prior art in favor of the unique robotic
3 production station design found in the Pacscube is strong evidence of copying
4 and non-obviousness.

5    I understand that DatCard has previously sued Codonics, Inc. for patent
6 infringement.   I also understand that the accused Codonics products
7 incorporated the Pacscube's patented features, including the robotic production
8 station design.  Also, in my initial report, I identified a number of other
9 companies that infringe DatCard's products.  These companies are also using
10 the unique patented features of the Pacscube, including the robotic production
11 station design.  This, again, is strong evidence of copying and non-obviousness.

12 **D.**    **Settlement**

13    I understand that a competitor's settlement with a patent owner can
14 evidence the competitor's respect for the patented invention.  I also understand
15 that Codonics – a direct competitor of DatCard – reached a settlement with
16 DatCard after DatCard sued Codonics for infringing the '164 patent.  As part of
17 that settlement, Codonics exited the market.   In my opinion, Codonics'
18 willingness to reach a settlement so averse to its own commercial interests
19 evidences Codonics' respect for the patented invention.  This is strong evidence
20 of non-obviousness.

21    **VIII.  DATCARD'S PACSCUBE PRODUCT**
22    **PRACTICES THE ASSERTED PATENTS**

23    As I stated in my Initial Report, I have operated and read the literature
24 regarding DatCard's Pacscube product.   Based upon this review, it is my
25 opinion that the Pacscube practices at least one claim of each of the Asserted
26 Patents.  My opinion is explained in greater detail below.

27

28

-70-

## A.    The Pacscube practices at least claim 9 of the '164 patent

| Claim Element | Opinions |
|---|---|
| *A system comprising:*<br><br>*a medical image server configured to receive medical image data that is generated by a plurality of imaging modalities, the medical image data being formatted in a standard medical imaging format used by specialized computers configured for viewing medical images;* | The Pacscube includes a server for receiving medical image data from DICOM archives, such as PACS archives, that include images from multiple modalities. (Pacscube 5.0 User Manual at DAT038108.) Accordingly, it is my opinion that the Pacscube satisfies this element. |
| *a database configured to store medical image data generated by the plurality of imaging modalities;* | The Pacscube includes a "local image database" for storing medical image data. (Pacscube 5.0 User Manual at DAT038108.) In addition, the Pacscube includes software for connecting to PACS archives and other sources (e.g., MITRA brokers). (Pacscube 5.0 User Manual at DAT038108, DAT038114.) Accordingly, it is my opinion that the Pacscube satisfies this element. |
| *a plurality of browsing terminals configured to receive a user selection that defines selected medical image data;* | Pacscube systems include software to facilitate connection to a plurality of browsing terminals. (Pacscube 5.0 User Manual at DAT038109.) This software allows "operators . . . to search for and select desired studies from the PACS to burn." (Pacscube 5.0 User Manual at DAT038108.) Accordingly, it is my opinion that the Pacscube satisfies this element. |
| *a search module configured to search the database for related medical image data that is related to the selected medical image data; and* | The PacsCube has a search module configured to search for and retrieve reports "from a variety of sources (e.g. MITRA broker, Structured Reports, HL7, etc.)." (Pacscube 5.0 User Manual at DAT038114.) Accordingly, it is my opinion that the Pacscube satisfies this element. |
| *a production station that is* | The Pacscube system includes a "robot" in the |

-71-

| | |
|---|---|
| *configured to record all of the following onto a single, portable data storage medium:* | form of a robotic disc burner for recording images and related reports to CDs and DVDs (Pacscube 5.0 User Manual at DAT038107, DAT038137), along with "DICOM Viewer, [which] enables the viewing of patient images contained on the CD/DVD." (Pacscube 5.0 User Manual at DAT038115.)  Accordingly, it is my opinion that the Pacscube satisfies this element. |
| *the selected medical image data, recorded in the standard medical imaging format,* | |
| *the related medical image data, recorded in the standard medical imaging format; and* | In conclusion, the Pacscube product practices claim 9 of the '164 patent. |
| *a viewing program that is configured to allow viewing of the selected and the related medical image data that is recorded onto the data storage medium on widely accessible computers not specifically configured with standard medical imaging software for viewing medical images.* | |

**B.    The Pacscube practices at least claim 6 of the '597 patent**

| Claim Element | Opinions |
|---|---|
| *A system for automatically generating a portable computer-readable medium containing medical data related to a patient, comprising:* | The Pacscube includes software for connecting to DICOM archives, such as PACS archives, which are configured to store medical data related to patients.  (Pacscube 5.0 User Manual at DAT038108.)  Accordingly, it is my opinion that the Pacscube satisfies this element. |
| *a first database configured to store medical data related to the patient;* | |
| *a second database configured to store medical* | The Pacscube can "be set to retrieve results (reports) from a variety of sources (e.g. MITRA |

| | |
|---|---|
| *data related to the patient, the second database being distinct from the first database;* | broker, Structured Reports, HL7, etc.)." (Pacscube 5.0 User Manual at DAT038114.) Accordingly, it is my opinion that the Pacscube satisfies this element. |
| *a computer-implemented interface configured to receive a request for medical data related to the patient;* | The Pacscube includes a computer-implemented "web interface" configured to receive a request for medical data related to a patient. (Pacscube 5.0 User Manual at DAT038108.) Accordingly, it is my opinion that the Pacscube satisfies this element. |
| *an application server coupled to the first database and the second database, said application server being configured to:* *send a search request, based on the received request, via a first interface to the first computer database for a first set of medical imaging data related to the patient;* *receive from the first database the first set of medical imaging data related to the patient;* *send a search request, based on the received request, via a second interface to the second computer database for additional medical data also related to the patient, wherein the second interface is different from the first interface; and* *receive from the second database the additional related medical data; and* | The Pacscube has an application server configured to send a search request to a PACS and receive a patient's medical imaging data from the PACS. (Pacscube 5.0 User Manual at DAT038114.) The application server is also configured to search another database "(e.g. MITRA broker, Structured Reports, HL7, etc.)" and receive additional medical data (reports) also related to the patient. (Pacscube 5.0 User Manual at DAT038114.) Accordingly, it is my opinion that the Pacscube satisfies this element. |
| *a production station* | The Pacscube system includes a "robot" in the |

-73-

**EXHIBIT 11**

| | |
|---|---|
| *configured to generate a portable computer-readable medium containing the first set of medical imaging data related to the patient and the additional related medical image data, wherein the medical imaging data is formatted in a standard medical imaging format used by a computer configured for viewing the medical imaging data.* | form of a robotic disc burner for recording images and reports to CDs and DVDs (Pacscube 5.0 User Manual at DAT038107, DAT038137), along with a "DICOM Viewer, [which] enables the viewing of patient images contained on the CD/DVD." (Pacscube 5.0 User Manual at DAT038115.) Accordingly, it is my opinion that the Pacscube satisfies this element.<br><br>In conclusion, the Pacscube product practices claim 6 of the '597 patent. |

## C.    The Pacscube practices at least claim 1 of the '174 patent

| Claim Element | Opinions |
|---|---|
| *A system comprising:*<br><br>*a medical image server configured to receive medical image data generated by one or more imaging modalities, the medical image data being formatted in a standard medical imaging format;* | The Pacscube includes a server for receiving medical image data from DICOM archives, such as PACS archives. (Pacscube 5.0 User Manual at DAT038108.) Accordingly, it is my opinion that the Pacscube satisfies this element. |
| *a database configured to store medical image data generated by the one or more imaging modalities;* | The Pacscube includes a "local image database" for storing medical image data. (Pacscube 5.0 User Manual at DAT038108.) In addition, the Pacscube includes software for connecting to PACS archives and other sources (e.g., MITRA brokers). (Pacscube 5.0 User Manual at DAT038108, DAT038114.) Accordingly, it is my opinion that the Pacscube satisfies this element. |
| *a plurality of browsing terminals configured to receive a user selection that defines selected medical* | Pacscube systems include software to facilitate connection to a plurality of browsing terminals. (Pacscube 5.0 User Manual at DAT038109.) This software allows "operators . . . to search for |

-74-

| | | |
|---|---|---|
| 1 2 3 | *image data;* | and select desired studies from the PACS to burn." (Pacscube 5.0 User Manual at DAT038108.) Accordingly, it is my opinion that the Pacscube satisfies this element. |
| 4 5 6 7 | *a search module configured to automatically search the database for related data based on the user selection; and* | The PacsCube has a search module configured to search for and retrieve reports "from a variety of sources (e.g. MITRA broker, Structured Reports, HL7, etc.)." (Pacscube 5.0 User Manual at DAT038114.) Accordingly, it is my opinion that the Pacscube satisfies this element. |
| 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 | *a production station that is configured to record all of the following onto a data storage medium:* *the selected medical image data for the patient, recorded in the standard medical imaging format,* *the related data, and* *a viewing program that is configured to allow viewing of medical image data that is recorded onto the data storage medium by a general purpose computer that is not specifically configured with medical imaging software for viewing of medical images formatted in the standard medical imaging format.* | The Pacscube system includes a "robot" in the form of a robotic disc burner for recording images and related reports to CDs and DVDs (Pacscube 5.0 User Manual at DAT038107, DAT038137), along with "DICOM Viewer, [which] enables the viewing of patient images contained on the CD/DVD." (Pacscube 5.0 User Manual at DAT038115.) Accordingly, it is my opinion that the Pacscube satisfies this element. In conclusion, the Pacscube product practices claim 1 of the '174 patent. |

**D.   The Pacscube practices at least claim 7 of the '157 patent**

| Claim Element | Opinions |
|---|---|
| *A system for generating a portable computer-readable medium containing medical data for a first patient,* | The Pacscube includes a computer-implemented "web interface" configured to receive requests for medical data related to a patient. (Pacscube 5.0 User Manual at DAT038108.) Accordingly, |

-75-

| | |
|---|---|
| *wherein the medical data for the first patient are audited based on a plurality of audit records stored in an audit database, comprising:*<br><br>*a computer-implemented interface configured to receive two or more requests for production of stored medical data related to the first patient; and* | it is my opinion that the Pacscube satisfies this element. |
| *an image production module that is configured, for each request for production of stored medical data related to the first patient;*<br><br>*to produce the portable computer-readable medium containing the requested medical data related to the first patient, wherein the requested medical data comprises medical image data formatted in a standard medical imaging format used by a computer configured for viewing the medical image data; and*<br><br>*upon producing the computer-readable medium, to automatically transmit, to the audit database, audit data that is specific to the computer-readable medium produced in response to the request for stored medical data, wherein the audit data comprises at least an identification specific to the* | The Pacscube has an image production module that is configured to produce a CD or DVD containing the requested medical data for a patient. (Pacscube 5.0 User Manual at DAT038107, DAT038137.) The Pacscube is configured to create "detailed audit trails of every disc produced by the system" (Pacscube 5.0 User Manual at DAT038135) "to track which users have submitted jobs for which exams" (Pacscube 5.0 User Manual at DAT038110). The "auditing information" includes "user, creation time, studies in job, etc." (Pacscube 5.0 User Manual at DAT038121.) Based on my inspection of the Pacscube system, I have determined that the auditing information further includes an identification specific to the CD or DVD and an identification of the relevant patient. Accordingly, it is my opinion that the Pacscube satisfies this element.<br><br>In conclusion, the Pacscube product practices claim 7 of the '157 patent. |

**CONFIDENTIAL ATTORNEYS' EYES ONLY**

| | |
|---|---|
| *computer-readable medium, an identification of a requester of the stored medical data, and an identification of the first patient, and is for at least one audit record in the plurality of audit records in the audit database.* | |

### E.   The Pacscube practices at least claim 8 of the '422 patent

| Claim Element | Opinions |
|---|---|
| *A system for automatically producing medical images on an optical storage medium, the system comprising:*<br><br>*a database configured to receive one or more medical images from at least one modality;* | Incoming medical images arrive on the Pacscube from a modality (or modalities) via a data port on a "DICOM server." (Discussion with Ken Wright.) The DICOM server includes a database for receiving the medical images. Accordingly, it is my opinion that the Pacscube satisfies this element. |
| *an application server coupled to the database and configured to create a timestamp when the application server detects a change in the database, thereby initiating a timer,* | The Pacscube also includes an application server, coupled to the DICOM server database, running "NetStat" software. The NetStat software monitors port activity on the DICOM server. (Discussion with Ken Wright.) The NetStat software creates a timestamp when the NetStat software detects a change in the database (such as a port close event or images received), thereby initiating a timer. (Discussion with Ken Wright.) Accordingly, it is my opinion that the Pacscube satisfies this element. |
| *wherein the timer resets when the application server detects an additional change in the database before a timeout interval, measured* | The timer resets when the NetStat software detects an additional change in the DICOM server database (such as a subsequent port close event or additional images received) before a timeout interval, measured from the timestamp, |

**CONFIDENTIAL ATTORNEYS' EYES ONLY**

| | |
|---|---|
| *from the timestamp, elapses; and* | elapses.  (Discussion with Ken Wright.) Accordingly, it is my opinion that the Pacscube satisfies this element. |
| *wherein the timer times out when the application server detects no additional change in the database after the timeout interval, measured from the timestamp, elapses; and* | The timer times out when the NetStat software detects no additional change in the DICOM server database after the timeout interval, measured from the timestamp, elapses. (Discussion with Ken Wright.)  Accordingly, it is my opinion that the Pacscube satisfies this element. |
| *a production station coupled to the application server and configured to automatically produce an optical storage medium comprising one or more selected medical images from the database based on when the timer times out, wherein the medical image data is formatted in a standard medical imaging format used by computers configured for viewing the medical image data.* | Based on when the timer times out, the NetStat software signals an "Autoburn" application to begin recording medical images received by the DICOM server database onto a CD or DVD. (Discussion with Ken Wright.)  The Pacscube system includes a "robot," coupled to the application server, which automatically produces the CD or DVD as instructed by the Autoburn software.  (Pacscube 5.0 User Manual at DAT038107, DAT038137; Discussion with Ken Wright.)  Accordingly, it is my opinion that the Pacscube satisfies this element. <br><br> In conclusion, the Pacscube product practices claim 8 of the '422 patent. |

## IX. REVISION OR SUPPLEMENTATION

I am continuing my study and analysis of the information that I have considered in preparing this rebuttal report.  From time to time, I may refine or expand on my opinions during the course of further study.  Also, I reserve the right to supplement or modify my opinions in the event that additional information is brought to my attention.  I expect to reevaluate my opinions once the Court has issued its claim constructions.

Dated: _12-5-2011_          _Dr Alan Rowberg MD_

Dr. Alan Rowberg, M.D.

12381028

-78-

# EXHIBIT A

**EXHIBIT A**

**MATERIALS REVIEWED**

1. U.S. Patent No. 7,302,164 ("the '164 patent")

2. Reexamination Certificate for U.S. Patent 7,302,164

3. U.S. Patent No. 7,729,597 ("the '597 patent")

4. U.S. Patent No. 7,734,157 ("the '157 patent")

5. U.S. Patent No. 7,783,174 ("the '174 patent")

6. U.S. Patent No. 7,801,422 ("the '422 patent")

7. U.S. Patent File History of 7,302,164

8. U.S. Patent File History of 7,729,597

9. U.S. Patent File History of 7,734,157

10. U.S. Patent File History of 7,783,174

11. U.S. Patent File History of 7,801,422

12. File History of First Reexam of 7,302,164 (Ctrl. No. 90/009,347)

13. File History of Second Reexam of 7,302,164 (Ctrl. No. 90/009,538)

14. Expert Report of Steven Horii, M.D., November 1, 2011, and exhibits ("Horii Rpt.")

15. Expert Report of Ian Jestice, November 1, 2011, and exhibits ("Jestice Rpt.")

16.     Expert Report of Michael J. Wagner, November 1, 2011, and exhibits ("Wagner Rpt.")

17.     Rough Deposition Transcript of Osman Ratib taken November 28, 2011 (with exhibits) ("Ratib Depo.")

18.     Declaration of Osman Ratib (with Exhibits)

19.     Deposition Transcript of Robert Petrocelli taken October 3, 2011 ("Petrocelli Depo.")

20.     Deposition of Jack Cusma of the Mayo Clinic taken August 24, 2011 (with exhibits)

21.     Deposition of Kenneth L. Wright taken August 4, 2011 "Confidential Eyes Only" (with exhibits)

22.     Deposition of Kenneth L. Wright taken August 4, 2011 "Non-Confidential Portion" (with exhibits)

23.     Deposition of Chet LaGuardia taken August 5, 2011 (with Exhibits)

24.     Deposition of Cyrus Samari taken August 23, 2011 (with Exhibits)

25.     PacsCube User Manual, Version 5.0 ("Pacscube 5.0 User Manual") (DAT038108–52)

26.     Patent Statutes (35 U.S.C. §§ 102, 103, and 112)

27.     *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007)

28.     *In re Gleave*, 560 F.3d 1331 (Fed. Cir. 2009)

29.     *Innogenetics, N.V. v. Abbott Laboratories*, 512 F.3d 1363 (Fed. Cir. 2008)

30.     *Unigene Laboratories, Inc. v. Apotex, Inc.*, 655 F.3d 1352 (Fed. Cir. 2011)

31.    Arenson R.L., et al.: Clinical Evaluation of a Medical Image
       Management System for Chest X-Rays. *AJR*, Vol. 150, 1988, pp. 55–
       59 ("Arenson") (PG026071–75)

32.    Cao F., et al.: Medical Image Security in a HIPAA Mandated PACS
       Environment. Computer Med. Imaging and Graphics, Vol. 27, Nos.
       2–3, 2003, pp. 185–196 ("Cao") (PG026039–50)

33.    Wayback Machine archive of http://www.heartlab.com/products/
       entserv.cfm, HEARTLAB PRODUCTS: DICOMview Enterprise
       Server®, dated 1999 ("DICOMview Enterprise Server web page")
       (PG024572–73)

34.    Email from Brian Cavanaugh at Pacsgear to Skip L. Kennedy at
       Kaiser Permanente (PG010642–44)

35.    HEARTLAB INC., "DICOMview® ReviewStation Version 1.9
       User's Guide," dated 1988 ("Heartlab user's guide") (PG018223–72)

36.    Federal Register, 45 C.F.R. Part 142, Security and Electronic
       Signature Standards; Proposed Rule, Part III. August 12, 1998 ("HHS
       Proposed Rule") (PG025991–6030)

37.    Inamura K., et al.: A Trial of PACS Employing Magneto-Optical
       Disks. SPIE, Vol. 1234, *Medical Imaging IV: PACS System Design
       and Evaluation*, 1990, pp. 59–59 ("Inamura") (PG025982–90)

38.    Internal Pacsgear email from Thomas Pickard to Chris Barnett and
       Abdul Khatri (PG010921)

39.    Levin K., et al.: Methods to Prefetch Comparison Images in Image
       Management and Communication Systems (IMAC). Proceedings of
       SPIE, Vol. 1234, 1980, pp. 270–274 ("Levin") (PG026066–70)

40.    Mehta, A., et al.: Enhancing Availability of the Electronic Image
       Record for Patients and Caregivers During Follow-Up Care. *Journal*

*of Digital Imaging*, Vol. 12, No. 2, Supp. 1 (May), 1999, pp. 78–80 ("Mehta") (DAT014231–33)

41.   Ratib, O., et al.: Self Contained Off-Line Media for Exchanging Medical Images Using DICOM-Compliant Media. Proceedings of *SPIE*, Vol. 3980, 2000, pp. 30–34 ("Ratib article") (PG000050–54)

42.   Seshadri S.B., et al.: The Architecture of an Optical Jukebox Image Archive. *SPIE*, Vol. 1234, *Medical Imaging IV: PACS System Design and Evaluation*,1990, pp.925–932 ("Seshadri 1990") (PG026031–37)

43.   Seshadri S.B., et al.: Software Suite for Imaging Archiving and Retrieval, RadioGraphics, Vol. 12, 1992, pp. 357–363 ("Seshadri 1992") (Horii Rpt., Ex. 6B)

44.   Sorna advertisement featuring FilmX-1 Automated DICOM Exchange Station, Medical Imaging, January 2000 ("Sorna") (Horii Rpt., Ex. 12)

45.   VEPRO COMPUTERSYSTEME GMBH, "MEDIMAGE®: The Image Management System: DICOM Archiving & Viewing Station: Software Vers. 4.2," Pfungstadt, Germany, dated January 26, 2000 ("VEPRO 2000") (PG008822–62)

46.   U.S. Patent No. 6,496,744 ("Cook") (PG009089–98)

47.   U.S. Patent No. 5,903,889 ("De la Huerga") (PG008921–55)

48.   U.S. Patent No. 5,518,325 ("Kahle") (PG000152–63)

49.   U.S. Patent No. 5,668,998 ("Mason")(PG015835–47)

50.   U.S. Patent No. 5,721,891 ("Murray") (PG008914–20)

51.   U.S. Patent Application Publication No. 2002/0085476 ("Samari-Kermani") (PG000144–51)

52.   U.S. Patent No. 6,954,802 ("Sutherland") (PG009140–54)

53.     U.S. Patent No. 6,272,235 B1 ("Bacus") (PG009052–88)

54.     U.S. Patent No. 5,924,074 ("Evans") (PG009015–51)

55.     U.S. Patent No. 4,736,256 ("Ichikawa") (PG008863–68)

56.     U.S. Patent No. 6,574,742 B1 ("Jamroga") (PG009099–122)

57.     U.S. Patent No. 5,920,317 ("McDonald") (PG008997–9014)

58.     U.S. Patent No. 5,272,625 ("Nishihara") (PG008869–901)

59.     U.S. Patent No. 6,678,764 B2 ("Parvulescu") (PG009123–39)

60.     U.S. Patent No. 5,909,551 ("Tahara") (PG000103–43)

61.     U.S. Patent No. 6,260,021 ("Wong") (PG024546–59)

62.     Arenson R.L., Seshadri S.B., Stevens J.F., Van der Voorde F.: The
        overlapping domains and interface between radiology information
        management system and medical image management system (PACS).
        *Proceedings Computer Assisted Radiology*, 1987, pp. 855–865
        (PG26076–86)

63.     CAMTRONICS, LTD., Camtronics Medical Systems Image
        Workstation: DICOM Conformance Statement: last updated October
        26, 1999 ("Camtronics") (PG008508–50)

64.     Cusma J., et al.: Replacement of Cinefilm with a Digital Archive and
        Review Network. *International Journal of Cardiac Imaging*, 1998,
        Vol. 14, pp. 293–300 (PG0011510–17)

65.     Elion, J.L.:  DICOM Media Interchange Standards for Cardiology:
        Initial Interoperability Demonstration.  *19th Annual Symposium on
        Computer Applications in Medical Care*, 1995, pp.591–95
        (PG026318–22)

66. First Consulting Group for the American Hospital Association:  The Impact of the Proposed HIPAA Privacy Rule on the Hospital Industry (PG24602–04)

67. Fischer, H.W.: Radiology *Departments: Planning, Operation, and Management*.  Ann Arbor, MI; Edwards Brothers, Inc. 1982: Chapter 7; Communication: 263–73. (PG26105–17)

68. Health Insurance Portability and Accountability Act, 1996, various statements and materials pertaining to the legislation and regulations promulgated thereunder (PG24592–601)

69. Horii, S.C.: DICOM, Chapter 4 in: Kagadis, G.C., Langer, S.C.: *Informatics in Medical Imaging*.  CRC Press, Boca Raton, FL, 2011: 41-67 (PG026289–317)

70. HUANG, H. K., PACS: Basic Principles and Applications, Wiley-Liss, Inc. USA, 1999 (DAT16770–7299)

71. ImageAXS Pro-Med Windows User's Guide, Digital Arts and Science, Alameda, CA, Printed May 1998 (PG008551–733)

72. Ligier Y., et al.: Distributed file management for remote clinical image viewing stations.  *Proceedings of SPIE*, 1996, Vol. 2711, pp. 475–482 (PG26058–65)

73. Mascarini Ch., et al.: In-house access to PACS images and related data through World Wide Web. *Proceedings of SPIE*, 1996, Vol. 2711 pp. 531–537 (PG26184–90)

74. Nissen S.E.: Evolution of the Filmless Cardiac Angiography Suite: Promise and Perils of the Evolving Digital Era. *American Journal of Cardiology*, 1996, Vol. 78, pp. 41–44 (PG015924–27)

75. RadWorks Product Line, Version 2.1 Product Catalog, Applicare Medical Imaging B.V., Summer 1997, ("RadWorks") (PG008734–79)

76.   Seshadri S.B., et al.: An image archive with the ACR/NEMA message formats. *Proceedings of SPIE*, 1988, Vol. 914, pp. 1409–15 (PG26051–57)

77.   TREX Medical Corporation, XRE Division, "SPEC, FUNC, TREXnet HR Image Network," last revision dated 25 January 2000 ("TREXnet") (PG008780–821)

78.   VEPRO COMPUTERSYSTEME GMBH, "MEDIMAGE®: The Image Management System: DICOM Archiving & Viewing Station: Software Vers. 4.42," Pfungstadt, Germany, dated May 9, 1999 ("VEPRO 1999") (PG009226–91)

79.   Zandell, C.: IBM 360/75 Computer Time Interface.   JPL Technical Report 32-1526, Vol 1. (PG26118–20)

80.   Collection of documents entitled DISC'95 (PG015947–49)

81.   Printout of web page entitled, "DICOMview® Family of Cardiology Image Products" (PG024566–67)

82.   Printout of web page entitled, "Heartlab introduces filmless, real-time cardiac network: The DICOMview® Enterprise Edition" (PG024564–65)

83.   The DICOM Story (presented at the DICOM Anniversary and Workshop, Baltimore, MD, September 2003), http://medical.nema.org/dicom/workshop-03/pres/mildenberger.ppt (PG026217–288)

84.   Printout of web page entitled, "ESC Dicom B'ham 96 – What is DISC Birmingham 96?" (PG015922)

12373531

1

**PROOF OF SERVICE**

2

I am a citizen of the United States of America, and I am employed in

3

Irvine, California.  I am over the age of 18 and not a party to the within action.

4

My business address is 2040 Main Street, Fourteenth Floor, Irvine, California.

5

On December 5, 2011, I served the within **REBUTTAL EXPERT**

6

**REPORT OF DR. ALAN ROWBERG, M.D.** on the parties or their counsel

7

shown below, as indicated below and by placing it in a sealed envelope

8

addressed as follows:

9

**VIA FEDERAL EXPRESS TO:**

10

Bill F. Holbrow
BLAKELY SOKOLOFF TAYLOR ZAFMAN, LLP

11

12400 Wilshire Boulevard
Seventh Floor

12

Los Angeles, CA  90025
T: (310) 207-3800

13

F: (310) 820-5988
Bill_Holbrow@bstz.com

14

I declare that I am employed in the office of a member of the bar of this

15

Court at whose direction the service was made.

16

Executed on December 5, 2011 at Irvine, California.

17

18

19

_____
Shirley Del Rosario

20

12381028

21

22

23

24

25

26

27

28

**EXHIBIT 11**