1   Craig S. Summers (SBN 108,688)
    craig.summers@kmob.com
2   Paul A. Stewart (SBN 153,467)
    paul.stewart@kmob.com
3   Brian C. Claassen (SBN 253,627)
    brian.claassen@kmob.com
4   Bridget A. Smith (SBN 253,548)
    bridget.smith@kmob.com
5   **KNOBBE, MARTENS, OLSON & BEAR, LLP**
    2040 Main Street, 14th Floor
6   Irvine, CA 92614
    Telephone: (949) 760-0404
7   Facsimile: (949) 760-9502

8   Attorneys for Plaintiff/Counterdefendant
9   **DATCARD SYSTEMS, INC.**

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE CENTRAL DISTRICT OF CALIFORNIA

12                      SOUTHERN DIVISION

13

| | |
|---|---|
| DATCARD SYSTEMS, INC., a California corporation, | Civil Action No. SACV10-1288 DOC (VBKx) |
| Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DATCARD SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT OF INFRINGEMENT OF U.S. PATENTS 7,783,174 AND 7,734,157** |
| v. | |
| PACSGEAR, INC., a California corporation, | |
| Defendant. | |
| AND RELATED COUNTERCLAIM | Date:    February 13, 2012 Time:   8:30 a.m. Ctrm:   9D |
| | The Honorable David O. Carter |

# TABLE OF CONTENTS

**Page No.**

I.    INTRODUCTION ................................................................... 1

II.   APPLICABLE LEGAL STANDARDS ...................................... 2

    A.   Summary judgment ........................................................ 2

    B.   Patent infringement ....................................................... 3

III.  PACSGEAR'S CUSTOMERS INFRINGE CLAIMS 1–4
    AND 7 OF THE '174 PATENT AND PACSGEAR
    CONTRIBUTES TO THE INFRINGEMENT ........................... 3

    A.   MediaWriter customers infringe claim 1 ....................... 4

        1.   The MediaWriter includes the recited "medical
        image server" ........................................................ 5

        2.   The MediaWriter includes the recited "database" ............... 5

            a.   Construction of "database" ......................... 5

            b.   The MediaWriter includes a database ........................ 7

        3.   Customers' systems include the recited "browsing
        terminals" and Pacsgear contributes to the
        customers' infringement ........................................ 7

            a.   Pacsgear's customers use a plurality of
            browsing terminals ..................................... 7

            b.   Pacsgear contributes to customers'
            infringement ............................................... 8

        4.   The MediaWriter includes the recited "search
        module configured to automatically search the
        database for related data based on the user
        selection" ........................................................... 11

            a.   Construction of "automatically search the
            database" ..................................................... 11

            b.   Construction of "related data" ................... 13

            c.   The MediaWriter "automatically" searches
            for "related data" as required by the claim ............... 14

        5.   The MediaWriter includes the recited "production
        station" ................................................................. 15

# TABLE OF CONTENTS
*(cont'd)*

**Page No.**

B.    MediaWriter customers infringe dependent claims 2–4 and 7 .......................................................................... 15

IV.   PACSGEAR DIRECTLY INFRINGES CLAIMS 7 AND 12 OF THE '157 PATENT .................................................. 16

A.    Pacsgear's experts offer no noninfringement position ................. 17

B.    MediaWriter infringes claim 7 ...................................... 17

    1.    MediaWriter includes the recited "computer-implemented interface" ........................................ 19

    2.    MediaWriter includes the recited "image production module" .......................................... 19

    3.    The MediaWriter image production module is configured to "automatically transmit . . . audit data that is specific to the computer-readable medium," as recited .......................................... 20

        a.    Construction of "identification specific to the computer-readable medium" ............................ 21

            i.    The computer-readable medium which stores patient images may be a single disc or multiple discs ........................... 22

            ii.    "Specific" does not mean that each *duplicate copy* of the same disc has a unique number ................................ 22

            iii.    The ordinary and customary meaning of specific supports DatCard's construction ........................................ 23

        b.    MediaWriter automatically transmits an "identification specific to the computer-readable medium" to its audit database ................... 23

C.    MediaWriter infringes dependent claim 12 ................... 25

V.    CONCLUSION ........................................................ 25

# TABLE OF AUTHORITIES

**Page No(s).**

*Amgen Inc. v. Hoechst Marion Roussel, Inc.,*
  457 F.3d 1293 (Fed. Cir. 2006) ........................................................................ 3

*Becton Dickinson & Co. v. C.R. Bard, Inc.,*
  922 F.2d 792 (Fed. Cir. 1990) ......................................................................... 3

*CollegeNet, Inc. v. ApplyYourself, Inc.,*
  418 F.3d 1225 (Fed. Cir. 2005) ................................................................ 11, 12

*DSU Med. Corp. v. JMS Co.,*
  471 F.3d 1293 (Fed. Cir. 2007) ....................................................................... 9

*Epistar Corp. v. U.S. Int'l Trade Comm'n,*
  566 F.3d 1321 (Fed. Cir. 2009) ............................................................... passim

*Fujitsu Ltd. v. Netgear Inc.,*
  620 F.3d 1321 (Fed. Cir. 2010) ................................................................. 9, 10

*General Mills, Inc. v. Hunt-Wesson, Inc.,*
  103 F.3d 978 (Fed. Cir. 1997) ......................................................................... 3

*Hearing Components, Inc. v. Shure Inc.,*
  600 F.3d 1357 (Fed. Cir. 2010) ....................................................................... 3

*i4i L.P. v. Microsoft Corp.,*
  598 F.3d 831 (Fed. Cir. 2010) ....................................................................... 10

*Linear Tech. Corp. v. U.S. Int'l Trade Comm'n,*
  566 F.3d 1049 (Fed. Cir. 2009) ..................................................................... 14

*Lucent Techs., Inc. v. Gateway, Inc.,*
  580 F.3d 1301 (Fed. Cir. 2009) ..................................................................... 10

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,*
  545 U.S. 913 (2005) ........................................................................................ 9

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ............................................... 3, 23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page No(s).**

*Ricoh Co., Ltd. v. Quanta Computer Inc.*,
    550 F.3d 1325 (Fed. Cir. 2008) .............................................................. 10, 11

*Sandisk Corp. v. Lexar Media, Inc.*,
    91 F. Supp. 2d 1327 (N.D. Cal. 2000) ........................................................ 9

*Spansion, Inc. v. Freescale Semiconductor, Inc.*,
    629 F.3d 1331 (Fed. Cir. 2010) ...................................................................... 9

## OTHER AUTHORITIES

35 U.S.C. § 271................................................................................................. 8

Fed. R. Civ. P. 30......................................................................................... 21, 24

The Oxford Dictionary ................................................................................. 5, 23

Plaintiff DatCard Systems, Inc. ("DatCard") hereby submits this Memorandum in support of its motion for summary judgment of infringement of U.S. Patents 7,783,174 ("the '174 Patent") and 7,734,157 ("the '157 Patent") by Defendant Pacsgear, Inc. ("Pacsgear").

# I. **INTRODUCTION**

In the 1990s and earlier, most hospitals used film to store images taken by X-ray, MRI and other imaging devices. However, some hospitals in the 1990s were slowly beginning the process of moving toward a computerized, filmless environment. The first step was the acquisition of a Picture Archiving and Communications System, known as a PACS. A PACS is a large computer capable of storing thousands of patient images. The introduction of the PACS provided significant savings in storage space, as hospitals no longer needed to store film images. However, it was still necessary to print individual images onto film whenever a physician needed to provide a copy of a patient's image to the patient or to a physician at a different facility.

To overcome this problem, devices known as medical disc publishers were developed. These devices electronically retrieved digital images from a PACS and burned those images to a CD, a DVD, or other digital media. The first medical disc publishers were quite crude. The CD or DVD had to be loaded by hand into a disc drive. The disc included only the patient's images, and not the critical textual report that contained the radiologist's analysis of the images. In addition, the patient's name had to be written by hand onto the disc. Further, the disc could be reviewed only on specialized computers that included the software necessary to view medical images.

DatCard's patented invention changed all of this. The patents are directed to an automated medical disc publishing system. The system includes a CD or DVD "production station" which robotically loads and unloads the CDs and DVDs into the disc drive to burn the images onto a disc. In addition, the

1  patented system retrieves the radiologist's report and other information related
2  to the patient's images and burns that to the disc as well.  The patient's name
3  and other identifying information are automatically printed onto the disc at the
4  production station.  And the disc can be viewed on essentially any computer
5  because the software needed to review the images is included on the CD or
6  DVD with the images themselves.  The patented invention also includes an
7  audit feature that tracks the CDs and DVDs created at the production station.  In
8  addition, the patented invention can be connected to other computer terminals
9  throughout a hospital, so that the system can be conveniently accessed from
10 almost anywhere within the hospital.

11     The inventions claimed in DatCard's patents spurred many copyists,
12 including Pacsgear, which markets its infringing MediaWriter system.  DatCard
13 brought the present action alleging infringement of five related patents in suit.
14 By this motion, DatCard seeks summary judgment that Pacsgear's MediaWriter
15 infringes two of those patents, the '174 and '157 Patents.  Many of the claims of
16 the '174 Patent are directed to a medical disc publisher connected to a second
17 computer terminal.  Pacsgear does not sell the second computer terminal, but
18 directs its customers to connect the MediaWriter to other computer terminals,
19 and the MediaWriter includes software that has no substantial use except for
20 connecting to those additional terminals.  Accordingly, for these combination
21 claims, DatCard is seeking summary judgment of contributory infringement,
22 rather than direct infringement.  The '157 Patent, in contrast, is directly
23 infringed by Pacsgear.

## II.  APPLICABLE LEGAL STANDARDS

### A.    Summary judgment

26     Because the Court is familiar with the summary judgment standard, and
27 because it is stated in other co-pending motions, DatCard will not repeat it here.
28 / / /

**B.      Patent infringement**

Determining patent infringement is a two-step process.  *Hearing Components, Inc. v. Shure Inc.*, 600 F.3d 1357, 1370 (Fed. Cir. 2010).  First, the asserted patent claim must be construed as a matter of law.  *Id.*  Second, the properly construed claims must be compared to the accused product.  *Id.*

Claim construction "must begin with the words of the claims themselves."  *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 457 F.3d 1293, 1301 (Fed. Cir. 2006).  When construing a claim, "the words of a claim 'are generally given their ordinary and customary meaning.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*).  And there is a heavy presumption that the ordinary meaning applies.  *Epistar Corp. v. U.S. Int'l Trade Comm'n*, 566 F.3d 1321, 1334 (Fed. Cir. 2009).  The patent specification "is always highly relevant to the claim construction analysis."  *Phillips*, 415 F.3d at 1315.  A court should also consider the patent's prosecution history before the U.S. Patent and Trademark Office.  *Id.* at 1317.

Disputes over the proper construction of a patent claim do not raise any genuine issues of material fact.  *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 797 (Fed. Cir. 1990).  Accordingly, "[w]here the parties do not dispute any relevant facts regarding the accused product, . . . but disagree over possible claim interpretations, the question of . . . infringement collapses into claim construction and is amenable to summary judgment."  *General Mills, Inc. v. Hunt-Wesson, Inc.*, 103 F.3d 978, 983 (Fed. Cir. 1997).

**III.   PACSGEAR'S CUSTOMERS INFRINGE CLAIMS 1–4 AND 7 OF THE '174 PATENT AND PACSGEAR CONTRIBUTES TO THE INFRINGEMENT**

As explained in more detail below, Pacsgear's MediaWriter is specially adapted to infringe independent claim 1 and its dependent claims 2–4 and 7. The MediaWriter itself includes each element recited in these claims except for

"a plurality of browsing terminals configured to receive a user selection that defines selected medical image data," as recited in claim 1. Pacsgear's customers supply this final element in accordance with Pacsgear's instructions, using software in the MediaWriter that has no function except to facilitate the use of the MediaWriter with the claimed "plurality of browsing terminals." Therefore, as DatCard will explain, Pacsgear contributes to the customers' infringement.

**A.** **MediaWriter customers infringe claim 1**

Claim 1 of the '174 Patent is directed to a "system" comprising five elements, each of which is analyzed below:

(1) "a medical image server configured to receive medical image data generated by one or more imaging modalities, the medical image data being formatted in a standard medical imaging format";

(2) "a database configured to store medical image data generated by the one or more imaging modalities";

(3) "a plurality of browsing terminals configured to receive a user selection that defines selected medical image data";

(4) "a search module configured to automatically search the database for related data based on the user selection; and"

(5) "a production station that is configured to record all of the following onto a data storage medium: the selected medical image data for the patient, recorded in the standard medical imaging format, the related data, and a viewing program that is configured to allow viewing of the medical image data that is recorded onto the data storage medium by a general purpose computer that is not specifically configured with medical imaging software for viewing of medical images formatted in the standard

1    medical imaging format."

2    Ex. 1 at 9:25–46.

3    **1.    The MediaWriter includes the recited "medical image server"**

4    The parties agree that nothing in the first element requires construction.

5    Thus, the medical image server of claim 1 is, as the claim defines, configured to

6    receive medical image data generated by one or more imaging modalities (such

7    as CT scanners, MRI machines, mammography machines, and the like), the

8    medical image data being formatted in a standard medical imaging format.

9    The MediaWriter includes the recited server.  A PacsGear representative

10   expressly testified that MediaWriters include a server.   Ex. 2 at 27:8–29:2,

11   97:9–22.    Furthermore, Pacsgear's manuals explain in detail how the

12   MediaWriter server is configured to receive medical image data that is

13   generated by one or more imaging modalities and formatted in the DICOM

14   format (a standard medical imaging format).  Ex. 3 at PG006756, 59–62, 65–66,

15   81; Ex. 4 at PG006796, 799–802, 804–805, 823; *see also* Ex. 23 at 55.

16   **2.    The MediaWriter includes the recited "database"**

17   **a.    Construction of "database"**

18   Database is a term familiar to both skilled artisans and laypeople alike.

19   The Oxford Dictionary defines database as "a structured set of data held in a

20   computer."  Ex. 5 at 3.  There is a heavy presumption that this ordinary and

21   customary meaning applies to the claim.   *See Epistar*, 566 F.3d at 1334.

22   Furthermore, in the specification, the word "database" generally describes

23   various computer modules that hold a variety of data, including medical image

24   data, related data, and audit records.  *E.g.*, Ex. 1 at 3:65–4:2, 6:1–15, 6:53–59.

25   Thus, in both the claims and the specification, "database" is an ordinary word,

26   used in its ordinary sense and consistently with the dictionary definition.

27   Pacsgear advocates a much more restrictive definition, which Pacsgear

28   purports to derive from the specification, namely: an "electronic collection of

image data stored in [a] way to allow for easy search and retrieval following the request of a user." Ex. 6 at 6–7. Thus, Pacsgear would limit "database" to a collection of *images* easily *searched at a user's request*. *Id.* This construction improperly restricts the scope of the claim and is inconsistent with the specification.

While statements in the specification can restrict the scope of the claims, such restriction occurs only in rare instances where the patentee "demonstrate[d] an intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of *manifest exclusion or restriction*, representing a *clear disavowal* of claim scope." *Epistar*, 566 F.3d at 1334 (alteration original) (emphases added). This is not one of those instances. Nothing in the patent suggests that "database" has some special or technical meaning, much less uses words of manifest exclusion or restriction to clearly disavow claim scope.

Furthermore, as explained above and as Pacsgear's expert admits, in the specification, the term database encompasses both image and textual data storage. *E.g.*, Ex. 1 at 3:65–4:2, 6:1–15, 6:53–59; *see* Ex. 6 at 6. For instance, the specification describes "database" as encompassing "audit records." Ex. 1 at 6:53–59. These audit records can include textual data, such as physician and patient names. *Id.* According to the specification, a database is not necessarily "searchable at a user's request." For example, the specification *never* states that the database is "searchable" for audit records. Yet, it is still a database. In light of the specification, Pacsgear's construction makes no sense.

Pacsgear's construction should be rejected because it is inconsistent with the plain meaning of "database" and it is inconsistent with the specification. Database should be construed to mean, simply, a structured set of data held in a computer.

/ / /

-6-

**b.      The MediaWriter includes a database**

As explained above, this element requires a structured set of data held in a computer, configured to store medical image data generated by the one or more imaging modalities.   The MediaWriter's local drive does precisely that. Specifically, the local drive of the MediaWriter's computer holds or stores (buffers) medical image data retrieved from a PACS.   Ex. 2 at 25:20–26:24; Ex. 6 at 11; Ex. 7 at PG009437; Ex. 8 at PG015479; *see also* Ex. 23 at 55–56. Even Pacsgear's own specifications describe the MediaWriter's local drive as having a "database."   Ex. 7 at PG009437; Ex. 8 at PG015479.   Thus, the MediaWriter satisfies this limitation.

**3.      Customers' systems include the recited "browsing terminals" and Pacsgear contributes to the customers' infringement**

The parties agree that nothing in the third element requires construction. *See* Ex. 6 at 7 ("the meaning of the element appears unambiguous").  This claim element requires a "plurality" or more than one browsing terminal.  It appears to be undisputed that a "browsing terminal" is simply a computer terminal.   *Id.* These computer terminals, as set forth in the claim, must be configured to receive input from a user that defines the medical image data that is being selected by the user.

**a.      Pacsgear's customers use a plurality of browsing terminals**

Every MediaWriter includes a computer terminal that allows users to select one or more medical imaging studies.   Ex. 3 at PG006765; Ex. 4 at PG006804; *see also* Ex. 23 at 56–57.  After a user confirms the selection, the MediaWriter's computer searches a PACS or imaging modality for image studies that match the study or studies that have been selected by the user.  Ex. 2 at 42:2–17, 47:23–48:13; *see also* Ex. 23 at 57.  In this way, the user's selection defines selected medical image data.

The MediaWriter does not itself include a second browsing terminal. However, every MediaWriter has an interface, known as a "web client," that connects the MediaWriter to any number of remote computer terminals, such as "any PACS, modality user interface, or web browser." Ex. 9 at PG006563, *see also* Ex. 2 at 117:12–119:8; Ex. 7 at PG009433; Ex. 8 at PG0015473; Ex. 10 at PG006593; *see also* Ex. 23 at 57. These remote terminals are also configured by the MediaWriter web client software to receive a user selection that defines selected medical image data. Ex. 11 at PG002931; Ex. 12 at PG008395–97; *see also* Ex. 23 at 57.

Pacsgear's Customer Service Logs demonstrate that many customers are using the web client to access the MediaWriter through remote computer terminals. Ex. 13 (e.g., "installed mw web client," "Contacted customer and installed MW Web Interface on his PC," "MW Web client reinstall fixed problem," "going to schedule a backup with him for next week to upgrade to MW 2.2 w/ webclient and new epson software," "I also installed the new mw webclient"). Furthermore, a Pacsgear customer, Denver Health Medical Center, specifically testified that Denver Health accesses the MediaWriter web client from five different remote terminals. Ex. 14 at 17:11–18:10. Thus, Pacsgear's customers, including Denver Health, plainly satisfy this claim limitation.

### b. Pacsgear contributes to customers' infringement

Pacsgear contributes to its customers' direct infringement. 35 U.S.C. § 271(c) provides that

[w]hoever offers to sell or sells within the United States . . . a component of a patented machine, . . . knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

-8-

"To establish contributory infringement, the patent owner must show the following elements . . . 1) that there is direct infringement, 2) that the accused infringer had knowledge of the patent, 3) that the component has no substantial noninfringing uses, and 4) that the component is a material part of the invention." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326, 1330 (Fed. Cir. 2010). DatCard does not need to prove that Pacsgear subjectively believed its customers to be infringing. *Sandisk Corp. v. Lexar Media, Inc.*, 91 F. Supp. 2d 1327, 1335 (N.D. Cal. 2000). Rather, intent to cause infringement is presumed from knowledge of the patent and the fact that the accused product has no substantial non-infringing use. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 932 (2005); *Spansion, Inc. v. Freescale Semiconductor, Inc.*, 629 F.3d 1331, 1335 (Fed. Cir. 2010) (citing *Grokster*, 545 U.S. at 932); *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1303 (Fed. Cir. 2007) (same).

DatCard has proven all four required elements by uncontroverted evidence. First, as explained throughout this motion, Pacsgear's customers using the MediaWriter with at least one other remote terminal directly infringe claim 1 of the '174 Patent. The MediaWriter includes every element of claim 1 except the plurality of browsing terminals. The MediaWriter also includes a specially designed web client interface that allows the MediaWriter to be connected to other computer terminals. Ex. 9 at PG006563, *see also* Ex. 2 at 117:12–119:8; Ex. 7 at PG009433; Ex. 8 at PG0015473; Ex. 10 at PG006593; Ex. 11 at PG002931; Ex. 12 at PG008395–97; *see also* Ex. 23 at 57. These remote terminals are configured to receive a user selection that defines selected medical image data. Ex. 11 at PG002931; Ex. 12 at PG008395–97; *see also* Ex. 23 at 57. Thus, DatCard's customers directly infringe when they connect the remote terminals to the MediaWriter. As just discussed, these customers include Denver Health and the customers listed in Pacsgear's Customer Service Log. Ex. 13; Ex. 14 at 17:11–18:10.

Second, Pacsgear had actual knowledge of the '174 Patent at least as early as August 18, 2010, about one week before the patent issued. Ex. 15. On September 15, 2010, a few weeks after the patent issued, DatCard provided claim charts to Pacsgear detailing how the '174 Patent relates to the MediaWriter and customers' infringing use of that product. Ex. 16 at PG008380, PG008387–89. Thus, Pacsgear not only knew of the '174 Patent, but also knew precisely its relationship to the claims of the '174 Patent. Despite this knowledge, Pacsgear distributed marketing materials that instructed customers how to use the web client feature to connect multiple browsing terminals to the MediaWriter. *E.g.*, Ex. 12 at PG008395–97.

Third, MediaWriters have no substantial noninfringing use. It is undisputed that, when a customer activates the MediaWriter's web client, the customer's system includes a plurality of browsing terminals configured to receive a user selection. Pacsgear may argue that, because some customers use MediaWriters without turning on the web client, MediaWriters have a substantial noninfringing use. This theory has been expressly rejected by the Federal Circuit, however. Whether a customer actually turns on the web client is "relevant to the extent of direct infringement, but it does not establish substantial noninfringing uses." *Fujitsu*, 620 F.3d at 1331; *see also i4i L.P. v. Microsoft Corp.*, 598 F.3d 831, 850–51 (Fed. Cir. 2010); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1320–21 (Fed. Cir. 2009); *Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325, 1337–39 (Fed. Cir. 2008).

Fourth, MediaWriters are plainly a material part of each customer's infringing system. Ex. 23 at 62. As just explained in this section, the MediaWriter satisfies every element of claim 1 except for the plurality of browsing terminals. *See also id.* And the MediaWriter includes special software to allow connection to additional browsing terminals. *Id.*

Thus, Pacsgear is a contributory infringer. After all, a defendant like

-10-

Pacsgear "who makes a special device constituting the heart of a patented [system] and supplies it to others with directions (specific or implied) to complete the [system] is obviously appropriating the benefit of the patented invention."   *Ricoh*, 550 F.3d at 1337 (quoting H.R. Rep. No. 82-1923 at 9 (1952)).

       **4.**       **The MediaWriter includes the recited "search module configured to automatically search the database for related data based on the user selection"**

          **a.**       **Construction of "automatically search the database"**

Pacsgear advocates an absurdly narrow construction of the term "automatically."   Specifically, Pacsgear contends that "automatically" requires that the function of searching the database must occur "without asking for user direction" and "without user intervention."   Ex. 6 at 18–19, 21, 27.   In Pacsgear's view, the patent is avoided if an otherwise automated, computerized system requires the user to check a box confirming that related data should be included on the disc before initiating the search for the related data.   *Id.* at 21. Similarly, in Pacsgear's view, the patent is avoided if the user must click a "confirm" button to confirm that the system should burn a disc.   *Id.*   Pacsgear's construction is inconsistent with the ordinary meaning of automatically and it violates basic tenets of claim construction.

In *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1235 (Fed. Cir. 2005), the Federal Circuit considered the proper construction of "automatically" in a computer-implemented method.   In that case, the parties' competing constructions were almost identical to the constructions proposed here.   The defendant proposed a very narrow construction similar to Pacsgear's, arguing that automatic means "a process that occurs *without human intervention*, such that a human does not have the option to intercede and alter the flow of that process."   *Id.* (emphasis in original).   The plaintiff, like DatCard here, argued

that automatically means that, "***once initiated***, the function is performed by a machine, without the need for manually performing the function."   *Id.* (emphasis in original).   Under this broader proposal, a person may initiate an automatic search by selecting the parameters for the search and confirming that a search should be conducted.

The Federal Circuit found the latter construction to be correct.   *Id.*   The Federal Circuit observed that many automatic processes have some amount of user intervention:

> [A] machine still performs the claimed functions without manual operation, even though a human may initiate or interrupt the process.  . . . Simply because a human has to load an automatic dishwasher and press the start button, and has the ability to turn it off mid-cycle, does not mean that the device does not "automatically" wash the dishes.  Similarly, an "autopilot" which is turned on by a human and necessarily must be able to be interrupted by a human once the automatic process is engaged remains an "automatic" device.

*Id.* (internal quotation marks, citations, and alterations removed for clarity). Likewise, it is ordinarily understood that an automatic search is still automatic, even if a user has to confirm certain settings and press the start button.

This construction of automatically also comports with a fundamental tenet of claim construction.  In *CollegeNet*, the claim at issue used the "inclusive or open-ended" transitional word "comprising" in the preamble.  418 F.3d at 1227–28, 1235 (reciting a "method of creating and processing [forms] over a computer network . . . comprising").  The Federal Circuit found that "the use of 'comprising' suggests that additional, unrecited elements are not excluded. Such elements could include human actions to expressly initiate the automatic [computer functions], or to interrupt such functions."  *Id.* at 1235.  Claim 1 of

1   the '174 Patent also uses the open-ended transitional word "comprising" in the

2   preamble.  Ex. 1 at 9:25 (a "system comprising").  Thus, the claim contemplates

3   that users may take additional, unrecited actions, such as confirming the user

4   selection and initiating the search.  Pacsgear's proposed construction, which

5   improperly excludes unrecited user actions, is incorrect as a matter of law.

6       Thus, consistent with the ordinary meaning of "automatically" and the

7   basic tenets of claim construction, "automatically search the database" means

8   "search the database such that, once initiated, the search function is performed

9   by a machine, without the need for manually performing the function."

10          **b.      Construction of "related data"**

11      In the context of claim 1, the meaning of the term "related data" is clear

12   and unambiguous.  Claim 1 recites:

13              (3) "a plurality of browsing terminals configured to receive a

14       user selection that defines *selected medical image data* . . ."; and

15              (4) "a search module configured to automatically search the

16       database for *related data* based on the user selection;"

17   *Id.* at 9:32–36 (emphases added).  In this context, it is clear that "related data" is

18   data related to the "selected medical image data."  Moreover, skilled artisans

19   and laypeople alike understand the words "related" and "data."   In fact,

20   Pacsgear's expert never contended that the term was ambiguous or too technical

21   to be understood by a lay jury.

22      Nevertheless, Pacsgear now seeks to avoid infringement by recasting the

23   phrase "related data" to mean "related medical images," to the exclusion of

24   textual diagnostic reports.  Ex. 6 at 7, 23.  Pacsgear cannot rationally argue that

25   its proposed language is part of the ordinary meaning of "related data."  This is

26   clearly language that Pacsgear has imported into the claim.  The only issue is

27   whether this is one of those rare cases where importing language into the claim

28   is warranted by the specification.  It is not.

-13-

The specification does disclose embodiments in which "related data" are images. The law is abundantly clear, however, that claims generally should not be narrowed to cover only specific embodiments disclosed in the specification. *See e.g.*, *Linear Tech. Corp. v. U.S. Int'l Trade Comm'n*, 566 F.3d 1049, 1058 (Fed. Cir. 2009).

Moreover, the specification as a whole is entirely consistent with the ordinary and customary meaning of related data discussed above. The specification states that "[o]ne embodiment of the claimed system allows for searching ***medical exam data that are related*** and placing such data on the same CD." Ex. 1 at 2:14–17 (emphasis added). "Medical exam data" plainly encompasses textual reports, such as reports prepared by radiologists after completing their examination of the patient's images. In light of this broad language, the specification does not demonstrate the clear intent to disavow claim scope that is ordinarily required to restrict the scope of claims. *See Epistar*, 566 F.3d at 1334.

### c. The MediaWriter "automatically" searches for "related data" as required by the claim

The MediaWriter is configured to search its local drive for "related data" based on the user selection. Ex. 23 at 58–59. These related data include "HL7" reports and other diagnostic reports. Ex. 2 at 34:8–35:3, 38:25–39:12; *see also* Ex. 23 at 58. Specifically, when the "Include Reports" button is selected, a Media Writer uses a unique identification number associated with the selected medical image data to search the local drive for related reports with a matching identification number. Ex. 2 at 34:8–35:3, 38:25–39:12; *see also* Ex. 23 at 58.

Furthermore, the MediaWriter is configured to perform this search "automatically." A user need only select specific studies, confirm the selection, ensure the "Include Reports" button is checked, and click "Confirm." Ex. 3 at PG006765–67; Ex. 4 at PG006804–06. When the user clicks "Confirm," the

-14-

MediaWriter will then select the chosen medical image data and automatically search for related data, without requiring any additional human intervention. Ex. 2 at 34:8–35:3, 38:25–39:12; Ex. 3 at PG006766; Ex. 4 at PG006804.

### 5.    The MediaWriter includes the recited "production station"

The parties have offered different constructions of the term "production station."   There is no dispute, however, that the MediaWriter includes a production station under either construction.[1]   It is also undisputed that the rest of the limitation is met, apart from the previously discussed dispute over "related data."   MediaWriter is a robotic disc burner that records DICOM images, related diagnostic reports, and a viewing program called "GearView" onto portable storage media.   Ex. 2 at 29:7–14, 65:10–16; Ex. 3 at PG006755, 6780; Ex. 4 at PG006795, 6822; Ex. 23 at 61–62.   Thus, Pacsgear customers directly infringe claim 1, and Pacsgear contributes to this infringement.

## B.    MediaWriter customers infringe dependent claims 2–4 and 7

Claim 2 of the '174 Patent specifies that the system of claim 1 "further compris[es] a configuration data module configured to allow a user to input identifying information relating to the selected medical image data."   Ex. 1 at 9:47–49.   There is no dispute that the MediaWriter includes this feature.   *See* Ex. 6 at 26 (providing no independent basis for non-infringement).   The MediaWriter provides two "Notes" fields in which a user may input identifying information relating to the medical image data that is to be recorded to disc. Ex. 3 at PG006767; Ex. 4 at PG006806; *see also* Ex. 23 at 64.

Claim 3 specifies that, in the system of claim 2, "the production station is

---

[1] The dispute over the proper meaning of "production station" is relevant to the validity of the patents in suit.   This dispute will be briefed in connection with the parties' motions relating to patent validity.

configured to produce a label for the data storage medium, the label containing the identifying information."  Ex. 1 at 9:50–52.  There is also no dispute that the MediaWriter is configured to produce the recited label, because all MediaWriters are configured to produce a disc label that includes the identifying information entered into the "Notes" field.   Ex. 3 at PG006768; Ex. 4 at PG006807; *see also* Ex. 23 at 64–65; Ex. 6 at 26 (providing no independent basis for non-infringement).

Claim 4 specifies that the system of claim 1 "further compris[es] an audit module that is configured to automatically provide an auditable trail of the selected medical image data."  Again, there is no dispute that the MediaWriter comprises the recited audit module.  *See* Ex. 6 at 26 (providing no independent basis for non-infringement).   All MediaWriters generate an audit log with information about each CD or DVD produced.  Ex. 3 at PG006785; Ex. 4 at PG006827; *see also* Ex. 23 at 65.

Finally, claim 7 specifies that, in the system of claim 1, "the data storage medium is an optical disk."  There is no dispute that, in the MediaWriter, the data storage medium is an optical disk.   *See* Ex. 6 at 26 (providing no independent basis for non-infringement).   MediaWriters are configured to produce CDs and DVDs, which are optical disks.  Ex. 3 at PG006752; Ex. 4 at PG006792; *see also* Ex. 23 at 66.

## IV. <u>PACSGEAR DIRECTLY INFRINGES CLAIMS 7 AND 12</u><br><u>OF THE '157 PATENT</u>

Claims 7 and 12 of the '157 Patent are directed to a system for (1) generating a computer-readable medium that contains a patient's medical data, and (2) storing audit records about the computer-readable medium. DatCard's technical experts, Dr. Alan Rowberg and Mr. Jack Goldberg, have concluded that the MediaWriter satisfies each element of claims 7 and 12 and, therefore, that it infringes the claims.  In response, Pacsgear's experts chose not

to rebut the evidence of infringement.  Pacsgear has instead seemingly decided to rely on its invalidity argument.   Summary judgment of infringement of claims 7 and 12 is therefore appropriate to narrow the issues for trial.

**A.      Pacsgear's experts offer no noninfringement position**

Neither of Pacsgear's technical experts, Mr. Ian Jestice and Dr. Steven Horii, offers any noninfringement position regarding the '157 Patent.  Ex. 17 at 73:25–74:6; Ex. 18 at 222:3–20.   In fact, Dr. Horii admitted during his deposition that the elements of the '157 Patent must be present for a CD burning system to comply with the Health Insurance Portability and Accountability Act (HIPAA).[2]  Ex. 18 at 204:24–206:10.  Accordingly, Pacsgear's technical experts have presented no noninfringement position to rebut DatCard's evidence that the MediaWriter system infringes claims 7 and 12 of the '157 Patent.  Instead, Pacsgear has relied solely upon attorney argument presented in its response to DatCard's Interrogatory No. 11.  Ex. 19 at 13–14.

**B.      MediaWriter infringes claim 7**

Claim 7 of the '157 Patent reads as follows:

A system for generating a portable computer-readable medium containing medical data for a first patient, wherein the medical data for the first patient are audited based on a plurality of audit records stored in an audit database, comprising:

a computer-implemented interface configured to receive two or more requests for production of stored medical data related to the first patient; and

an image production module that is configured, for each

---

[2] Confirming that Dr. Horii's opinion applies to the MediaWriter, Pacsgear's User's Manual states that the product keeps audit logs that "contain time-stamped access and action information that can be used to address HIPAA security concerns."  Ex. 3 at PG006785.

1  request for production of stored medical data related to the patient[:]

2  to produce the portable computer-readable medium
3  containing the requested medical data related to the first patient,
4  wherein the requested medical data comprises medical image data
5  formatted in a standard medical imaging format used by a computer
6  configured for viewing the medical image data; and

7  upon producing the computer-readable medium, to
8  automatically transmit, to the audit database, audit data that is
9  specific to the computer-readable medium produced in response to
10  the request for stored medical data, wherein the audit data
11  comprises at least an identification specific to the computer readable
12  medium, an identification of a requester of the stored medical data,
13  and an identification of the first patient, and is for at least one audit
14  record in the plurality of audit records in the audit database.

15  Ex. 20 at 10:12–38.

16  Pacsgear has not contested infringement with respect to the preamble of
17  this claim.  Ex. 19 at 13–14.  In any event, Pacsgear's MediaWriter clearly
18  satisfies the preamble.  Pacsgear's User's Manual explains that the "Media-
19  Writer writes DICOM studies, results, and an optional viewer to CDs, DVDs,
20  and USB flash drives."  Ex. 3 at PG006755.  These CDs and DVDs are the
21  "portable computer-readable medium" of claim 7, as explained in the following
22  sections.  They contain at least "DICOM studies," which indisputably are
23  "medical data."

24  The User's Manual further explains that MediaWriter keeps "audit logs"
25  that "contain time-stamped access and action information."  Ex. 3 at PG006785.
26  Pacsgear's 30(b)(6) representative confirmed that the audit logs are kept in a
27  database in the MediaWriter.  Ex. 2 at 81:19–22.  These "audit logs" are the
28  claimed "plurality of audit records stored in an audit database."  The

-18-

MediaWriter, therefore, satisfies the preamble of claim 7.  Ex. 23 at 80.
Pacsgear's MediaWriter also satisfies each of the remaining claim elements, as
discussed in the following sections.

### 1.     MediaWriter includes the recited "computer-implemented interface"

The first claim limitation is "a computer-implemented interface . . . ."
Ex. 20 at 10:17–19.  The parties agree that no terms in this claim element
require construction.   Moreover, the undisputed evidence shows that the
MediaWriter satisfies this element.  Ex. 23 at 81.  The MediaWriter includes a
"simple user interface that can be installed on any PC."   Ex. 3 at PG006755.
This user interface is a computer-implemented interface.  A user can interact
with the interface at the MediaWriter's local computer or at a remote computer
through a browsing terminal, similar to accessing a website on the Internet.
Ex. 23 at 81.  The user interface allows a user to select multiple patient studies
containing medical images and reports that are then displayed in a "burn
configuration dialog box," as shown in Section 3.2 of the User's Manual.  Ex. 3
at PG006767.   These selections are the claimed "requests for production of
stored medical data related to the first patient."  Accordingly, the MediaWriter
satisfies this claim element.  Ex. 23 at 81.

In its Supplemental Response to DatCard's Interrogatory No. 11,
Pacsgear's attorneys argue that the MediaWriter does not meet this limitation.
Ex. 19 at 13–14.  Pacsgear cites no evidence in support of this assertion.
Neither of Pacsgear's experts adopted it.  Furthermore, in the same interrogatory
response, Pacsgear's attorneys admit that a MediaWriter user can burn CDs with
medical images.  *Id*.  Pacsgear, therefore, has presented no reasonable basis to
challenge MediaWriter's satisfaction of this element.

### 2.     MediaWriter includes the recited "image production module"

Claim 7 next requires "an image production module . . . ."   Ex. 20 at

-19-

10:20–22.  The parties agree that no terms in this claim element require construction, and Pacsgear does not contest infringement with respect to this claim element.  Ex. 19 at 13–14.  Moreover, the undisputed evidence shows that the MediaWriter includes an image production module that can produce a portable computer-readable medium containing the requested data for each request for production.  Ex. 3 at PG006755 ("The MediaWriter System includes a CD/DVD burner").  And the MediaWriter records the requested medical data onto a CD or DVD in the DICOM format, which is a standard medical imaging format used by a computer configured for viewing the medical image data.  Ex. 23 at 81; Ex. 2 at 29:7–14, 65:10–16.  Therefore, the undisputed evidence shows that MediaWriter satisfies this claim element.

### 3. The MediaWriter image production module is configured to "automatically transmit . . . audit data that is specific to the computer-readable medium," as recited

The next disputed element of Claim 7 requires the image production module to "automatically transmit … audit data that is specific to the computer-readable medium."  Ex. 20 at 10:29–38.  Dr. Rowberg and Mr. Goldberg independently concluded that the MediaWriter satisfies this claim element.  Mr. Goldberg reviewed the MediaWriter source code and found that the MediaWriter stores two identifications specific to produced CDs or DVDs to an audit database stored on the local drive of the MediaWriter: (1) a "DiscID" in versions 4.0 and earlier, and (2) a "JobID" in all versions.[3]  Ex. 22 at 40–45.  Mr. Goldberg also found from the source code that the MediaWriter

---

[3] The transmitted audit data also includes "an identification of a requester of the stored medical data," and "an identification of the first patient," as required by the portion of this limitation which has not been quoted in the main text.  Ex. 25 at 40-45.  It appears to be undisputed that MediaWriter satisfies these requirements.  Thus, they will not be discussed further here.

1    automatically transmits audit data to the audit database.  *Id.*  Dr. Rowberg
2    reviewed Pacsgear's User's Manuals, the Rule 30(b)(6) deposition of Pacsgear,
3    and Mr. Goldberg's report, to support his conclusion that MediaWriter satisfies
4    this limitation.  Ex. 23 at 15, 81–82.

5         Pacsgear's experts have taken no position on whether MediaWriter
6    satisfies this claim element.  Instead, Pacsgear's attorneys argue without support
7    that the MediaWriter does not include "an identification specific to the
8    computer-readable medium."  Ex. 19 at 13–14.  Pacsgear concedes that the
9    MediaWriter assigns an identification number to each job, or completed request,
10   to create one or more CDs or DVDs.  However, Pacsgear contends that the job
11   identification number falls outside the scope of the claims for two reasons.
12   First, the job may span multiple discs, and the same job identification number
13   will be associated with each of those multiple discs.  Ex. 2 at 78:16–79:12.
14   Second, if a user creates multiple copies of the same job, those copies will have
15   the same job identification number.  *Id.*; Ex. 19 at 13–14.  This attorney
16   argument is based entirely upon an erroneous claim construction.[4]

17        **a.    Construction of "identification specific to the computer-**
18              **readable medium"**

19        To determine whether the MediaWriter's audit data includes "an
20   identification specific to the computer-readable medium," the Court first must
21   construe the terms "specific" and "computer-readable medium."
22   / / /
23   / / /
24   / / /
25   
26        [4] The first argument regarding a job spanning multiple discs does not
27   apply to versions of MediaWriter prior to 4.0.1.  Those versions of MediaWriter
     also logged a "DiscID" that identified the individual discs within a job spanning
28   multiple discs.  Ex. 2 at 79:6–12.

i.   **The computer-readable medium which stores patient images may be a single disc or multiple discs**

The "computer-readable medium" of the claim refers to the entire medium that contains the requested medical data, and not merely a single CD or DVD.  The specification discloses that a suitable medium comprises CDs and DVDs — ***plural*** — and "any suitable portable digital recording medium can be substituted for CDs."  Ex. 20 at 3:30–41.  If the requested medical data exceeds the storage capacity of a single disc, a set of discs is a suitable portable digital recording medium.  The construction of "identification specific to the computer-readable medium," therefore, should not require that each disc within a set of discs for a single job have a unique identification.  Instead, the identification should be specific to the computer-readable medium as a whole: the set of discs.

ii.   **"Specific" does not mean that each *duplicate copy* of the same disc has a unique number**

Pacsgear contends — solely through attorney argument — that the MediaWriter CD identification number is not an "identification specific to the computer-readable medium" because a user could burn duplicate copies of a CD, which would all have the same identification number.  Ex. 19 at 13–14.  Pacsgear's contention seemingly attempts to substitute the word "unique" for the word "specific" in the claimed phrase "identification specific to the computer-readable medium."  It also ignores the '157 Patent specification.

The '157 Patent specification discloses that the audit record can include an identification number of the CD.  Ex. 20 at 6:53–59.  The specification also describes a separate "number of copies" value, indicating the number of copies of CDs to be produced.  *Id.* at 6:23–28.  If the system required that each copy of the same CD have a "unique" identification number, as Pacsgear contends, a value for the number of copies would not be needed.  The specification

therefore does not describe an identification number of the CD that is "unique" for each copy of a CD.  Instead, the specification describes an identification number that is "specific to" the medium, yet independent of the number of copies of the medium.  Pacsgear's construction, therefore, is not consistent with at least one embodiment of the claimed invention.

### iii.   The ordinary and customary meaning of specific supports DatCard's construction

Furthermore, the ordinary and customary meaning of "specific" in the context of claim 7 does not require that the identification be "unique" to a copy nor to a particular disc within a set of discs.  To determine the ordinary and customary meaning of a claim term, it is appropriate for the Court to consult a dictionary.  *Phillips*, 415 F.3d at 1318.  The Oxford Dictionary defines specific as "clearly defined or identified."  Ex. 5 at 4 (definition 1).  There is a heavy presumption that this ordinary and customary meaning applies to the claim.  *See Epistar*, 566 F.3d at 1334.

Accordingly, the phrase "identification specific to the computer-readable medium" should be given its ordinary meaning, namely, an identification, such as a clearly defined or identified number, of the computer-readable medium. The computer-readable medium should be understood within the context of the specification to refer to a disc, a set of discs, or other suitable recording medium.  This ordinary meaning is consistent with the specification and the dictionary definition of the term.

### b.   MediaWriter automatically transmits an "identification specific to the computer-readable medium" to its audit database

The MediaWriter source code shows that it transmits the claimed audit information to an audit database on the MediaWriter when a CD or DVD is created.  Ex. 22 at 40; *see also* Ex. 2 at 81:23–82:7.  The transmitted audit data

-23-

includes "the user that was logged into the MediaWriter, patient identification, accession number, job number, and a time stamp." Ex. 22 at 40. The job number ("JobID") is a numerical identifier corresponding to the burn job — the creation of the CD, DVD, or set of CDs or DVDs. The job number ("JobID") therefore includes an identification that is specific to the computer-readable medium for that job. *Id*. at 42. For versions 4.0 and earlier of the MediaWriter software, the audit database also included a "DiscID," another identification specific to the computer-readable medium. *Id*. The DiscID also identifies a particular CD or DVD within a set of CDs or DVDs. Accordingly, the source code establishes that the MediaWriter satisfies this claim element. *Id*.

Pacsgear's User's Manuals, the Fed. R. Civ. P. 30(b)(6) deposition of Pacsgear, and testing of the MediaWriter also establish infringement. Ex. 23 at 15, 81–82; Ex. 21 at 41:15–43:21. The User's Manual at Section 9.1 shows the user interface for the MediaWriter's "audit logs." Ex. 3 at PG006785. It describes that the "audit logs contain messages that accumulate during product use." *Id*. Pacsgear's 30(b)(6) deponent testified that the audit log "records the user that was logged into the MediaWriter at the time the disk was made, some patient identifying information, the patient name and medical record number, the accession number which identifies the study, and then a job number, a time stamp." Ex. 2 at 71:20–72:4. The job number, in particular, specifically identifies the computer readable medium. It identifies each completed burn of a CD or DVD (or a set of CDs or DVDs) based on a user request. The job number therefore specifically identifies the disc or set of discs on which the patient's information was recorded. Ex. 23 at 81–82. In addition, version 4.0 and earlier of the MediaWriter also included a disc identification number that specifically identified the medium on which the patient's information was recorded. *Id*. This, too, satisfies this claim element. *Id*.

/ / /

## C.    MediaWriter infringes dependent claim 12

Claim 12 of the '157 Patent specifies that, in the system of claim 7, "the audit data comprises the date and time that the requested medical data related to the first patient was recorded to the portable computer-readable medium." Ex. 20 at 10:50–53.  The parties agree that no terms in this claim, apart from the disputed elements of independent claim 7, require construction.    Ex. 19 at 13–14.

The source code of the MediaWriter confirms that the MediaWriter transmits a time stamp to its audit database.  Ex. 22 at 40.  Pacsgear's 30(b)(6) deponent also testified that the audit log comprises a time stamp.  Ex. 2 at 71:20–72:4.  The timestamp is the date and time that the MediaWriter recorded the requested data to the computer-readable medium.   Accordingly, the MediaWriter satisfies this claim element.  Ex. 23 at 82–83.  Pacsgear does not contest infringement with respect to the added limitation of this claim.  Ex. 19 at 13–14.  There is therefore no dispute that MediaWriter satisfies this claim. Accordingly, DatCard requests that the Court grant summary judgment of infringement with respect to claim 12.

## V. CONCLUSION

The uncontroverted evidence establishes that Pacsgear contributes to the infringement of the '174 Patent and directly infringes the '157 Patent. Accordingly, DatCard respectfully requests that the Court grant this motion for summary judgment in its entirety.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: <u>January 16, 2012</u>    By:<u>   /s/ Paul A. Stewart</u>
Craig S. Summers
Paul A. Stewart
Brian C. Claassen
Bridget A. Smith
Attorneys for Plaintiff/Counterdefendant
DATCARD SYSTEMS, INC.

12499229

-25-