Willmore F. Holbrow, III (State Bar No. 169688)
Bill_Holbrow@bstz.com
Dennis G. Martin, Esq. (State Bar No. 54060)
dennis_martin@bstz.com
BLAKELY, SOKOLOFF, TAYLOR & ZAFMAN, LLP
12400 Wilshire Boulevard, Seventh Floor
Los Angeles, California 90025
Tel:  (310) 207-3800
Fax:  (310) 820-5988

Attorneys for Defendant PACSGEAR, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| DATCARD SYSTEMS, INC., a California corporation | Case No. SACV 10-1288 DOC (VBKx) |
| Plaintiff, | **PACSGEAR INC.'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF <u>NON-INFRINGEMENT</u> OF THE "SEARCH/BURN PATENTS"** |
| v. | |
| PACSGEAR, INC., a California corporation | |
| Defendant. | |
| PACSGEAR, INC., a California corporation, | |
| Counter-Claimant, | Hearing Date:  February 13, 2012 |
| | Hearing Time: 8:30 a.m |
| v. | Courtroom of Judge Carter |
| | Discovery Cut-Off:  Dec. 23, 2011 |
| | Trial Date: April 17, 2012 |
| DATCARD SYSTEMS, INC., a California corporation, | |
| Counter-Defendant. | |

# **TABLE OF CONTENTS**

**PAGE NO.**

I.  OVERVIEW ........................................................................................... 1

II.  DESCRIPTION OF THE MEDIA WRITER ...................................... 2

III.  THE MEDIA WRITER DOES NOT INFRINGE THE '164
       PATENT .............................................................................................. 5

       A.  Claim Construction Of Claim 9 ................................................. 5

             1.  Claim construction principles ........................................... 5

             2.  Person having ordinary skill in the art .......................... 5

             3.  The first three limitations are unambiguous ................. 6

             4.  Limitation 4:  "Search" of "the database" for "related
                  medical image data" ........................................................ 7

                  a.  Doctor Horii's construction ..................................... 7

                  b.  Dr. Rowberg's construction as modified in his
                       deposition .................................................................. 8

                       (1) related medical image data ................................. 8

                       (2) "search" for related data in "the database" ...... 10

             5.  The fifth limitation .......................................................... 11

       B.  The MediaWriter Does Not Infringe Claim 9 ......................... 11

             1.  The MediaWriter does not search for "related medical
                  image data" as Rowberg construes it: all image data it
                  retrieves is selected medical image data ....................... 11

             2.  Reports Are "Selected" and do not Constitute
                  "Medical Image Data" ..................................................... 12

             3.  The MediaWriter does not search for text reports in the
                  image database ................................................................. 12

i

|     |     |     | 4. | Infringement by equivalence is also precluded | 13 |
|  | C. | Independent Claim 15 Is Not Infringed Under Rowberg's Construction | | | 14 |
|  | D. | Independent Method Claim 16 Is Also Not Infringed | | | 14 |
|  | E. | Independent Method Claim 21 Is Also Not Infringed | | | 14 |
| IV. | THE MEDIA WRITER CANNOT INFRINGE THE '597 TWO DATABASE PATENT | | | | 15 |
|  | A. | The '597 Patent | | | 15 |
|  |  | 1. | Construction issues | | 15 |
|  |  |  | a. | "additional medical data" is the same as "additional related medical data", and both are the same as related medical image data | 15 |
|  |  |  | b. | "automatically" | 16 |
|  |  | 2. | Non-infringement of claim 1 | | 17 |
|  |  |  | a. | No automatic search | 17 |
|  |  |  | b. | The MediaWriter does not automatically search two image databases | 18 |
|  |  | 3. | Construction and non-infringement of claim 6 | | 18 |
|  | B. | No Infringement By Equivalence | | | 20 |
| IV. | THE MEDIA WRITER CANNOT INFRINGE THE '174 PATENT | | | | 20 |
|  | A. | Claim Construction Of The '174 Patent | | | 20 |
|  | B. | The MediaWriter Does Not Infringe Claims 1 And 8 Of The '174 Patent | | | 20 |
|  | C. | No Infringement By Equivalence | | | 22 |
| CONCLUSION | | | | | 22 |

1

# TABLE OF AUTHORITIES

2

**PAGE NO.**

3
## CASES

4

Abtox, Inc. v. Exitron Corp., 122 F.3d 1019 (Fed.Cir. 1997) .............................................. 5

E-Pass Technologies, Inc. v. 3Com Corp, 473 F.3d 1213, 1221 (Fed. Cir. 2007),

    citing Hilton Davis Chem Co., v. Warner-Jenkinson Co., 520 U.S. 17 (1997)............ 13

Hockerson-Halberstadt, Inc. v. Avia Group Int'l., 222 F.3d 951, 955 (Fed.Cir.

    2000) ........................................................................................................................ 5

Karsten Mfg. Corp. v. Cleveland Golf Co., 242 F.3d 1376, 1384 (Fed. Cir. 2001) .......... 13

Markman v. Westview Inst., Inc., 52 F.3d 967 (Fed.Cir. 1995), aff'd, 517 U.S.

    370, 116 S.Ct. 1384 (1996) ..................................................................................... 5

Nat'l Recovery Tech., Inc. v. Magnetic Sep. Syst. Inc., 166 F.3d 1190 (Fed. Cir.

    1999) ...................................................................................................................... 16

Perkin-Elmer Corp. v. Computervision Corp., 732 F.2d 888 (Fed. Cir. 1984).................. 13

Standard Havens Products, Inc. v. Gencor Industries, Inc., 953 F.2d 1360, 1374

    (Fed. Cir. 1991), cert. denied, 506 U.S. 817, 121 L.Ed.2d 28, 113 S.Ct. 60

    (1992) .................................................................................................................... 18

## I.   OVERVIEW

PacsGear seeks summary judgment of non-infringement as to all claims that its MediaWriter product does not infringe three of the five patents in suit:  U.S. Patents Nos.,7,302,164 B2, reissued without substantial change as the 7,302,164C1, and its two offspring 7,729, 597 and 7,783,174.  We refer to these as the Search/Burn patents because they all claim a system and method for searching for medical images on a DICOM conforming PACS system, and burning the images onto a compact disc.  DICOM is the standard for taking images from modalities (X-Rays, MRI's etc.), storing them and making them searchable by doctors.  DICOM-compliant PACS are systems which convert medical images derived from various modalities into the standard format (DICOM), thereby permitting easy and cost-effective storage, search, transmission, viewing and copying.  See PacsGear Reports and Deposition Excerpts, Ex. A, Horii Initial Report, ("Horii I"), pp. 9-11.

PacsGear does not include the '157 "HIPAA" patent in this motion because it believes that keeping an electronic record of CD's carrying patient information cannot be patentable, in part because it is essentially illegal not to have an audit trail.  It is filing a separate MSJ for invalidity and non-infringement of the '422 patent, because that patent centers on a technical issue of software programming, calling for a different skill in the art.

This motion discusses only the independent claims, because if PacsGear does not infringe those, it cannot infringe their dependent claims.

Some of the claims are method claims.  Generally, plaintiff does not allege that PacsGear directly infringes such claims, but rather that its customers infringe them in the manner that they use them.  We analyze them from the customers' perspective because if they do not infringe, then PacsGear cannot be liable for contributory infringement or inducing infringement.

For ease of reference, we attach the complete '164 patent as Appendix A, followed by the claims of each patent in readable type size, with the limitations numbered as Appendices B-D.  The central issue with all three patents is the meaning to be giving to the

distinction between data "selected" by the user, and "related" data which is somehow "automatically" generated in response to the users selection, regardless of whether the user wants it.  Depending on the construction of these terms, the Search/Burn claims are either invalid and/or are not infringed, and occasionally both.

## II.    DESCRIPTION OF THE MEDIA WRITER

PacsGear's MediaWriter is a PACS accessory called a medical disk publishing device.  It consists of a computer with a single monitor, a CD/DVD burning device and software which enables a user to select medical image studies[1] from a hospital's DICOM-conforming PACS image database and burn them onto a CD along with viewing software so they can be read by any computer.  The dialog box below shows how a user can select specific studies:



FIGURE 1

---

[1] A "study" is the term of art for the image or images taken by a modality in a single exam, whether it be one image (X-Ray) or hundreds (heart catheterization procedure).  "Reports" are text data, such as diagnostic reports.

2

The MediaWriter does not conduct an automatic secondary search for images related to the selected images. In other words, the only *images* that can be burned on to the CD are those that are expressly selected by the user, using the dialog box as shown.

Starting with MediaWriter version 3.0, PacsGear added a feature to the software that allows the user to burn the radiologist's text reports interpreting the selected images onto the CD along with the selected images. ("Configure Reports Option", Ex. 217, User's Manual, p. 24-25).

The user of the MediaWriter and/or PacsGear, based on the customer's request, must specifically configure the MediaWriter software to search for these text reports, namely reports received by the MediaWriter via an HL7[2] feed or from a DICOM compliant archive, namely a PACS broker. This feature, however, does not allow the user to conduct a search for image studies.  See Ex. 258, Cavanaugh Dec., ¶¶2-17.  These reports can be stored in a distinct folder on the hard drive of the MediaWriter or on a PACS broker, sometimes referred to as a MitraBroker, designed to store text reports. These reports are in text format and are not DICOM images.

Several steps are necessary for the MediaWriter to burn medical images onto a CD. First, the user inputs the patient's name and is shown a menu of studies.  He/she then selects all the image studies he/she wants to burn by moving a cursor to a box preceding each entry of the listed studies and clicking the computer's mouse, and then positioning the cursor over the Burn Studies button and clicking the computer's mouse (i.e., hitting the Burn Studies button on the dialog box above).  After clicking on the computer's mouse to hit the Burn Studies button, a Confirm Studies dialog box pops up (see below), which allows the user to make additional choices, including whether to include text reports.  If text reports are desired AND the system has been previously configured to obtain such text reports, the user can check the "Include Reports" box and then click on the "Confirm"

---

[2] HL7 ("Health Level 7") is the communication protocol used by a hospital to distribute written information from its Radiological Information System (RIS).  The HL7 protocol sends diagnostic reports from the RIS to devices configured to receive them.

1   button and the images originating from the (DICOM) image database and the text reports

2   from a separate location are burned onto a CD along with a viewing program.  The CDs

3   are automatically labeled with identifying information drawn from the patient

4   demographics and relevant studies.  (Ex. 217, User's Manual, pp. 24-25).

5

6

7

8

9

10

11

12   

13

14

15

16

17

18      The MediaWriter processes HL7 or Mitra broker reports for all relevant purposes,

19   in essentially the same way as the prior art system installed at UCLA in 1998-99 and

20   described in the Ratib Article, (Ex. 148 in the Exhibit book) and Declaration (¶¶9-16).

21   Other features of the MediaWriter will be discussed as they pertain to specific claims.

22

23

24

25

26

27

28

## III.   THE MEDIA WRITER DOES NOT INFRINGE THE '164 PATENT[3]

### A.   Claim Construction Of Claim 9

#### 1.   Claim construction Principles

The court must interpret the claims as a matter of law before determining validity or infringement. *Markman v. Westview Inst., Inc.*, 52 F.3d 967 (Fed.Cir. 1995), aff'd, 517 U.S. 370, 116 S.Ct. 1384 (1996). Where one patent is a continuation from the same application as another, construction of terminology common to them should be the same for both patents. *Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019 (Fed.Cir. 1997). Where terms have been given no special meaning by the inventor, they are to be interpreted according to how one with ordinary skill in the art would read them. *Hockerson-Halberstadt, Inc. v. Avia Group Int'l.*, 222 F.3d 951, 955 (Fed.Cir. 2000). Ambiguous terms are to be interpreted under a hierarchy of evidence, the claims, the specification, then the file history, and, if still ambiguous, to extrinsic evidence. (*Markman* at 979-980).

#### 2.   Person having ordinary skill in the art

PacsGear's medical image expert Dr. Horii discusses the need for the person of ordinary skill in the art (PHOSITA) to blend knowledge of digital information systems and DICOM imaging technology in the medical field. He has a unique background for that task in that he was on the committee that drafted the initial examination for Certified Informatics Information Professionals ("CIIPs"), implemented in 2007. CIIP's have training and experience in digital information technology and imaging modalities as they relate to DICOM. Dr. Horii's profile of the hypothetical person of skill is a CIIP, had that title existed at the time of the patent filing, with five years experience in the design, use and implementation of PACS or a radiologist or medical computer networking specialist with equivalent experience. (Ex. A, Horii I, pp. 8-9).

---

[3] For convenience, the '164 Patent is attached as Appendix A, hereto. The Claims in a more readable format are attached as Appendix B ('164), Appendix C ('597 Patent) and Appendix D ('174 Patent).

Inventor Ken Wright's profile of the PHOSITA is extremely similar.  He posits someone who would "at least need to be certified with some sort of medical schooling or medical background…" and "who would need to understand the business of radiology or information systems, training enough to understand DICOM and how the inner working parts work" with "three or four years of experience."  (Ex. I, Wright Dep., pp. 233-34).

Plaintiff's PACS expert Dr. Rowberg's profile is a person with a bachelor's degree in science or engineering with a year of work experience, or a person with 3 years of work experience.  (Rowberg Initial Report, Ex. C, pp. 14-15 ("Rowberg I")).  Since he does not state whether the work experience has to have anything to do with radiology, medicine, computer programming or hospitals—Dr. Rowberg's profile is inadequate.

### 3.    The first three limitations

The first three limitations in Claim 9[4] provide for a medical image server configured to receive medical images from a plurality of—at least two-- modalities, e.g. MRI's and X-rays—in a "standard medical imaging format"—i.e., DICOM—viewable on computers capable of viewing DICOM images.

The second provides for "a database" configured to store medical images generated by plural modalities.  Necessarily, this database must store images in DICOM format,

---

[4] 9. A system comprising:

[1] medical image server configured to receive medical image data that is generated by a plurality of imaging modalities, the medical image data being formatted in a standard medical imaging format used by specialized computers configured for viewing medical images;

[2] a database configured to store medical image data generated by the plurality of imaging modalities;

[3] a plurality of browsing terminals configured to receive a user selection that defines selected medical image data;

[4] a search module configured to search the database for related medical image data that is related to the selected medical image data; and

[5] a production station that is configured to record all of the following onto a single, portable digital data storage device that is removable from the production station: the selected medical image data, recorded in the standard medical imaging format, the related medical image data, recorded in the standard medical imaging format, and a viewing program that is configured to allow viewing of the selected and the related medical image data that is recorded onto the data storage device on widely accessible computers not specifically configured with standard medical imaging software for viewing of medical images.

because the images it receives must be in DICOM format according to the first limitation. It also must be searchable as a user searches it to retrieve the selected images.

The third requires a "plurality" of "browsing terminals," computers or dumb terminals with a browser configured to receive "a user selection that defines "selected medical image data." This merely means that users on separate computers/terminals, are able to enter search terms defining the medical image studies data they wish to view.

### 4. Limitation 4: "Search" of "the database" for "related medical image data"

#### a. Doctor Horii's construction

The fourth limitation calls for a "a search module *configured to search the database for related medical image data* that is related to the selected medical image data."

Dr. Horii reads "related medical image data" to mean digital medical images in DICOM format that are somehow related to the images initially selected by the user—such as earlier studies of the same patient, or, if the user selected a patient's MRI, perhaps a CATScan of that patient. (Horii I, Ex. A, pp. 12-13).

Horii explicitly excludes text reports, based on the "standard medical imaging format", the parallel claim language terms, "selected medical image data" and "related medical image data" as well as the examples in the specification consisting only of medical images. Horii I, pp. 12-13. He reads "the database" to refer back to the same database called for in the second limitation...." He states "...the system is capable of searching the same database in which it found the selected medical images for additional medical images related to the selected medical images." (Ex. B, Horii Rebuttal Report ("Horii II"), p. 8).

He also opines that "database" in the context of claim 9 and according to the conventional technical definition "to mean the electronic collection of image data stored in a way to allow for easy search and retrieval following the request of a user." (Ex. B, Horii II, p. 7). That is, the database must be searchable.

**b. Dr. Rowberg's construction as modified in his deposition**

**(1) related medical image data**

In his infringement report, but not in his testimony, Dr. Rowberg disagrees with Dr. Horii on the issue of whether text data—non-image data--is encompassed by "related medical image data."

In his 103-page infringement report Rowberg does not separately construe the claims, but instead implicitly adopts his own construction in his itemized infringement charts. (Rowberg I, Ex. C). He does not reference other limitations, other claims or the specification, and performs no other analysis of the claim terms. His construction must be ferreted out from his invalidity and infringement reports. Thus, in connection with the fourth limitation, he proclaims that the Media Writer meets the limitation because, he says, it can be configured to copy *written reports* to the CD.[5] Rowberg explains away the "related medical image" language by saying it includes text reports "related" to the "selected medical image data," instead of the obvious literal meaning, medical *image* data that is related to the selected medical *image* data. Under his construction, while, the selected medical image data is restricted to image data, the related medical image data need not be.

At his deposition Dr. Rowberg was asked to find any reference to written reports in the specification. (Ex. J, Rowberg p. 46). After an embarrassingly long period, he could not find one. Finally he pointed to a sentence using the term "medical exam data" which Rowberg contended meant written reports. (Ex. I, Rowberg Dep. p. 52). But, he retreated from that statement, too, admitting that in context and based on the specification it was used *as a synonym for medical images*. (Rowberg Dep. p. 56-57). The word "exam" is employed a few times in the specification and each time it specifically refers to images.

---

[5] "In my opinion, the term 'related medical image data' includes data related to a medical image. Reports originating from HL7 feeds, Mitra broker reports and DICOM structured reports comprise data that is related to a medical image. Thus, it is my opinion that these items constitute 'related medical image data' within the meaning of [limitation 4]." Ex. C, Rowberg Infringement Report, p. 22:20-23.

8

See, specification Appendix A, hereto, Col. 8:10-35.  (e.g., See also Figure 5 of the '164 Patent).  Finally, he admitted that "related medical image data" in limitation 4, just like its antecedents "selected medical image data" in limitation 3 and "medical image data" in limitation 2 referred only to medical images.  (Ex. J, Rowberg Dep. p. 123 ll. 8-12):

> Q.  "So one skilled in the art seeing "image data" would think that it only meant---it only referred to images to the exclusion of other things, correct?
>
> A.  Yes."

Additionally, according to the inventor, Mr. Wright, in 1999, PACS only stored DICOM images and it wasn't until the 2005/2006 time period that a few PACS manufacturers began allowing anything but images to be stored.  (Ex. I.  Wright Dep. p. 149).  Since at the time of the invention, PACS only stored images, one skilled in the art at the time the application was filed in January, 2001 would have interpreted "related medical image data," in the '164 patent to mean images only.

If Rowberg's admission were insufficient, the fifth limitation puts an end to DatCard's contention that text reports are included within related medical image data.  It calls for a CD burner or analogous "production station" configured to download the "selected" *and* "related medical image data", *both* recorded in the "standard medical imaging format."  As we have seen, HL7, Mitra reports and any other reports the MediaWriter is configured to collect are in text format, not DICOM.  The requirement that related data be in the standard medical imaging format is the final proof that the data in "related medical image data" must consist solely of images.[6]  Additionally this limitation requires the viewing software burned onto the CD to be capable of viewing the "selected and related image data."  The eFilm viewing software, identified in the patent specification, could only view images and could not read text reports.  (Ex. I, Wright Dep. p. 156:7-9).

---

[6] One of the inventors, Ken Wright, was involved with HL7 projects from 1992-1999.  (Wright Dep. 20:12-20) If he had intended for the patent to cover HL7 reports, he surely would have included it in the specification.

### (2) "search" for related data in "the database"

In connection with the term in limitation 4, "search module configured to search the database for related medical image data," Rowberg's report states that this claim is satisfied where the search module searches a different database than the database referred to in limitation 2.  (Rowberg Infringement Rpt. Ex. C, p. 23).  This was in the context of trying to make claim 9 read on items retrieved in connection with the Configure Reports option (e.g., HL7 fed and Mitra broker reports), which can be stored separately on the MediaWriter's hard drive, in order to make the MediaWriter infringe.

This aspect of Rowberg's report self-destructed when he admitted in deposition that "the database" in limitation 4, contrary to his report, could only refer back to the DICOM PACS medical image database in limitation 2:

> Q. So the question is, the Claim 9, the second limitation starts off: A database...
> And the fourth limitation states:  A search module configured to search
> the database.
> My question is, is it your understanding that the database identified in the
> second  limitation can be different than the database identified in the fourth
> limitation?
> A. (Reviews document.)  Because it has defined "database" and then says "the
> database," I think it's referring back to the same one. So I would think it would
> be the same.  (Rowberg Dep.  40:1-15)

This admission precludes Rowberg's "two database" theory of claim 9.  As it is abundantly clear that searching two databases – one for images and the other for text reports is not substantially the same function, way or result as searching one database for selected and "related" images. Also, it is another proof that the text reports, because they cannot be stored in the same medical image database called for in limitation 2, cannot constitute "related medical image data."

### 5. The fifth limitation

Aside from its importance in rebutting Rowberg's construction of the fourth limitation, the fifth limitation is clear enough.  It states that the CD burner loads a viewing program onto the CD along with the selected and "related images", both in DICOM-format. The MediaWriter does not do that.

### B. The MediaWriter Does Not Infringe Claim 9

DatCard bears the burden of establishing that the Accused Product satisfy each claim limitation either literally or under the Doctrine of Equivalents.  For the reasons discussed below it cannot raise a genuine issue of disputed fact from which a reasonable jury could conclude infringement.

### 1. The MediaWriter does not search for "related medical image data" as Rowberg construes it: All image data it retrieves is selected medical image data.

The menu of the MediaWriter appearing on the doctor's workstation gives a series of options for selecting the images the user desires.  If a user wants to view all studies ever taken of the patient, he inputs the patient's name and a list of all studies belonging to that patient will appear.  He can then check all studies or some of the studies.  If he wants the most recent study, he can select that study by date or limit the search to begin with by date.  Either way he will only get the study he is seeking.  Or he can pick and choose whatever he wants from a list in the menu on the screen.  In all these cases, the only images retrieved and received are those selected at the user's volition.[7]

If the user wants additional images he selects additional images as to that patient off the menu.  Or he can move on to another patient.  Either way, the search yields "selected" image data because it is the product of the user's selection.  There certainly is no meaningful distinction, as far as the MediaWriter is concerned, between a selection of

---

[7] This applies to Structured Reports, which were not available until well after the time period of the invention, and scanned-in images.  Both these items are only burned on the disc if the user selects them.  See Figure 1 above which includes an option to select SR – Structured Reports.

more data about the same patient and a selection of data for a different patient.  It is all "selected."

There also is no meaningful distinction between selected and related image data as separate components of what is burned onto the CD's as called for in limitation 5.  Once the user has viewed the available image studies, he separately selects which image studies he wants to have burned, all, some or none.

### 2.     Reports Are "Selected" and do not Constitute "Medical Image Data"

Text reports are not DICOM images and therefore cannot satisfy the limitations for searching for related DICOM images and burning them onto a disc.  Additionally, the text reports will not be burned on the disk unless the user makes a decision to include them.  (See Figure 2 above.) There is an option which allows the MediaWriter to be preset to copy text reports from the workstation related to a patient's medical image.  Even then, however, the user is presented with an option of deselecting reports or including them, which again constitutes a user's selection.

### 3.     The MediaWriter does not search for text reports in the image database

By admitting that "database" in limitation 4 could only be the medical image database specified in limitation 2, and "related medical image data" could only be medical images, Rowberg demolished that part of his infringement analysis that depended on text reports stored in a separate folder on the hard drive meeting limitation 4's requirement of a search module "configured to search *the* database for related medical image data."  The text reports stored on the hard drive (a) are not medical images and (b) are not stored in the medical image database specified in limitation 2, which only stores images.

To be sure, the MediaWriter can be configured to have text data to be burned onto the same CD that contains image data, but text data gets to the disk by a separate path and source from those employed to retrieve DICOM medical images as contemplated by Claim 9.  See Ex. 258, Cavanaugh Dec. ¶¶2-17.

### 4.   Infringement by equivalence is also precluded

Rowberg argues that if there is no literal infringement, then the text reports fed to the MediaWriter workstation hard drive via HL 7, Mitra Broker or other method satisfy limitation 4 under the Doctrine of Equivalents:

> "Pacsgear may also contend that using the Accused Products with a report broker that is not part of a PACS does not satisfy this claim element because the Accused Products would not search the same database for both selected medical image data and related medical image data….*Even assuming that Pacsgear is somehow correct, it is my opinion that there are insubstantial differences between searching the same database for related medical image data and searching another database for related medical image data.* [emphasis added]."  (Rowberg I, pp. 22-23, Ex. C).

Under the Doctrine of Equivalents, if an accused device does not literally meet a limitation in a patent, but has a feature which performs the same function, in the same way, with the same result, it may be found to infringe by equivalence.  *Perkin-Elmer Corp. v. Computervision Corp.,* 732 F.2d 888 (Fed. Cir. 1984).  A DOE analysis is confined to the particular limitation:  it is not open to argue that the overall result of the entire claim is similar to the alleged equivalent result of the Accused Product.  *E-Pass Technologies, Inc. v. 3Com Corp*, 473 F.3d 1213, 1221 (Fed. Cir. 2007), citing *Hilton Davis Chem Co., v. Warner-Jenkinson Co.*, 520 U.S. 17 (1997).  As Dr. Horii concludes a device that searches a single database does not perform substantially the same function in substantially the same way to achieve substantially the same result as a device that searches multiple databases.  (Ex. A, Horii Report, p. 15).

There is absolutely nothing in the claims, specification, figures, or file history giving the remotest hint that text reports are intended to be included along with images as related medical data.  This alone would exclude that meaning because the patent specification does not enable the person of ordinary skill to practice the patent, or avoid infringing it. It would be invalid for non-enablement if the term were stretched to cover text reports.  *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1384 (Fed. Cir. 2001)(Patent terms amenable to more than one construction should, when it is reasonably possible to do so, be construed to preserve their validity).

### C.       Independent Claim 15 Is Not Infringed Under Rowberg's Construction

Independent claim 15 is the same as claim 9 except presented in a method claim format, with the sole difference that it adopts an "optical disk" as the "single, portable data storage medium."  Since a CD is an optical disk, our analysis of claim 15 is identical to the analysis of claim 9, namely that the claim is not infringed literally or by equivalence.

### D.       Independent Method Claim 16 Is Also Not Infringed

Claim 16 claims the method used in generating the CD with the "selected" and "related" data.  Although the limitations are slightly rearranged, it consistently calls for "related medical image data."  For that reason alone, it excludes "text reports".  Additionally, it is "[a] method for selecting and automatically recording medical image data onto a data storage medium" and it requires that "the received *medical image data* be formatted in a standard medical imaging format" without distinguishing "selected" from "related" data (limitation 1) further confirming that the claim excludes text reports.

Claim 16 also requires that the production station (i) print a label and (ii) affix the label to the data storage device (i.e., CD).  The MediaWriter, on the other hand, uses a CD Burner with an ink jet system that quickly and directly places information on the CD.  It does not (i) print a label and then (ii) affix it to the CD.  For this reason alone, the MediaWriter does not infringe Claim 16.  Rowberg, after reviewing the MediaWriters CD Burner, contends that "The inkjet head is activated as the printing part and the ink is spread on the disc is the applied part."  (Ex. J, Rowberg Dep. 185:13-20).  Activating an inkjet head does not constitute "printing a label."  The MediaWriter does not perform substantially the same function in substantially the same way to achieve substantially the same result as a device that requires a two-step process – print the label and affix the label – as required by the limitation.

### E.       Independent Method Claim 21 Is Also Not Infringed

Claim 21 is the same as Claim 16 with the exception that it specifically identifies the data storage medium as an optical disk.  The MediaWriter does not infringe Claim 21 for the same reasons it does not infringe Claim 16.

**IV.   THE MEDIA WRITER CANNOT INFRINGE THE '597 TWO DATABASE PATENT**

    **A.   The '597 Patent**

        **1.   Construction issues**

            **a.   "additional medical data" is the same as "additional related medical data", and both are the same as related medical image data.**

Method Claim 1 of the '597 patent, issued in 2010, is a refinement on Claim 9 of the '164 patent in that it requires "automatically" searching two different databases, the first database through one interface for "medical imaging data" pursuant to a "received request" (i.e. a selection) and the second through a different interface for "additional related medical data." Appendix C. It is DatCard's burden to establish that each of these limitations is satisfied.

The changes in wording to "request" instead of "selection" and "additional related medical data" instead of "related medical image data" are inconsequential. Rowberg testified that such claim terms were ambiguous, therefore necessitating reliance on the specification. (Rowberg Dep. 65:3-25)

DatCard's proposed construction that the additional related medical data can be text data must be rejected for these reasons:

The specification consistently uses "related data" to refer to image data. All ten uses of "related data" in the specification (App. A, col. 8:25-60) in context can only refer to image data. See, in particular, the references to "PACS systems stored in the 'related data storage' field" which the applications server searches for "related data." Col. 8:44-46. The only data identified as being stored on these PACS systems is image data and the only data sent to the production station from these PACS systems is "the medical image data originally received in step 132 and the related medical <u>image</u> data." (App. A, '164 Patent- Col. 6:38-58)

The specification and figures nowhere mention or illustrate the storage, retrieval, or copying of text data.

The claim would be invalid if interpreted to include text data, because the patent does not enable the person of ordinary skill to practice it.  See e.g., *Nat'l Recovery Tech., Inc. v. Magnetic Sep. Syst. Inc.*, 166 F.3d 1190 (Fed. Cir. 1999)(Motion for summary judgment for invalidity upheld where patent's specification does not enable person of ordinary skill in the art to practice claim without undue experimentation; in this case, the complete omission of language encompassing text data from the specification and figures provides no starting point from which a PHOSITA can base his experimentation towards successfully practicing the invention).

In the file history, there is no suggestion that  "related data," "related medical image data," "additional related medical data" or any other variations encompasses text data.

The continuation application leading to the '597 was filed on June 24, 2009, two years after MediaWriter was introduced on the market.  DatCard had the luxury of designing its claims in an attempt to entrap the MediaWriter, but never gave any hint to the Patent Office that text data was included, not just in pursuing the '597 application but in *ten years* of prosecuting these patents.

Dr. Rowberg, in any event, admitted that the "related data" was limited to medical image data.  (Ex. J, Rowberg Dep., pp. 119-121).  He also conceded that medical data is synonomous with medical image data and would not include text reports.  (Ex. J, Rowberg Dep., p. 69:3-7)

### b.  "automatically"

The other disputed term in the '597 is "automatically." It appears in 6 of the seven limitations: "automatically searching a first computer database" (lim. 2), "automatically retrieving the first set of medical imaging data…," (lim. 3), automatically searching , based on the received request, a second computer database…"  automatically searching, based on the received request, a second computer database ….for additional medical..." (lim. 4)

16

1   automatically receiving the additional related medical data (lim 5) and "automatically

2   generating a portable computer readable medium…(lim. 6).

3       This feature is discussed in the specification in the context of pre-setting the system

4   to automatically search for related medical image data, and is illustrated in the Figure 5

5   flow chart.  The patent specification uses "automatically" variously meaning "without

6   prompting for user selection" (7:53-55) and "without asking for user direction" (8:48-49).

7               **2.    Non-infringement of claim 1**

8                   **a.    No automatic search**

9       The MediaWriter does not infringe because there is no mechanism for automatically

10  broadening the user's selection to encompass image data outside the scope of the selection.

11  The user simply selects what medical images are desired, gets them and no others.  There

12  is no automatic search; the user must make another selection to obtain additional materials.

13      Additionally, the MediaWriter does not satisfy all the limitations because the

14  operations set forth in the claim do not occur automatically.  That is the claim requires that

15  upon "receiving, via computer-implemented interface a request for medical data related to

16  the patient" all the other steps occur "automatically" resulting in a CD containing selected

17  medical image data, additional related medical data and viewing software.

18      The MediaWriter does not work that way.  To the contrary, after receiving a request

19  of medical data related to the patient, a user of the MediaWriter must still select the image

20  studies by positioning the cursor over a box next to each study and clicking the computer's

21  mouse, positioning the cursor over and clicking on the Burn Studies button, at which point

22  a Confirm Burn dialog box will appear.  Next the user can select whether or not it wants to

23  include reports and only after it approves of the selections on the Confirm Burn dialog box

24  and clicks on the "Confirm" button, will the images be burned on the CD.  (Ex. 217,

25  MediaWriter User's Manual 4.0. p. 10-13).  This multistep process is outside the scope of

26  the claim limitations and their equivalents.

27

28

17

**b.  The MediaWriter does not automatically search two image databases**

Rowberg identifies HL7 databases, Mitra Report Brokers and a second PACS or other modalities as the "second database" which the MediaWriter searches for additional medical data.  (Ex. C, Rowberg I, p. 44-45).  Rowberg next contends that the Claim's 5th limitation (*automatically receiving the additional related medical data)* is satisfied by the Configure Reports option added to the MediaWriter in version 3.0.  (Rowberg I, Ex. C, p. 46).  As discussed above, the MediaWriter can not search for or receive images from any database through the Configure Reports option.  (Ex. 258, Cavanaugh Dec., ¶¶ 2-17). Morever, DatCard has failed to provide any evidence demonstrating that anyone has used the MediaWriter to conduct, via the Configure Reports option, a search of a second PACS or modality for medical images, nor can they!  *Standard Havens Products, Inc. v. Gencor Industries, Inc.,* 953 F.2d 1360, 1374 (Fed. Cir. 1991), *cert. denied,* 506 U.S. 817, 121 L.Ed.2d 28, 113 S.Ct. 60 (1992)(The method claims of the patent at issue were held not directly infringed by the mere sale of an apparatus capable of performing the claimed process, as method claims are directly infringed only when the claimed process is *performed*.) In short, the only images received are those initially selected by the user. Additionally, as discussed above, even text reports are not automatically included on the CD as they are only included following a volitional act of the user.

**3.  Construction and non-infringement of claim 6**

Claim 6, a system claim, rearranges the sequence of the limitations of claim 1, and adds the additional limitation that the data in all instances is "related to the patient."  It also deletes the term "automatically" from each limitation although it is included in the claim's preamble.  The Claim requires a first and second database which store medical images (lims. 1 & 2) an application server which is connected to both databases (lim. 4), which after receiving a request, is configured to send a search request, "based on the received request" (lim. 3) to a first database for medical imaging data, and to a "different" "second database" distinct from the first database for additional medical data related to the patient.

(lims. 5 and 7).  The system receives the "additional related medical data" (lim 8) and the productions station burns "the first set of medical imaging data"…and the "additional related medical data" onto the CD.

The data, regardless of the formulation, is all DICOM image data, for the reasons discussed above and as Rowberg admitted.

The limitation that the second search is based on the first request means that there is no second selection of data by the user: it is triggered <u>automatically</u> by the original request "without user intervention."

As with Claim 1 of the '597 Patent, the MediaWriter does not infringe claim 6 because in order to do so it must get image data from two different databases.  The fourth limitation specifically requires an application server connected to two databases capable of providing the images, which are ultimately burned on to the CD.  Rowberg contends this element is satisfied by the MediaWriter's connection to (i) a PACS and (ii) any of the following: a second PACS, a modality, HL7 reports database or a Mitra Broker in connection with the Configured Reports option.  (Ex. J, Rowberg Dep., pp. 51-53).  As discussed above, however, DatCard has not provided any evidence that the application server has ever been coupled to a second PACS or modality in connection with such a search.  Additionally, the Configured Reports option does not allow one to search for or retrieve images - it only allows for the retrieval of text reports.

As discussed above, the claim language requires that the search of the second database occur automatically "based on the (original) received request" (Appendix C., lim. 7).  The MediaWriter does not automatically burn reports or any images on to CDs. Instead, after the user inputs the patient's name, the user must select the studies by positioning a cursor over a box next to each desired image study and clicking a mouse button, positioning the cursor over and clicking on the Burn button (Figure 1 above), and then making a decision in the Confirm Burn dialog box (Figure 2 above) whether or not to include the reports AND then clicking on the Confirm button.  If all those user steps are

not completed the images from the PACS archive and any text reports resulting from the Configured Reports option, will not be placed on the CD.

## B. No Infringement By Equivalence

There can be no infringement by equivalence of the '597 patent, because the MediaWriter does not accomplish the same function in the same way to achieve the same result:  There is no automatic search for unselected image data nor is image data obtained from two databases.

## IV. THE MEDIA WRITER CANNOT INFRINGE THE '174 PATENT

### A. Claim Construction of the '174 Patent

The '174 patent[8] parallels the '164 patent, except that it is slightly more broad in that it allows for images to originate from a single modality instead of the plurality required by the '164 Patent.  Claims 1 and 8, the two independent claims, use similar terms and for purposes here can be analyzed together.  The claims use the term "related data" instead of "related medical data" or "related medical image data."  As discussed above, however, for purposes of the patent claims "related data" necessarily means related medical image data in DICOM format.[9]  (See above discussion of "medical data" and "related data" in connection with the '597 Patent).  Additionally, the fourth limitations of the claims mandates that the search module <u>automatically</u> search the database for related data based on the user selection.  The term "automatically" would have the same meaning used above – i.e., no user intervention.

### B. The MediaWriter Does Not Infringe Claims 1 And 8 Of The '174 Patent

As with the '164 Patent, both the selected and related images must come from the same database.  The second limitation requires the database be configured to store medical images and the fourth limitation requires that the same database be searched automatically

---

[8] See Appendix D.

[9] In fact, Claim 5 of the '174 Patent confirms this interpretation as it states: "selected medical image data and *related medical image data*" were recorded onto the data storage medium. Showing at the the applicant considered the terms to be synonymous.

1   for related images.  The two databases identified by Dr. Rowberg to satisfy the second

2   limitation are (i) the local hard drive which stores the medical images but is not searchable

3   by the user and (ii) PACS/imaging modalities.  (Ex. C, Rowberg I, p. 55-56).  Dr. Rowberg

4   then identifies the following different "databases" which he contends satisfies the fourth

5   limitation of Claim 1.  (Ex., C, Rowberg I, p. 58-61):

6       1) *The MediaWriter is capable of storing reports received from HL7 feeds*

7       *or brokers on its hard drive.*  The files which store these text reports on the

8       MediaWriter's local drive are not the same "database" Rowberg identified in

9       connection with second limitation.  Additionally, the reports themselves are text

10      reports and not image data.

11      2)  Dr. Rowberg next contends that the "related data" includes DICOM

12      Structured Reports or DICOM images, which are scanned into a PACS.  As

13      discussed above, these Structured Reports and/or scanned images are directly

14      associated with images on the PACS and would be burned on to the CD only if they

15      were "selected" by the user.  See Figure 1 above.

16      3)  Dr. Rowberg also contends the MediaWriter is configured to search the

17      database for related data "via a report broker, such as a Mitra broker".  Again, the

18      reports generated by these brokers are text reports and not images.  Additionally,

19      the Mitra brokers and other brokers are a separate and distinct database compared to

20      the "database" Dr. Rowberg identified in connection with the second limitation of

21      Claim 1.[10]

22  All his proposed "database" options fail to satisfy the claim language.

23      The fourth limitation also requires that the search for related data occur

24  automatically.  As discussed above in connection with the '597 Patent, the user must

---

[10] Dr. Rowberg opines that there are "insubstantial differences between searching the same database for related medical images data and searching another database for related medical image data." (Ex. C, Rowberg I, pp. 60-61) While technically-speaking, searching multiple databases versus a single database could be accomplished by one skilled in the art, the scope of Claim 1 is specifically limited to searching a single database.

1  intervene on multiple occasions before the search for related data occurs – even if "related

2  data" includes reports (e.g., position cursor and clicking the mouse to select studies,

3  position cursor and clicking the Burn button, select whether or not reports should be

4  included, click the Confirm button, etc…).

5      In light of the above, the MediaWriter does not infringe Claims 1 or 8 of the '174

6  Patent.

7      **C.    No Infringement By Equivalence**

8      There can be no infringement by equivalence of the '174 patent, because the

9  MediaWriter does not accomplish the same function in the same way to achieve the same

10  result: a system which searches multiple databases versus a single database, searches for

11  text reports instead of images and requires user intervention as opposed to occurring

12  "automatically" - performs a substantially different function in a substantially different

13  way to achieve a substantially different result.

14

15                          **CONCLUSION**

16      For all the above reasons, the MediaWriter does not infringe the three Search/Burn

17  Patents.

18

19                                          Respectfully submitted,

20

21  Dated: January  16 , 2012

22                                          Willmore F. Holbrow, III
                                            Dennis G. Martin
23                                          BLAKELY, SOKOLOFF, TAYLOR & ZAFMAN, LLP
                                            Attorneys for Defendant PACSGEAR, INC.
24

25

26

27

28