1
2
3
4
5
6
7        **UNITED STATES DISTRICT COURT**
8       **CENTRAL DISTRICT OF CALIFORNIA**
9          **WESTERN DIVISION**
10

| | |
|---|---|
| DATCARD SYSTEMS, INC., a California corporation | Case No. 8:10-cv-01288-MRP-VBK **Claim Construction Order** |
| Plaintiff, | |
| v. | |
| PACSGEAR, INC., a California corporation | |
| Defendant. | |

### I.    Introduction

Datcard Systems, Inc. ("Datcard") has sued Pacsgear, Inc. ("Pacsgear") for patent infringement.[1] ECF No. 1. Datcard's patented inventions facilitate the handling and delivery of medical image data. The asserted patents fall into three

---

[1] The asserted patents are U.S. Patent No. 7,302,164 (filed Jan. 17, 2001), entitled "System and Method for Producing Medical Image Data onto Portable Digital Recording Media"; U.S. Patent No. 7,729,597 (filed Jun. 24, 2009) (continuation of the '164 patent); U.S. Patent No. 7,783,174 (filed Jun. 12, 2009) (continuation of the '164 patent); U.S. Patent No. 7,734,157 (filed Jun. 24, 2009) (continuation of the '164 patent); and U.S. Patent No. 7,801,422 (filed Jun. 5, 2009) (continuation of the '164 patent).

groups: (1) Search and Burn; (2) HIPAA; and (3) Timeout. The Search and Burn group includes three patents. These patents claim various ways of managing the flow of medical image data from cradle to grave, i.e., from the image-generation device, to intermediate database servers, and ultimately to the end-user in the form of a labeled CD. The HIPAA patent automates the process of regulatory compliance relating to the privacy of medical records. The Timeout patent claims a way to avoid the premature burning of data onto CDs.

The parties dispute the meaning of certain claim terms in the patents. In this Markman order, the Court construes those terms.

## II.     Principles of Claim Construction

The purpose of claim construction is to determine the meaning and scope of the patent claims asserted to be infringed. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). Claim construction is a pure question of law. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). For purposes of claim construction, the Court reviews both intrinsic and extrinsic evidence, placing emphasis on the former.

### A. Intrinsic Evidence.

### i.     Claim Language

"The words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips v. AWH Corp.¸* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citation

omitted). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. "The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation." *Id.* "That starting point is based on the well-settled understanding that inventors are typically persons skilled in the field of the invention and that patents are addressed to and intended to be read by others of skill in the pertinent art." *Id.*

### ii.   Specification

The specification is "always highly relevant to the claim construction analysis." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995). As Judge Rich wrote shortly after the creation of the Federal Circuit, "the specification . . . is the primary basis for construing the claims." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985). "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. "In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id*. In such

cases, the inventor's intention as expressed in the specification "is regarded as dispositive." *Id.*

### iii.    Prosecution History

The Court also considers the patent's prosecution history, if it is in evidence. "The prosecution history, which we have designated as part of the "intrinsic evidence," consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." *Id.* The patentee created the prosecution history much like the specification in an attempt to explain and obtain the patent, and thus the prosecution history provides evidence about how the PTO and the inventor understood the patent. *Id.* "Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* "Nonetheless, the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

### B. Extrinsic Evidence

In addition to using intrinsic evidence, this Court is also authorized to use extrinsic evidence in claim construction. *Phillips*, 415 F.3d at 1317 ("[W]e have . .

-4-

. authorized district courts to rely on extrinsic evidence . . . .”). Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id*. While extrinsic evidence can shed light on claim meaning, it is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Id*. (citation omitted). Finally, extrinsic evidence is "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id*. at 1319.

## III.   CLAIM CONSTRUCTION

### A. Search Burn Patents

The three Search Burn patents are directed to systems and methods for facilitating the search and delivery of a patient's medical images.[2] The parties dispute the meaning of certain claim terms. Some disputes are over identical terms in all three patents. Other disputes are over similar terms across the patents. The Court has grouped these disputes because the analyses are similar. The grouped disputes (with corresponding patent numbers) are:

i.     "related medical image data" ('164), "additional medical data . . . related to the patient" ('597), and "related data" ('174);

ii.    "database" ('164, '174);

---

[2] The three Search Burn patents are: (1) U.S. Patent No. 7,302,164 (filed Jan. 17, 2001) ("the '164 patent"), entitled "System and Method for Producing Medical Image Data onto Portable Digital Recording Media"; (2) U.S. Patent No. 7,729,597 (filed Jun. 24, 2009) ("the '597 patent") (continuation of the '164 patent); and (3) U.S. Patent No. 7,783,174 (filed Jun. 12, 2009) ("the '174 patent") (continuation of the '164 patent).

iii.    "automatically" ('597, '174); and

iv.    whether the claim elements "printing" and "affixing" the label must occur sequentially ('164).

The Court next considers each dispute in turn:

> **i.    "related medical image data" ('164 patent), "additional medical data . . . related to the patient" ('597 patent), "related data" ('174 patent)**

The relevant claim limitations for these disputed claim terms are:

> (a) "a search module configured to search the database for ***related medical image data*** that is related to the selected medical image data . . . ." '164 patent at col. 10 II. 53-55 (emphasis added);

> (b) "automatically searching, based on the received request, a second computer database via a second database interface for ***additional medical data*** also ***related*** to the patient . . . ." '597 patent at col. 9 II. 34-36 (emphasis added); and

> (c) "a search module configured to automatically search the database for ***related data*** based on the user selection . . . ." '174 patent at col. 9 II. 24-47 (emphasis added).

The accused infringing product, MediaWriter version 3.0, allows the user to burn a radiologist's text reports onto a CD along with selected images.[3] Not surprisingly, the parties dispute whether the claim terms above cover non-image data like text reports.

//

---

[3] Pacsgear's Motion for Summary Judgment of Non-Infringement of the Search/Burn Patents [hereinafter "Mot."] at 3 (ECF No. 67). Datcard's opposition to the above motion is hereinafter referred to as "Opp." ECF No. 87.

### (a) "related medical image data" '164 patent

The Court finds that "related medical image data" means data which is (1) in a standard medical imaging format, and (2) is related to the selected medical image data.[4] The Court rests this finding on three bases: (1) claim language; (2) the rule of internal consistency; and (3) support in the specification.

### 1. Claim language

The phrase "related medical image data" contains three nested modifiers. We start with the word "data." "Image" modifies "data" yielding "image data." "Medical" modifies "image data" yielding "medical image data." Finally, "related" modifies "medical image data" yielding "related medical image data." But before construing "related medical image data," it is helpful to analyze the meaning of the sub-phrase "medical image data." "Medical image data" is neither a technical term of art in the relevant field,[5] nor a specially defined term in the specification.

The first limitation of Claim 9 recites: "a medical server configured to receive medical image data that is generated by a plurality of imaging modalities, the *medical image data being formatted in a standard medical imaging format* used by specialized computers configured for viewing medical images . . . ." Here, "medical image data" plainly refers to data formatted in a standard medical

---

[4] Whether or not this covers a radiologist's text report turns on whether the report is stored in a standard medical imaging format.

[5] *See, e.g.,* Dr. Rowberg's testimony, Opp. at 16 ("I almost wonder if it's a legal term instead of a medical term because it's out of my normal vocabulary.").

imaging format. Thus, "related medical image data" simply means medical image data that is related to the selected medical image data. Put another way, "related medical image data" means data that is both: (1) formatted in standard medical imaging format; and (2) related to the selected medical image data.

Datcard argues that "related medical image data" means any kind of data (not just medical image data) that is related to the selected medical image data. Opp. at 21. This is incorrect because it fails to account for the modifying effect of "medical image" upon "data." Pacsgear argues that "related medical image data" only refers to images. Mot. at 9. This too is incorrect because it would exclude non-image data formatted in standard medical imaging format. Some such non-image data include "patient demographics[] and exam information such as patient name, patient age, exam number, exam modality, exam machine name, and exam date." '164 patent at col. 1 II. 48-55 (listing non-image DICOM compatible data types stored in the header preceding the exam images).

### 2.  The rule of internal consistency

Under this rule, "[a] word or phrase used consistently throughout a claim should be interpreted consistently." *Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998). Thus, the Court should interpret "related medical image data" consistently throughout Claim 9.

Claim 9 contains other instances of "related medical image data":

the selected medical image data, recorded in the standard medical imaging format,

the ***related medical image data, recorded in the standard medical imaging format***, and

***a viewing program that is configured to allow viewing of*** the selected and the ***related medical image data*** that is recorded onto the data storage medium on widely accessible computers not specifically configured with standard medical imaging software for ***viewing of medical images***.

'164 patent at col. 1 II. 40-50 (Claim 9).

"Related medical image data" in the above instances is plainly limited to data recorded in the standard medical imaging format. The rule of internal consistency thus calls for the same construction for "related medical image data" in the claim limitation under consideration.

### 3.  Support in the specification

The specification of the '164 patent provides further support for limiting the scope of "related medical image data" to data formatted in the standard medical imaging format. The specification states:

> To ease the communication of data, the DICOM (Digital Imaging and Communications in Medicine) standard was developed by ACR-NEMA (American College of Radiology-National Electrical Manufacturer's Association) for communication between medical imaging devices and PACS. In addition to the examined images, patient demographics, and exam information such as patient name, patient age, exam number, exam modality, exam machine name, and exam date can also be stored and retrieved in DICOM compatible data format. A DICOM file stores patient and exam information in the header of the file, followed by the exam images. PACS store ***medical image data*** in DICOM format.

'164 patent at col. 1 II. 43-55.

The specification, therefore, supports the Court's construction of "related medical image data" as limited to data formatted in standard medical imaging format.

The Court's approach has: (1) placed primary emphasis on the plain and ordinary meaning of the claim language; (2) abided by the rule of internal consistency; and (3) construed "related medical image data" in light of specification. "Related medical image data" is data: (1) formatted in the standard medical imaging format; (2) related to the selected medical image data. The parties dispute about whether "related medical image data" covers a radiologist's test reports. Under the Court's construction, the answer to that question depends on whether radiologist reports are formatted in the standard medical imaging format. Pacsgear asserts that such reports are not in a standard medical imaging format. Mot. at 3 ("[The radiologist's] reports are in text format . . . ."). Datcard does not appear to take a contrary position. "Related medical image data" does not cover such reports, assuming they are not formatted in a standard medical imaging format.

//

//

//

-10-

### (b) "additional [related] medical data," '597 patent; and "related data" '174 patent

The relevant claim terms are:

(1) "automatically searching, based on the received request, a second computer database via a second database interface for ***additional medical data*** also ***related*** to the patient . . . ." '597 patent at col. 9 II. 34-36 (emphasis added); and

(2) "a search module configured to automatically search the database for ***related data*** based on the user selection . . . ." '174 patent at col. 9 II. 24-47 (emphasis added).

Claim terms like "related data" and "additional [related] medical data" have fewer modifiers for "data" than the claim term "related medical image data." This might seem, at first blush, to support a broader construction for the former claim terms than the latter. Not surprisingly, the seemingly broader claim terms appear in continuation patents. "The name of the game is the claim" for parent patents and continuations alike.[6] But the Court must pay close attention to the specification when construing a claim term in a continuation.[7] The fundamental tension between the prohibition against importing limitations from the specification into the claims on the one hand, and construing claims in light of the specification on the other, is of special concern in the continuations context. Even in a regular setting, the

---

[6] Giles S. Rich, *The Extent of the Protection and Interpretation of Claims – American Perspectives*, 21 INT'L REV. INDUS. PROP. & COPYRIGHT L. 497, 499, 501 (1990).
[7] *See* Mark A. Lemley & Kimberly A. Moore, *Ending Abuse of Patent Continuations*, 84 B.U. L. REV. 63 (2004)

prohibition against importing limitations and the mandate of construing claims in light of the specification presents a fundamental problem of claim construction.

No Federal Circuit opinion captures the essence of this fundamental problem quite as vividly as *Arlington Industries, Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246 (Fed. Cir. 2011). Judge Lourie's opinion in that case, concurring in part and dissenting in part, is particularly revealing. In relevant part, Judge Lourie states, "[T]he basic mandate is for claims to be interpreted in light of the specification of which they are a part because the specification describes what the inventors invented. The specification is the heart of the patent. In colloquial terms, '*you should get what you disclose.*'" *Arlington Indus.*, 632 F.3d at 1257 (Lourie, J., concurring in part and dissenting in part). To that point, the author of the majority opinion, Chief Judge Rader, stated,

> The concurrence-in-part and dissent-in-part characterizes the specification as the "heart of the patent" and, using "colloquial terms," states that "you should get what you disclose." This devalues the importance of claim language in delimiting the scope of legal protection. "Claims define and circumscribe, the written description discloses and teaches." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1347 (Fed.Cir.2010) (en banc). To use a colloquial term coined by Judge Rich, "*the name of the game is the claim.*" Giles S. Rich, *The Extent of the Protection and Interpretation of Claims–American Perspectives*, 21 INT'L REV. INDUS. PROP. & COPYRIGHT L. 497, 499, 501 (1990). Indeed, unclaimed disclosures are dedicated to the public. *Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1051 (Fed.Cir.2002) (en banc).

> *Id.* at 1255, n.2 (emphasis added).

-12-

Incidentally, the difference between "the name of the game is the claim" and "you should get what you disclose" is identical to that between the prohibition against importing limitations and construing the claims *in light of* the specification.

Returning to the claim terms at hand, the dispute between the parties is whether "additional [related] medical data" in the '597 patent and "related data" in the '174 patent are limited to DICOM images, to the exclusion of non-image data like text reports. Again, both parties propose incorrect constructions. The terms are neither so broad as to encompass all types of data, nor so narrow as to be limited to images. Instead, as explained below, "related data" and "additional [related] medical data" are limited to data: (1) in a standard medical imaging format; and (2) related to the selected medical image data.

*Texas Digital*, a case criticized in *Phillips*, had listed two circumstances where the patent's specification and prosecution history must be consulted to determine if the patentee has used claim terms in a manner inconsistent with the ordinary meaning reflected in a dictionary definition: (1) where the patentee, acting as his or her own lexicographer, has clearly set forth an explicit definition of the term different from its ordinary meaning; and (2) if the inventor has disavowed or disclaimed scope of coverage by using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope. 415 F.3d at 1319 (citing *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002).

But *Phillips* characterized *Texas Digital*'s take on claim construction as placing "too little [reliance] on intrinsic sources, in particular the specification and prosecution history."

*Phillips* stated, "Assigning such a limited role to the specification . . . is inconsistent with our rulings that the specification is ***the single best guide to the meaning of a disputed term*** . . . ." *Id.* at 1320-21 (citation omitted). *See Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004) ("Even when guidance is not provided in explicit definitional format, the specification may define claim terms ***by implication*** such that meaning may be found in or ascertained by a reading of the patent documents."); *Bell Atl. Network Servs., Inc. v. Covad Commc's Grp., Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001) ("[A] claim term may be clearly redefined without an explicit statement of redefinition.").

To be sure, *Phillips* acknowledged "that the purpose underlying the *Texas Digital* line of cases – to avoid the danger of reading limitations from the specification into the claim – is sound." *Id.* at 1323. But *Phillips* also acknowledged that "the distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim can be a difficult one to apply in practice." *Id.* "[T]he line between construing terms and importing limitations can be discerned with reasonable certainty and

-14-

predictability *if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms*." *Id.* (emphasis added). "[T]he person of ordinary skill in the art is deemed to read the claim not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. *See also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . *in a vacuum*. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history.").

Datcard seeks too broad a construction by interpreting "related data" to include "data in general." Opp. at 10. The three patents share a common specification. This specification only describes an invention where "data" in "related data" or "additional [related] medical data" is stored in a standard medical imaging format. It is perfectly legitimate to ask for more real estate, so to speak, by drafting broader claim terms in a continuation application; so long as those newer and broader claims are moored to the specification. Construing "related data" and "additional [related] medical data" as referring to data in a standard medical imaging format is not an exercise in importing a limitation from a preferred embodiment in the specification. Instead, it is a grant of patent protection that ends at what the

patentee disclosed and described in the specification. It is a construction of the claims in light of the entire specification; not a construction of claims in a vacuum.

Pacsgear is also incorrect in limiting "related data" and "additional [related] medical data" to images. The patent specification states, "In addition to the examined images, ***patient demographics[] and exam information*** . . . can also be stored and retrieved in DICOM compatible data format . . . in the header of the file, followed by the exam images." '164 patent col. 1 II. 58-52. These non-image data types, i.e., patient demographics and exam information, are as much part of the standard medical imaging standard as the images themselves. There is no basis for excluding these types of related data or additional related medical data from the claim scope. While Pacsgear attempts to exclude such non-image DICOM data from the claim scope, Datcard attempts to do the opposite, i.e., include non-image ***non-***DICOM data such as the radiologist's text reports within the claim scope. Under the Court's construction, "related data" and "additional [related] medical data" exclude a radiologist's text reports unless they are stored in a standard medical imaging format.

### ii.    "database" ('164, '174, '597);

Claim 9 of the '164 patent, in relevant part, recites:

> ***a database*** configured to store medical image data generated by the plurality of imaging modalities;

> a plurality of browsing terminals configured to receive a user selection that defines selected medical image data;
>
> a search module configured to search ***the database*** for related medical image data that is related to the selected medical image data

Claim 1 of the '174 patent, in relevant part, recites:

> ***a database*** configured store medical image data generated by the one or more imaging modalities;
>
> a plurality of browsing terminals configured to receive a user selection that defines selected medical image data for a patient;
>
> a search module configured to automatically search ***the database*** for related data based on user selection

The parties dispute about the construction of the claim limitation "database." Pacsgear contends that database means "the electronic collection of image data stored in a way to allow for easy search and retrieval following the request of a user." Mot. at 7. Datcard cites the dictionary for a definition of database as "a structured set of data held in a computer." Opp. at 9.

In the context of the above claims, it is redundant to define database in terms of its contents. The claim language itself performs that task by requiring "a database" to be configured to store medical image data, which the Court previously construed as limited to data in a standard medical imaging format. While the Court agrees with Pacsgear that "*the* database" in the above claims plainly refers back to "a database" earlier in the same claim, it also agrees with Datcard that a database is merely "a structured set of data held in a computer."

-17-

Claim 1 of the '597 patent, in relevant part, recites:

> automatically searching a first computer **database** via a first database
> interface for a first set of medical image data related to the patient based on
> the received request;
>
> automatically retrieving the first set of medical imaging data related to the
> patient;
>
> automatically searching, based on the received request, a second computer
> **database** via a second database interface for additional medical data also
> related to the patient, wherein the second interface is different from the first
> interface

Unlike the '164 and '174 patents, where "the database" referred back to "a

database," Claim 1 of the '597 patent defines two separate databases. Here, too, it

is redundant to limit "database" by the type of content stored because the claims

adequately do that by reciting the steps of searching the first database for medical

image data and the second database for additional medical data. The Court has

already construed "medical image data" and "additional medical data" to mean

data in a standard medical imaging format. Consequently, again, the Court agrees

with Datcard that a database is merely "a structured set of data held in a

computer."

### iii.    "automatically" ('597, '174)

Claim 1 of the '597 patent is a multi-step method patent. The claim recites:

A computer-implemented method for automatically generating a portable
computer-readable medium containing medical data related to a patient,
comprising:

-18-

receiving, via computer-implemented interface a request for medical data related to the patient;

*automatically* searching a first computer database via a first database interface for a first set of medical imaging data related to the patient based on the received request;

*automatically* retrieving the first set of medical imaging data related to the patient;

*automatically* searching, based on the received request, a second computer database via a second database interface for additional medical data also related to the patient, wherein the second interface is different from the first interface;

*automatically* receiving the additional related medical data; and

*automatically* generating a portable computer-readable medium, at a production station, containing the first set of medical imaging data related to the patient and the additional related medical data, wherein the first set of medical imaging data is formatted in a standard medical imaging format used by a computer configured for viewing the medical imaging data.

'597 patent col. 9 II. 24-47 (Claim 1)

First, the claim requires receiving a request for medical data. Next, the claim requires automatic performance of a series of tasks (retrieving, searching, receiving, and generating). The parties dispute the meaning of "automatically." According to Datcard, automatically means that "once initiated, the function is performed by a machine, without the need for manually performing the function." Opp. at 11. Given that "automatically" appears in several recited steps, Datcard's definition must be applied to *each* step. Datcard is effectively construing "automatically" as "once *[each step]* is initiated, the function is performed by a

-19-

machine, without the need for manually performing the function." But that is not a satisfactory interpretation of the claim language because the "receiving" limitation lacks an "automatically" qualifier despite the fact that once a user initiates the receiving step by submitting a request for medical data, the receiving function is performed by a machine, without the need for manually performing the function.

In the specification, the patentee compares and contrasts two disclosed embodiments – one with the "automatically" feature with one without. The embodiment without the "automatically" feature states, "The user is then asked in step 180 if he/she desires to find related data of that patient for comparative study. If the user answers yes, the application server 110 then searches for related data." '164 patent at col. 8 II. 37-41; and "[s]till referring to FIG. 5, the user is then prompted to select all or some of the related data from the list of found related data for production, in step 184." '164 patent at col. 8 II. 54-56. By contrast, the embodiment with the "automatically" feature states, "In another embodiment, once the user has selected a patient/exam combination, the application server 110 automatically searches for related data *without asking for user direction*," '164 patent at col. 8 II. 46-49, and "In another embodiment, all found related data are automatically selected by the application server 110 for production, *without prompting for user selection*."

"Automatically," in the context of the claim language and in light of the specification, means performing the claim steps beginning with "automatically" *without* first asking for user selection or direction for *each* step. Mot. at 17.

### iv. whether the claim elements "printing" and "affixing" the label must occur sequentially ('164).

Claim 16 recites "printing a label using the production station, wherein the label includes identifying information associated with the selected medical image data; and affixing the label to the data storage medium using the production station." Opp. at 22. "The MediaWriter . . . uses a CD Burner with an ink jet system that quickly and directly places information on the CD." Mot. at 14. Pacsgear construes Claim16 as requiring printing to take place before affixing. *Id.* (arguing non-infringement because Pacsgear's products do not first print, ***then*** affix the label to the CD). But "[u]nless the steps of a method actually recite an order, the steps are not ordinarily construed to require one." *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001). While some order is inherent in certain subsets of the claim steps (e.g., receiving data before storing it, searching data before recording it, etc.), Claim 16 does not recite any order of performance for the steps. Instead, the claim recites "printing . . . and affixing." '164 patent at col. 11 II. 47-52.

The Court finds that printing and affixing are not sequential operations.

//

## B. HIPAA Patent

The HIPAA patent is U.S. Patent No. 7,734,157 (filed Jun. 24, 2009) ("the '157 patent"), entitled "System and Method for Producing Medical Image Data onto Portable Digital Recording Media." The parties dispute the meaning of some claim terms in Claim 7 in the '157 patent:

> A system for generating a portable computer-readable medium containing medical data for a first patient, wherein the medical data for the first patient are audited based on a plurality of audit records stored in an audit database, comprising:
>
> > *a computer-implemented interface configured to receive two or more requests for production of stored medical data related to the first patient*; and
>
> > an image production module that is configured, for each request for production of stored medical data related to the first patient;
>
> > to produce the portable computer-readable medium containing the requested medical data related to the first patient, wherein the requested medical data comprises medical image data formatted in a standard medical imaging format used by a computer configured for viewing the medical image data; and
>
> > upon producing the computer-readable medium, to automatically transmit, to the audit database, audit data that is specific to the computer-readable medium produced in response to the request for stored medical data, wherein the audit data comprises at least *an identification specific to the computer-readable medium*, an identification of a requester of the stored medical data, and an identification of the first patient, and is for at least one audit record in the plurality of audit records in the audit database.

'157 patent at col. 10 II. 12-38.

The parties dispute the meaning of the bolded claim language. The Court addresses each dispute in turn:

### i.    **"a computer-implemented interface configured to receive two or more requests for production of stored medical data related to the first patient"**

Pacsgear contends that this claim term requires a user to make two requests for production relating to the same patient. Pacsgear's opposition to Datcard's motion for summary judgment of infringement for the '174 and '157 patents [hereinafter "Opp."] at 17.[8] Given that Claim 7 is a directed to an apparatus claim and not a method claim, Datcard argues that "[t]he disputed claim limitation says nothing about what a 'user' must do." Reply at 17. According to Datcard, the claim limitation only means that the computer interface must have structural components enabling it to receive two or more requests for production of stored medical data related to the first patient. *Id.* The Court agrees with Datcard. The disputed claim term refers to a system's configuration to receive two or more requests. This system claim does not refer to user action.

### ii.    **"an identification specific to the computer-readable medium"**

Pacsgear proposes the following construction: "an identification unique to the *single* compact disc or other storage medium." Opp. at 19. Datcard proposes "an

---

[8] Datcard's motion is hereinafter referred to as "Mot."

identification, such as a clearly defined or identified number, of the computer-readable medium (plural)." Mot. at 23.

The plain and ordinary meaning of the claim language is written in the singular given that the word "medium" is in a singular form. But this could mean that the singular form attaches to the type of medium (CD, DVD, Bluray, flash drive, each being one medium), or it could mean that the singular form means "one CD." The first line of the patent specification states, "This invention relates to a system and method for the production of medical image data on portable digital recording *media* such as compact *discs*." '157 patent at col. 1 ll. 23-25. The patentee has thus used the plural form "media" when discussing multiple compact discs. The first line of the section called "Summary of the Invention" states, "The claimed system allows for digital medical image data to be produced on a portable digital recording *medium* such as *a CD*." *Id.* at col. 2 ll. 7-9 (containing further references to the singular form such as "a CD," "the CD," and "the same CD"). The specification further states, "The number of CDs produced corresponds to the 'number of copies' number sent by the application server 110 in step 142." *Id.* at col. 6:66-67, 7:1. But in a section entitled "Detailed Description of the Preferred Embodiment," the specification states, "Digital portable recording *medium* comprises *CDs* and DVDs . . . any *suitable portable digital recording medium* can be substituted for *CDs.*" *Id.* at col. 3 ll. 30-31.

Thus, the patentee has used "medium" when referring to both singular and plural forms of CD at different places in the specification. But in these last statements, the patentee is not referring to the plural form ("CDs") as a solution to the problem that arises when the requested medical data exceeds the storage capacity of a single disc. Instead, the plural form is only invoked to describe the generic medium of compact discs. When referencing the actual operation of the claimed invention, the specification is clear that only one CD is anticipated to store image data. The only instances of the plural form, "CDs," in the context of the operation of the invention are references to the number of copies requested by the user. Again, the specification states, "The number of CDs produced corresponds to the 'number of copies' number sent by the application server 110 in step 142." *Id.* at col. 6:66-67, 7:1.

Datcard argues that "[i]f the requested medical data exceeds the storage capacity of a single disc, a set of discs is a suitable portable digital recording medium." Mot. at 22. That may be so, but the specification is void of any reference to multiple CDs being used to store one image because of size constraints. The patent neither describes a multiple-CD-based solution to the size-constraint problem, nor evidences the patentee's possession of such an invention at the time of filing. As a technical matter, it is just as plausible to have unique identification numbers for multiple discs for the same job (with a numerical suffix, for example,

indicating the disc number for the same job), as it is to have a unique identifier specific to a set of discs. Given the claim language, and in light of the void in the specification for this issue, the appropriate construction for "computer readable medium," therefore, is limited to one compact disc. Accordingly, the claim term "an identification specific to the computer readable medium" refers to a unique identification for each instance of the computer-readable medium (e.g., each CD).

**C. Timeout Patent**

The Timeout patent is U.S. Patent No. 7,801,422 (filed Jun. 5, 2009) ("the '422 patent"), entitled "System and Method for Producing Medical Image Data onto Portable Digital Recording Media." The parties dispute the meaning of some claim terms in Claims 1 and 8 of the '422 patent. The Court discusses each claim in turn.

**i.    Claim 1**

Claim 1 of the Timeout patent, with the point of contention bolded, states:

A method of automatically producing medical image data and related data on an optical storage medium upon expiration of a timeout period, the method comprising:

***detecting whether a server has changed within a timeout period after receiving medical image data or related data*** from a modality and resetting the timeout period when the change is detected; and

automatically producing an optical storage medium comprising selected medical image data and related data from the server based on when the timeout period has expired and recording on the optical storage medium program code that, when executed, allows viewing of the selected medical image data, wherein the medical image data is

formatted in a standard medical imaging format used by a computer configured for viewing the medical image data.

'422 patent, col. 9 II. 15-32.

Before commencing a comparative study of the parties' diverging contentions regarding the meaning of the bolded claim phrase, the Court introduces two concepts to aid the analysis: (1) the time of detection; and (2) the range of detection. The time of detection refers to the discrete point in time when the system performs the detecting step. The range of detection refers to the time interval for which detection takes place. These are fundamentally different ideas. An analogy helps to define the concepts and draw out the distinction. Consider the year-to-date gain of a stock, where the stock price is checked at the end of the first quarter. Here, the time of detection is April 1. The range of detection for the year-to-date gain is the three-month period between January 1 and March 31.

Returning to the case at bar, the disputed claim phrase is "detecting whether a server has changed within a timeout period after receiving medical image data or related data." Pacsgear's proposed construction conflates the concepts of time and range of detection. DatCard's proposed construction is that whereas the time of detection is *after* the expiry of the timeout interval, the range is *before*. The Court reviews the claim language and specification to determine the appropriate time of detection and range of detection for the detecting step.

//

**(a) Time of detection**

The claim language states "detecting whether a server has changed within a timeout period after receiving medical image data or related data." PacsGear argues that this claim language "requires the detection to take place **before** the time interval expires." Mot. at 2. The only way the claim language "requires" the detection to take place before the time interval expires is if the phrase "detecting whether a server has changed within a timeout period" is rearranged as follows: "detecting, within a timeout period, whether a server has changed." A more likely interpretation is that the phrase "within a timeout period" qualifies "server has changed" and not "detecting." While the claim language does not settle the issue, the specification does.



'442 Patent, Figure 3.

The detecting step 130 in Figure 3 entitled "Database Still Changing?" occurs *after* step 128 entitled "Wait for an Interval." The specification provides further confirmation that the time of detection is *after* the timeout period. "[U]pon observing a change in the image server database 202, '[t]he application server 110 then proceeds to step 128 and waits for an interval, typically 35 to 65 seconds. **_After_** the interval, the application server 110 **_checks_** whether the image server database 202 is still changing, in step 130.'" Mot. at 2 (citing the '422 patent specification, col. 5:28-33) (emphasis).

PacsGear's argument in its motion that "Claim 1 requires the detection to take place **before** the time interval expires" might be logically consistent with the claim language, but wholly excludes the preferred embodiment in the '422 specification. "A claim construction that excludes the preferred embodiment 'is rarely, if ever, correct and would require highly persuasive evidentiary support.'" *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010) (quoting *Vitronics Corp. v. Conceptronic Inc.*, 90 F.3d 1576, 1583-84 (Fed. Cir. 1996)). PacsGear has failed to provide the requisite "highly persuasive evidentiary support."

In light of Figure 3 and the cited language in the specification, the Court finds that the time of detection is *after* the expiry of the timeout interval. "There is sometimes a fine line between reading a claim in light of the specification, and

reading a limitation into the claim from the specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (citation omitted). The Court has taken care not to import this limitation from the preferred embodiment into Claim 1, and has only interpreted the claim language *in light of* the specification.

### (b) Range of detection

By arguing that "knowing that the size of the database is increasing <u>after</u> the expiration of the waiting interval tells you nothing about whether the database was changing '<u>before</u>' or '<u>within</u>' the waiting interval," Pacsgear has effectively argued that the range of detection is *after* the expiry of the timeout interval. Reply at 2-3. The Court rejects this argument because Pacsgear improperly connects the phrase "after the expiration of the waiting interval" to the changes in the "size of the database." Nothing in the patent refers to post-timeout changes in the size of the database.

The present-continuous tense of the phrase "Database Still Changing" in Figure 3 might suggest a detection mechanism for post-timeout changes in the database. But that phrase does not exist in isolation; it appears in a sequential flowchart immediately ***after*** step 128 entitled "Wait for an Interval." The claim language, "detecting whether a server has changed," maps to "Database Still Changing?" Thus, Pacsgear's argument mischaracterizes the patented claim by

1    improperly isolating a phrase from a sequential flowchart and further improperly

2    focusing on a difference in tense.

3        The Court finds that the range of detection is *before* the expiry of the

4    

5    timeout interval.

6        **(c) "timeout period"**

7

8        The parties dispute the meaning of the phrase "timeout period" in Claim 1.

9    PacsGear argues that the "timeout period" refers to "a period that starts over every

10

11   time an **<u>unpredictable</u>** event occurs." DatCard argues that "timeout period" refers

12   to "a predefined length of time that began at the occurrence of a **<u>specified</u>** event."

13   Opp. at 5.  PacsGear's use of the word "period" in its construction is consistent

14

15   with DatCard's use of the phrase "predefined length of time." Further, the

16   specification states that "[t]he application server 110 then proceeds to step 128 and

17

18   waits for an interval, typically 35 to 65 seconds." '422 patent at col. 5 II. 29-31. In

19   light of the specification, the Court finds that the timeout period is a predefined

20

21   length of time. The parties' only remaining dispute is whether the event triggering

22   a restart of the timeout period is unpredictable or specified.

23       PacsGear's proposed qualification of the event triggering a restart of the

24

25   timeout period as "unpredictable" contradicts the preferred embodiment which

26   specifies the triggering event as "a change in the image server database." '422

27

28   patent at col. 5 II. 26-29 ("If there is a change in the image server database 202,

-31-

then the application server 110 proceeds to step 126 and time-stamps the moment

that the change started."). The Court does not define the timeout period in terms of

the type of event which triggers a resetting of that period. The claim step in

question recites "detecting whether a server has changed within a timeout period

after receiving medical image data or related data from a modality and resetting the

timeout period when the change is detected." Thus, the claim language itself

discloses further claim limitations pertaining to the event triggering a resetting of

the timeout period, i.e., a change in the server. The event triggering the resetting of

the timeout period does not inform the definition of the claim term "timeout

period" in and of itself, which simply refers to a predefined period of time.

Thus, the Court construes "timeout period" as a predefined period of time.

**ii.    Claim 8**

Claim 8 of the Timeout patent, with the point of contention bolded, states:

A system for automatically producing medical images on an optical storage
medium, the system comprising:

a database configured to receive one or more medical images from at
least one modality;

an application server coupled to the database and configured to create
a timestamp ***when the application server detects a change in the
database***, thereby initiating a timer,

wherein the ***timer resets when the application server detects an
additional change in the database before a timeout interval***,
measured from the timestamp, elapses; and

-32-

wherein the timer times out when the application server detects no additional change in the database after the ***timeout interval***, measured from the timestamp, elapses; and

a production station coupled to the application server and configured to automatically produce an optical storage medium comprising one or more selected medical images from the database based on when the timer times out, wherein the medical image data is formatted in a standard medical imaging format used by a computer configured for viewing the medical image data.

The parties dispute the meaning of the phrase "wherein the timer resets when the application server detects an additional change in the database before a timeout interval." As with Claim 1, the parties' dispute is over the time and range of detection referred to by the "detects" step. Pacsgear's error lies in its conflation of the concepts of time and range of detection. The Court construes the disputed terms in Claim 8 in a manner consistent with its construction for Claim 1. Datcard proposes that the word "timer" refers to "a device which keeps track of time." It is not clear whether Pacsgear disputes this position. The Court does not need to construe claim language not in dispute.

Thus, consistent with its construction for Claim 1, the Court finds that the time of detection for the "detects" step is *after* the expiry of the timeout interval, whereas the range for detection is *before*.

//

//

//

## IV.   CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed claim terms in this suit. The constructions shall govern all proceedings in this case.

| Search and Burn claims | Claim Construction |
| --- | --- |
| "related medical image data" ('164), "additional medical data . . . related to the patient" ('597), "related data" ('174) | Data that is: (1) formatted in a standard medical imaging format; and (2) related to the selected medical imaging data.<br><br>Such data types include images, patient demographics, and exam information such as patient name, age, exam number, exam modality, exam machine name, and exam date because all of the above are in the standard medical imaging format (in the header or the image).<br><br>Data types not formatted in the standard medical imaging format are outside the scope of these terms. |
| "database" ('164, '174, '597) | A structured set of data held in a computer. |
| "automatically" ('597, '174) | Performing the corresponding claim step without first asking for user selection or direction for the step. |
| Whether the claim elements "printing" and "affixing" the label must occur sequentially ('164) | No. |
| **HIPAA claims** | **Claim Construction** |
| "a computer-implemented interface configured to receive two or more requests for production of stored | A system configured to receive two or more requests. This claim does not refer to user action. |

-34-

| medical data related to the first patient" | |
|---|---|
| "an identification specific to the computer-readable medium" | A unique identification for each instance of the computer-readable medium (e.g. each CD). |
| **Timeout claims** | **Claim Construction** |
| "detecting whether a server has changed within a timeout period after receiving medical image data or related data" | Time of detection is *after* the timeout interval expires. The range of detection is *before*. The timeout period is a predefined period of time. For a fuller discussion of the concepts "time of detection" and "range of detection," refer to parts (a) and (b) of Section III.C.i. *Supra* at 27-31. |
| "wherein the timer resets when the application server detects an additional change in the database before a timeout interval." | Time of detection is *after* the timeout interval expires. The range of detection is *before*. The timeout interval is a predefined period of time. For a discussion of the concepts of "time of detection" and "range of detection," refer to parts (a) and (b) of Section III.C.i. *Supra* at 27-31. |
| "timer" | No construction necessary at this time given the absence of a dispute. |

IT IS SO ORDERED.


DATED: October 26, 2012

*Mariana R. Pfaelzer*

_____

Hon. Mariana R. Pfaelzer
United States District Judge

-35-