1          **UNITED STATES DISTRICT COURT**

2       **CENTRAL DISTRICT OF CALIFORNIA — WESTERN DIVISION**

3        *HONORABLE MARIANA R. PFAELZER, U.S. DISTRICT JUDGE*

4                       **- - -**

5   DATCARD SYSTEMS, INC.,                    )
                                              )
6                        Plaintiff,           )    **Case No.**
                                              )
7              vs.                            )    **SA—CV10—1288—MRP**
                                              )
8   PACSGEAR, INC.,                           )
                                              )
9                        Defendant.           )
    _____)
10  DATCARD SYSTEMS, INC.,                    )
                                              )
11                       Plaintiff,           )    **Case No.**
                                              )
12             vs.                            )    **SA—CV10—1434—MRP**
                                              )
13  DATA DISTRIBUTING, INC.,                  )
                                              )
14                       Defendant.           )
    _____)
15

16

17              *REPORTER'S TRANSCRIPT OF*
                *MOTIONS FOR SUMMARY JUDGMENT*
18              *THURSDAY, SEPTEMBER 20, 2012*
                        *1:00 P.M.*
19              *LOS ANGELES, CALIFORNIA*

20

21

22
    _____
23
                *VICTORIA L. VALINE, CSR 3036, RMR, CRR*
24                FEDERAL OFFICIAL COURT REPORTER
                  312 NORTH SPRING STREET, ROOM 440
25                LOS ANGELES, CALIFORNIA  90012
                       www.victoriavalinecsr.com

*UNITED STATES DISTRICT COURT*

1                   *APPEARANCES OF COUNSEL:*

2

3   *FOR THE PLAINTIFF:*

4             KNOBBE, MARTENS, OLSON & BEAR
            Attorneys at Law
5             BY:  Craig S. Summers, Esq.
               Paul A. Stewart, Esq.
6             2040 Main Street, 14th Floor
            Irvine, California  92614
7             949-760-0404

8

9   *FOR THE DEFENDANT PACSGEAR, INC.:*

10            BLAKELY, SOKOLOFF, TAYLOR, ZAFMAN, LLP
           Attorneys at Law
11            BY:  Willmore F. Holbrow, III, Esq.
             Dennis G. Martin, Esq.
12              Chris Henderson, Paralegal
           12400 Wilshire Boulevard, Seventh Floor
13            Los Angeles, California  90025
           310-500-4746
14

15

16  *FOR THE DEFENDANT DATA DISTRIBUTING, INC.:*

17            HANKIN PATENT LAW
           Attorneys at Law
18            BY:  Marc E. Hankin, Esq.
           12400 Wilshire Boulevard, Suite 1265
19            Los Angeles, California  90025
           310-979-3600
20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1           LOS ANGELES, CALIFORNIA;  THURSDAY, SEPTEMBER 20, 2012

 2                          1:00 P.M.

 3                            -  -  -

 4           THE CLERK:  In the matter of calendar item number 1,

 5   case number SA-CV10-1288, DatCard Systems, Inc. versus

 6   Pacsgear, and case number SA-CV11-1434 DatCard Systems, Inc.

 7   versus Data Distributing, Inc.

 8           Counsel, please state your appearances for the

 9   record.

10           MR. SUMMERS:  Good afternoon, your Honor.  Craig

11   Summers from Knobbe, Martens, Olson & Bear representing the

12   plaintiff DatCard Systems in both cases, and with me today is

13   my partner Paul Stewart.

14           MR. HOLBROW:  Good afternoon, your Honor.  Bill

15   Holbrow representing defendant Pacsgear.  Along with me is my

16   partner Dennis Martin, and our paralegal Chris Henderson.

17           THE COURT:  Good afternoon.

18           MR. HANKIN:  Good afternoon, Judge Pfaelzer.  Mark

19   Hankin of Hankin Patent Law in the other case against Data

20   Distributing.  With me is the President of Data Distributing

21   Nancy Fisher, and her mother, and a couple of associates.

22           Good to see you, your Honor.

23           THE COURT:  Yes.  All right.  Should we get started?

24   You picked the order in which you're going to do this, so

25   let's start out.
```

**UNITED STATES DISTRICT COURT**

1       MR. HOLBROW:  Looks like I drew the short straw, your

2   Honor.  I'm going to be starting off here.  I think the way

3   we broke it out is, I'll cover the -- Pacsgear's motion for

4   noninfringement for the search and burn patents, and then

5   DatCard is going to rebut that as well as address their

6   motion for --

7       THE COURT:  You're going to do the search and burn

8   first?

9       MR. HOLBROW:  Yes, your Honor.

10       THE COURT:  Good.

11       MR. HOLBROW:  Yes, your Honor.

12       THE COURT:  Okay.

13       MR. HOLBROW:  We're going to focus on infringement,

14   and then go back and forth, and then --

15       THE COURT:  That's fine.

16       MR. HOLBROW:  -- switch gears to validity.

17       THE COURT:  Whatever you think is most desirable from

18   your standpoint is fine with me.

19       MR. HOLBROW:  Okay.  Great.  First, in terms of

20   infringement, the first step is claim construction.  There's

21   a few --

22       THE COURT:  You didn't have one, did you?

23       MR. HOLBROW:  Excuse me?

24       THE COURT:  You did not have a claim construction?

25       MR. HOLBROW:  No, your Honor, we did not have a

*UNITED STATES DISTRICT COURT*

1    separate Markman hearing.  The claim construction issues were

2    briefed in the motions.

3              THE COURT:  So, go ahead.

4              MR. HOLBROW:  So, the -- not too many terms in

5    dispute on the search and burn patents.  The first one is the

6    *related medical image data* and its synonymous terms *related*

7    *data, medical data*.  Another term in dispute is *database*,

8    *automatically* is another term, and then *production station* as

9    well.

10             So I'm going to start with related medical image data

11   with the claim construction issue, and then move on to the

12   infringement analysis -- or noninfringement analysis.

13             The parties agree that the terms on the screen from

14   the different patents all mean the same thing.  We have the

15   164 patent that uses the term *related medical image data,* the

16   597 patent which uses the terms *additional medical data* and

17   *additional related medical data*, and the 174 patent which

18   uses *related data*.

19             The crux of the dispute is whether these terms

20   include diagnostic text reports, or whether these terms are

21   limited to medical images --

22             THE COURT:  Yes.  That's right.

23             MR. HOLBROW:  -- in the dot-com format.

24             MR. SUMMERS:  I apologize for interrupting, your

25   Honor.  Our monitor doesn't seem to have any images shown.

*UNITED STATES DISTRICT COURT*

1    I'm wondering if we're doing something wrong.  I apologize.

2         MR. HOLBROW:  No.  No.  That's perfectly fine.

3    That's fair.

4         MR. SUMMERS:  We just want to make sure we see what's

5    on everybody's screen.

6         MR. HOLBROW:  Chris, I was just kidding you didn't

7    have to take --

8                        (Laughter.)

9         MR. HOLBROW:  Okay.

10        THE COURT:  You both agree that they're all the same?

11        MR. HOLBROW:  Our position is that all the terms

12   exclude text reports.

13        THE COURT:  Right.

14        MR. HOLBROW:  I believe DatCard's position is that

15   they all include text reports.

16        THE COURT:  Oh.

17        MR. HOLBROW:  So in analyzing the claim language, the

18   first place to look is the claims themselves.  Starting with

19   Claim 9 in the 164 patent, it's pretty clear that the claim

20   uses medical image data formatted in a standard medical

21   imaging format.

22        THE COURT:  Yes.

23        MR. HOLBROW:  There's no dispute that the standard

24   medical imaging format in this case is DICOM, and DICOM

25   refers to images and images only.  So that first limitation

1    urges the construction that we propose.

2         The medical data generated -- the second limitation

3    says this medical image data is generated by a plurality of

4    imaging modalities.  Those are CTs -- CAT scans, MRIs,

5    x-rays, so those by the very nature only generate medical

6    images.

7         THE COURT:  Yes.

8         MR. HOLBROW:  The term *selected medical image data* is

9    used in the claims as well.  There's no dispute that when the

10   term *selected medical image data* is used, that that

11   exclusively refers to text data -- I mean to image data.  So

12   again, consistency in claim construction, selected medical

13   image data means only images -- related medical image data

14   must refer only to images.

15        And then the final limitation seals the deal in our

16   opinion, where it talks about that the related medical --

17   related medical image data is recorded in the standard

18   medical imaging format.  Again, that refers to DICOM, and it

19   also requires that the viewing program be able to view that

20   in standard medical -- in the standard medical imaging

21   format.  Again, the viewing software only can view DICOM

22   images.

23        The other claims similarly support our proposed claim

24   construction.  The Claim 1 of the 597 patent uses the term

25   *medical data*, but then uses a synonymous term to refer to it

*UNITED STATES DISTRICT COURT*

1    in the next limitation here, which is *first set of medical*
2    *imaging data*, and then they talk about a second set.  In the
3    second set they refer to the term that's in dispute,
4    *additional medical data*.  But again, with the *medical data*
5    being synonymous with *medical imaging data*, this claim
6    language also supports Pacsgear's proposed construction.
7          Finally with the 174 patent, we have language that's
8    quite similar to the 164 patent here.  It uses the medical
9    imaging data and the medical imaged data in the first
10   limitation, and then in the second limitation refers to a
11   database configured to store medical image data.  And then in
12   the fourth limitation it refers back to the same database
13   that's identified in limitation 2, and states that that --
14   that the related data comes from this same database.
15         So the database in limitation 2 is clearly an image
16   database, because it refers to storing medical image data,
17   and the limitation in Claim 4 refers back to that same
18   database and talks about related data coming from -- as well
19   from the same database.
20         Claim 5, again the applicant and the patent owner
21   uses the terms interchangeably.  Claim 5, which depends on
22   Claim 4, which depends on Claim 1 uses the term *related*
23   *medical image data* instead of *related data*.  So again, our
24   belief is the claims strongly support the conclusion that all
25   related -- that the terms *related medical image data*,

**UNITED STATES DISTRICT COURT**

1    *additional medical data*, and *related data* all refer back to

2    DICOM images and DICOM images only.

3              THE COURT:  Yes.  I understand.

4              MR. HOLBROW:  Okay.  Now, DatCard has taken the

5    position that there's a few entries in the specification

6    which refer to something other than image data.  They refer

7    to an entry in column 2, line 6 through 8 where it talks

8    about one embodiment of the claims system allows for medical

9    exam data.  There's another reference to medical exam --

10             THE COURT:  I saw that.

11             MR. HOLBROW:  Excuse me?

12             THE COURT:  I saw that.

13             MR. HOLBROW:  Okay.  And then there's another

14   reference to exam data --

15             THE COURT:  Yes.

16             MR. HOLBROW:  -- on column 8, lines 35 through 40

17   which says, *if authorized, the user prompted to select a*

18   *patient in step 176 and selects exams of the select a patient*

19   *in step 178, the user is then asked in step 180 if he or she*

20   *desires to find related data of the patient for comparative*

21   *study*.  So those are the two places that have been identified

22   that use exam data.

23             If you turn to Figure 5, which this reference in

24   column 8 refers to, you see that when they're talking about

25   exams, they're clearly talking about related image data.  So

1      that theory that the specification somehow refers to

2      diagnostic text reports by using exam data is not supported

3      by the specification.

4            The other area that plaintiff -- the other entry that

5      plaintiff identifies as referring to text data in the

6      specification is in column 4, lines 24 to 26 where they say,

7      *the viewing program also allows users to read the patient*

8      *demographics and examine information associated with the*

9      *image data*.  This has nothing to do with text reports.  This

10     has to do with headers that are found on the DICOM images

11     themselves.  And the way we know that is by referring to the

12     first column in the patent at lines 48 through 55 where it

13     describes what is in a header in a DICOM image.  Essentially

14     it says, *in addition to the examed images, patient*

15     *demographics and exam information, such as patient name, age,*

16     *exam date, et cetera, are stored and retrieved in the DICOM*

17     *compatible data format.  A DICOM file stores patient and exam*

18     *information in the header of the file followed by the exam*

19     *image*.

20           So it's not much different than your old x-rays where

21     it would have the patient name and what side of the body the

22     exam was -- the -- whether it was the left arm or the right

23     arm and the doctor's information.  This header information is

24     just associated with the DICOM image.  So it's not a -- it's

25     incorporated and an integral part of the DICOM image, it's

*UNITED STATES DISTRICT COURT*

1    not a separate diagnostic text report.

2         So again, turning back to their suggestion in

3    column 4 that the viewing program also allows user to read

4    the patient demographics and exam information associated with

5    the image data, what all that means is that the viewing

6    program can view the header that's associated with the DICOM

7    image.  Again, it's the DICOM image and not any form of text

8    report or any other type of transfer other than a DICOM

9    image.

10        We had the opportunity to take the deposition of a

11   Dr. Alan Rowberg who is DatCard's expert.  We went through

12   the patent specification with him during the deposition.  He

13   concluded during that deposition that everywhere the term

14   *related data* was found, it was shorthand for *related medical*

15   *image data*.  He also confirmed that one skilled in the arts

16   seeing *image data* would think that it only meant -- it only

17   referred to images to the exclusion of all other things.

18        So the specification only refers to *related medical*

19   *image data*.  One skilled in the art seeing *image data* would

20   only come to the conclusion that that means images to the

21   exclusion of all other things.  That satisfies the second

22   step of the analysis.  The specification certainly supports

23   the definition that DatCard -- that Pacsgear is proposing.

24        So the claims support it, the specification supports

25   it.  The file history is pretty light, but there is an entry

*UNITED STATES DISTRICT COURT*

1    in the file history in a declaration signed by the inventor

2    where he -- where he says that the application allows users

3    to select medical images, and that his entry doesn't refer to

4    text reports whatsoever.  It's, again, all about just the

5    images.

6            We cited a case, the *AstraZeneca vs Apotex*, which

7    states, *when a patentee uses a claim term throughout the*

8    *entire patent specification, in a manner consistent with only*

9    *one meaning, he has defined that term by implication*.  And

10   that's -- the AstraZeneca cite is 633 F.3d 10 --

11           THE COURT:  You don't have to do that.

12           MR. HOLBROW:  Okay.  Okay.  So that ends the

13   discussion on the meaning of related medical image data,

14   additional medical data, and related data as the claims, the

15   specification, and the file history all support the

16   conclusion that it only refers to images and does not refer

17   to text.  Pacsgear's proposed construction of the claim that

18   it just refers to images is the appropriate one.

19           The next term at issue is *database*.  This definition

20   was arrived at by Pacsgear's expert Dr. Steven Horii after

21   reviewing the claims in the specification, and essentially

22   *database* means electronic collection of image data stored in

23   a way to allow for easy search and retrieval following the

24   request of a user.

25           DatCard's proposed construction is much shorter.  It

**UNITED STATES DISTRICT COURT**

1    doesn't require storage, it doesn't require search and

2    retrieval, and it is simply a structured set of data held in

3    a computer.  They don't refer to the claims and

4    specification, they find a dictionary definition and say that

5    it's just an ordinary word.

6         Well, we beg to differ, and by looking at the claims

7    I think it becomes clear that Pacsgear's proposed definition

8    is the correct one.  Again, starting with Claim 9, I put

9    Pacsgear's proposed definition at the bottom of this page to

10   help easily track where the proposed language came from.

11   Electronic storage, we're talking about DICOM images, those

12   are electronic.  Image data, the claim talks about storing

13   medical image data -- the database configured to store

14   medical image data, so it's image data stored.  It's

15   retrieved based on the request of a user, and talks -- and

16   limitation 4 talks about search and retrieval.  So the

17   proposed claim language tracks pretty much literally from the

18   claim language.

19        The other patent -- the other patents, the 597 also

20   has the same terminology *searching*, *storing*, *retrieving image*

21   *data on the database*.

22        The 174 patent again mirrors the 164 patent, and it

23   also has searching based on a user selection, storing image

24   data.  Again, this database is the same database that's

25   referred to in limitation 4.  So all the claim language

*UNITED STATES DISTRICT COURT*

1    supports the same -- the same construction that we're

2    proposing.

3           Also, in reviewing the patent, all the databases in

4    the patent which store images only store images.  They don't

5    store text reports.  During his deposition Mr. Wright

6    testified that at the time of the invention the PACS

7    database -- the PACS databases which stored the images only

8    stored images, and Dr. Rowberg confirmed that where in one

9    limitation it refers to a database and the second -- the

10   later limitation refers to another database, that it's

11   referring to the same one.  So if the first database stores

12   image data, then the antecedent, which is the antecedent for

13   the subsequent database, that also necessarily stores images.

14          Now, DatCard has taken the position that there is a

15   database referred to in the patent that does store something

16   other than text.  They point to the production history

17   database, which is shown in Figure 1 of the patent.

18          THE COURT:  It's --

19          MR. HOLBROW:  And it's right here.

20          THE COURT:  Yes.

21          MR. HOLBROW:  That's an entirely different database

22   with an entirely different purpose than the --

23          THE COURT:  You have it turned around.

24          MR. HOLBROW:  Oh, I'm sorry.  Is that better?

25          THE COURT:  Yes.  Go ahead.

*UNITED STATES DISTRICT COURT*

1      MR. HOLBROW:  It's an entirely different database

2    than the image databases that are referred to throughout the

3    patent that are actually being searched by virtue of the

4    claims.

5        I guess the other point that DatCard makes referring

6    to the production history database is that there's nothing in

7    the specification that says it's searchable, so therefore

8    databases don't have to be searchable.  Well, it's the audit

9    log database, by its very existence needs to be searchable if

10    you're going to have any sort of auditing capability.  So a

11    production history database is irrelevant for the purposes

12    that we're discussing, because we're focusing on image

13    databases.  It is searchable and satisfies most of the

14    limitation -- most of the words in the definition that we're

15    proposing.

16        We also, to the extent it's needed, although I think

17    the specification in the claims adequately support our

18    proposed construction, definition of -- definitions of

19    database clearly show that they're designed to store a

20    collection of data for rapid search and retrieval, that they

21    can be classified according to type.  One type is image.

22        So, in summary, based on the intrinsic evidence as

23    well as the extrinsic evidence, database means electronic

24    collection of image data stored in a way to allow easy search

25    and retrieval following the request of a user.

**UNITED STATES DISTRICT COURT**

1        The next term is *automatically*, which refers -- which

2    means acting or operating in a manner essentially independent

3    of external influence or control.  The specification defines

4    *automatically* on a couple of occasions.  The first is at

5    column 7, lines 53 to 55 where it defines *automatically* as

6    *without prompting for user selection*, and then also at column

7    8, lines 48 to 49 it says, *without asking for user direction.*

8        DatCard has an alternative proposed construction.

9    They suggest that *automatically* means once initiated, the

10    function is performed by a machine without the need for

11    manually performing the function.

12        It cites to another case with another patent, another

13    specification that helps them come up with this construction.

14    There's no -- they don't cite any support for the claims or

15    specifications for it, and it really doesn't make sense.  In

16    some cases where you have a -- I think the automatic

17    dishwasher is an example used that once you start the

18    dishwasher, it automatically goes so the dishes are washed

19    without the need for manual performance of the function.

20        Here, it really doesn't apply, because we're talking

21    about searching a database, retrieving images, and there's

22    really no manual way to do that.  You -- the only way you can

23    do that is electronically through the systems that we're

24    discussing.

25        So, for that reason alone, DatCard's proposed

**UNITED STATES DISTRICT COURT**

1    construction should not be used.

2         Again, we found some dictionary definitions which are

3    in our papers, Exhibit 276 --

4         THE COURT:  Yes.

5         MR. HOLBROW:  -- which also support that.

6         THE COURT:  Yes.

7         MR. HOLBROW:  Finally *production station*.  Not much

8    to say about this, except for the meaning of production

9    station is essentially determined by the claim language

10   itself.

11        In Claim 9 of the 164, Claim 1 of the 597, and

12   Claim 1 of the 174, production station is used in a way that

13   all that has to happen is that the production station creates

14   a data storage medium.  It can be a CD.  It can be a DVD.  It

15   can be a thumb drive.  It doesn't have to be, in those

16   claims, a CD robot that mass produces CDs and labels them.

17        Claim 16, on the other hand, has additional

18   limitations where the system requires that the label -- a

19   label be printed and then affixed to the CD.  For this

20   limitation, the production station does have additional

21   requirements, creating a label and affixing it to the CD.

22        So for that -- that limitation in Claim 16, it would

23   require more than, for example, a stand alone CD burner that

24   can burn one CD at a time, whereas Claims 9, 1 -- whereas

25   other claims from the other search and burn patents don't

*UNITED STATES DISTRICT COURT*

1    have those additional limitations.

2            So that's my spiel on claim construction.

3            Now, I'm going to get into a little bit on the -- why

4    we don't believe the media writer infringes any of the

5    asserted claims.

6            The first step on that process is to understand how

7    the media writer works.  The media writer is a product that

8    essentially has two major components.  It has a computer and

9    then it has a CD burner.  The computer has software on it

10   that allows it to go search different databases and archives,

11   like PACS databases for images and then take those images and

12   burn them onto the CD.  Then the CD burner itself is an

13   off-the-shelf CD burner that's capable of burning multiple

14   CDs, as well as creating a label on them.

15           The label that's created, the way the media writer

16   works, is that the CDs come with the label already on it, and

17   then there's just an inkjet printer inside the CD burner that

18   creates the words or logos or whatever else you want to put

19   on the label of the CD.

20           So if you step up to a media writer and turn it on,

21   one of the first screens you'll see is the enter DICOM

22   setting screen.  And that's the screen that allows you to

23   direct the media writer to a certain archive.  You can direct

24   it to a PACS or you can direct it to a modality, somewhere

25   where there's images that you want to retrieve to ultimately

*UNITED STATES DISTRICT COURT*

1    burn onto a CD.  You can add or delete archives by hitting

2    the add and delete button.

3         So once you select what archive you're looking at,

4    the next step is to select where you want to burn -- how you

5    want to make copies of whatever you're burning -- or whatever

6    you're selecting.  So, it's just like selecting a printer at

7    your office.  You go through, hit the dialogue box, find the

8    CD burner that you want to use, and direct the images that

9    you're downloading towards that CD burner.

10        The next step would be to enter a -- a search for and

11   selecting studies.  That's on Page 130 of Exhibit 217.

12   Essentially you can type in a patient's name.  You can type

13   in the first letter of a patient and all the patients that

14   begin with the letter C will appear on that screen, for

15   example.  Then you can select which patient you're looking

16   for images for, and once you do that, you can hit the burn

17   studies button.

18        Here's a little clearer picture of the -- of that

19   screen.  So you've already searched.  You've selected the

20   patient.  And then number of studies will come up.  Within

21   the study there might be some sub-studies.  The way the media

22   writer works is you simply move the mouse up into the box,

23   hit the click -- check the button on the images that you want

24   to copy, you select those images, then you hit the burn

25   studies button.  From there the studies don't burn.  You have

*UNITED STATES DISTRICT COURT*

1    to go to another screen, and that's the screen showed on

2    Page 132 of Exhibit 217, and here you have a lot of other

3    options to decide on.  You can select whether you want to

4    burn to a CD, or a DVD, or some other medium.  You can select

5    which viewing software you want stored on the CD, or whether

6    you don't want viewing software on the CD, and you can also

7    check a box here for including reports.  If you check that

8    box -- whether you check that box or not, you hit confirm,

9    and then the CD starts to burn the images that you've

10   selected.  If you check the box, it will also search for

11   diagnostic text reports.

12        Now, the way it searches for diagnostic text reports

13   is shown on Page 145 of this exhibit, and this is how it's

14   set up.  Media writer doesn't come set up to search for text

15   reports.  A lot -- most companies -- most customers don't

16   utilize the text report function, but those that do, there

17   are options for a user to select different forms of text

18   reports.

19        The declaration of Brian Cavanaugh, which was

20   submitted, kind of goes into detail on how the text reports

21   function -- how the text report functions.  There's basically

22   three different types of text reports that can be downloaded.

23   The -- without -- there's a lot of citations to source code,

24   but at the end of the day, the conclusion is that the text

25   reports only search for diagnostic text reports.  They don't

**UNITED STATES DISTRICT COURT**

1    search for images.  And they are -- all the text reports are

2    stored on a database other than the PACS or the modality that

3    PACS -- that the media writer goes to search for images.

4         So media writer searches PACS and modalities, those

5    databases for images, and then it searches other directories

6    for -- for the text reports.  And the text reports --

7         THE COURT:  The media writer does that?

8         MR. HOLBROW:  The media writer does that, exactly.

9    So it searches the PACS and other modalities for images in

10   the first screen we saw, and then if you want to include

11   reports, it goes to different directories to find any text

12   reports that it wants to -- that are existing relating to the

13   patient.  And it does that based on a session number.  If

14   the -- which is the number associated with the study that

15   might be selected.  So, if the study that's selected to be

16   burned is 124, it will go to the folder and see if there's a

17   session number that matches 124, and if there is, it will

18   include that on the CD when the CD is burned.

19         So that's the media writer.  How the media writer

20   works.  We've got the claim construction.  So the next step

21   is to review the claims and show how the media writer does

22   not satisfy the claims.

23         The first patent is the 164 patent, and you'll

24   notice, as we covered during claim construction, 164

25   patent -- the second limitation of the 164 patent has a

*UNITED STATES DISTRICT COURT*

1    database that is configured to store medical image data

2    generated by a plurality of imaging modalities.  So it's the

3    image database that we talked about.

4         The fourth limitation talks about searching the same

5    database for related medical image data that is related to

6    the selected medical image data.

7         THE COURT:  Yes.

8         MR. HOLBROW:  The media writer, as we discussed,

9    doesn't search for -- the only images that are burned on the

10   CD are those that are affirmatively selected.  So there's no

11   second category here of related medical image data.  The only

12   images that are burned onto the CD using the media writer are

13   the selected medical image data.

14        DatCard's taking the position that the text reports

15   constitute the related medical image data.

16        THE COURT:  Yes.

17        MR. HOLBROW:  We obviously disagree with that, but

18   even if that is the case, as we just discussed the text

19   reports are found on a different -- a different database.

20   It's not on the same database as the images.

21        Similarly, when we talked about the way the reports

22   are -- ultimately find their way onto the CD, there's an

23   additional step, the user has to actually affirmatively want

24   to include the reports by checking that box that we saw on

25   the -- in the media writer user manual.  So they don't

**UNITED STATES DISTRICT COURT**

1    automatically go onto a -- on to the CD.  The user has to

2    take the affirmative step, after it hits the burn studies

3    button to go -- hit the button to include reports, and then

4    hit another button to confirm that that's what they want to

5    do.

6            So both literally and under the doctrine of

7    equivalence, the media writer does not infringe Claim 9 of

8    the 164 patent.

9            The other independent claims, 15, 16, and 21, all

10   have virtually the same language, that the related medical

11   image data, which doesn't include text reports, has to come

12   from the same database, that the search has to happen without

13   user intervention, essentially.  So, all these claims -- all

14   the independent claims in the 164 patent fail for the same

15   reason.  There's no -- text reports don't constitute related

16   medical image data, and they come from different databases.

17           Under the doctrine of equivalence, a system which

18   searches one database for a DICOM medical image functions an

19   entirely different way than one that searches two databases,

20   also provides a substantially different result, obtaining

21   diagnostic text reports is a substantially different result

22   than obtaining DICOM medical images.  Searching a PACS

23   database for images is done in a substantially different way

24   than searching both a PACS database and the directory storing

25   the diagnostic text reports.  And finally, a system where the

*UNITED STATES DISTRICT COURT*

1    user must affirmatively select to include diagnostic reports

2    on the CD functions in an entirely different way than a

3    system where images are included without such action.

4            Just to -- for belts and suspenders, I alluded to

5    Claim 16, which has the additional limitations of printing a

6    label and affixing the label to the CD.  The media writer

7    doesn't do that.  It doesn't print a label and affix it to a

8    CD.  The label is already on the CD, and all the media writer

9    does is use inkjet technology to put words or images onto the

10   CD.  So, in addition to the other reasons I've discussed,

11   Claim 16 doesn't -- isn't infringed for that reason as well.

12           The next patent which we'll apply -- we'll take a

13   look at in connection with the 597 -- is the 597 patent,

14   comparing that to the media writer, again obtaining -- this

15   patent requires that the -- uses the term *automatically*

16   throughout.  So one of the limitations requires that

17   automatically searching based on the received request a

18   second computer database via a second database interface for

19   additional medical data also related to the patient, wherein

20   the second interface is different from the first interface.

21   As we discussed, the media writer doesn't have any second

22   interface that goes to an image database to recover images.

23   The media writer focuses on a single database, the PACS

24   archive or modality, and then brings those images back to the

25   device.  There's no second search that happens automatically

**UNITED STATES DISTRICT COURT**

1    to recover image data.

2         Additionally, if related -- if additional medical

3    data does constitute diagnostic text reports, then the media

4    writer doesn't allow that to happen automatically based on

5    the input of the user selection.  Rather, as we went through,

6    the media writer requires the user to hit the burn studies,

7    then affirmatively select or not select whether they want to

8    include reports and then hit another button to burn the

9    studies.  So, for the 59 -- in Claim 1 of the 597 patent is a

10   method claim, Claim 6 is its companion.  System claim --

11        THE COURT:  Wait.  Wait.  Wait.  Wait.

12        MR. HOLBROW:  Sure.

13        THE COURT:  Yes.  Mmmm-hmmm.  Yes.

14        MR. HOLBROW:  Okay.  The language, for our purposes,

15   is -- means the same thing in terms of our infringement

16   analysis.  The search and -- Claim 5 talks about medical

17   imaging data, and then the second request, again for

18   additional medical data, which we believe means medical

19   images, the media writer doesn't do that, and it doesn't --

20   the preamble talks about it, these steps happening

21   automatically, and the media writer doesn't allow for that.

22   The user has to affirmatively select or deselect whether they

23   want to have reports included on the CD.  So, the Claims 1

24   and 6 --

25        THE COURT:  Text, you mean?

*UNITED STATES DISTRICT COURT*

1          MR. HOLBROW:  Pardon me?

2          THE COURT:  Text, you mean.

3          MR. HOLBROW:  Text, right.  Text reports.

4          So claims 1 and 6 -- of the 597 patent also don't

5     cover the media writer, either literally or under the

6     doctrine of equivalence, because obtaining diagnostic text

7     reports is substantially different than obtaining selected

8     and related images and provides a substantially different

9     result.  And a system or method that acquires and burns the

10    related data automatically, as required in the claim,

11    operates in an entirely different way and functions in an

12    entirely different -- entirely differently than the

13    multi-step system of selection that the media writer utilizes

14    to get the text reports.

15          And we're a little ahead of ourselves in terms of

16    getting into the validity issue, but a lot of these -- the

17    claim constructions will likely be dispositive of a lot of

18    issues in the case.  But it also, depending on which way the

19    claims are construed, will make it easier to find some of the

20    prior art -- identify prior art that anticipates the claim.

21          THE COURT:  I know that.

22          MR. HOLBROW:  Okay.

23          THE COURT:  I am aware of that.

24          MR. HOLBROW:  Okay.  Thank you.

25          Then the final search and burn patent is the 174

*UNITED STATES DISTRICT COURT*

1    patent, and this is, for all intents and purposes, very

2    similar to the 164 patent.  It has a database configured to

3    store medical image data, so it's an image database as shown

4    in the second limitation.

5         The fourth limitation refers to a search module

6    configured to automatically search that database.  So the

7    search module automatically searches the --

8         THE COURT:  The image base?

9         MR. HOLBROW:  The image database, yes, identified in

10   limitation 2.

11        The media writer doesn't satisfy those -- the

12   limitations of the 174 patent because the media writer

13   doesn't allow for a second search of the same database for

14   images.  You search it once, you select what you want, and

15   then you can burn it onto the CD.  If you want, you can go to

16   the second page before you confirm it and include reports,

17   but the only images that the media writer burns onto CDs are

18   those selected from the database -- from the PACS database or

19   the modality.

20        So the 174 patent doesn't infringe either literally

21   or under the doctrine of equivalence, because media

22   writers -- because a system which searches one database for

23   DICOM medical images functions in an entirely different way

24   than one that searches two databases.  It also provides

25   substantially different results.  Obtaining diagnostic text

*UNITED STATES DISTRICT COURT*

1     reports is a substantially different result than obtaining

2     DICOM medical images.  Searching a PACS database for images

3     is done in a substantially different way than searching both

4     a PACS database and the folder or directory storing the

5     diagnostic text reports.

6          And finally, a system where the user must

7     affirmatively take steps and make selections does not happen

8     automatically.  The images and the text are not burned

9     automatically.

10         Again, this, as we discussed with the 164 patent, the

11    174 patent requires that the database that you get the images

12    from is the same database that you get the related data from.

13         THE COURT:  I understand that point.

14         MR. HOLBROW:  I think that's all I have on

15    infringement, your Honor.  I have a few things probably I'll

16    use in rebuttal to DatCard's motion, but I think -- I've done

17    enough talking for now, so I'll sit down.

18         Thank you.

19         THE COURT:  Let me ask you a question before you get

20    started.  Did you agree or did Judge Carter decide not to

21    have a claims construction?

22         MR. SUMMERS:  Judge Carter did not order a claim

23    construction.  It was our understanding he wanted to have the

24    claim construction in the context of the summary judgment

25    motions.

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Yes.

2          MR. SUMMERS:  That's why we briefed it that way.

3          THE COURT:  Yes.  I understand.

4          MR. SUMMERS:  Okay.  Well, good afternoon, your

5    Honor.  Again, I'm Craig Summers.  I represent DatCard.  We

6    have a PowerPoint presentation I'd like to hand up.  My

7    experience is judges like to write sometimes on the

8    presentation, so we have printed it out in a booklet form for

9    you, and I'd like to hand that up.  If it's convenient for

10   the Court, I'd also be happy to place one copy and flip it

11   over on the Elmo.  If you're happy to just have the booklet

12   and work from that, then I won't bother with the Elmo.

13         THE COURT:  I'll do that.

14         MR. SUMMERS:  Okay.  Very good.  May I approach, your

15   Honor?

16         THE COURT:  Yes.  Thank you.

17         MR. SUMMERS:  So, your Honor, the booklet has some --

18   somewhat of an index.  You'll see the tabs at the bottom.  We

19   have divided up the presentation to cover the three patents,

20   plus some relevant law at the back, but we know how familiar

21   you are and how experienced you are in all the legal matters,

22   so we don't plan to turn to that, but it's there for the

23   Court's convenience if you find it to be useful.

24         THE COURT:  Thank you.  That's fine.

25         MR. SUMMERS:  Page 2 is a little bit of an outline,

**UNITED STATES DISTRICT COURT**

1    and I'm going to cover what starts on Page 4 today, but

2    before I do that, your Honor, if you wouldn't mind turning to

3    Page 3, you'll see the patents that are at issue here, the

4    164 patent is the original patent that issued from the patent

5    office, and the four others followed.

6              THE COURT:  Yes, we saw that.

7              MR. SUMMERS:  Okay.  The 164 patent was the subject

8    of a prior lawsuit against a company called Kadonics

9    (phonetic).

10             THE COURT:  Yes.

11             MR. SUMMERS:  And that resulted in a settlement with

12   Kadonics exiting the market as we talked about last time.

13             THE COURT:  Yes.

14             MR. SUMMERS:  Kadonics cited quite a bit of prior art

15   in that lawsuit.  All of that prior art was submitted to the

16   patent office in the other four patents that you see at the

17   bottom.

18             The 164 patent also went through a re-examination by

19   Kadonics, with a lot of prior art disclosed as well, and I

20   just wanted to bring that up at the outset so your Honor has

21   an idea of, you know, where these patents got started and how

22   they sort of evolved over time.

23             Your Honor, I'd also like to introduce my clients who

24   are here with me today.

25             THE COURT:  Oh.

*UNITED STATES DISTRICT COURT*

1        MR. SUMMERS:  On your left is Mr. Ken Wright.  He's

2   the President and CEO and co-inventor on the patents in suit.

3   Next to him is Mark Pagano.  He's the Chief Financial

4   Officer.  Next to him is Andrew Rosenzweig.  He's the Vice

5   President of the company.

6        THE COURT:  You're very welcome.

7        MR. SUMMERS:  I know you're familiar with the

8   patents.  Just one note about them, your Honor.  When

9   Mr. Wright and Mr. La Guardia came up with this invention,

10   that's what caused them to start DatCard.  They built their

11   company around the PACS Cube product, which they make.

12   That's a medical disk publisher.  And they also built their

13   company around the patents that they applied for to protect

14   the PACS Cube device.  It practices the patents.  It's not

15   really the subject of anything here today, but I just wanted

16   to point that out as a little bit of a background.

17        So, your Honor, I would like to start first in

18   responding to the defense arguments.  With our motion for

19   summary judgment of infringement of the 174 patent.  And I

20   will get to all those other issues that you've been hearing

21   about, so if you'll bear with me, I'll start with that.

22        THE COURT:  Well, it's not the first time I

23   encountered them.  I have looked at them quite steadily for

24   awhile.

25        MR. SUMMERS:  Very good, your Honor.  We appreciate

*UNITED STATES DISTRICT COURT*

1    all the time that you've spent on that, and for having us in

2    here so quickly.  We really do appreciate that.  If you find

3    that I'm going too slow for you, please tell me and I'll pick

4    it up.

5              THE COURT:  Go at your own pace.

6              MR. SUMMERS:  Okay.  Very good.  This all kind of

7    brings together things in context, which I think is helpful.

8              So I'm starting with the 174 patent first.  That's

9    not the first patent that was issued, it's one of the later

10   patents.  Slide 5 shows that we are seeking a summary

11   judgment of infringement of independent Claim 1 and some

12   dependent claims.  We're asserting that Pacsgear is a

13   contributory infringer.

14             The only limitation that is not supplied by Pacsgear

15   is the plurality of browsing terminals in these claims of the

16   174 patent.  Pacsgear's customers supply that plurality of

17   browsing terminals, as we'll show, and the customers are the

18   direct infringers.

19             The sixth slide, your Honor, shows Claim 1 from the

20   174 patent, and we've highlighted the terms that are in

21   dispute, which you've already heard about, the database, the

22   term *automatically*, and the term *related data*.  So I'm going

23   to focus my presentation on those issues.

24             On Page 7 are the proposed constructions of the

25   parties.  You can see DatCard's construction of database is a

**UNITED STATES DISTRICT COURT**

1    structured set of data held in a computer.  Pacsgear's

2    construction is much longer.  It's *electronic collection of*

3    *image data stored in a way to allow for easy search and*

4    *retrieval following the request of a user*.  So one word just

5    turned into quite a few more words, but the important thing

6    to take away from this is that Pacsgear is trying to limit

7    the term *database* to a collection made up exclusively of

8    images that are also easily searched at a user's request, and

9    those words just don't appear in the claim.

10         Turning to slide 8, it's our position that the term

11   *database* --

12         THE COURT:  Wait, just a minute.

13         MR. SUMMERS:  Yes.

14         THE COURT:  Go on.

15         MR. SUMMERS:  Thank you, your Honor.

16         I'm now on slide 8, for the Court.  These slides now

17   talk about the analysis of database, and it's DatCard's

18   position that the term *database* is not an ambiguous term, and

19   it does not have a special meaning in the art.  Pacsgear has

20   not contended otherwise.  Skilled artisans and lay people

21   alike can understand a word like *database*.  It's a simple

22   word.

23         On slide 9, your Honor, we see that under these

24   circumstances the ordinary and customary meaning of the word

25   should apply.  That's the law, as the Court knows, and

*UNITED STATES DISTRICT COURT*

1    there's a heavy presumption that that custom and ordinary

2    meaning applies.

3         It is still appropriate to consult a dictionary to

4    determine if the ordinary and customary meaning is consistent

5    with the specification, and that's why, because this term is

6    in dispute, we really don't think it needs interpretation,

7    but if it does, we've looked to the dictionary -- the Oxford

8    Dictionary, and it says, *database is a structured set of data*

9    *held in a computer*.  Pacsgear has also cited some dictionary

10   definitions, which you saw previously, and at the bottom of

11   slide 9 you'll see it's our position that even the dictionary

12   definition cited by Pacsgear are consistent with the

13   definition that DatCard has offered.  All of Pacsgear's

14   dictionary definitions relate to the storage of data.  They

15   relate to the storage of information, and none are limited to

16   images or a specific type of data.  And the exhibits where

17   you'll see their definitions, I believe, are at Exhibit 269

18   and 279 of Pacsgear's materials.

19        So turning to slide 10, your Honor, you know we have

20   a dictionary definition, but if it's inconsistent with the

21   claims, or if it's inconsistent with the specification, then

22   it should not be used.  But if we look at the second

23   limitation of our -- of our Claim 1, it says, *a database*

24   *configured to store medical image data*.  So we know that the

25   database can store medical image data.

**UNITED STATES DISTRICT COURT**

1    The fourth limitation talks about the search module,

2    which is configured to automatically search the database for

3    related data.  So the third bullet point summarizes here that

4    we know this database can store both medical image data and

5    related data, but the claim says nothing about a database

6    being limited to images and only images.

7    Turning next to the specification on slide 11.  We're

8    going to check again to see if this definition is consistent

9    with the specification.  And you heard previously that there

10   are several databases that are described in the patent.

11   There's an application server database, 114, there's a

12   production history database, 116, an image server database,

13   202, it's our position that these databases that are

14   described in the patent, some of them store images, some of

15   them store non-image data such as text, but these databases,

16   there are several different kinds, and it's a broad

17   disclosure that database can have lots of things in it, and

18   it would be improper, even if the database in the patent was

19   an image-only database, it would still be improper to limit

20   the term *database* to an image database, because the word

21   *image* isn't in the claim.

22   So if you look at slide 12, your Honor, we see some

23   of the problems that we believe exist with Pacsgear's claim

24   construction.  One is that it violates a canon of claim

25   construction that you should not import limitations into the

1   claim that are not there.  This claim could have been written

2   as an image database.  It could have been written as a server

3   database or something else, but the patent drafter chose to

4   use the term *database* and database only.

5        So by limiting the claim to images -- a database with

6   images, Pacsgear's construction improperly imports

7   limitations into the claim.

8        Slide 13 points out another problem with Pacsgear's

9   proposed construction.  There was a lot of reference today to

10  the specification and how this term was supposedly defined in

11  the specification, or it was restricted in that fashion.  We

12  think that's incorrect.  Reading the specification, it's

13  clear that DatCard did not act as its own lexicographer and

14  specifically define the term *database* as being a database of

15  only images.  That definition is not there.

16       The other problem is that by restricting the database

17  term to an image database, that requires a special disavowal

18  in the specification.  The federal circuit is very clear, as

19  the Court knows, if you're not acting as a lexicographer, you

20  can't limit the claim that way.  And unless there is a clear

21  and manifest exclusion or restriction in the specification,

22  or a clear disavowal, then the plain meaning of that term

23  should not be restricted.

24       And we cite -- I cite the *Epistar* case here for the

25  Court, but we also cited in our brief a very important case

**UNITED STATES DISTRICT COURT**

1    called the *Thorner vs Sony* case, that cite is 669

2    F.3d 1362 --

3            THE COURT:  The name of it again?

4            MR. SUMMERS:  Yes, your Honor.  It's called *Thorner*

5    *vs Sony*.  669 --

6            THE COURT:  And what -- no.  That's all right.  Tell

7    me what that says.

8            MR. SUMMERS:  Let me get that case, your Honor.

9            THE COURT:  No.  You mean on the --

10           MR. SUMMERS:  I have it in a booklet.

11           THE COURT:  Okay.  Just tell me what it says.

12           MR. SUMMERS:  I'm going to do that, your Honor,

13   because I don't want to misstate what this -- which I think

14   is a very good case for us says.

15           It first talks about the general rule that you give

16   terms their ordinary and customary meaning as understood by a

17   person of ordinary skill.  And there are only two exceptions

18   to that general rule, one is when the patentee acts as his

19   own lexicographer, and second when the patentee disavows the

20   full scope of the claim.  This is at Page 1365.

21           So to act as its own lexicographer it says quote, *a*

22   *patentee must clearly set forth a definition of the disputed*

23   *claim term other than its plain and ordinary meaning.  It is*

24   *not enough for a patentee to simply disclose a single*

25   *embodiment or use a word in the same manner in all*

**UNITED STATES DISTRICT COURT**

*embodiments.  The patentee must 'clearly express an intent to*

*redefine the claim.'*  Database is nowhere redefined in the

specification.

       With respect to disavowal the *Thorner* case says at

Page 1366, *the standard for disavowal of claim scope is*

*similarly exacting.*  Quote, *where the specification makes*

*clear that the invention does not include a particular*

*feature, that feature is deemed to be outside the reach of*

*the claims of the patent, even though the language of the*

*claims could encompass it.  The patentee may demonstrate*

*intent to deviate from the ordinary and customary meaning of*

*a claim term by including in the specification expressions of*

*manifest exclusion or restriction representing a clear*

*disavowal.*

       And I know you've read the patent, your Honor, and I

hope you agree with us that we didn't do that.  We have cited

examples of what's in a database.  They're embodiments.

There was no redefinition, and there was no clear disavowal.

And that applies to some of the other terms we're going to

talk about here too, like related data, related medical image

data, and additional medical image data, those three terms.

There was no lexicography going on there, and there was no

disavowal.

       THE COURT:  Okay.  You can leave that point.

       MR. SUMMERS:  Thank you.  Sorry, I probably beat that

**UNITED STATES DISTRICT COURT**

1    one into the ground a little too much.

2             THE COURT:  No.  That's all right.

3             MR. SUMMERS:  Thank you, your Honor.

4             So I'd like to move to slide 14.  And here's the

5    slide that shows the evidence that Pacsgear has a database.

6    It has a local database.  You heard earlier about different

7    databases.  There's databases in the hospital at the PACS, at

8    the image modalities like MRI machines, they have databases,

9    but the media writer has a database, too, and it stores

10   images.  And it stores text reports.  Pacsgear's 30(b)(6)

11   witness testified that there is a hard drive that stores

12   medical images.

13            The first bullet point where it says, *media writer*

14   *has a local database that stores images*, that term *local*

15   *database* is taken right out of their documents.  We didn't

16   make up that term.  It's in their documents, and it says the

17   media writer has a local database.  So we think this claim

18   term relating to the database is literally satisfied by the

19   media writer and its local database.

20            If the Court is ready, I'd like to move to another

21   claim term, *automatically*.

22            THE COURT:  Yes.  Mmmm-hmmm.

23            MR. SUMMERS:  That's on Page 15, your Honor.  You'll

24   see there the title of this slide says, *construction of*

25   *automatically search the database*.  We -- we put it in

*UNITED STATES DISTRICT COURT*

1    context because *automatically* relates to what is happening.

2    There is a search of the database that's done automatically.

3    We have DatCard's construction of automatically and

4    Pacsgear's construction right on this slide.  I won't repeat

5    them in the interest of time --

6         THE COURT:  Don't.  I understand them.

7         MR. SUMMERS:  Very good.  The important point here

8    about *automatically*, your Honor, is on slide 16.  The federal

9    circuit has already addressed the term *automatically* in the

10   context of a computer implemented method.  That case is

11   *CollegeNet* cited on Page 16.

12        The arguments that we're making here in this case

13   were the same arguments that the plaintiff made in *CollegeNet*

14   that were adopted by the federal circuit.  And the same

15   arguments that Pacsgear's making in this case are essentially

16   the same arguments that were made by the federal circuit --

17   excuse me, by the defendant in that *CollegeNet* case, which

18   were rejected by the federal circuit.

19        And the important thing here is that the term --

20   these claims have the word *comprising* in them, which I know

21   you're familiar with.  It's an open-ended transitional phrase

22   that means everything --

23        THE COURT:  I know what it is.

24        MR. SUMMERS:  Good.  Okay.  Well, that was a huge

25   distinction, a huge important point for the federal circuit

**UNITED STATES DISTRICT COURT**

1    in that case, because they said, you know, something can be

2    done automatically, but that doesn't mean there isn't any

3    human intervention or interaction, it just means it's

4    performed by a machine.  Once the process is initiated, it's

5    performed by a machine without the need for manually

6    performing the function.  So Pacsgear says we don't do

7    anything automatically.  Well, they don't do it manually.  No

8    one is doing anything manually in their machine except maybe

9    clicking some buttons or pointing to things, but those are

10   the exact kind of interactions with a computer that the

11   *CollegeNet* says that's fine.  You can still do that.  And it

12   doesn't take it outside the scope of what is done

13   automatically.

14        Turning to slide 16.  I'm now going to get into

15   related data, your Honor.  Our proposed construction is on

16   slide 17 Pacsgear's is there as well.  The important takeaway

17   here is that Pacsgear wants to limit the term *related data* to

18   *solely medical images*.  They want to exclude other things

19   that are not images such as textual data, diagnostic reports,

20   and things that are related to selected medical image data.

21        THE COURT:  Yes.  That's right.

22        MR. SUMMERS:  Okay.  So again, slide 18 tells us

23   related data is not an ambiguous term.  It's two words,

24   related and data.  Those are plain and ordinary words.  They

25   don't have a special meaning in the art.  Pacsgear does not

**UNITED STATES DISTRICT COURT**

1     contend otherwise.  Skilled artisans and lay people can

2     understand --

3          THE COURT:  You don't have to do that.  Go on.

4          MR. SUMMERS:  So they jump to the specification to

5     start redefining the term, and we think that's improper.

6     Slide 19 shows that the claims confirm the customary and

7     ordinary meaning, and I think this is important for the

8     Court's analysis of this term.

9          So let's look to the claims first.  Claim 1 says, *a*

10    *plurality of browsing terminals configured to receive a user*

11    *selection that defines selected medical image data*.  That's

12    the first thing that the browsing terminals do.

13         The next claim term is element 4, there's this *search*

14    *module configured to automatically search the database for*

15    *related data based on the user's selection*.  Our point here

16    is that the term *related data* is related to the selected

17    medical image data, but it doesn't say that the related data

18    has to be another image.

19         The specification confirms this -- this

20    interpretation, your Honor, at slide 20.  It's clear that the

21    specification does disclose embodiments in which related data

22    are images.

23         THE COURT:  Yes.

24         MR. SUMMERS:  We don't deny that.

25         THE COURT:  Yes.

*UNITED STATES DISTRICT COURT*

1           MR. SUMMERS:  We do not.

2           THE COURT:  It does.

3           MR. SUMMERS:  It certainly does, but we also think

4    there's broader language in the patent, and as the Court

5    knows from the many, many years you've been trying patent

6    cases, that sometimes it's a sentence, sometimes it's two

7    sentences that expand the scope and call for broader

8    disclosure.  And those two -- the two portions of the

9    specification that we think provide that expansion are there.

10   You've heard them again, and I'm not going to repeat them,

11   but it's our position that those phrases there on slide 20

12   that are quoted give us the broader latitude for express

13   disclosure that related data can include more than images.

14   It can include something other than an image, but even -- you

15   know, so this broad language is there and -- but even if we

16   hadn't put this in here, it's still broad enough to include

17   something that isn't an image, because the term *related data*

18   doesn't say *related images*.  It says *related data*.  And we'd

19   ask for a construction that comports with the plain and

20   ordinary meaning of that term.

21           In the interest of time I'm going to skip over slide

22   21, but it -- it compares some of the language in the

23   specification.  It uses the term *associated with* and sounds a

24   lot like *related to*, but I'm going to skip over that.

25           Slide 22, this is the one we covered.  Once again

**UNITED STATES DISTRICT COURT**

1    Pacsgear, we think, is trying to import limitations into the

2    claim.  Again they're trying to import the word *medical*

3    *images* -- use the term *medical images* instead of *data,* and

4    there's just no support.  It comes -- it comes from an

5    embodiment, but they want to limit us to that embodiment.

6    And that's improper.

7         Slide 23 is another slide that talks about

8    lexicography and disavowal.  I'm not going to --

9         THE COURT:  No.  Don't do that.

10        MR. SUMMERS:  I'm not.  I won't, your Honor, but

11   you've heard a couple of things here about what Dr. Rowberg,

12   our expert witness, testified about, where he supposedly

13   agreed that the term *medical image data* includes only images.

14        THE COURT:  Yes.

15        MR. SUMMERS:  That was a discussion about what was in

16   the specification and what that term said, and he wasn't

17   talking about the claims.  He was talking about what's in the

18   specification.  There was no doubt that medical image in the

19   specification included images.  But as you know, your Honor,

20   what an expert witness says is extrinsic evidence, and it's

21   about at the lowest rung of what's relevant.  The federal

22   circuit said it's entitled to little or no weight.  We

23   weren't putting up Dr. Rowberg to be an expert on claim

24   construction.

25        You also heard about a declaration of Mr. Wright in

1    the patent office where we talked about related medical image

2    data images.  Again, he was talking about what's in the

3    application.  If you look at that -- that quote that was

4    referred to earlier, you'll see that he starts out saying, *in*

5    *the application*.  He didn't say in the claims.  So to try to

6    use our own expert and our own inventor to argue that related

7    data is limited to images, we believe is incorrect.

8          Slide 24 is the evidence that media writer searches

9    for related data.  I told you earlier that the media writer

10   has a database, a local database that has images on it.  It

11   also has a feature that allows that database to receive

12   diagnostic reports from a feed, it's called an HL7 feed, and

13   it comes in automatically, if you enable that feed, and some

14   of their customers do.  When that feed's enabled, the reports

15   show up on that database.

16         THE COURT:  Well, counsel mentioned that.

17         MR. SUMMERS:  But what was not mentioned was, that

18   when the search is done to burn the disk, the search that the

19   media writer does is a search of the local database for the

20   images that are on that database and the text that's on that

21   database.

22         I want to clarify something, because I don't want to

23   confuse you, your Honor, about databases.  We selected the

24   media writer local database for purposes of our infringement

25   motion, because we felt there's no fact issue there, it's a

**UNITED STATES DISTRICT COURT**

1      simple argument --

2              THE COURT:  Say that just once more.

3              MR. SUMMERS:  I will.  I will.  I want you to be

4      clear -- I would ask that you understand our position that

5      when we're talking about a database for purposes of our

6      motion for infringement, we're talking about the local

7      database on the media writer device.  It has images.  It has

8      diagnostic reports.  Before that disk is burned, that machine

9      searches for those things and puts them on the disk.  That's

10     our position for purposes of asking for summary judgment of

11     infringement.

12             But, if we have a trial, we're not going to limit

13     ourselves to that argument, because there are other databases

14     that the media writer searches.  You heard about them.  The

15     PACS database which has images.  There are things called

16     report.  Brokers who have databases with reports.  The media

17     writer searches for those, too, and they're in different

18     databases.  And the 174 patent talks about searching the same

19     database, and we didn't want to get involved in a -- whether

20     searching one database or two databases is equivalent or

21     literal.

22             For purposes of my client seeking summary judgment we

23     wanted to simplify things, because their database -- their

24     local database has those things.  But, if we get to trial --

25     and we'll see in a few minutes why factual issues still exist

*UNITED STATES DISTRICT COURT*

1    about that, is searching one database or two databases the

2    equivalent?

3         And we -- we've made those arguments in opposing

4    their summary judgment motion.  So, I'm just talking about --

5         THE COURT:  Yes, you made the argument, but it isn't

6    entirely clear.  Tell me again what you're going to reserve?

7         MR. SUMMERS:  Well, when we oppose their motions, and

8    what we would reserve for trial is the issue of the doctrine

9    of equivalence on the 174 patent.  We didn't make that

10   argument in our motion.

11        THE COURT:  No.

12        MR. SUMMERS:  We're saying there's one database

13   called for by that claim, and that one database is in the

14   media writer.  It's in its local database.  But if you reject

15   that argument, your Honor, for whatever reason, we would --

16   we would ask that you not -- there's no -- we think they

17   haven't shown noninfringement under the doctrine of

18   equivalence.  They're seeking to get a summary judgment of

19   noninfringement completely on this 174 patent.  We disagree

20   with that because we think there is literal infringement, but

21   that's what our motion is based on.

22        THE COURT:  It's literal infringement under the --

23   looking only at the local --

24        MR. SUMMERS:  Yes.

25        THE COURT:  -- database.

*UNITED STATES DISTRICT COURT*

1    MR. SUMMERS:  Yes.  That's correct.

2    THE COURT:  Well, now that's kind of an interesting

3    interpretation.

4    MR. SUMMERS:  But when their president testified that

5    their media writer has a database, and we saw it in their own

6    documents, it became a -- to us, something that the Court can

7    easily focus on and address.  So we didn't ask for

8    infringement under the doctrine of equivalence under the 174

9    patent, because that would require us to argue they're

10   searching two databases.  We think that's equivalent to

11   searching one.  That's what our expert said.  Pacsgear

12   disagrees.  We've raised that argument in opposing their

13   summary judgment motion for noninfringement.

14   THE COURT:  Yes.

15   MR. SUMMERS:  So we think it's improper to grant

16   summary judgment of noninfringement under the doctrine of

17   equivalence, because that's an issue of fact.  Our expert

18   says it's equivalent.  Their expert says it's not equivalent.

19   There's conflicting testimony.

20   Infringement under the doctrine of equivalence is a

21   question of fact.  And we'll also talk about how they analyze

22   DOE.  It's in basically a sentence, and they didn't carry

23   their burden, but I'm getting ahead of myself a little bit,

24   your Honor.

25   Slide 25 deals with the issue of whether they do the

1    search of the database for related data automatically.

2    You'll see on slide 25, your Honor, the sequence that a user

3    needs to follow to get everything put on that disk.

4    Mr. Holbrow explained it, and we've summarized it here.

5    Images are selected, the selection is confirmed, there's a --

6    there's a box to say, *do you want to include reports?*  If you

7    check that box --

8            THE COURT:  He said that.

9            MR. SUMMERS:  -- it searches.  But there's also a

10   default that can be set up in advance to do that as a

11   default, so you don't even have to click reports.  It's

12   already there.  Then, when you click the burn button,

13   everything goes to the disk, and we think that is an

14   automatic search --

15           THE COURT:  When you say *everything goes to the disk,*

16   you mean the text and the images?

17           MR. SUMMERS:  Yes, your Honor, I do.  That's exactly

18   right.  The images that were selected and the reports that

19   were found --

20           THE COURT:  And it will do that by default?

21           MR. SUMMERS:  It can do that by default, and it can

22   do that by a user deciding to not make it the default, but to

23   check a box and do it on a case-by-case basis.

24           THE COURT:  You mean if nothing is done, that's what

25   will happen?

*UNITED STATES DISTRICT COURT*

1          MR. SUMMERS:  If the -- if the include reports box

2      has been checked by default --

3          THE COURT:  How do you do that?

4          MR. SUMMERS:  It's a -- it's something that the user

5      can do, I believe, in advance when setting up the machine.

6      So when you buy one of these media writers, you can -- you

7      open the box and you can configure it to burn reports

8      automatically by checking the include reports button --

9          THE COURT:  You mean, if I get this media writer --

10         MR. SUMMERS:  Okay.

11         THE COURT:  -- and if I don't do anything, it will

12     automatically give me reports?

13         MR. SUMMERS:  I don't think that's quite correct.  If

14     you buy it, open it up, it won't search for reports unless

15     you configure it to do it by default, automatically -- for

16     lack of a better word -- or you can check it on a

17     case-by-case basis.

18         THE COURT:  But you can configure it by default?

19         MR. SUMMERS:  Yes.

20         THE COURT:  How do you do that?

21         MR. SUMMERS:  It's part of the setup, and I don't

22     have those details, your Honor, with me.

23         THE COURT:  All right.

24         MR. SUMMERS:  We can look for it, but I don't have

25     that at my fingertips.

*UNITED STATES DISTRICT COURT*

1          THE COURT:  But what you're talking about is not, I

2     open it and I don't do anything to it?

3          MR. SUMMERS:  And get reports?

4          THE COURT:  Yes.

5          MR. SUMMERS:  I don't think you get images either,

6     your Honor.  You'd have to -- there has to be some human

7     interaction with the machine to get the images, to ask for

8     the reports to be located or found -- searched.

9          THE COURT:  You have to do something?

10          MR. SUMMERS:  You do.  And the -- you did in

11     *CollegeNet*.  *CollegeNet* was a case about --

12          THE COURT:  Well, no.  Don't --

13          MR. SUMMERS:  Okay.

14          THE COURT:  -- don't do it by analogy.  I'm just

15     asking you factually.

16          MR. SUMMERS:  Yes.  Sorry, your Honor.

17          THE COURT:  You have to do something?

18          MR. SUMMERS:  Yes, your Honor, you do.  Something has

19     to be done.

20          The last thing I'll say about automatically, your

21     Honor, is that there's no dispute that the media writer, the

22     machine itself, does the searching.  A human doesn't do the

23     searching.  A human doesn't go out and find the report and

24     put it on the disk.  There's a search of that database for

25     the report and that's done by the machine.  And that's all

**UNITED STATES DISTRICT COURT**

1      that's required by the claim.

2             As far as the plurality of browsing terminals goes,

3      that's something that Pacsgear's customers provide, as shown

4      on slide 26.  Those are -- those customers supply that.

5      They're the direct infringers here.  I don't think that's in

6      dispute.  Of course they don't admit there's infringement,

7      but they don't deny that their customers, you know, hookup a

8      plurality of browsing terminals to the media writer.  We have

9      deposition testimony of that, and we have their customer

10     service logs that show that's, in fact, what happens.  So,

11     there is a direct infringement.

12            Turning to slide 27, your Honor, just the elements of

13     contributory infringement, which is our claim here.  There's

14     evidence of direct infringement by the customers.  There's

15     knowledge of the patent by Pacsgear, that's not disputed.

16     The media writer has no substantial noninfringing uses, which

17     I'll explain in a minute.  And the media writer, as a

18     component, is a material part of the claimed invention.

19            On slide 28 we explain how the customers connect to a

20     plurality of browsing terminals, because Pacsgear doesn't

21     sell multiple terminals when they sell a media writer, as far

22     as we can tell.  So when the customers get the media writer,

23     there's a feature in the media writer called a web client,

24     and you can turn it on or you can turn it off.  But

25     whether -- and that web client allows the customer, if you

*UNITED STATES DISTRICT COURT*

1    turn it on, to connect to multiple browsing terminals.

2         The fact that the web client is there is sufficient

3    to establish that the media writer is -- has no substantial

4    noninfringing uses, because whether a customer turns it on or

5    not, that's only relevant to show direct infringement.  It

6    does not establish substantial noninfringing uses as the

7    *Fujitsu* case we cite there explains.

8         And then Pacsgear argued that the browsing terminals

9    are not a material part of the invention.  Well, that's

10   exactly backwards, your Honor, because it's our position the

11   media writer is the material part of the invention, not the

12   browsing terminals.  Pacsgear provides the media writer.  It

13   has everything in the claim except for the browsing

14   terminals.

15        I'd like to now turn briefly to the 5 --

16        THE COURT:  Wait a minute.  Let's go over this last

17   part.  I'm on 28, the last point.

18        MR. SUMMERS:  Yes.

19        THE COURT:  Say it once more.

20        MR. SUMMERS:  Yes, your Honor.

21        The last point relates to the fourth element to prove

22   contributory infringement.  The fourth element of

23   contributory infringement requires that the component is a

24   material part of the invention, and we are saying that the

25   media writer is the component that is the material part of

**UNITED STATES DISTRICT COURT**

1    the invention, not as Pacsgear argues, the browsing

2    terminals.  They say the browsing terminals are not a

3    material part of the invention.  Well, that's irrelevant

4    because they don't sell them.  They sell the media writer.

5    That has everything but the browsing terminals, and that's

6    why it's the material component.

7            Did I help clarify that, your Honor?

8            THE COURT:  I have your answer, yes.

9            MR. SUMMERS:  Okay.  Thank you.  May I move to the

10   597?  It's on Page 29.

11           THE COURT:  Yes.  We -- we're trying to analyze what

12   that second database is.

13           MR. SUMMERS:  The 597 patent has -- it recites two

14   databases.  It's a claim that calls for a system or method

15   that will first search one database for selected medical

16   image data, and then it searches a second database for

17   additional medical data related to the patient.

18           THE COURT:  Correct.  That's right.

19           MR. SUMMERS:  Different terminology.  And it's our

20   position that that term *additional medical data also related*

21   *to the patient* does not have to be an image and only an

22   image.  It could be an image, that's what one of the

23   embodiments in the invention -- the application shows.

24           THE COURT:  Yes.  That's right.  Yes.

25           MR. SUMMERS:  But it doesn't have to be only an

1    image.

2         So, they're right.  Their device doesn't do a search

3    for additional images, and that's their point.  But it hinges

4    on limiting the claim to a search for images when the claim

5    doesn't say *a search for additional images*, it says, *a search*

6    *for additional medical data*.

7         THE COURT:  And your point is that this is the --

8    this is the button you push?  The text?

9         MR. SUMMERS:  On their device to get that additional

10   report you need to enable the report's feature, include

11   reports I think is what it's called.

12        THE COURT:  And -- and so is this -- this can be

13   either report, according to you -- or images?

14        MR. SUMMERS:  Well, we think the claim covers both,

15   but we acknowledge that their device does not search for

16   related images.

17        THE COURT:  No.

18        MR. SUMMERS:  We feel that the claim is broad enough

19   to cover a search for related images, or a search for related

20   other medical data like reports.

21        THE COURT:  Mmmm-hmmm.

22        MR. SUMMERS:  Okay.

23        THE COURT:  That's what I just asked you.

24        MR. SUMMERS:  All right.  I apologize --

25        THE COURT:  This includes either images?

*UNITED STATES DISTRICT COURT*

```
1            MR. SUMMERS:  Yes.
2            THE COURT:  And/or -- not either, but it can have
3    either or both?
4            MR. SUMMERS:  Correct.
5            THE COURT:  All right.  Go on.
6            MR. SUMMERS:  Thank you, your Honor.
7            Slides 30, 31 and 32 -- actually 30, 31 really are
8    repetitive of the argument as to why medical data should not
9    be limited to images, because it's not ambiguous, it wasn't
10   defined in the specification, the specification doesn't
11   clearly disavow or restrict that term to images only.  So I'm
12   not going to go over that again, unless the Court has a
13   question with respect to that?
14           THE COURT:  No.  I don't have any -- no, I don't.
15           MR. SUMMERS:  Okay.  Thank you.
16           Slide 32 talks a little bit about the two database
17   issue because we're now on the two database patent.  Slide 32
18   summarizes, you know, some of the databases that the media
19   writer can connect to, PACS databases, report broker
20   databases, media writer's own local database.  There's also
21   modalities like MRI machines that have their own database.
22   The media writer has the ability to reach out to all of those
23   databases and grab images, and grab reports, pull them into
24   the local database, and then throw it all onto the disks.
25           And so we're talking about the 597 patent and
```

1    DatCard's opposition to Pacsgear's motion for summary

2    judgment of noninfringement.  You know, they have the burden

3    here to show noninfringement, and we've put up plenty of

4    evidence to show that a reasonable jury could find in our

5    favor on this patent.

6         The last slide here on this patent is slide 33.  It

7    talks about the doctrine of equivalence.  And to grant

8    Pacsgear's summary judgment of noninfringement means the

9    Court would have to find that there's no infringement under

10   the doctrine of equivalence.

11        And Pacsgear has the burden of proof on that issue.

12   And if you look at their brief, they analyzed the doctrine of

13   equivalence in one sentence, and I'd just like to read it.

14   *There can be no infringement by equivalence of the 597*

15   *patent, because the media writer does not accomplish the same*

16   *function in the same way to achieve the same result.  There*

17   *is no automatic search for unselected image data, nor is*

18   *image data obtained from the two databases*.  That is a

19   recitation of the DOE legal standard and a conclusion.  It's

20   not an analysis.  It does not carry their burden of proof on

21   this motion to get summary judgment of noninfringement.

22        And there are a multitude of factual disputes.  The

23   two experts conflict on what -- what things are doing.  What

24   their machine does.  Our expert says it does one thing, and

25   there's some dispute there.

*UNITED STATES DISTRICT COURT*

1          THE COURT:  You're going to have to tell me a little

2     bit more about that.

3          MR. SUMMERS:  Well --

4          THE COURT:  Just because the two experts disagree,

5     does that create, automatically, a question of fact?

6          MR. SUMMERS:  Not necessarily, because it may clasp

7     into an issue of claim construction, all right?

8          We contend that the local database searches for

9     images and the text reports that come in through the HL7

10    feeds, for example.  And Pacsgear's expert says that isn't a

11    search of the local database.  Those -- those things are just

12    sort of there.  They're in different folders.  They're not

13    technically in a database, even though their documents call

14    that thing a database.  So, our expert says one thing, their

15    expert says another.

16         I think the two database limitation issue is -- their

17    argument is, we don't search a second database for images.

18    And they don't.  So that's probably not a factual dispute.

19    If you construe the claim to limit all of these terms,

20    related medical image data, additional medical data, and

21    related data to be limited to images, if you -- if you find

22    that -- and we hope you don't because we think it's the

23    incorrect claim construction -- they don't do that.  But is

24    searching for related -- is searching for a report the

25    equivalent?  Because this invention was about the idea -- one

**UNITED STATES DISTRICT COURT**

1    of the ideas was, you know, let's make it easy for all these

2    people.  We're converting to a digital environment, and PACS

3    are now storing images electronically rather than on film.

4    And people are losing film, and it's expensive --

5            THE COURT:  I know that.

6            MR. SUMMERS:  -- and Mr. Wright came up with this

7    idea --

8            THE COURT:  I know that.  That was the purpose.

9            MR. SUMMERS:  Sure.  And a big purpose of this

10   invention is not just to search for images and then search

11   for related images which we describe in the preferred or, you

12   know the embodiments that are described, but you know,

13   anything else.  These folks may want something else, and if

14   it's related, we show them how to do that.

15           THE COURT:  You mean -- you mean your patent covers

16   any database, a multitude of them?

17           MR. SUMMERS:  The 597 clearly does, your Honor.  It's

18   the two database patent, and we say that you have to search

19   one database for the images, and then you search a second

20   database for the diagnostic reports.  We say that's covered

21   by the patent.

22           THE COURT:  Go on.

23           MR. SUMMERS:  Thank you.

24           The final issues relate to the 164 patent.  Again,

25   Pacsgear is seeking summary judgment of noninfringement of

*UNITED STATES DISTRICT COURT*

1    that patent.  We oppose that motion.  We think a reasonable

2    jury could find infringement.  The two claim construction

3    issues here are related medical image data and the printing

4    and affixing limitations.

5        Slide 35 shows the parties' competing constructions

6    on the *related medical image data* term.  Once again, Pacsgear

7    wants to restrict the term *related medical image data* to mean

8    only medical images, and nothing else.  And for the reasons

9    which I've expressed previously, we think that's incorrect.

10       And if I may give the Court some background and

11   history as to why we think that, because if I'm sitting where

12   you are -- and I would be fortunate to be able to do that one

13   of these days, I'd say well, you know, there's the 164 patent

14   that has the term *related medical image data*, and then

15   there's these other two patents.  They don't use that term.

16   They use the term *related data* in the 174 patent, and *medical

17   data* in the 597 patent.  But Mr. Summers is telling me that

18   they -- they include images and reports.  How can that be?

19   And here's the answer, your Honor.

20       When we sued Kadonics under the 164 patent, that was

21   the only patent we had.  They came up with this argument that

22   related medical image data did not include text reports, and

23   we thought well, we disagree with that.  That's not right.

24   That term shouldn't be limited to only images, but they made

25   the argument, and we litigated that argument.  There was no

*UNITED STATES DISTRICT COURT*

```
 1    claim construction, but it was something we had to face.  So
 2    we had continuation applications pending, and DatCard went
 3    back to the patent office and changed the terms -- changed
 4    the language to try to make it crystal clear --
 5              THE COURT:  Obviously.
 6              MR. SUMMERS:  -- that it's not images only.
 7              THE COURT:  Obviously.
 8              MR. SUMMERS:  Okay.  Good you're on that?
 9              THE COURT:  I'm not in agreement with your
10    conclusion, but that is what happened.
11              MR. SUMMERS:  That is what happened.
12              THE COURT:  There was a change sought.
13              MR. SUMMERS:  Yes.  There was a change sought.  The
14    word images aren't in those later patents when it comes to
15    related data.  The patent office allowed those.  One other
16    thing that Pacsgear's talked about is that the related
17    medical image data has to be recorded in the standard medical
18    imaging format.
19              THE COURT:  DICOM.
20              MR. SUMMERS:  DICOM is the standard medical imaging
21    format, that is true, today.  It's broad enough to cover
22    things that will come up later, I suppose.
23              And it's our view -- we disagree with this, but if
24    you turn to slide 20 --
25              THE COURT:  Turn to slide 20.
```

*UNITED STATES DISTRICT COURT*

1           MR. SUMMERS:  Yes, of my presentation.  In the middle

2     it says, *a viewing program that allows users to read the*

3     *patient demographics and exam information associated with the*

4     *image data*.  And we think that is broad enough to include the

5     reading of text data with the viewing program.

6           So their argument that the related medical image data

7     has to be in a standard medical imaging format like DICOM, we

8     think it is.  It's right there.  There's a distinction

9     between exam information, which is not an image, and then the

10    image data -- if you want to call image data just an image.

11    We're talking about two things there, text and image data,

12    and it's done by the viewing program.  That's what the patent

13    says.  And we think that's broad enough to include the text

14    data to be viewed by the viewing software, the DICOM format,

15    that's our position.  They disagree with it, so that's where

16    we are on that.

17          THE COURT:  Just to sound very simplistic, are you

18    telling me you could put the text in DICOM?

19          MR. SUMMERS:  Yes.  There is written information

20    associated with like -- if you get an MRI on your brain,

21    you're going to see your brain, and there's -- there's all

22    kinds of text associated with that.  Why can't that be text

23    as well?

24          Some will say well, that's -- that's not text,

25    because the -- the picture of your brain is an image, and I

**UNITED STATES DISTRICT COURT**

1    suppose, technically speaking, that -- that data that's on

2    there, the numbers and your name, that's a photograph, too.

3    That's an image, someone might say, but I don't think you

4    have to say that.  Why can't you say that's text?  You're

5    looking at it through the viewing program.

6            THE COURT:  All right.

7            MR. SUMMERS:  The printing and affixing limitations

8    are the last things I would like to address.  Those are on

9    slides 37.

10           The steps are not sequential, your Honor.  There's a

11   printing a label and then affixing the label to the disk.

12   Pacsgear contends there's an order that that is done in.  We

13   say it is not.

14           The claims do not say that the label is applied to

15   the CD after the label is printed.  If you look at the CDs

16   that their device creates, they don't dispute that there is a

17   label on there that is printed and it is affixed.  And the

18   patent specification talks about using the robotic printer to

19   apply all of that using the robotic.  It's a -- it's a --

20   it's sprayed on -- it can be sprayed on right onto the disk.

21           THE COURT:  Right.

22           MR. SUMMERS:  That's printing through the inkjet

23   head --

24           THE COURT:  Yes.

25           MR. SUMMERS:  -- and applying.

**UNITED STATES DISTRICT COURT**

1          THE COURT:  All right.  Now --

2          MR. SUMMERS:  That's our position, your Honor.

3          THE COURT:  All right.

4          MR. SUMMERS:  Lastly DOE, another issue here, very

5    little argument on doctrine of equivalence.  And this is for

6    the 164 patent, and again, to me this is key.  They're

7    seeking summary judgment of noninfringement of all of the

8    asserted claims of the 164 patent.  And the only one they

9    analyzed under the doctrine of equivalence was Claim 9.

10         We think that there is equivalence, but even if you

11   find there's no equivalence on Claim 9, and we think you

12   should because again it's a one sentence analysis of the DOE.

13   They didn't do it for the other claims.  And they didn't meet

14   their burden.  And with all due respect, your Honor, you're

15   busy, it's respectfully not your job to go and do that for

16   them.  They had the burden of proof on the motion, and they

17   didn't carry it.  For any of the claims, they just did not

18   analyze them.  Claim 9 was -- was analyzed in one sentence.

19   It's a quote from Dr. Horii's report, and it's on Page 40,

20   and once again, it's a simple recitation of the DOE standard.

21   There is zero analysis.  That does not carry their burden.

22         Thank you, your Honor.

23         THE COURT:  Yes.

24         MR. SUMMERS:  I'm done with infringement.

25         THE COURT:  That's fine.

*UNITED STATES DISTRICT COURT*

1          MR. SUMMERS:  Thank you.

2          MR. HOLBROW:  Your Honor, just a few things.

3          THE COURT:  Yes.  That's fine.

4          MR. HOLBROW:  Picking up where he left off on the

5     doctrine of equivalence.  I don't think there's any question

6     that our analysis on little infringement was extremely

7     thorough in explaining why the media writer doesn't literally

8     infringe the -- any of the patents.

9          The doctrine of equivalence analysis falls, the

10    little infringement analysis immediately.  Judges understand

11    the doctrine of equivalence is really no reason for the

12    parties to restate everything we just said in the little

13    infringement analysis under the doctrine of equivalence

14    analysis.

15         We do identify the various areas which are

16    substantially different, and as I discussed during my

17    opening, for the reasons identified, one database doesn't --

18    isn't the equivalent of two databases.

19         THE COURT:  I don't think I want to hear anything

20    about equivalence.

21         MR. HOLBROW:  Okay.

22         THE COURT:  I just -- I just have read --

23         MR. HOLBROW:  Okay.

24         THE COURT:  -- an article on that, and I think I am

25    quite capable, based on the jurisprudence that's developed of

**UNITED STATES DISTRICT COURT**

1    analyzing that as it's applied here.  I don't think I want to

2    hear argument about it.

3         MR. HOLBROW:  You won't hear another word from me on

4    it, your Honor.

5         THE COURT:  The reason I mention the article is we're

6    not sure about equivalence now.

7         MR. HOLBROW:  Mr. Summers talked about an attempt to

8    try and have these image data also include text data,

9    referred to that section --

10        THE COURT:  And that it can be in the DICOM.

11        MR. HOLBROW:  It can be in the DICOM header, and the

12   viewing software can view it.  That's not consistent with the

13   testimony that Mr. Wright gave we cited in our brief, but at

14   Page 156, Lines 7 to 9 I asked him whether the E-film, which

15   is the viewing software, allows one to read text reports or

16   just images?  And he responded *just images, I believe*.

17        So, the viewing software can't review text reports.

18   The viewing software only can view DICOM images and can only

19   view -- and can read the header information.

20        Mr. Summer also talked about the new patents that

21   were submitted to the patent office, and that they changed

22   the words.  Well, I think what actually happened was, they

23   submitted new patents with new words.  I don't think there

24   was any change during prosecution.  But either way, the fact

25   of the matter is they didn't say *text reports*.  They didn't

**UNITED STATES DISTRICT COURT**

1   say *diagnostic reports*.  If they wanted to have it cover

2   diagnostic reports, they're in the position to do that.

3   Instead, they use the terms *related data*, *medical data*, and

4   *related medical image data*.

5          The reason they did that is because there wouldn't

6   have been any support for text documents from the

7   specification.  In order to have claims that are based on the

8   same specification, you must have some support for them in

9   the specification.  If they changed it to text reports, they

10  wouldn't have been able to get that through, because there's

11  no support for it.

12         So instead they used intentionally, kind of an

13  ambiguous term, that the examiner likely interpreted like we

14  did to mean image data, but now they're trying to twist it

15  when we come to the litigation to include something that it

16  doesn't, namely text reports.

17         In terms of the claim construction, there was a lot

18  of discussion on how related data, and medical data, and

19  related medical image data everybody knows what it means from

20  the claims itself.  You don't even need to go to the

21  specification.

22         Well, we asked Mr. Rowberg -- Dr. Rowberg what his

23  understanding of those terms meant, and that's at Page 58 and

24  59 of his deposition.  We said, *all right.  So from a medical*

25  *understanding the terms that are used in the patents,*

1    *'related data, related medical image data, selected medical*

2    *image data' are those vague in the medical community so we*

3    *need to look to the patent to figure out what they mean?*

4        *ANSWER:  Yes.*

5        So, people in the medical community, according to

6    their own expert, don't understand what the terms mean.

7    That's why you rely on the specification.  There's nothing in

8    the specification that would teach one skilled in the art how

9    to get -- how to think about getting text reports or how to

10   get the text reports.

11       We referred previously to the declaration of

12   Mr. Cavanaugh, who goes through the way that the media writer

13   is set up to get text reports, and again I won't bore you

14   with the details, but it's quite a convoluted process.  It's

15   a lot of steps, a lot of code that needs to be written.  You

16   need to interact with the hospital information system to get

17   the text reports sent to the media writing.  You need to

18   coordinate with any of the outside brokers that supply the

19   diagnostic text reports.

20       So, there's more involved than merely doing -- more

21   involved than what's discussed in the specification which,

22   again, just focuses on images.

23       Again, Mr. Summer talked about Dr. Rowberg talking

24   about terms kind of in the atmosphere and not specifically

25   related to the claims.  We asked him at Page 62 of his

**UNITED STATES DISTRICT COURT**

1    deposition, *okay.  So in this claim anyway, the term 'related*

2    *medical image data' necessarily refers to images.*

3        He says, *it seems to.*

4        THE COURT:  All right.

5        MR. HOLBROW:  The -- Mr. Summer spoke a little time

6    on the term *automatically* and how he wants to use another

7    case with another patent and another specification to define

8    that term.  Leaving aside all the issues it will create in

9    terms of anticipation based on some prior art, the

10   specification in this case does specifically define what

11   *automatically* means.

12       At column 7, Lines 53 to 55 it says, *patient will be*

13   *automatically selected* -- and it says, *without prompting for*

14   *user selection.*

15       Additionally, at column 8, Lines 57 through 60 it

16   says, *automatically selected by the application server for*

17   *production without prompting for user selection.*

18       We cited it in our brief.  It also talks about

19   without volition.  So the specification does, in this case

20   explain what is meant by *automatically.*

21       There was some interaction between you and

22   Mr. Summers on the database issue where Mr. Summers was

23   reserving his right to claim that other databases, if the

24   Court finds that this database on the media writer's hard

25   drive doesn't satisfy the language.  And the reason that the

*UNITED STATES DISTRICT COURT*

1    media writer's hard drive doesn't satisfy the claim

2    limitations is because the images aren't searchable when

3    they're put on the media writer hard drive.

4         If I understand Mr. Summers' analysis correctly, he's

5    saying the hard drive itself is the database.  And then you

6    have a directory on the hard drive that stores the -- or --

7    directory or text report database that stores the text

8    reports, and then over here somewhere else on the hard drive

9    you have these -- you have the images that are being

10   processed through to send to the CD burner.

11        There's no dispute that the media writer -- you can't

12   search the media writer hard drive for images.  The only way

13   images are searched for using the media writer is through a

14   PACS or a modality.

15        Leaving aside the question that a hard drive is not a

16   database by any stretch of the imagination, it does explain

17   why DatCard has proposed the definition for database, which

18   is on this slide which states, *a structured set of data held*

19   *in a computer*.  It doesn't say that it can be searched.  It

20   doesn't say anything about retrieving.  It doesn't say it's

21   based on a user request.  And yet every single claim that

22   I -- we discussed earlier in the search and burn patents

23   talked about searching the database based on a user

24   selection.

25        They also referred to the -- in the 164 and the 174

*UNITED STATES DISTRICT COURT*

1    that those databases must be image databases.  Now, we don't

2    disagree that some databases might have text and some might

3    have images, but the database --

4         THE COURT:  Well, you have to agree to that.

5         MR. HOLBROW:  Yeah.  No.  We're not disagreeing.

6    We're just focusing on the patent and the language in the

7    claimants which say that -- which highlight that it's an

8    image database, and that there's no database in the

9    specification that has both images and text.

10        A hard drive is not a database.  In fact, on -- at

11   Page 7 of their motion, I think it's docket 65, they -- they

12   refer to the location on the media writer's hard drive as a

13   buffer.  We didn't use that term until they -- but they used

14   that term, that it's a buffer.  A buffer is not a hard drive.

15   A buffer is just an unsearchable location where images are

16   temporarily stored before being sent out.

17        The patent, in fact, describes this very potential

18   embodiment where images will just pass through the patented

19   device -- the device disclosed in the specification and go

20   straight from the image database straight through the PACS --

21   straight through the recovery device and onto the CD through

22   the CD burning.  And it's interesting the language that the

23   patent uses here, is at column 6, Lines 15 through 20.  *In*

24   *another embodiment the application server transmit the --*

25   *transmits the data received in step 132 to the target*

1    *production station, without storing a copy of the data in the*

2    *application server database.*

3              So, what they're saying there is that in this

4    embodiment it's just passing straight through to the CD

5    burner.  They say it's not even stored on the database -- on

6    the hard drive or anyplace else, it just passes straight

7    through.

8              Again, a hard drive is not a database.  The -- they

9    found a specification -- a software summary that someone

10   wrote up a while ago that used some inartful terms, but that

11   doesn't change the facts.  A hard drive is not a database,

12   especially a database as defined by the specification.

13             And in addition to the patent specification, which

14   says that there's -- using a buffer doesn't even constitute

15   copying the data onto the server database, when we asked

16   Dr. Rowberg about this issue -- and this is at Page 74 and 75

17   of his deposition, and I asked, *and you agree that there's no*

18   *way for the media writer to search its own local drive for*

19   *images, it has to go to the PACS or modality, correct?*

20             *When burning the CD it has to use the images it has*

21   *already stored when it's ready to burn.*

22             *I'm talking about searching first.*

23             *That isn't searching.  That's just receiving them.*

24   *It knows where they are.  It doesn't have to search for them.*

25             And that explains why, of all the definitions that

*UNITED STATES DISTRICT COURT*

1    have been proposed, DatCard doesn't have search -- doesn't

2    require a database to be searched.  That just doesn't make

3    any sense.  The whole purpose of a database is to be

4    searched.  It's to store information to make it easy to

5    search based on a user's request.  The -- the rest of the

6    argument in connection with the meaning of the terms *related*

7    *data*, I think we've covered that in spades.

8            THE COURT:  We have.

9            MR. HOLBROW:  Okay.

10           THE COURT:  I am -- you want to say something else,

11   don't you?

12           Are you finished?

13           MR. HOLBROW:  I believe I am.  Yes, your Honor.

14           THE COURT:  All right.  Thank you.  Please.

15           MR. SUMMERS:  Actually one of the questions I wanted

16   to ask, before we start talking about the validity issues

17   with respect to the search and burn patents is time?

18           We have other patents to talk about, and I think you

19   were going to give us three hours, and I want to be

20   respectful of the Court's time, but I also want to cover

21   those other things, and I just want to check in with you,

22   your Honor, to see --

23           THE COURT:  I don't know.  I -- I was intending to go

24   through the whole thing today.

25           MR. SUMMERS:  Great.

**UNITED STATES DISTRICT COURT**

1        THE COURT:  But I do see one problem.  I've got to

2   make a decision about the claim construction.  And before I

3   hear the rest of it, I almost have to make up my mind about

4   that, don't I?

5        MR. SUMMERS:  Are you suggesting that we just argue

6   claim construction and then have, perhaps, another hearing --

7        THE COURT:  That's what I'm suggesting.

8        MR. SUMMERS:  Okay.  The one term I did not argue

9   with you, your Honor, was the term *production station*,

10  because that's more of an issue for the invalidity motions,

11  and that's the only one I have not argued.

12       I think -- oh, and there's also some other patents

13  with -- maybe we should do that because I think we're going

14  to probably -- no pun intended -- burn up the time on claim

15  construction.

16       THE COURT:  I'm not -- it's not the time I'm

17  interested in so much.

18       MR. SUMMERS:  It's the sequence.

19       THE COURT:  It's the logical progression of what we

20  should be doing.  I think I've really got to think about

21  these claim constructions, and then think about the

22  infringement, and then think about having another meeting

23  with you in which we look at the validity.

24       MR. SUMMERS:  And the infringement issues that are

25  not covered under the other patents?

**UNITED STATES DISTRICT COURT**

1     THE COURT:  Yes.

2     MR. SUMMERS:  Would you like us to focus the rest of

3  our time today on claim construction?

4     THE COURT:  You mean what you've already covered?

5     MR. SUMMERS:  Well, we've already covered a lot of

6  terms, and I think -- I don't plan to come up and say

7  anything more about, you know, Mr. Holbrow's rebuttal to what

8  I said.  I don't have anything further to say on that.

9     THE COURT:  No.  No.

10     MR. SUMMERS:  But the one term I have not argued on,

11  search and burn --

12     THE COURT:  You have to do that.

13     MR. SUMMERS:  I'll do that.  And then should we

14  immediately move to the claim construction on the other

15  patents?

16     THE COURT:  I don't know whether to do that.  You

17  see, this is really not the way I do it.  I would have had a

18  claim construction -- a Markman hearing.

19     MR. SUMMERS:  Right.

20     THE COURT:  Always.  If there is very much at issue

21  between the two of you, and there is plenty, and it's,

22  moreover, quite decisive.

23     MR. SUMMERS:  Judge Carter told us you liked to do it

24  that way.

25     THE COURT:  Well, I mean, he doesn't have to do it

*UNITED STATES DISTRICT COURT*

1    that way.

2           MR. SUMMERS:  Of course not.

3           THE COURT:  I'm not criticizing him.

4           MR. SUMMERS:  No.  No.  Not at all.  I didn't mean

5    that at all, your Honor.

6           THE COURT:  I'm just telling you that's the way my

7    mind works in these situations.  Perhaps I have to hear you

8    on the other claim construction right now.

9           MR. SUMMERS:  Very good.

10          THE COURT:  And then stop it.

11          MR. SUMMERS:  Okay.

12          MR. HOLBROW:  I think that makes a lot of sense and

13   it would --

14          THE COURT:  Well, there is no point in my going much

15   beyond that, because it affects -- sometimes the -- the claim

16   construction doesn't matter that much, but it makes a lot of

17   difference here.  It's the whole thing.

18          All right.  You tell me about the other claims.  And

19   let's see if you agree about this.

20          MR. HOLBROW:  Excuse me?

21          THE COURT:  Let's see if you agree with him.

22                          (Laughter.)

23          MR. HOLBROW:  I think there's probably less dispute

24   on the remaining ones here, so...

25          THE COURT:  Oh, is that right?  Then you can just

1      read them off.

2            MR. SUMMERS:  We'll see.  Your Honor, if you would

3      please refer to Page 48 of my slides.

4            THE COURT:  Yes.  All right.

5            MR. SUMMERS:  This is -- this is actually the section

6      of my presentation that deals with the invalidity motions on

7      the search and burn patents, and I'm focusing in on just the

8      slides that relate to the construction of the term *production*

9      *station*.  I'm going to cover that, and then I'm going to sit

10     down.

11           Mr. Holbrow's already covered the production -- or

12     the construction of production station, so here's my response

13     to that.

14           We have a dispute here.  DatCard's construction of

15     the term *production station* on slide 48 is *robotic disk*

16     *burner*.  Pacsgear's construction is *any device from which an*

17     *image is recorded onto a portable storage medium*.

18           The reason we have provided a construction of this

19     term is that we believe the term *production station* does not

20     have an ordinary and customary meaning, and it does not have

21     a meaning in the art.  It's not a term of art.  And under

22     these circumstances, the law tells us that we should look to

23     the specification to understand how the inventors used the

24     term.

25           The *Honeywell* case citation there is -- explains

*UNITED STATES DISTRICT COURT*

1    exactly that.  But I want to address one thing that may be on

2    your mind, your Honor.  You might think well, Mr. Summers,

3    you just told me that you don't really need to, you know --

4    what about related data?  You're saying you don't really have

5    to look to the spec.  Look at the plain meaning of the words.

6    Look at the plain meaning of the word *related data*, *medical*

7    *data, medical image data*.  I told you those were words that

8    weren't ambiguous.  They have an ordinary and customary

9    meaning.  You might be thinking well, now, why is he up here

10   telling me that the term *production station* doesn't fall into

11   that category?

12            THE COURT:  Don't worry about that.  I have -- I --

13   no, I'm not wondering why you're doing that.

14            MR. SUMMERS:  Okay.  Good.  Because I just want to

15   make sure I answer all your questions, and maybe I shouldn't

16   try to get in your head, but that's part of my job.

17            So we don't think -- we think it is something that's

18   not a term of art, you need to look at the specification.

19   Let me tell you why we think our construction makes sense.

20            Turning to slide 49, we're going to construe the

21   production station here in light of the specification, and

22   the 164 patent says that, *the CD production stations 300A,*

23   *300B, and 300C in the preferred embodiment are produced by*

24   *Rimage Corporation of Edina, Minnesota.*

25            THE COURT:  Of course.

**UNITED STATES DISTRICT COURT**

1        MR. SUMMERS:  Yes.  Then it says, *details about the*

2   *Rimage CD production stations can be found in certain patents*

3   *that are incorporated into the specification.*

4        And it's our position that this passage from the

5   specification informs us what a production station is.  It's

6   the type of device that's made by Rimage Corporation, and

7   Rimage Corporation makes the robotic disk burner.  Each of

8   the production stations disclosed in those patents is a

9   robotic disk burner.

10       THE COURT:  Yes.

11       MR. SUMMERS:  If we turn to slide 50, I'm going to

12  refer your Honor to Figure 1 from the 164 patent.  We've

13  highlighted a few things here.  On the left we've highlighted

14  the features of a browsing terminal, three of them, and we've

15  highlighted the production stations that are on the lower

16  right side.

17       The Court will recall that the claims recite a

18  plurality of browsing terminals, and then the production

19  station, and the claims also talk about just a display

20  terminal.  If you look at, towards the middle lower left,

21  there's a number 118, it says *display terminal*.

22       Now, if you just have a unit with a display terminal,

23  you can use that display terminal to burn disks.  And under

24  those circumstances, you know, maybe it might be just a

25  regular manual standalone burner that's not robotic.  But our

1   claim cites –- recites more than that.  Our claim recites a

2   plurality of browsing terminals, which can be all over the

3   place, and they often are.  And to have a plurality of

4   browsing terminals at these locations and then not have

5   something that –- and then have to go load manually a

6   production station –- a burner to get your disks, doesn't

7   make a whole lot of sense.

8         These are the things that we're relying on to

9   construe this term.  But having said that, your Honor, you

10  know, we recognize that this is, perhaps, a closer question

11  about whether you consult the specification or not.  We think

12  that the grounds for consulting the specification to construe

13  this term, *production station*, are much, much stronger than

14  the grounds to construe related data and those other terms by

15  relying on the specification only.

16        You know, if –- if the Court thinks *production*

17  *station* has an ordinary meaning and it can be a manual CD

18  burner, then we think *related data* easily then falls within

19  the category of construction according to its ordinary and

20  customary meaning that includes more than images.

21        That's all I have to say about production station,

22  your Honor, unless you have questions.

23        THE COURT:  More than images?

24        MR. SUMMERS:  Well, yeah, back to the related data,

25  yes, more than images, your Honor.  I didn't mean to, you

*UNITED STATES DISTRICT COURT*

1    know, hammer that back again, but I think you understood my

2    point about when do we go to the specification to limit a

3    term, or to define it, or construe it?

4           And we think the arguments for using the

5    specification were stronger for production station, that's

6    why we did it, but we don't have to have that construction,

7    your Honor, because, you know, there's an argument we're

8    doing that to avoid prior art.  That's not true.  Because

9    some of the prior art -- it was disclosed to the patent

10   office showed robotic CD burners.  So we're not here trying

11   to persuade you to construe the term this way to avoid prior

12   art.  It would help if we get some references that don't show

13   robotic disk burners, like the Rateeg (phonetic) reference,

14   but it's not going to make or break our case.

15          So, if you're going to construe *production station*

16   according to its ordinary meaning and not say it's a robotic

17   disk burner, we're okay with that, but I think that means, in

18   our view, that *related data* ought to get the same -- same

19   benefit and same construction as a plain and ordinary term,

20   used in the claim, and not limited by a preferred embodiment

21   or any embodiment, because the claims, as you know, are not

22   limited that way.

23          Thank you very much, your Honor, for the search and

24   burn discussion today.  If you have no more questions, I'm

25   going to sit down and maybe Mr. Holbrow wants to say a few

*UNITED STATES DISTRICT COURT*

1    things, but with your permission my partner, Paul Stewart,

2    will handle the claim construction on the last patents.

3        THE COURT:  Go ahead.

4        MR. HOLBROW:  Just quickly on production station,

5    your Honor.  Looking at the 164 patent, I think it simplifies

6    the analysis where Claim 2 is dependent on Claim 1.  Claim 1

7    uses the term *production station*.  It also refers to --

8        THE COURT:  Wait a minute.  Wait a minute.  Just a

9    second.  I see.

10        MR. HOLBROW:  It's difficult to read, but it talks

11   about producing a data storage medium.  It doesn't

12   necessarily mean a CD.  It could be a device that burns thumb

13   drives or other types of portable media.

14        Now, if we look at Claim 2, Claim 2 specifically says

15   that the data storage medium is an optical disk.

16        THE COURT:  Yes.

17        MR. HOLBROW:  So, on your claim differentiation

18   Claim 1 has to be broader, therefore has to include something

19   other than an optical disk, which would include a thumb

20   drive, which I don't think anyone's going to argue that the

21   Rimage unit -- the Rimage CD robot makes thumb drives or

22   other types of portable storage mediums other than optical

23   disks.  And I'm going to resist the temptation to go back and

24   forth on when you need to go to the specification and when

25   you need to look at the claims.

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Don't do that.

2          MR. HOLBROW:  I'm not going to.

3          THE COURT:  No.  I mean, we -- I certainly know about

4     that.

5          MR. HOLBROW:  I know you do, your Honor.  That's all

6     I have on production station.

7          THE COURT:  All right.

8          MR. HOLBROW:  Thank you.

9          THE COURT:  Next.

10         MR. STEWART:  Good afternoon, your Honor.  I'm going

11    to turn first to the audit patent, the 157 patent, then I

12    guess the original plan was to sit down and let Mr. Holbrow

13    deal with the 422 patent.  We're dealing just with claim

14    construction now, but I guess we'll still go forward with

15    that plan unless --

16         MR. HOLBROW:  That works for me, whatever you want to

17    do.

18         MR. STEWART:  Okay.  So we'll finish the 157 patent,

19    and then we'll move on to 422 after that.

20         My presentation on the audit patent begins on Page

21    68, and it's phrased in terms of infringement, because up

22    until a few moments ago I thought that was the appropriate

23    way to phrase it.  I do think that the presentation still

24    makes sense.  The infringement arguments have a little bit of

25    context for why -- why we're disputing some of these claim

*UNITED STATES DISTRICT COURT*

1    terms, and so I'll very briefly touch on them just for

2    context.

3          If you turn to Page 69, we just have a very brief

4    overview of the 157 patent.  It relates generally to the same

5    types of medical disk burning devices as the other patents,

6    but it includes this added requirement of a database of

7    information relating to past disk production, and that

8    database is automatically updated each time a disk is

9    created.

10         On these motions two claims are at issue, Claim 1

11   which is a method claim, and Claim 7 which is a system claim.

12   Turning to Page 70, this is where it does get a little bit

13   into infringement, but I think this -- this frames the issue

14   for the claim construction dispute.

15         Pacsgear's contention -- its first contention -- its

16   first theory of noninfringement, is that the claims require

17   burning the results of two requests for information to the

18   same disk.  So what I'm going to do now is to look at the

19   claim language --

20         THE COURT:  Well, that's interesting.

21         MR. STEWART:  Yes.  And see what -- what the claims

22   actually require, and I think show to the Court that two

23   requests need not be burned to the same CD.

24         So, turning to Page 71, the first relevant piece of

25   claim language is at the top of the page.  A computer

1    implemented interface, which is configured to receive two or

2    more requests for production of stored medical data.  And so

3    you can understand -- and this is set forth on Page 72, that

4    the computer must be configured to receive at least two

5    search requests.  There's no requirement that the computer

6    store two search requests to the same disk.  In fact, that

7    would read out the preferred embodiment from the claims,

8    because that's never described anywhere in the specification.

9    And we think that this interpretation is confirmed by the

10   second bit of claim language that's quoted on Page 71, which

11   is that there's an image production module that's configured

12   for each request to produce the portable computer readable

13   medium.

14        So for each request, you produce a portable computer

15   readable medium.  So for each individual request, as stated

16   on Page 72, the device is configured to produce a disk.  This

17   actually contradicts the proposal that two separate requests

18   for production of information are recorded to the same disk.

19   There's just a single request for production that's recorded

20   to the disk.  The machine is configured to receive many

21   requests, and over time it will receive hundreds, if not

22   thousands of requests, but for each individual disk, it's

23   going to be recording just what was recently requested.

24        THE COURT:  Just the most recent one?

25        MR. STEWART:  Well, that's all that's required by the

*UNITED STATES DISTRICT COURT*

1    claims.  Certainly if you recorded multiple requests, I think

2    you would still fall within the scope of the claims, but all

3    the claims require is the recording of the current request

4    for information.

5            THE COURT:  Oh.

6            MR. STEWART:  So I'll move on to the second claim

7    construction issue raised by the 157 patent, which is framed

8    in terms of infringement on slide 73.  Where Pacsgear has

9    argued that it avoids infringement by applying a single I.D.

10   number to a large job that's printed across multiple CDs or

11   multiple DVDs, and the background here is that some of these

12   image sets are extremely large.  An MRI can consist of over a

13   hundred very detailed images, and the technology didn't

14   exist, and certainly didn't exist when these patents were

15   written, to store all of that information on a disk.  So for

16   large MRI studies it's necessary, in most cases, to span it

17   across two, three, four or even more disks to get all of that

18   information into -- into disk format.

19           And so looking at slide 74, we see the claim language

20   that Pacsgear is relying upon and it's the phrase *computer

21   readable medium*.  The claim calls for automatically

22   transmitting to the audit database, audit data that is

23   specific to the computer readable medium.  So they've relied

24   on the fact that the data must be specific to the computer

25   readable medium, to argue that the computer readable medium

*UNITED STATES DISTRICT COURT*

1    must be a single disk.  And we think we've got very strong

2    rebuttal to that, your Honor, and in fact we've moved for

3    summary judgment on this.

4         We start with the ordinary meaning of *computer*

5    *readable medium*.  For that we start with the definition that

6    was actually submitted by Pacsgear in Exhibit 277.  They

7    didn't rely on it in their brief, but they did submit it, and

8    that is, *a particular form of storage material for computer*

9    *files such as magnetic tapes or disks.*  And you can see from

10   this definition that the word *medium* isn't referring to the

11   number of tapes or disks that you have, or the number of

12   other objects that you have.  It's referring to the type of

13   material not the quantity.

14        So here they use the plural, because it can be

15   multiple tapes or disks that form a particular medium, and we

16   think it's the same thing in the -- in the 157 patent.  The

17   specification supports this.  We've got quoted here an

18   excerpt from the specification where it refers to digital

19   portable recording medium comprises CDs and DVDs.

20        Again, it's telling you that the medium that you're

21   going to be restoring your large studies on could be CDs or

22   DVDs, not just a CD or a DVD.  And then the specification

23   continues that any suitable digital recording medium can be

24   substituted for CDs.  Again, it's contemplating that multiple

25   CDs are going to be your recording medium in some instances.

**UNITED STATES DISTRICT COURT**

1    Not in all instances.  There are some jobs that are small

2    enough for a single CD or a single DVD, but in many instances

3    that -- it is going to be the case that you're going to be

4    spanning multiple CDs or multiple DVDs, and that's precisely

5    what was contemplated by the patent, and it's precisely what

6    was contemplated by the ordinary meaning of the word *medium*.

7            The rest of the material I have, your Honor, is

8    specific to infringement and validity, so I think, since

9    we're limiting our scope now to claim construction, I'll turn

10   it over to Mr. Holbrow or his colleague.

11           THE COURT:  You can do that.

12           MR. STEWART:  Then I'll be back up for the 422.

13           MR. HOLBROW:  Thank you, your Honor.

14           I think, for the most part, our briefs cover this

15   topic.  One -- Mr. Stewart talked about dictionary

16   definitions and ordinary meaning and neglected to focus on

17   the specification section that actually talks about this part

18   of the patent, and that specification system is -- let me see

19   if I can figure out the zoom.  Look at that -- is that column

20   6, Lines 59 through 65, and it's not a lot, that's about the

21   extent of their discussion on this audit log or audit record

22   system.  And it says, *for each CD to be produced, the*

23   *application server adds one audit record to the production*

24   *history database, in step 144.  The new audit record*

25   *comprises the identification number of the CD -- the CD*

**UNITED STATES DISTRICT COURT**

1  singular, *and other relevant information about the CD, such*

2  *as the physician who requested the production, if any, and*

3  *the names of the patients whose exams are on that CD.*

4         It couldn't be more clear that the specification

5  refers to a single CD.  The other -- and that's consistent

6  also with the claim language, which we're talking about here

7  where it says, *audit data that is specific to the computer*

8  *readable medium produced.*

9         The other dispute relates to the limitation 1, where

10  it says two or more requests for production.  And then

11  limitation 3 which refers to the request.  Frankly not sure

12  what that means.  I'm not sure why they have two more

13  requests in limitation 1, and why they have a reference to

14  the request in limitation 3.  It seems inconsistent.  The way

15  we interpret it is the -- it's referring back up to the two

16  or more requests at the top, because that's the only requests

17  that it could refer to, and if that's the case the media

18  writer doesn't operate that way.

19         I don't have much more to say on that.

20         THE COURT:  That's fine.

21         MR. HOLBROW:  It's a confusing set of limitations,

22  and we did our best to try to interpret it.

23         THE COURT:  That's fine.

24         MR. HOLBROW:  That's all I have.

25         MR. STEWART:  Your Honor, if I may briefly respond.

**UNITED STATES DISTRICT COURT**

1          Your Honor, I just want to respond to the reliance by

2     Mr. Holbrow on the specification.  It really does -- it is

3     kind of a theme of the dispute we're having across all of

4     these patents, where in this case there's a single example

5     given in the patent of how the audit database will -- may

6     operate.  And for simplicity, the drafter of the patent chose

7     a single CD because it's obviously much easier to describe

8     than describing what happens with multiple CDs.  But there's

9     no definition of the term *computer readable medium* or any of

10    the other claim terms to suggest that they're limited to a

11    single CD and an update of the database each time a CD is

12    created.

13         And there's no express disavowal, as Mr. Summers was

14    saying earlier in connection with the other patents.  So we

15    think that that reliance on the specification is really for

16    an improper purpose of reading a limitation into the claim

17    from the specification.  That was all I wanted to say in

18    response on the 157.

19         Bill, did you want to go first on the 422 or --

20         MR. HOLBROW:  You're there.

21         MR. STEWART:  I am here.  I'll go first on the 422.

22         So on the timeout patent, the 422 patent, that begins

23    on Page 97 of the presentation.  And this is a patent that,

24    just by way of background, deals with a bit of a different

25    issue than the other patents.

*UNITED STATES DISTRICT COURT*

1          THE COURT:  I know what it deals with.

2          MR. STEWART:  Okay.  Then I'll just jump right into

3     the claim language, your Honor, on Page 98.

4          The first claim limitation that's in dispute is this

5     phrase, *detecting whether a server has changed within a*

6     *timeout period*.  And there's two competing constructions that

7     really, really boil down to a grammatical dispute between the

8     party.  We think that detecting whether a server has changed

9     within a timeout period means that you determine whether the

10    server has changed during the timeout period.

11         Has there been a change during the timeout period?

12         Pacsgear says you have to determine during the

13    timeout period if the server has previously changed at some

14    time.  And we think that the ordinary meaning in the

15    specification and common sense all support our construction.

16         Turning to slide 99, the ordinary meaning, as we see

17    it, and we tried to explain it as grammatically using the

18    rules of grammar in our brief, but the simple way of putting

19    it is that the phrase, *during a timeout period,* modifies the

20    word *changed*.  It doesn't modify the word *determining*.

21         In order to try to make it modify the word

22    *determining*, you have to rearrange the words, as we did on

23    Page 98, to try to move the words during the timeout period

24    next to the word *determining* so that they would modify that.

25    And we think that's the first mistake that Pacsgear is making

**UNITED STATES DISTRICT COURT**

1    here.

2           Then the specification, we think very strongly

3    supports us here.  The only example in the specification

4    determines if a change has occurred within the timeout

5    period, by checking immediately after the timeout period has

6    expired, whether or not during that prior period there has

7    been a change.  That's what's shown in figure 3, which we

8    went through in our brief and Pacsgear concedes this.  They

9    view this as some sort of a disconnect between the

10   specification and the claims, but the only reason they have

11   the disconnect is because they're forcing an awkward meaning

12   onto the claim.

13          If you take the ordinary meaning of the claim, the

14   specification fits in just fine.  Figure 3 shows checking

15   immediately after the timeout period has expired whether or

16   not a change had occurred at some point during that timeout

17   period.

18          We also think that this is consistent with common

19   sense, your Honor.  The way that you determine if a change

20   has occurred on a Thursday is to check immediately after

21   midnight on Friday morning.  If you start checking in the

22   middle of the day on Thursday whether or not a change has

23   occurred on Thursday, you don't have all the information yet.

24   A change may occur after the checking time.  And you won't

25   know about that change.  So that's why we think consistent

*UNITED STATES DISTRICT COURT*

1    with the ordinary meaning, common sense tells you that

2    checking --

3          THE COURT:  Tell me practically how this is supposed

4    to work?

5          MR. STEWART:  Yes.  Sure, your Honor.  You've got

6    a -- an image that has arrived --

7          THE COURT:  That's right.

8          MR. STEWART:  -- and it's one of a large set of

9    images from an MRI or something similar.

10         THE COURT:  Yes.  Right.

11         MR. STEWART:  And you want to know whether or not all

12   of the images from that MRI study have arrived.  They

13   typically arrive close together in sequence, but there could

14   be a straggler that's a couple of seconds behind.

15         So what you do is, you mark the time down when the

16   first -- when the first image has arrived.  And if it's a

17   one-image study, there's not going to be anymore images, so

18   let's start with that example.

19         You mark the time when the image has arrived, and you

20   wait the timeout period, which is usually about 30 seconds,

21   because you figure that's enough time to ensure that

22   everything ought to have arrived.  If, after 30 seconds have

23   gone by there's -- that's the point at which you check to see

24   whether or not an additional image has arrived.  And if it

25   has arrived, you say oh, my, maybe we're not done yet.  But

*UNITED STATES DISTRICT COURT*

1    if there was just a single image in the study, then you'll

2    conclude that there are no more images forthcoming, and

3    you'll burn the disk.  But if an image has arrived, then the

4    process starts all over again, and you ask yourself whether

5    the second image is the final image in the set.  And to

6    determine that, you wait 30 seconds, and then you see if

7    another image has arrived.  You check after 30 seconds to see

8    if another image has arrived, and if it has, then you

9    conclude that you're still receiving data, and you wait

10   another 30 seconds, and this process goes on, and on, and on

11   until there's finally a 30-second gap at which point you burn

12   the disk.

13             THE COURT:  You keep checking all the time?

14             MR. STEWART:  We keep checking at intervals that are

15   typically 30 seconds.  You can change that interval if you

16   want, but we keep checking at intervals of 30 seconds.

17   There's not a constant check.  That's -- my understanding is

18   that would be impossible.  You just can't do that.  You have

19   to have some interval of time that you wait before you check

20   again.

21             THE COURT:  How is this check made?

22             MR. STEWART:  The check is made by -- at least in the

23   preferred embodiment, by literally monitoring a port which is

24   the place --

25             THE COURT:  The user does that?

**UNITED STATES DISTRICT COURT**

1          MR. STEWART:  No.  This is all done automatically.

2          THE COURT:  That's what I thought.

3          MR. STEWART:  Yes.  Yes.  Yes, your Honor, this is

4     all done automatically.  The computer is monitoring the port

5     through which the data flows, and every 30 seconds it goes

6     back to check, has more data flowed through that port?

7          THE COURT:  The computer does that?

8          MR. STEWART:  Yes, absolutely.  This is definitely

9     automated.

10         THE COURT:  All right.  Please.

11         MR. HOLBROW:  Are you done?

12         MR. STEWART:  I'm trying to see if we had anything --

13    I think this was the claim term that's at issue here, so I

14    think that's -- I think I am done.

15         MR. HOLBROW:  Any time patent lawyers have to start

16    falling back on their grammatical history and grammar issues,

17    you're in trouble.  I was an engineering major, and I think

18    Mr. Stewart was as well, so I think you just look at the --

19    to refer to grammar in terms of which prepositional phrase

20    fits where, I think gets you in trouble.  I think you just

21    look at the claim language as it's set forth, and it's clear

22    to us that --

23         THE COURT:  I just said what practically -- what does

24    this mean *practically*?

25         MR. HOLBROW:  Well, that would get into the -- I'm

**UNITED STATES DISTRICT COURT**

1    not so sure that it does at the end of the day, in terms of

2    our -- I don't think we infringe for a number of reasons,

3    separate and apart from where that takes place -- where the

4    detection takes place.  I also think that there's a lot of

5    evidence on validity that you'll hear at some point that will

6    take care of this patent as well.  So...

7         THE COURT:  Well, what's the object of the patent?

8         MR. HOLBROW:  Excuse me?

9         THE COURT:  What is the --

10        MR. HOLBROW:   Object?

11        THE COURT:  -- the object of it?

12        MR. HOLBROW:  It's --

13        THE COURT:  It's so that you won't burn it

14   prematurely?

15        MR. HOLBROW:  Exactly.  It's like basically, you want

16   to make sure all the patents --

17        THE COURT:  That's right.

18        MR. HOLBROW:  So we want to make sure we have all the

19   images --

20        THE COURT:  That's right.

21        MR. HOLBROW:  -- before we send them to the CD

22   burner.  It's -- I mean, getting into invalidity, it's pretty

23   obvious that you don't want to send them prematurely, so you

24   need to come up with some sort of timeout time or methodology

25   --

*UNITED STATES DISTRICT COURT*

1          THE COURT:  That's right.

2          MR. HOLBROW:  -- to ensure that you have everything

3     before it gets sent out to the CD burner.

4          Now, there's a few wrinkles here and there.  You can

5     do different design choices, but that's just a matter of

6     programming not a matter of concept.  And the concept is you

7     just want to have some methodology in place to prevent

8     premature sending of CD images, so someone gets home and

9     looks at their CD and they say --

10         THE COURT:  Incomplete.

11         MR. HOLBROW:  -- incomplete.  I don't have the most

12    recent study.  Or I don't have the -- I have the x-ray that

13    was taken two weeks ago, but I don't have today's x-ray.

14         THE COURT:  That's right.

15         MR. HOLBROW:  So, that's all it's about, and we can

16    get into the invalidity and all the obvious --

17         THE COURT:  No.  You don't have to do that.

18         MR. HOLBROW:  There's a couple other terms -- I think

19    we've briefed -- I think it's challenging to talk about where

20    to put words, it's much easier --

21         THE COURT:  It's not all that helpful.

22         MR. HOLBROW:  Right.  I agree.  So I think our briefs

23    are there.  I guess in terms of claims construction, I'm not

24    sure if there's a dispute on specific terms within the claim.

25    In our brief Pacsgear -- I mean, Pacsgear has defined timeout

1    period to refer to the period that starts over every time an

2    unpredictable event happens, and these timeout periods are

3    very common.  Don't touch your keyboard for a certain period

4    of time, the screen saver comes on.  That means the timeout

5    period's expired, and in order to save burning the monitor,

6    the screen saver comes on, or if you use -- if you leave your

7    ATM card in the ATM too long, it will start beeping to let

8    you know you need to take it out.  So those are all examples

9    of timers and timeouts that have been around for quite some

10   period of time.

11          Our proposal on what a timer is, is just what it is.

12   It's a clock that either counts up or counts down.  It's a --

13   it can go from zero to 30 or 30 to zero, it really doesn't

14   matter, but that's essentially what a timer is in computer

15   speak.  We provided some support for that.

16          The term *reset* also appears in Claim 8.  Referring to

17   the timer resetting.  And that means that the timer starts

18   over before elapsing.  So the timer can go 30 to zero, but if

19   you catch it somewhere in between, it will reset.  So it

20   might go 30 to 12 and then go back up to 30, whereas the

21   timer times out, means that it gets all the way from 30 to

22   zero.

23          I think that's it for claim construction.

24          THE COURT:  All right.

25          MR. HOLBROW:  Thank you, your Honor.

*UNITED STATES DISTRICT COURT*

1        THE COURT:  Is that it?

2        MR. STEWART:  Your Honor, just one very brief point.

3    And I -- I just wanted to clarify, because the Court's

4    ultimately going to be addressing validity, that the idea of

5    all the passengers getting on the train is kind of the final

6    step in the invention.  We think there's a lot more that went

7    into this invention before then that's kind of being read

8    into the problem facing the inventor here, and I think that's

9    all for another day, but I did want to clarify that we -- we

10   don't -- we don't disagree that that's part of the problem

11   that the inventor faced, and that it was accurately described

12   by Mr. Holbrow as making sure all the passengers get on the

13   train, but we don't --

14        THE COURT:  Wait.

15        MR. STEWART:  -- we think there's a lot that went

16   into that.

17        THE COURT:  If that's -- let me understand what you

18   just said.

19        MR. STEWART:  Sure, your Honor.

20        THE COURT:  Isn't that all it's about?

21        MR. STEWART:  Your Honor, what the inventors were

22   really faced with was the situation where they wanted to send

23   a set of images from -- directly from the modality to the

24   image-burning device -- the patented invention.  And in order

25   to do that, that -- that basically created the problem of

*UNITED STATES DISTRICT COURT*

1    worrying about whether or not you've received all of your

2    images.

3          The other patents deal with the situation where

4    you're doing a search for images, you've -- you've asked for

5    images --

6          THE COURT:  That's quite so.

7          MR. STEWART:  Yeah.  You've searched for images.

8    You've asked for specific images.  You've pulled them down

9    into your local database, so you know you've got the images.

10   This patent deals with a very different situation where

11   somebody else is sending images --

12         THE COURT:  I understand that.

13         MR. STEWART:  Yeah.  And so part of what the

14   inventors here invented was the very concept of getting

15   images directly from the modality to the -- to the local

16   machine, the image burner, and that sets up for the inventors

17   then, the final problem of ensuring that all the passengers

18   get on the train before it leaves the station.

19         THE COURT:  The final problem?

20         MR. STEWART:  Yeah.  The first problem was -- was

21   coming up with the idea that it would be a good idea to do

22   what we call an auto burn, which is to send all of the images

23   directly from the modality to the local device for burning.

24         THE COURT:  Yes.

25         MR. STEWART:  That -- that is what we view as kind of

**UNITED STATES DISTRICT COURT**

1    the first and primary problem that the inventors were facing,

2    and then the final step in the solution was ensuring that all

3    the passengers get on the train.

4              THE COURT:  And that's where?

5              MR. STEWART:  I'm sorry, I --

6              THE COURT:  Where is that final step?

7              MR. STEWART:  That final step --

8              THE COURT:  In what I'm looking at?

9              MR. STEWART:  That's in the claims of the 422 patent,

10   your Honor.

11             THE COURT:  All right.

12             MR. STEWART:  If the Court has no further questions,

13   then I'll --

14             THE COURT:  No.  I have not any more.

15             MR. STEWART:  Thank you, your Honor.

16             THE COURT:  Do you have anything further?

17             MR. SUMMERS:  No, your Honor.  Unless you have

18   questions?

19             THE COURT:  No.  I don't.

20             MR. SUMMERS:  Thank you.

21             THE COURT:  Do you have anything further?

22             MR. HOLBROW:  No, your Honor.  I think we're set.

23             THE COURT:  All right.  Then we will take a look at

24   this, and we'll see just what we do with it.

25             All right.  You will hear from us.

**UNITED STATES DISTRICT COURT**

1          MR. HOLBROW:  Thank you, your Honor.  Thank you for

2     your time.

3          THE COURT:  Thank you.

4          MR. SUMMERS:  Thank you very much, your Honor.

5          MR. STEWART:  Thank you.

6          MR. HANKIN:  Thank you, your Honor.  Have a good

7     afternoon.

8          (Whereupon the matter concluded at 3:53 p.m.)

9                         --o0o--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*UNITED STATES DISTRICT COURT*

1                    *CERTIFICATE OF OFFICIAL REPORTER*

2


3    *COUNTY OF LOS ANGELES        )*
                                   *)*
4    *STATE OF CALIFORNIA          )*

5                    *I, VICTORIA L. VALINE, FEDERAL OFFICIAL*

6    *REALTIME COURT REPORTER, REGISTERED MERIT REPORTER, IN AND*

7    *FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT*

8    *OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION*

9    *753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A*

10   *TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED*

11   *PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE*

12   *TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS*

13   *OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.*

14

15   *DATE:   November 2, 2012*

16

17

18

19   */S/ VICTORIA L. VALINE*
     _____
20   *VICTORIA L. VALINE, CSR No. 3036, RMR, CRR*

21   *FEDERAL OFFICIAL COURT REPORTER*

22

23

24

25


*UNITED STATES DISTRICT COURT*