1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                         ---

4        HONORABLE MARIANA R. PFAELZER, JUDGE PRESIDING

5                         ---

6

7

8    DATCARD SYSTEM, INC.,              )
                                        )
9                                       )
                                        )
10                   Plaintiff,         )
                                        )No. 10-1288MRP
11          VS                          )
                                        )
12   PACSGEAR, INC.,                    )
                                        )
13                                      )
                     Defendant.         )
14   _____)

15

16            Reporter's Transcript of Proceedings
                   **MARKMAN RE-HEARING**
17                      11:00 A.M.
                   Los Angeles, California
18               MONDAY, NOVEMBER 5, 2012

19

20

21

22
              ANNE KIELWASSER, CRR, RPR, CSR
23            Federal Official Court Reporter
              312 North Spring Street, Room 432
24            Los Angeles, California 90012
                Telephone: (213) 894-2969
25              annekielwasser@gmail.com
                    AKtranscripts.com

```
1                    A P P E A R A N C E S

2

3      ON BEHALF OF THE PLAINTIFFS:

4
       CRAIG S SUMMERS
5      PAUL A STEWART
       BRIDGET ANNE SMITH
6      Knobbe Martens Olson and Bear LLP
       2040 Main Street 14th Floor
7      Irvine, CA 92614
       949-760-0404
8      Fax:  949-760-9502
       Email:  Craig.summers@kmob.com
9

10

11
       ON BEHALF OF THE DEFENDANT:
12
       WILLMORE F HOLBROW, III
13     DENNIS G MARTIN
       Blakely Sokoloff Taylor and Zafman LLP
14     12400 Wilshire Boulevard Suite 700
       Los Angeles, CA 90025
15     310-207-3800
       Fax:  310-820-5988
16     Email:  Bill_Holbrow@bstz.com

17     Also Present:
       CHRIS HENDERSON, Paralegal
18

19

20

21

22

23

24

25
```

```
 1   MONDAY, NOVEMBER 5, 2012                    11:00 A.M.

 2                          ~ ~ ~

 3                    MARKMAN RE-HEARING

 4                          ~ ~ ~

 5        COURT CLERK:  In the matter of Calendar Item

 6   No. 1.  Case No. SA 10-CV-1288MRP.  DatCard Systems, Inc.,

 7   versus PacsGear, Inc.

 8             Counsel, please state your appearances for

 9   the record.

10        MR. SUMMERS:  Good morning, Your Honor.  Craig

11   Summers representing the plaintiff DatCard Systems.  And with

12   me are Paul Stewart and Bridget Smith.

13        MR. HOLBROW:  Good morning, Your Honor.  Bill

14   Holbrow here representing defendant PacsGear.  Along with me

15   are Dennis Martin and Paralegal Chris Henderson.

16        THE COURT:  All right.  Now, I just looked at this

17   briefly.  So, you tell me, please, Mr. Summers, what it is

18   you want to do on what the relevance of it is.

19        MR. SUMMERS:  Thank you, Your Honor.

20        THE COURT:  First of all, I suppose I should say

21   it's not my impression that the Court in a claim construction

22   must choose one side or the other.  It isn't your impression

23   either.

24        MR. SUMMERS:  I agree with you completely, Your

25   Honor.  You're totally entitled to select your own claim
```

1    *construction* that is not advocated by either party.

2           THE COURT:  Yes.  Well, okay, go ahead.

3           MR. SUMMERS:  And that's what happened with

4    respect to one of the terms -- I guess several terms in the

5    *search and burn* patents.  The terms *related medical image*

6    *data* --

7           THE COURT:  Well, no, I know which ones you're

8    talking about.

9           MR. SUMMERS:  Okay.  The construction for the

10    terms that the Court adopted was a construction that neither

11    party advocated.  So, it's a new construction, and under this

12    new construction, DatCard feels that it needs an opportunity

13    to submit additional evidence directed to that new *claim*

14    *construction*.

15           THE COURT:  What -- and you sent some evidence in.

16           MR. SUMMERS:  Yes.

17           THE COURT:  What does the evidence show?

18           MR. SUMMERS:  Okay.  The evidence shows that the

19    MediaWriter -- well, first of all, the evidence shows how the

20    MediaWriter is set up to search for reports automatically.

21           THE COURT:  The book --

22           MR. SUMMERS:  Well, those are the screen shots,

23    Your Honor.  The screen shots show that how an administrator

24    sets up the MediaWriter and then how the user actually uses

25    it.  And at the last hearing I remember you asking me some

```
1    questions about:  How do you use it?  How does it work?  You
2    know, we talked about it coming out of the box.  I thought
3    this would be helpful to the Court to dig into those details
4    so you can see how it works, and it relates to finding
5    reports on the same database as the images, and those
6    reports, as the Court's new construction says, the related
7    data:  Must be formatted in a standard medical imaging
8    format --
9              THE COURT:  I didn't say that in the -- oh, no,
10   no, no, I didn't say that.  I didn't say the report should
11   be.
12             MR. SUMMERS:  The data must be.
13             THE COURT:  Yes.
14             MR. SUMMERS:  But data can be images and it can be
15   non-image data as we understand the Order.
16             THE COURT:  Identifying data.
17             MR. SUMMERS:  Only identifying data.
18                  As I read the Construction it says -- and I
19   know you know what it is, but if I can just read it out loud:
20                  Data that is formatted in a standard medical
21   imaging format and related to the selected medical imaging
22   data.  And then it continues:  Such data types include, which
23   we considered to be inclusive but not limiting, examine
24   images, patient demographics and so forth.
25                  And then the Court says:  Data types not
```

UNITED STATES DISTRICT COURT

1      *formatted in the standard medical imaging format are outside*

2      *the scope of these terms.*

3                  THE COURT:  Yes.

4                  MR. SUMMERS:  And then there's some sites --

5                  THE COURT:  Well, what does the patent say about

6      that related data in DICOM form?  What kind of -- what does

7      the patent say about what kind of information it is?

8                  MR. SUMMERS:  I can get the patent, Your Honor.

9      But it talks about --

10                 THE COURT:  You can get it.  I've looked at it.

11                 MR. SUMMERS:  Okay.  It says:  Stated in your

12     *Claim Construction* Order, Your Honor.

13                 THE COURT:  It is.

14                 R. SUMMERS:  Yes.  It's says:  *Stated in the*

15     *Order.*  And there were some phrases from the order, if I

16     may -- the Court acknowledges the dispute the parties have

17     about whether radiologists reports are --

18                 THE COURT:  Yes.

19                 MR. SUMMERS:  -- within the scope of related

20     medical in this data.

21                 THE COURT:  Yes, yes.

22                 MR SUMMERS:  And the Court said that related

23     medical image data does not cover such reports assuming they

24     are not formatted in a standard medical imaging format.

25                      But it's our position that there are

1    radiologists' reports that are formatted in the standard

2    medical imaging format in the DICOM format.  That's what our

3    new evidence, additional evidence is designed to display.

4            THE COURT:  Well, now, tell me where the patent

5    refers to radiologists' reports in DICOM form.

6            MR. SUMMERS:  There is no expressed disclosure in

7    the patent.

8            THE COURT:  No.

9            MR SUMMERS:  -- of a radiologists' reports in

10   DICOM format or a standard medical imaging format.

11           THE COURT:  No, there isn't.

12           MR. SUMMERS:  There isn't.  There is not in the

13   specification.  We understood your *claim construction* to be

14   such that related data could include text data other than

15   just headers in DICOM that would include radiologists'

16   reports in the DICOM format.

17           THE COURT:  I wouldn't blame you for wanting to

18   read it that way.  But I'm asking you something different,

19   which is:  What's in the patent?

20           MR. SUMMERS:  May I have a moment, Your Honor?

21           THE COURT:  Yes, sure.

22           (Brief pause.)

23           MR. SUMMERS:  I'm sorry, I lost your question,

24   Your Honor.  You were asking what the patent said about --

25           THE COURT:  Radiologist's report.

UNITED STATES DISTRICT COURT

1              MR. SUMMERS:  It says nothing about that.

2              THE COURT:  It doesn't.

3              MR. SUMMERS:  It doesn't.  There isn't -- and my

4    understanding about what the Court's *claim construction* meant

5    to me was genuine and based in part on some of the things

6    that were said in the Order -- and I'm referring to page 10.

7              THE COURT:  Well, we only have to -- we don't

8    really have to do that now.  The things that I'm looking at

9    have to do with identifications, don't they?  The ones that

10   you submitted to me that says Clark or Smith or -- isn't that

11   the evidence that I was looking at?

12             MR. SUMMERS:  I'm not --

13             THE COURT:  I've only had five minutes to look at

14   it.

15             MR. SUMMERS:  I understand that, Your Honor.  I

16   apologize.  Are you talking about the screen shots that we

17   submitted?

18             THE COURT:  Yes.

19             MR. SUMMERS:  Yes.  Those are the screen shots --

20             THE COURT:  Somebody's name --

21             MR SUMMERS:  Right.  Those are fictitious names.

22   Those are -- we have an MediaWriter, Your Honor, and we

23   connected it to --

24             THE COURT:  Oh, I see, you did that.

25             MR. SUMMERS:  Yes, we did.  Ms. Smith did that.

```
1              THE COURT:  Okay.  I understand.  All right.

2              MR. SUMMERS:  May I say one more thing, Your

3    Honor?

4              THE COURT:  Yes.

5              MR. SUMMERS:  And just from the claim construction

6    Order, it says:  The parties' dispute about whether related

7    medical image data covers a radiologist's test reports.

8    Under the Court's construction, the answer to that question

9    depends on whether the radiologists' reports are formatted in

10   the standard medical imaging format.

11             THE COURT:  I understand that's what where you --

12   yes.

13             MR. SUMMERS:  Okay.  Very good, thank you.

14             THE COURT:  Please.

15                  Now, this could be -- this could be our error

16   or our enlargement or a phrase that shouldn't be in the claim

17   construction Order.

18             MR. MARTIN:  I don't believe there is any error at

19   all.

20             THE COURT:  I don't think there is; but, you know

21   you read those things -- it's in the eye of the beholder.

22             MR. MARTIN:  No, in our claim construction we did

23   a lot of shorthand references.  We referred to DICOM as a

24   surrogate for standard imaging format without limiting --

25             THE COURT:  I understand.
```

1          MR. MARTIN:  And that's really what happened with

2     that issue on the identification information.

3          THE COURT:  Yes.

4          MR. MARTIN:  And somewhere -- it's placed on that

5     information.  It's on the images, and that's the end of it.

6          THE COURT:  I would think it would have to be on

7     the images.

8          MR. MARTIN:  Yes, yes.

9              I don't know if you want me to address the

10    evidence per se as opposed to the procedural issue which is,

11    I think they're in the usual trap when you come up with

12    evidence displayed, that if it's not something that you could

13    have not discovered beforehand, then you have to explain why

14    you didn't enter it before, and they acknowledge in their --

15         THE COURT:  Well, it's more than that.  I am very

16    uncertain what evidence I was looking at.

17         MR. MARTIN:  We were too, as to the screen shots

18    in particular.

19         THE COURT:  Yes.  But I didn't realize that they

20    had been prepared in the manner in which you described.

21             Well, what do you say we should do?

22         MR. MARTIN:  Well, I think certainly the ex parte

23    should be denied.  It's up to Your Honor as to whether to

24    follow their suggestion that it be put off.  I think if -- I

25    think it's pretty late in the game, and I think the idea that

1   this was something new that just occurred to them is defeated

2   by their own admission, that that court does take a contrary

3   position and did at the time.  They contested whether the

4   text reports were not part of DICOM, and now they're coming

5   up with new maybe cumulative evidence, but it's a little late

6   to do that.  And you certainly, I don't think, and credibly

7   say that you didn't anticipate that the Court might come up

8   with this construction.

9                   I think once the essential decision was made

10  by Your Honor that related data was defined by medical --

11  whether in the standard medical imaging format, which is not

12  really different from what we said.  Your Honor said it more

13  precisely.

14                  Once that hurdle was over, they had every

15  incentive to anticipate that that might be the result just

16  from the a briefing.  They could have put in additional

17  evidence.  If they think there is evidence already in that

18  helps them, they can argue that.  But either way, I don't

19  think they've made showing --

20          THE COURT:  Well, I mean, it's not -- I wasn't

21  able to read the deposition.  That's -- I -- but I'm not

22  going to go through all that evidence just a minute before a

23  hearing.

24          MR. MARTIN:  I --

25          THE COURT:  So, I suggest that we leave this for

UNITED STATES DISTRICT COURT

```
 1    the moment, and we'll come back to what should be done about

 2    additional evidence and let's get on to the meat of the

 3    argument.

 4              MR. MARTIN:  Very good.  Thank you.

 5              THE COURT:  I would like to just say one thing to

 6    you.  There are varying points of view about whether and when

 7    you have a claim construction.  We have -- we, judges, who

 8    have been interested in patent law for a long time, have been

 9    fighting about this.  I don't mean fighting about it, but we

10    have been discussing it for a long, long time.  And we had a

11    judge in our court who didn't believe that you should ever

12    have claim construction until final arguments.  And I used to

13    ask him to come and speak on the same panel with me because I

14    do believe that claim construction does clarify a lot of

15    things, and it should be done early.

16                   I'm not criticizing the way Judge Carter does

17    it because people in our court are equally divided about

18    whether you should make it part of the motions or what you

19    should do.

20                   So, it doesn't hurt my feelings to hear any

21    argument about claim construction either way.  However, it

22    does point up the need to get this done earlier.  And now

23    you've got the claim construction.  I hope you'll argue it

24    here.

25                   MR. MARTIN:  I agree.
```

UNITED STATES DISTRICT COURT

 1                    THE COURT:  I hope you'll argue it as part of a

 2      motion.

 3                    MR. MARTIN:  Right.

 4                    THE COURT:  Yes.

 5                    MR. MARTIN:  I was going to say --

 6                    THE COURT:  Not argue about what it says and

 7      whether it should be changed but argue it as part of the

 8      motion.

 9                    MR. MARTIN:  I think I'm understanding you.  There

10      are some tweaks, as it were, that --

11                    THE COURT:  Go ahead.  Tell me what they are.

12                    MR. MARTIN:  Well, I'm just speaking generally.

13      That -- well, the language is awfully precise.  In fact, I

14      think there is a note in your Order that says:  For now this

15      is the *claim construction*.

16                    THE COURT:  That's right.

17                    MR. MARTIN:  I took from that that it's subject to

18      further refinement.

19                    THE COURT:  Right.  It always is.

20                    MR. MARTIN:  Yes.

21                    THE COURT:  Because the *claim construction* is open

22      until the final instructions to the jury.

23                    MR. MARTIN:  Right.  And my two cents' worth on

24      this side, I think litigators like combining *claim*

25      *construction* and infringement sometimes because for a judge

```
 1   who is not very conversant on patent law, it let's them know
 2   what's important and what isn't.  I don't think that's the
 3   case here.
 4           THE COURT:  Well, you could be right.  You might
 5   be right about that.  That's why I say I'm not critical
 6   because I've had this discussion 50 times.
 7           MR. MARTIN:  Yeah, it's a quandary every time.
 8           THE COURT:  It is.  All right.
 9           MR. MARTIN:  Thank you.
10           THE COURT:  So, now --
11               Please.
12           MR. SUMMERS:  If I could just make a suggestion
13   for the record.  You asked about what to do.  My view is that
14   we should proceed to the argument on two of the patents today
15   but put the search and burn patents on hold and allow the
16   parties to submit very short briefs on why -- why we think we
17   need new evidence, and why they can oppose it.
18               We can give the Court a little more time to
19   digest that issue because it's not fair for you, I agree, to
20   try to figure this out this morning.
21               We received your claim construction Order on
22   Monday, and --
23           THE COURT:  That's right.
24           MR. SUMMERS:  -- acted as quickly as we could.
25           THE COURT:  Uh-huh.
```

1          MR. SUMMERS:  This case has been pending for

2     almost two years now.

3          THE COURT:  Well, it's not going to pend that long

4     now.  We're going to get down to it.

5               So, let's argue the *claim construction* the

6     way it's written in the motions as you go.

7          MR. SUMMERS:  All right.  Am I allowed to use the

8     evidence that we have submitted with the ex parte so that the

9     Court will understand its relevance?  And if the Court

10    decides to exclude it, it's not like we have a jury trial,

11    so, I would ask the Court to let me make my argument with the

12    evidence, the additional evidence that we're submitting --

13         THE COURT:  If you don't -- if you don't dwell on

14    it, if you take three minutes to say this is what we've shown

15    in the additional evidence, I might listen to that.  But bear

16    in mind, I'm not very good at arguments that rely on things I

17    haven't read.

18         MR. SUMMERS:  I think as I go through it, it's

19    going to be more of a, you know, step by step.

20         THE COURT:  I'll bet I'll understand it.

21         MR. SUMMERS:  You're very smart, Your Honor, and

22    I'm sure you understand it very well; but there are some

23    nuances, like, one of the issues was, how do these reports

24    get searched for automatically in the MediaWriter?  And that

25    was, I think that was something that was probably hard for me

1    to explain in a way that I could make you understand it.  And

2    that's the -- one of the reasons to have these additional

3    screen shots.

4              THE COURT:  All right, all right.

5                   You're going to start?

6              MR. HOLBROW:  Actually, no.  Just so I

7    understand -- based on the *claim construction*.  And if I

8    understand based on your dialogue with Mr. Summers is, the

9    *claim construction* is that the related medical image data,

10   additional medical image data, related data, that data has to

11   include an image, and it can include a header with various

12   demographic information relating to the image.  And if it's a

13   text report without an image, then that's not covered by the

14   scope of the *claim construction*.

15             THE COURT:  Well, he's going to say it is.  And I

16   understand the point.  That's why I asked him:  What's in the

17   patent?  The text is not in the patent.

18             MR. HOLBROW:  Right, and that's how we interpreted

19   the Court's Order.

20             THE COURT:  All right, well, let's go on.

21             MR. HOLBROW:  Okay.  And I did notice you asked

22   about any issues with the Order.  There is a -- in the table

23   at the end there is a parenthetical after the second

24   paragraph that says:  In the header or in the image -- I

25   think it is a typo.  It should be "in the header of the

1    image."

2              THE COURT:  I think probably should.

3                    What page are you on?

4              MR. HOLBROW:  That's page 34, Your Honor.

5              THE COURT:  Okay.  Please.

6              MR. HOLBROW:  Okay.  And we understand the Order

7    with respect to the evidence, and we'll just maintain our

8    evidentiary objection.  Thank you.

9              THE COURT:  Please.

10             MR. SUMMERS:  Your Honor, may I approach?

11             THE COURT:  Certainly.  Thank you.

12                   Now, I'm going to expect you to start with

13   *search and burn*.

14             MR. SUMMERS:  Yes, Your Honor.

15             THE COURT:  All right.

16             MR SUMMERS:  Before I begin, I would just like to

17   say a little bit about DICOM.  It is a way to communicate

18   between two entities, a PACS database, for example, and the

19   MediaWriter.  As you know, DICOM stands for digital imaging

20   and communications in medicine, and it's a stand for the

21   handling and transmitting of information in medical imaging.

22             THE COURT:  Yes, I know that.

23             MR. SUMMERS:  Includes file formats, definitions

24   and so forth.  And DICOM -- things that are formatted in

25   DICOM are generally called objects, and they can be images,

1   but they can also be things that are not images, like

2   structured reports, Mitra broker reports.  Because for these

3   diagnostic reports to be sent from one database to the

4   MediaWriter, they come across in a DICOM format, And they're

5   not images in the strictest sense.  They are wrapped in a

6   DICOM format which is, itself, sometimes called an image in

7   the terminology, but it's not like a scan of my brain.  But

8   it comes across in what's called the DICOM format, which is

9   considered an object, some people consider it to be an image;

10  but it's not the image in the sense that the patent is

11  talking about when we talk about CT scans and things like

12  that.

13          So, I'm going to try to get through this

14  quickly, Your Honor.  We have the handout for you.  It's

15  another PowerPoint presentation, which I've printed in black

16  and white, so it's easier for you to make notes if you'd

17  like.

18          Page 2 of that handout lists the outline for

19  today's hearing.  I think we've already agreed to that.  And

20  I won't dwell on that.

21          Turning to page 4, Your Honor, is the

22  overview of the first motion.  I'm going to talk about the

23  '174 patent.  It just reminds the Court what we said last

24  time:  What claims are asserted, what the accused product is,

25  and how we assert that PacsGear is a contributory infringer

1    and the direct infringers of the customers.

2                  Page 5 is directed to some of the points I've

3    been making already.  It's our view that radiologists'

4    reports are formatted in the standard medical imaging format.

5    And under the Court's construction, we view related data as

6    excluding these kinds of text reports unless they're stored

7    in a standard medical imaging format.

8                  PacsGear is searched that these reports are

9    in a text format and not considered DICOM images, and we

10   disagree.  And this is set forth in some of the slides that

11   I'm going to discuss now.  It shows that diagnostic reports

12   are formatted in a standard medical imaging format, just like

13   DICOM images of your brain or another body part.

14                 Page 6 is a -- this is new evidence, Your

15   Honor, but I'll just point out -- it's a deposition of

16   PacsGear 30(b)(6) witnesses.  And they were asked:  Does

17   MediaWriter search for Mitra broker radiological reports?

18   And the answer was:  Yes, it does.

19                 The next page, page 7, is also part of the

20   additional evidence, and it just shows that Mitra broker uses

21   the DICOM format.  We have some excerpts there that discuss

22   Mitra broker reports and how they complied with the DICOM

23   standard.

24                 Page 8 shows the kinds of databases that are

25   typically set up when the MediaWriter is used.  The box on

1    the left shows a situation where there are two distinct

2    databases, a Mitra broker database to the left, a PACS

3    database to the right, and then an MediaWriter below it.   All

4    those facilities or databases communicate with each other in

5    the DICOM format.   That's how they're set up.

6              The box on the right shows a situation where

7    the PACS and the Mitra broker reports are in the same

8    database.   That's important for the '174 patent.   And that

9    database can communicate with the MediaWriter via DICOM.   And

10   the support for -- of Mitra broker being in the same box or

11   database as a PACS is cited there in Exhibit 4 from that --

12   from the Smith declaration with some additional testimony

13   from PacsGear's 30(b)(6) witness.

14             If we could turn to slide 10 -- strike that,

15   Your Honor.   Let's skip some of this and get through this

16   quickly.

17             Let's turn to slide 12, if you would.   After

18   the MediaWriter is turned on and the administrator logs in, a

19   screen is displayed.   And that's shown on page 12.   What I'm

20   going to talk about now is what an administrator does to --

21   when they purchase the MediaWriter, they have to do a setup,

22   and this is how they set it up to automatically search for

23   reports, the related data.

24             THE COURT:   Now, you're going to talk to me about

25   infringement, are you?

1             MR. SUMMERS:  Yes, yes.  This is the back -- this

2    is the foundation for why there is infringement.

3             So, first there is an initial setup; and once

4    that's done, now the MediaWriter will be ready to be used by

5    people.  So, in fact, let's move to slide 13, Your Honor, if

6    you would.

7             Here is where the administrator configures

8    the MediaWriter to set up to a PACS, which is shown by the

9    arrow that's pointing to DICOM, and the MediaWriter can be

10   set up to communicates with one or more PACS sources during

11   the initial setup, and that communication happens in DICOM.

12            As for reports, that's shown on slide 16.

13   This may take a minute.  It's the same screen that you saw

14   before, and the user clicks on "settings" in the upper

15   left-hand corner, and a drop-down menu falls down, and there

16   is an entry for reports.

17            And when the administrator clicks on that,

18   the administrator can configure the MediaWriter to receive

19   the Mitra reports as part of this initial setup.

20            Page 17, slide 17 shows a box that comes up

21   that allows the administrator to add a Mitra report broker to

22   search.  They're in DICOM, and all the administrator does is

23   they enter an address to make a DICOM connection to the

24   report broker.

25            I don't want to go too fast, Your Honor, but

1   I'm trying to adhere to your --

2           THE COURT:  No, you're not going too fast.

3           MR. SUMMERS:  Okay, thank you.

4           On slide 18, this is where the administrator

5   sets the MediaWriter to automatically include the Mitra

6   reports.

7           As we can see from the right arrow, the Mitra

8   reports use DICOM.  They're communicated in DICOM from the

9   Mitra report broker to the MediaWriter.  And there is a box,

10  the bottom arrow, Your Honor, you can see there is a box

11  checked that says "Include Reports By Default."  This is

12  where the administrator during the initial setup includes

13  Mitra reports by default to occur.  They will be searched

14  automatically by checking that box during the initial setup.

15          We're going to come back -- when we show how

16  the user uses the MediaWriter, you're going to see why

17  reports are searched for automatically.

18          Slide 19 is just the excerpt from the

19  MediaWriter user's manual, and it says:  Reports can be

20  included by default.  And you select that box to

21  automatically include reports in burn jobs.

22          After slide 19, Your Honor, the initial

23  one-time setup is now complete, and the MediaWriter is ready

24  to use by user who wants to actually burn studies.

25          Slide 21 shows the first thing that a user

will do to start burning studies.  First they enter all or part of the patient's name.  In this case the patient's name is Doug, and the MediaWriter then returns and checks with the checkmark in a box next to the studies that are pulled up for this person.  In this case it's the image study for a CT chest.

The user, to go to the next step, then follows the bottom arrow and clicks on the box that says "burn studies."

When the user does that, we move to slide 22 to see what happens next.  In slide 22 we can see that a box. Another box is displayed, and it lists the studies that were checked in the previous slide, in this case, the CT chest study for the test subject Douglas.

Because of the way the MediaWriter can be set up, if we look at the arrow to the right, we will see that the "Include Reports Box" has been checked, and it wasn't something that a user was asked to do.  That was already done by the administrator during the initial setup.

So, here is a situation where the option to search for the Mitra reports is already checked by default, and the user does not have to do anything to search for the Mitra reports.

The next step in slide 22 is the bottom arrow to the left where the user clicks the "Confirm" button to

1    burn to the disc the images and the reports.  After that

2    "Confirm" bottom is clicked, the MediaWriter does the rest,

3    grabs the images that were selected, it goes out and finds

4    the reports that relate to those images, and it burns it to a

5    disc.  And the user, after clicking "Confirm," walks over to

6    the MediaWriter and pulls out the disc.

7                    Slide 24 starts really -- what I have to talk

8    about now is really, kind of, how it works, you know, one way

9    it could be configured to work.  Slide 24 now starts the

10   arguments on why we believe there is infringement under the

11   Court's *claim construction*.  And the point in slide 24 is

12   that before burning occurs, the MediaWriter searches for and

13   processes the Mitra reports.

14                   The MediaWriter uses DICOM to search for the

15   reports that match the checked studies that we just saw,

16   which there is only one.  The MediaWriter then uses DICOM to

17   retrieve the matching reports.

18                   PacsGear testified that when the reports

19   arrive at the MediaWriter, they are converted and changed

20   from the DICOM format to a different format.

21                   Now, we have to talk about that because I

22   think PacsGear is going to argue, well, that's now -- they're

23   not in the DICOM format anymore, so, maybe there is no

24   infringement.  But we'll talk about that in a second, because

25   they are received at the MediaWriter in the DICOM format; and

1    only after they are received are they changed to a textual

2    HTML web format, and then at that point, they are burned to

3    the disc.

4              Let's skip slides 25 and 26.  That just

5    repeats the Court's *claim construction* as the basis for the

6    next discussion.

7              In slide 27 we talk about PacsGear and how

8    they search for the related data, which we've already

9    discussed in the setup and use of the machine.

10             The MediaWriter is configured to search for

11   the Mitra broker reports and their related data based on the

12   user selection.  Their related data because there was a

13   selection for the CT chest for Doug, and then when the

14   "Confirm" button was hit, the MediaWriter did a search for

15   studies, Mitra broker reports related to that CT chest study.

16   When the "Include Reports" button is selected, it just does

17   that search, and it's done automatically, as set forth in

18   slide 28.

19             We talked earlier about how the administrator

20   configures MediaWriter so that the "Include Reports" button

21   was checked during the initial setup by default.  And then

22   burning the disc with the images, and the Mitra reports only

23   requires that selecting the medical images and then

24   confirming that selection by clicking the "confirm" button.

25             And when the "Confirm" button is clicked, the

```
 1    MediaWriter will burn the chosen medical images, and it will

 2    search for at that point and burn the reports without first

 3    asking for user selection or direction for the step.

 4                    You may want to go get back to slide 22 for a

 5    moment, Your Honor.  Thank you.

 6                    The claim calls for there to be a user

 7    selection, the selection of medical image data.  It's

 8    DatCard's position that that, that the selection of the

 9    medical image data is completed when a "Confirm" button is

10    selected.

11                    And I'd like to think of an analogy like

12    online shopping.  If I go to a web site for Nordstrom and I

13    want to buy some shoes, I can select different kinds of

14    shoes, and I can put them in my shopping cart, and I may add

15    to that cart additional shoes or clothes, and I may remove

16    from that shopping cart.  But once I decide that the cart has

17    what I want in it and I proceed to the checkout, so to speak,

18    that's when I've made my selection.

19                    By analogy, when the list of studies comes up

20    from the initial search by the MediaWriter, many studies are

21    displayed, and the user can, you know, maybe, check some of

22    them or not; and then they come back to that dialogue box,

23    and they have to confirm it.  This is where they have to do

24    the "checkout and pay" if you will.  And it's only when that

25    "confirm" button is hit that the selection is finally made,
```

1    because it could be changed up to that point.

2                    And once the "Confirm" button is hit, that's

3    when the search is done automatically for the reports.

4                    These Mitra reports are searched for in the

5    same database as the PACS.  It can be configured to do that.

6    On slide 29 we cite to some evidence, some of it already of

7    record.  The first bullet point shows the PACS as a database.

8    It's configured to store medical image data generated by the

9    imaging modalities as we know.

10                    But PacsGear also testified that PACS

11   databases can have a built-in Mitra broker.  So they're in

12   the same spot.  We think that's the same as, literally, or

13   equivalent to the same database.

14                    I'll just make one final point here in slide

15   30 with respect to the searching that's going on here, and

16   why we think this -- well, we already covered why DatCard

17   believes these Mitra broker reports, diagnostic reports, are

18   related data under the Court's *claim construction*.

19                    But I'd like to address one other point with

20   respect to the burning of the reports to the disc.  As I said

21   before, they're not burned to the disc in the DICOM format,

22   they're burned in the HTML or web format.

23                    We still think that's covered by the claims

24   of the '174 patent.  There is a limitation that talks about

25   the production station and what it does, and that's shown at

1    the bottom of slide 30.  So, the production station is

2    configured to record all of the following onto the data

3    storage medium or the disc.  One is the -- it records the

4    selected medical image data for the patient recorded in a

5    standard medical imaging format.  So, it's explicitly called

6    out that the medical image data is recorded in the standard

7    medical imaging format.

8                         As for the related data, it does not specify

9    that.  It just says the related data is recorded onto the

10   data storage medium or disc.  The claim does not specify that

11   the recording of the related data must be in a standard

12   medical imaging format.

13                   MR. MARTIN:  Are you at a break point?

14                   MR. SUMMERS:  Not yet.

15                         Slides 31, 32, 33 all relate to DatCard's

16   arguments as to why PacsGear is a contributory infringer and

17   the customers of PacsGear are the direct infringers, we made

18   those arguments last time.

19                   THE COURT:  Yes.

20                   MR. SUMMERS:  And unless the Court would like me

21   to go through those, I won't.

22                   THE COURT:  No, no.

23                   MR. SUMMERS:  And the only additional point here

24   is that when we argued last time, we argued that the only

25   missing element was the plurality of the browsing terminals.

1    This time there is also a missing element in view of the

2    Court's *claim construction*.  That's the database.  PacsGear

3    does not provide the databases in the evidence that I just

4    gave to you.  The databases is in the PACS, it's not in the

5    MediaWriter, and that database is something that the

6    customers connect to in order to use the MediaWriter.  If

7    they could not connect to a database, the MediaWriter is

8    pretty much not usable.

9              That concludes my presentation on the '174

10   patent, but I'm also prepared to now address the '597, *search*

11   *and burn* patent.

12             THE COURT:  Let him speak to the --

13             MS. SUMMERS:  Okay.  That's what I wanted to find

14   out.

15             MR. MARTIN:  May I -- I would like to make an

16   objection, Your Honor, in that I think we've heard something

17   that was entirely a theory based on this evidence that's

18   pending but rather than examples, using the Mitra broker as

19   an example --

20             THE COURT:  Yes, well, you've noted your

21   objection.

22             MR. MARTIN:  Okay.  Thank you.

23             THE COURT:  Please.

24                Now, in opposition.

25             MR. HOLBROW:  Mr. Summers, are you done with your

1    infringement?

2            MR. SUMMERS:  Well, I had finished the '174.

3    Shall I go now into the '597?

4            THE COURT:  I'd rather somebody spoke about -- in

5    opposition to you on '174.

6            MR. SUMMERS:  Well, I think the Judge would like

7    to hear about the '174 opposition --

8            THE COURT:  I would like to.

9            MR. SUMMERS:  -- than talk about '597 and '164.

10           MR. HOLBROW:  Thank you, Your Honor.

11               And as we previously alluded to, this is --

12   seems to be an end around the Court's construction.  There is

13   no -- Mr. Summers seems to agree that the Mitra broker

14   reports do not include any images, and he's not talking about

15   images with headers.  He's talking about diagnostic text

16   reports.

17           THE COURT:  Yes, he is.  That's what he's been

18   talking about.

19           MR. HOLBROW:  Okay.  So, based on our

20   understanding of the *claim construction*, these Mitra broker

21   reports are outside of the *claim construction*.

22               To address the Mitra broker reports, Your

23   Honor, the -- I guess just to start off with addressing the

24   various points made by Mr. Summers there.

25               First of all, looking at the -- hold on a

1    second.  Here we go.

2                    Your Honor, I've just put on the screen the

3    last two limitations of the '174 patent where we've inserted

4    the --

5                THE COURT:  The screen?

6                MR. HOLBROW:  It's showing on mine.

7                THE COURT:  Not showing on mine.

8                    All right.  We're on the last two limitations

9    of '174.

10               MR. HOLBROW:  Correct.  And we've inserted the

11   Court's *claim construction* into the limitations that are part

12   of '174, claim 1 of '174.

13               THE COURT:  Wait just a minute.

14                    Yes.

15               MR. HOLBROW:  So, we've substituted our related

16   data and added in the Court's *claim construction*, which is --

17   requires that not only the images that are being searched for

18   in the limitation No. 4 must be in standard medical imaging

19   format, but when they're burned on to the CD, they also must

20   be in standard medical imaging format.

21                    And our position is that neither the format

22   that's searched for at the Mitra broker nor when it's burned

23   onto the CD are in standard medical imaging format.

24                    In terms of the way the MediaWriter works to

25   get the images -- to get the text data from the Mitra broker,

1    Exhibit 258, which is the declaration of Bryan Cavanaugh, he

2    went through and explained how the MediaWriter works in

3    detail in order to get these reports off the Mitra broker.

4    And it's quite clear that the format that both the

5    MediaWriter uses to receive Mitra broker reports, and the

6    Mitra broker reports that are configured at the Mitra broker

7    are not in standard medical imaging format.

8           There's no images with the -- again, there's

9    no images with the, in the format that the Mitra broker uses.

10   In fact, in Exhibit 260, which we submitted, and this is page

11   48 of Exhibit 260, it describes how the Mitra broker provides

12   the conformance, and it uses its own private SOP, which is

13   Service Object Pair class.  He puts that in the report.  So,

14   this isn't a standard medical imaging format.  Again, there

15   is no images in it to begin with.  It's a Mitra privately

16   designed structured format.  So, for that reason, again, the

17   images that -- the data that the MediaWriter seeks is not in

18   standard medical imaging format.

19          I think there is some confusion.  The

20   communication protocol that is used is DICOM, but the format

21   that the Mitra reports are sent in is not standard medical

22   imaging format, does not include images, and it's a format

23   that's been designed by Mitra and identified by Mitra in

24   their conformance report as their Mitra private SOP class.

25          And there doesn't seem to be any dispute that

1    the reports, when burned on the CD, are in HTML context --

2    format.  And this is a page from Docket Entry 89, Exhibit 2,

3    page 19, where it says:  *Reports will be formatted into HTML*

4    *text by MediaWriter before they're written to the disc.*

5                    So, again, when they're written on the disc,

6    they're not in standard medical imaging format.

7                    And this is, again, as the claim limitations

8    for '174, they're actually representative of all the

9    independent claims in the *search and burn* patents.  They have

10   the requirement at the format that is being searched, the

11   related data format that's being searched is in the selected

12   medical imaging format, and that the related data is being

13   burned onto the CDs being selected in standard medical

14   imaging format.

15                   The reasons just discussed, the MediaWriter

16   doesn't satisfy either of those limitations in any of the

17   *search and burn* patents.

18                   And this is just a quote from PacsGear -- or

19   DatCard's expert discussing DICOM images, and he says here:

20   And then the three elements after that related medical image

21   data recorded in the standard medical imaging format.  This

22   should be images because DICOM is the standard imaging format

23   described in the document.

24                   So, this just goes back to the point that it

25   needs to be -- the DICOM, the standard medical imaging format

```
 1    necessarily includes an image as defined by the patent.

 2                    Turning to the discussion relating to

 3    automatically that Mr. Summers raised.

 4                    THE COURT:  Yes.

 5                    MR. HOLBROW:  I believe he's trying to conflate

 6    the two actions.  One, the selection of images with the

 7    automatically doing a second search for --

 8                    THE COURT:  Reports.

 9                    MR. HOLBROW:  --  reports.  In this case, reports,

10    right.  The way the MediaWriter works is that the -- this is

11    from the user manual, Exhibit 217, a user that operates the

12    MediaWriter can select images by clicking the box, and then

13    pressing the "Burn Studies" button.  By hitting the "Burn

14    Studies" button, there is -- no automatic search takes place.

15    All that happens is that those images that are selected are

16    potentially cued up to be burned onto a CD.

17                    THE COURT:  What do you have to do to get the

18    reports?

19                    MR. HOLBROW:  Okay.  That's -- that initial page

20    was page 10 of the user manual.  To get reports, we'll turn

21    to page 12 of the user's manual, and in order to get reports,

22    you get an entirely separate dialogue box.  The studies that

23    you're showing here, that you've selected will appear in the

24    upper corner; and then you have to take -- user intervention

25    has to hit this "Confirm" button in order for the images and
```

1    the reports to be burned on, and it's not -- it's not quite

2    the same as the analogy Mr. Summers said where you can pick

3    and choose what's in the shopping cart or not.

4              If you ever want to go back to select new

5    images, you have to go back to that initial screen, which is

6    on page 10, select the images, hit the "Burn Studies"

7    buttons, and then you'll still be given that -- take it back

8    a little bit -- and you'll still be provided with the burn --

9    the next dialogue box, which is page 12, to confirm.  So,

10   it's not a matter of putting something in the shopping cart

11   and it's going to stay there; once you go back to the

12   original screen on page 10, you start your shopping all over.

13             And then in order to get the reports, you

14   have to take the affirmative step of going to the second

15   dialogue box here and hitting the "Confirm" button.  And

16   based on the Court's *claim construction*, this would

17   constitute user intervention; and, therefore, the claims that

18   require the search to be conducted automatically, which are

19   '178 and the '174 and the '597 patent would be not infringed

20   for that reason as well.

21             (Brief pause in the proceedings.)

22             MR. HOLBROW:  Sorry, Your Honor, I have one file

23   that seems to have escaped.

24             (Brief pause in the proceedings.)

25             MR. HOLBROW:  Sorry about that, Your Honor.

```
 1                THE COURT:  It's all right.

 2                MR. HOLBROW:  Here is a summary of reasons we

 3     don't believe that the MediaWriter infringes.

 4                     We've done -- we've done the -- combined the

 5     three search and burn patents together.  But the -- don't

 6     infringe any of the patents because all of the patents, as I

 7     alluded to earlier, regard that both the selected and related

 8     data be burned onto the CD in standard medical imaging

 9     format.

10                     As a -- even if you decide the Mitra broker

11     reports do constitute medical imaging standard format, there

12     is no dispute that when they're burned onto the CD, they're

13     in HTML, which is not a standard medical imaging format.

14                     The next reason is the search module that's

15     used does not go to search a --

16                THE COURT:  Now, do I have this?

17                MR. HOLBROW:  You can have this, yes, Your Honor.

18                THE COURT:  Yes, I'd like it.

19                MR. HOLBROW:  Okay.

20                THE COURT:  Let's go on here.

21                MR. HOLBROW:  So the second reason, the search

22     model is used to search for medical image data.  Again

23     inserting the Court's Construction, even using the Mitra

24     broker, what's searched for isn't in standard medical imaging

25     format, it's Mitra, the company's own specialized report
```

```
1    structure.

2                      Mr. Summers alluded to the -- in the '174

3    patent, the '164 patent, both the selected medical image data

4    and the related data have to come from the same database.

5                      The Mitra broker has its own separate storage

6    database, not -- it can be connected with the PACS', but it's

7    storing its own materials and its own format.  So it's not

8    the same database as the PACS' databases, which is an image

9    database.  But it will have its separate connectivity channel

10   and will not -- and, again, does not store images; whereas

11   the PACS archive does store images.

12                     And then the fourth reason down here is that

13   the -- for the '597 and the '174 patents, the search and

14   MediaWriter does not occur -- the search for reports and

15   recording that's onto the CD does not occur automatically.

16                 THE COURT:  All right.  Is that it?

17                 MR. HOLBROW:  That is it.  I also have just a

18   chart on the Mitra broker here that explains why the Mitra

19   broker does not satisfy the claim language.  Probably did

20   them in reverse order -- the -- of importance, but as I

21   alluded to, the reports from Mitra broker are stored on the

22   CD in HTML format, not standard medical imaging format.  And

23   that's demonstrated by Exhibit 2, Docket Entry 89, pages 15

24   to 19.

25                     The data sent by the Mitra broker to the
```

```
 1   MediaWriter cannot contain images.  The MediaWriter is set up
 2   only to receive data without images from the Mitra broker,
 3   which is further evidence that it's not in standard medical
 4   imaging format.  The Mitra broker conformance statement,
 5   Exhibit 260, page 46, identifies the Mitra broker using its
 6   own private format.
 7            THE COURT:  So, I'll take this one as the
 8   references that I want.
 9            MR. HOLBROW:  Okay.  And then on the fourth one, I
10   think, is probably the most important; and that is, as you
11   alluded to earlier, there is nothing in the specification
12   that supports to suggest retrieving diagnostic reports from
13   Mitra broker and have that be included as something that the
14   claims could cover, I think, runs contrary to the claim
15   construction Order.
16            THE COURT:  All right.  Let's go on to the next
17   one.
18            MR. HOLBROW:  Okay, Your Honor.
19                May I approach, Your Honor?
20            THE COURT:  Yes, please.  I need the citations.
21                Thank you.
22                Please go ahead.
23            MR. SUMMERS:  Thank you, Your Honor.
24                Now, at slide 34 of DatCard's presentation,
25   I'm going to talk about the '597 patent.  This is a patent
```

1    that requires the searching of the first database for medical

2    image data related to a patient and searching a second

3    database for additional medical data.  Also --

4              THE COURT:  You're on 34?

5              MR. SUMMERS:  Yes, Your Honor.

6              THE COURT:  All right.

7              MR. SUMMERS:  This is the two-database patent,

8    Your Honor.

9              THE COURT:  Yes, I understand.

10             MR. SUMMERS:  Okay.  This is the first database

11   search and the second one that is a search for additional

12   medical data --

13             THE COURT:  Right.

14             MR. SUMMERS:  -- also related to the patient.

15                  Slide 35, again, what we're talking about the

16   setup or use of the MediaWriter in this case.  So, in

17   slide 35, the user types in the patient's name to record

18   images, structured reports on a disc.

19                  And slide 36, you can see when you type in

20   someone's name, in this case Doug, the MediaWriter will

21   return all of the studies matching that selected patient, and

22   it will include images as well as structured reports.  You

23   can see that in the dialogue box or slide that's shown on

24   page 36.  So, it pulls up images as well as reports.

25                  And that's a search that's been done through

1    a single -- to a single PACS, Your Honor.  If you look in the

2    upper right corner of that screen shot, you'll see a header

3    that says "Source," and then underneath it says,

4    "PACSCUBEJT."  That source box tells the user how many PACS

5    sources are being searched.  In this case it's one, the

6    PACSCUBEJT, and that's on slide 36.

7              At slide 37, I'm going to explain how the

8    MediaWriter can search more than one PACS.  The source box

9    that we saw in the previous page would have said PACSCUBEJT

10   now says "All."

11             The PACS -- sorry, the MediaWriter can be set

12   up to search multiple PACS sources when the administrator

13   sets up the machine.  And in this case, the administrator has

14   set up the machine to search more than one PACS source.  In

15   other words, it's going to search all the PACS sources that

16   were entered.  If you were to click on that, a drop-down menu

17   would appear and show how many PACS sources have been

18   connected to the MediaWriter.

19             When a search is done for Doug, this time

20   searching all sources, we get more studies, and we can see

21   that there is a CT chest study with a report attached, that's

22   at the top, and then another CT chest study with some other

23   things below it, five, six, other things below it.

24             And if we look to the right of those studies,

25   we will see the source from which they came.  The first study

1    for CT chest came from a PACS source having an electronic

2    address of 192.68, the arrow is blocking out the next part,

3    .182.

4              The next study below that came from another

5    PACS source.  This time it's the PACSCUBEJT source.

6              So, it's clear that the MediaWriter can

7    search multiple databases for images and reports.  It, the

8    MediaWriter also functions, as I had previously described,

9    when the user hits the "Burn Studies" button, the slide on

10   page 38 appears, and it also includes the box already checked

11   during the initial setup to include Mitra reports; and when

12   the "Confirm" button is hit by the user, all of the studies

13   will be burned from the two different databases as well as a

14   search will be conducted for Mitra reports in this example.

15   All of that will be then be burned to the disc.

16             Slide 39 is an excerpt from the deposition

17   testimony of PacsGear's 30(b)(6) representative.  Talking

18   about how the MediaWriter can burn images and structured

19   reports in a standard medical imaging format from two

20   different -- sorry, the images in the structured reports are

21   in the DICOM format, and they're all burned to the disc in

22   the MediaWriter.

23             To save time, I won't read that quote into

24   the record, but it's found at Document 66, Exhibit 2 at

25   page 42, lines 2 through 16.  And we've bolded the important

1    part where we're talking about images and structured reports,

2    and it says:  They're all DICOM formatted objects.

3            If you remember at the beginning of my

4    argument, Your Honor, I talked about how those in the field

5    talked about things that are formatted in DICOM as objects,

6    and there -- they can be images, they can be these structured

7    reports.  They're treated as objects.  Sometimes they're

8    called images, even though the underlying information may be

9    text data and not a picture of your brain or some other part

10   of your body.

11           Turning to slide 40, it's DatCard's position

12   that the two database limitation of the '597 patent has been

13   satisfied because the MediaWriter can connect to and search

14   multiple databases, multiple PACS databases, it can search a

15   PACS and report broker that's distinct from the PACS.  Those

16   limitations are satisfied.

17           And it's important to note in the '597 patent

18   that the search for the additional medical data also related

19   to the patient is not based on selected medical image data,

20   it's based on a user request.  So, in this sense the '597 is

21   different than either the '174 or the '164 patents.

22           I'd just like to address the Doctrine of

23   Equivalents briefly.  That discussion is on page 41.  If the

24   Court finds there is no literal infringement, then we still

25   believe there is infringement under the Doctrine of

1    Equivalents.  That holds true for the '174 patent, which

2    we've already finished, but for the '597 as well, PacsGear

3    analyzed Doctrine of Equivalents in one sentence, was

4    basically a recitation of the function-way-result argument.

5              THE COURT:  I'm sorry, but I don't understand that

6    very well.

7              MR. SUMMERS:  Okay.  Excuse me for one second,

8    Your Honor.

9              (Brief pause.)

10             MR. SUMMERS:  Well, under the Doctrine of

11   Equivalents, if there is any limitation that's not literally

12   present, infringement can still be found under the Doctrine

13   of Equivalents under the Insubstantial Differences test --

14             THE COURT:  Yes, I understand.

15             MR. SUMMERS:  Very good.

16             And PacsGear is moving for a summary judgment

17   of non-infringement of the '597 patent.  So, they have the

18   burden to show there is no literal infringement and no

19   infringement under the Doctrine of Equivalents.

20             And the point here is that we believe the

21   analysis that PacsGear did for infringement under the

22   Doctrine of Equivalents or non-infringement under the

23   Doctrine of Equivalents is insufficient.  It was a

24   one-sentence analysis, and that's not good enough.

25             They said:  *There can be no infringement by*

1    *equivalents under the '597 patent because the MediaWriter*

2    *does not accomplish the same function in the same way to*

3    *achieve the same result:  There is no automatic search for*

4    *unselected image data, nor is image data obtained from two*

5    *databases.*

6              I think we've just seen, from what I've

7    described, MediaWriter does search two databases.  You'll see

8    from the previous slides that it searches in two databases,

9    and it pulls up images from each database, and it pulls up

10   structured reports from another database.  So, it clearly

11   satisfies that limitation literally.

12             But even if it didn't or if there is some

13   other limitation that the Court finds to be not literally

14   present, we think the analysis under the Doctrine of

15   Equivalents is insufficient as a matter of law, and PacsGear

16   hasn't carried its burden of proof to show non-infringement

17   under the Doctrine of Equivalents.  And at the very least,

18   "equivalents" is a question of fact.  We think it should be

19   something that seems to be disputed here, and we'd like the

20   jury to decide that question.

21             THE COURT:  All right.

22             Please.

23             MR. HOLBROW:  The argument that Mr. Summers just

24   made in connection with the MediaWriter capability of going

25   out and finding data from two different PACS, I don't believe

1    I've seen before, and I think when we get into *invalidity*

2    argument, the reason it probably wasn't raised before becomes

3    more clear because there are a number of prior art references

4    that will go out and search databases, select the data and

5    have them burned onto to a CD, and that whether you search a

6    single database or multiple databases is certainly within the

7    knowledge of one skilled in the art.

8              But I don't -- in terms of clarifying the way

9    the MediaWriter works, there is a screen shot, whether you're

10   searching a single PACS or a multiple PACS, all the images

11   come down and are shown in this -- in a single screen shot,

12   and then the user is given the option to select them from

13   this dialogue box, and then once they're selected, it will go

14   to the "confirm" box and decide whether to add reports or

15   make any of the other selections that are available on the

16   confirm boxes, which is page 12 of the user's manual.

17             So, the reason that this doesn't satisfy the

18   claims of the '597 patent is because it's a single search

19   conducted by -- single search conducted by a user for a

20   patient based on a patient's name and whether that search

21   goes out and searches one PACS or two PACS, it's the images

22   that are being selected and burned onto the CD are those that

23   are selected form a single screen shot.

24             And whether that happens to be a structured

25   report attached to the -- loaded on is kind of a different --

1    because, again, if someone wants that -- whatever the user

2    selects is what is getting burned onto the CD.  There is no

3    surprises.  They affirmatively select whether they want

4    images or whether they want structured reports and burn those

5    onto the CD.

6                  THE COURT:  All right.

7                  MR. HOLBROW:  Just in terms of the burden here,

8    obviously, we brought the motion.  It's ultimately

9    plaintiff's burden on infringement to show that the

10   MediaWriter does infringe.  Not going to go through --

11                 THE COURT:  Well, we're not going to go down on

12   burden.  Anyway.

13                 MR. HOLBROW:  And then in terms of the Doctrine of

14   Equivalents, for the reasons we stated in terms of why the

15   MediaWriter doesn't infringe, they all, all the reasons are

16   supported that they don't infringe because they're

17   substantially different than what the patent calls for.

18                     For example, the patent calls for, in the

19   '174 patent, searching the same database and burning related

20   images and selected images.  The patent, MediaWriter doesn't

21   do that.  It only burns selected images.  And then if you

22   want reports, they come in as HTML, which is entirely outside

23   of the scope of the patent claims.

24                 THE COURT:  All right.

25                 MR. HOLBROW:  That's all I have on the '597.

```
 1            THE COURT:  If we can go on to the next one.

 2            (Discussion off the record.)

 3            MR. SUMMERS:  Thanks.  Looking at this chart, we

 4    talked about the user must do some kind of selection.

 5            THE COURT:  Yes.

 6            MR. SUMMERS:  I don't think they need to.  It's

 7    already checked by default; and if that's what they want,

 8    it's already done.  It's more of an option to deselect than

 9    to select.  Just wanted to point that out.

10            Also the '597 patent really doesn't talk

11    about, you know, making these selections.  It talks about

12    receiving a request for medical data related to the patient

13    and then automatically searching two databases to get it.

14    And we showed how it searches one databases for images, and

15    then it searches another database and gets images and

16    reports.  And we think that's covered.

17            The final patent is the '164 patent, and I

18    have just three slides on this one, Your Honor, starting at

19    slide 42, and I won't retread any of the other arguments that

20    apply to this patent.  I think we've already discussed in

21    connection with the '174 patent.  But we do have an

22    additional term here, it's the printing and affixing the

23    label claim limitation.  The Court found that these claim

24    elements, printing and affixing the label, need not occur

25    sequentially.
```

1          Turning to slide 43, we know from the

2    evidence that the MediaWriter prints and applies the label to

3    each disc that comes out because of a built-in medical label

4    printer on the MediaWriter.  And PacsGear cannot deny that

5    its label is printed on and affixed to the CDs that the

6    MediaWriter produced.  If there is any doubt about that, we

7    think it's a question of fact for the jury to decide whether

8    that is printing and affixing within the meaning of the

9    claim.

10         Finally, on slide 44, Your Honor, one more

11   point about the Doctrine of Equivalents with respect to --

12         THE COURT:  Excuse me.

13         MR. SUMMERS:  Yes.

14         THE COURT:  Tell me what Dr. Rowberg said about

15   this.

16         MR. SUMMERS:  I don't have the cite for that, Your

17   Honor, at my fingerprints.  Would you mind if we looked for

18   that and came back to you?

19         THE COURT:  Never mind.  Go on.

20         MR. SUMMERS:  Thank you, Your Honor.  I apologize

21   for that.

22         With respect to the Doctrine of Equivalents

23   on slide 44, PacsGear only analyzed claim 9 of the '164

24   patent under the Doctrine of Equivalents.  There are four

25   other independent claims in that patent that they're asking

1     for summary judgment of non-infringement on, but there has

2     been no analysis as to those other claims under the Doctrine

3     of Equivalents, and those are the 15, 16, and 21.

4                     And as for claim 9 under the Doctrine of

5     Equivalents, again, it was a conclusory analysis and recital

6     of the function-way-result test.  We've quoted the full

7     extent of the analysis in slide 44 that's found in their

8     brief at document 78-2 at 15.  Actually, I don't think it's

9     the brief.  I think they're quoting -- this is where they're

10    quoting from Dr. Horii.

11                THE COURT:  Is that it?

12                MR. SUMMERS:  May I have one minute to see of we

13    can find that Doctrine of Equivalents?

14                THE COURT:  No, no, that's all right.

15                MR. SUMMERS:  Are you sure?

16                THE COURT:  That's all right.

17                MR. SUMMERS:  All right, thank you, Your Honor.

18                    Your Honor, I think it's Exhibit 78-3.  No,

19    that is not right.  Sorry.

20                    Exhibit 23?  We do have it, Your Honor,

21    and --

22                THE COURT:  Twenty-three?

23                MR. SUMMERS:  Yes, Ms. Smith will read it in the

24    record, please.

25                MS. SMITH:  It's Exhibit 23, pages 37 through 39.

```
 1                    THE COURT:  Thank you.
 2                       All right.  Now let's go on to Invalidity.
 3                    MR. HOLBROW:  One second on the --
 4                    THE COURT:  Yes.
 5                    MR. HOLBROW:  On the -- I think there is no
 6     dispute on how the MediaWriter printer works.  It comes with
 7     pre-assembled CDs that receive -- that are capable of
 8     receiving.  Our position is that the MediaWriter does not
 9     label and affect -- and does not -- the patent requires that
10     the system print the labels using a production station and
11     affix the label using a production station.  The MediaWriter
12     merely puts ink onto a ready-to-receive CD, much like a --
13     sending a piece of paper through a printer.
14                    THE COURT:  Yes, I understand.
15                    MR. HOLBROW:  Okay.  And -- in terms of a Doctrine
16     of Equivalents, I think the difference is that we've
17     previously identified between the grounds for why the
18     MediaWriter doesn't infringe the search and burn patents are
19     substantially different and satisfy the function-way-result
20     test.  We can add to that, if Your Honor requests, we can
21     move on to Invalidity.
22                    THE COURT:  Yes, let's go on to Invalidity.
23                    (Brief pause in the proceedings.)
24                    MR. HOLBROW:  All right.  Thank you, Your Honor.
25     Validity of the search and burn patents are not -- pending
```

1    the invalidity of the *search and burn* patents.

2                    As we've just discussed, the *search and burn*

3    patents essentially allow a user to go search a single

4    database, multiple databases using a single browsing

5    terminal, multiple browsing terminals and get selected in

6    related image data to burn onto a CD.

7                    And looking back at the history, I think in

8    Exhibit A to our papers, Dr. Horii who is intimately involved

9    with the DICOM process, does a great job of discussing the

10   history of the movement from using film moving onto CDs.

11                   The progress was accelerated in the '80s and

12   '90s when the hospital systems went from using film, laser

13   films, like an x-ray, and shipping it off to different

14   offices and having --

15               THE COURT:  Yes.

16               MR. HOLBROW:  And then came along the PACS system

17   of picture archiving communication system which digitized all

18   these images.  So, now someone could be sitting at their

19   computer and want to see the broken right arm of Mary Smith,

20   type in Mary Smith, the image, the x-ray or whatever image is

21   related to Mary Smith would come up on their screen.

22                   Now, the problem that they ran into is that

23   you have Fuji and Phillips and GE, all these medical

24   companies making devices that couldn't communicate with each

25   other.  So, you have a GE workstation that might not be able

1    to talk to a Phillips database.

2                    So, along comes DICOM, and this is a combined

3    effort between the cardiology community and the radiology

4    community to come up with a communication protocol that will

5    allow for easy transfer communication between multiple

6    databases.

7                    In addition, what DICOM did was they

8    recognized that, hey, this film thing is a thing of the past.

9    We're going to be moving on to digital review.  We're going

10   to have some sort of medium to store the digitized images,

11   and they opted to go with the CD.  So, this is back in the

12   early '90s, the mid '90s, the DICOM community decided that CD

13   is going to be mode of transfer.

14                   So, within DICOM itself, you almost have a

15   foundation for what's claimed in these patents because you

16   have the ability to communicate between multiple modalities,

17   multiple workstations, multiple databases and then the chosen

18   medium for recording it is the CD.

19                   To get the word out, what the medical

20   community did was, in 1995 at the American College of

21   Cardiology convention, the folks from the DICOM committee put

22   together what's shown on this screen as Exhibit 76, which is

23   the cover of a CD which was distributed at the convention.

24   They had over 5,000 of these CDs distributed.

25                   THE COURT:  Oh, yes, I saw that.

1          MR. HOLBROW:  And each of the CDs contained

2     related medical image data for a fictitious patient in

3     various modalities so that the user could get an experience

4     in viewing the different modalities, and these were handed

5     out.  So here we have a CD with related image data on it that

6     was handed out in 1995.

7               In 1996 they upgraded a little bit, and they

8     brought another CD to the convention, and this is referenced

9     in this 1996 article.  And what happened in the -- the

10    difference in the 1996 disc versus the 1995 disc was that

11    they added a viewer onto the disc so it could be viewed on

12    any standalone PC.  It didn't need the -- I guess the

13    equivalent of the Adobe Acrobat to view a PDF.  It didn't

14    need a specialized viewing program.  They installed it on the

15    disc as they handed out the disc.

16              The other interesting thing here is that,

17    again, this is a 1996 article, but they recognize that the --

18    this reach projection of CD ROM, Figure 2 projection of CD

19    ROM units installed by year 1998.  They recognized that CD

20    ROMs and CD burning was going to be the movement of the

21    future and that the use of film and film technology was going

22    down.

23              So, here you have a CD with related images on

24    it with various modalities as well as viewing software, which

25    is essentially what the result is when using the patented --

1    the claims patented device there.

2              So, from 1996 -- and the patent wasn't filed

3    until 2001 -- asking the question, what was the inventive

4    step?  What were the obstacles that the inventor had to

5    overcome in order to get this claimed invention?  And first

6    thing was the software they used.  How did he get that?  Did

7    he design it himself?  Did he come up with it on his own?

8    No.

9              Here are some pages from the deposition

10   testimony of Ken Wright, one of the named inventors, where he

11   says:  *You acquired the software for free sometime in 1999*

12   *and began using it yourself?*

13              *Yes, that's correct.*

14              *And the downloaded medical images on the*

15   *workstation that also had this E-film software?*

16              *Yes.*

17              *And did it function similar to the way we*

18   *previously discussed, where you would type in a patient's*

19   *name and would search the database on E-film workstation for*

20   *medical images related to that patient?*

21              *That is correct.*

22              *And that if you wanted to burn a selected*

23   *image onto the CD, the E-film software allowed for that.  You*

24   *could burn a selected image onto a CD?*

25              *Yes.*

1                    *Did E-film have just one piece of software or*

2     *did it have multiple pieces of software?*

3                    *It just had one piece of software.*

4                    *I saw somewhere there's a reference to E-film*

5     *Lite.  Is there any difference between those two pieces of*

6     *software?*

7                    *It's the same suite.  So if you ask me about*

8     *E-film workstation, E-film workstation includes E-film Lite*

9     *or did in 1999.*

10                   *What's the difference between E-film and*

11    *E-film Lite?*

12                   *E-film Lite is a viewing software that lives*

13    *on the CD when you burn a CD.*

14                   *Why would you want E-film Lite to be on a CD*

15    *that you burn with medical images?*

16                   *So you can display the images that are on the*

17    *CD, and you can do that on any PC or Mac, Windows-based PC.*

18                   *Okay.  So essentially you could use E-film*

19    *software to burn an image on a CD.  Along with the image*

20    *would be this E-film Lite and then you could take that to*

21    *any -- to your home PC or anywhere and view the image at that*

22    *PC; is that a fair summary?*

23                   *Yes, that's a fair summary.*

24            THE COURT:  All right.

25            MR. HOLBROW:  So the software -- not only did Disc

1    96 promote it but the named inventor also was aware that

2    there was a software that allowed for searching for medical

3    images, burning them onto a CD with viewing software.  That

4    was one of the obstacles.

5              Mr. Wright also testified -- this is on

6    page 78 of his deposition, which is Exhibit I, he says:  What

7    other obstacles -- I won't read the whole thing but just to

8    summarize, he says:  *What other obstacles did you encounter?*

9              *That was about it.*

10             *So the first obstacle was satisfied by the*

11   *Rimage CD production unit, and the second obstacle was*

12   *satisfied by the E-film server.  Is that a fair summary?*

13             *That's correct.*

14             The reason he talked about earlier, he wasn't

15   aware that there was a Rimage CD robot that can burn multiple

16   CDs.  Not that it didn't exist, but he just wasn't aware of

17   it.

18             So, based on just this limited adventure into

19   the prior art, the question becomes how does this patent

20   become allowed?  And there was -- initially, it was rejected

21   by the patent examiner multiple times, and I'm sure

22   Mr. Summers is going to be talking about the presumption of

23   validity and the standard given to the -- for clear and

24   convincing evidence for invalidity.  And part of the reason

25   that the presumption of validity is afforded to issued

 1   patents is because there is this requirement for candidness

 2   between the applicant and the patent office.

 3             THE COURT:  What did you say?

 4             MR. HOLBROW:  Requirement for candidness.

 5             THE COURT:  Oh, yes.

 6             MR. HOLBROW:  Just if you know of something, you

 7   need to provide it to the patent office, is the quid pro quo.

 8   They'll give you the patent.  If you know of any prior art,

 9   for example, you have to provide it to the patent office.

10             So, here we've established that Mr. Wright

11   knew well before the date of the invention that this E-film

12   software had the capability of burning selected images onto a

13   CD with viewing software.

14             But during the application process, and this

15   is Exhibit 5, Mr. Wright submitted a declaration where he

16   goes through and explains why the examiner had cited several

17   pieces of prior -- some prior art references.  Said that the

18   claims are rejected based on that.

19             The -- Mr. Wright and his attorneys fought

20   back and said:  No, none of those pieces of prior art teach

21   burning viewing software onto a CD as part of the process.

22   In other words, the CD that comes out of some of these prior

23   art references would need to be viewed on a computer that

24   had -- that was especially designed to be able to read.  In

25   other words, had software on it that was designed to read and

1    view the images.

2                So, at this point, Mr. Wright submits a

3    declaration to overcome those rejections that were cited by

4    the patent office.  And he says here, and this is a

5    declaration that was signed by Mr. Wright on July 19, 2007,

6    saying:  *As far as I'm aware, before the invention disclosed,*

7    *the '795 application was made, existing systems required the*

8    *use of viewing workstations that were specifically configured*

9    *to view medical image data stored in a standardized medical*

10   *imaging format, such as DICOM format.  This substantially*

11   *limited the distribution and portability of medical image*

12   *data.*

13               That's on the screen, Your Honor, that's

14   paragraph 4 of Exhibit 5.

15               So, Mr. Wright is essentially telling the

16   patent office that none of these prior art references should

17   hold up his patent because they don't teach the addition of

18   viewing software onto a CD.  Nowhere prior to this or during

19   this process did Mr. Wright or his attorney submit the E-film

20   software to the Patent and Trademark Office.  And I want to

21   make perfectly clear we're not accusing Mr. Wright's

22   attorneys of doing anything nefarious here.  We're just

23   highlighting the process here.

24               And then shortly thereafter the --

25   Mr. Wright's attorneys submitted an amendment to the patent

1    application further narrowing the claim requiring that the

2    viewing software be installed on the CD, and that the -- that

3    the claims would only be applicable for -- as it says here,

4    for software that was installed on the CD that allowed for

5    widely accessible computers, not specifically configured with

6    the standard medical imaging software for viewing of medical

7    images.

8                    So, essentially what they're saying here is

9    that we're narrowing the claims, and now, in order to get it

10   allowed, the reason we're getting it allowed is because it

11   has viewing software on it.  And as we previously

12   demonstrated, Mr. Wright was fully aware that CDs with

13   viewing software were well known in the art well before he

14   filed the application.

15                   I think there has also been some reference to

16   the re-exam that took place on the '164 patent; and, again,

17   we discussed that in our brief and explained that there were

18   numerous exchanges between DatCard's counsel and DatCard and

19   the Patent and Trademark Office during the re-exam process.

20   And initially the examiner rejected all the asserted claims

21   based on --

22                   THE COURT:  Of '164?

23                   MR. HOLBROW:  Of the '164, yes.  That's the only

24   one that's been through a re-exam, correct.

25                   Originally they rejected based on one

1    reference, namely Wang (phonetically spelled.)  Ultimately

2    that got -- after some interviews, they decided that Wang

3    didn't teach the viewing software, but it's clear from the

4    record that the examiner and the panel never looked at any of

5    the other prior art that was submitted which did teach

6    viewing software.

7                    Each interview identifies what prior art

8    reference was discussed, and the only reference that was

9    discussed was the Wang reference, even though other

10   references had been submitted.

11                   So, based on that, we'll move forward on to

12   discussing some of the specifics on the -- in terms of the

13   prior art references that we've submitted.

14              THE COURT:  Now, you're still on '164?

15              MR. HOLBROW:  Actually, Your Honor, I'm doing --

16   they're all related.  In terms of the prior art references to

17   the extent our chart has laid out, which is Exhibit 249, and

18   it's shown on your screen, the chart lays out for each of the

19   limitations which one is not satisfied or which one is

20   satisfied by each reference, and this exhibit goes through

21   each of the claims in each of the references.

22              THE COURT:  Wait just one minute.

23              MR. HOLBROW:  I can zoom in a little bit.

24              THE COURT:  Yes, that's fine.

25              MR. HOLBROW:  So, example, across the top we've

```
1    listed the prior art references, and the limitations are

2    illustrated in the rows below.

3              THE COURT:  All right.

4              MR. HOLBROW:  Okay.  And I think the easiest way

5    might be to go through the references first, and then I think

6    it will become clear how they relate to each of the

7    limitations for each of the claims.

8              THE COURT:  Go ahead.

9              MR. HOLBROW:  Okay.  And you'll see on this chart

10   that there is a reference here to '174 AESD, and, for

11   example, the vPro column, and also the column for Mehta.

12             THE COURT:  Yes, I do see.

13             MR. HOLBROW:  Okay.  What that refers to is -- I

14   changed screens here.  This is an Accelerated Examination

15   Support document.  And this is a process that the PTO has

16   adopted and allows applicants to use if they want to

17   accelerate the prosecution process.

18                   So, the quid pro quo here is that the

19   applicant must do its own search, and the search must be

20   thorough, and they must explain what they did, and then they

21   also must go through each of the references that are found

22   and candidly identify what limitations are satisfied by the

23   cited reference and those that are not disclosed by the cited

24   reference.

25                   So, here we have the ASD for the '174 patent,
```

1  which is Exhibit 224.  One of the references that is used

2  here is Mehta, and that refers to an article written by a

3  Professor Mehta --

4          THE COURT:  Yeah.

5          MR. HOLBROW:  And as the Court can see, DatCard

6  agreed that all the first four limitations are satisfied by

7  Mehta; that it includes the medical image server; that it

8  includes the database configured to store medical image data;

9  that it includes the plurality of browsing terminals; and

10 that includes the search module configured to automatically

11 search the database for related data based on the user

12 selection.

13          The only limitations that says are not found

14 are the production station, which refers to the CD burner,

15 and that those -- the selected and related images were burned

16 onto a CD.

17          We believe that Mehta does, in fact, teach

18 burning all these images onto a CD, and I'll -- and thereby

19 satisfies the final limitation of claim 1.

20          And here is the Mehta article, specifically

21 here in the intro.  It says the images are burned to the CD.

22 The CD ROM contains a copy of the browser to view images,

23 which is the viewing software, and some other materials.  And

24 it also includes the copies of all pertinent imaging studies

25 for a particular patient.

1          So, here you have a CD burner that burns

2    images, all images related to a patient as well as the

3    viewing software onto a CD, discusses the CD burner, I think

4    that is used to burn the CD.

5          I think this is an issue that, I guess,

6    involves a unresolved *claim construction* issue.  I think

7    Mr. Summers, last time we were here, argued that the

8    production station had to be the big CD robot that is used

9    by, made by Rimage, for example.  And our position was that a

10   production station can be just a simple CD burner, as long as

11   it can burn the images and the viewing software onto the CD,

12   which was satisfied by Mehta.

13         Another prior art reference that -- actually,

14   if you'd look at the screen, this is the Samari Kamani

15   (phonetically spelled) patent application.  It's Exhibit 256,

16   I'll refer to it as the Samari reference just so I don't get

17   tongue tied.

18         But it has, it shows the modality, a

19   workstation, and a production station connected, and talks

20   about how it works, in paragraph 10, and basically it's the

21   same thing that's essentially described in the *search and*

22   *burn* patents, computer server communication with other

23   medical devices on the network using DICOM protocol, receives

24   medical images from other devise, processes the images and

25   burns to each patient's images on one or more CDs along with

1    medical viewing software and other files as defined by DICOM

2    protocol.

3              And here, this one also satisfies the

4    production station issue regardless of how it's ultimately

5    construed, because the Samari reference talks about a robotic

6    CD burner that is capable of printing labels and making CDs

7    with the information burned on the labels and other graphics.

8              There are some dependent claims in the *search*

9    *and burn* patents that talk about having a -- creating some

10   sort of trail for -- an audit trail for tracking when the

11   images are burned and that the images are burned -- let me

12   get those.  For example, claim 12 of the '164 patent, and

13   claim 13 of the '164 patent, and this is also on the screen

14   showing that the --

15             Your Honor, can I give you a copy of this

16   table?  Would that make things easier.

17             THE COURT:  Yes.  It's the print on the --

18             MR. HOLBROW:  Yeah, it's kind of --

19             THE COURT:  Not too clear.  No, this is fine.

20             (Discussion off the record.)

21             THE COURT:  Go on.

22             (Brief pause in the proceedings.)

23             MR. HOLBROW:  Sorry for the delay, Your Honor.

24             THE COURT:  That's all right.

25             MR. HOLBROW:  I was just referring to claims 12

1    and 13 of the '164 patent, and those are dependent claims

2    pending from claim 9.

3              And claim 12 has an additional limitation

4    that there would be an audit module that is configured to

5    provide a model trail of the selected medical image data and

6    that claim 13, that there be an audit trail includes a record

7    of when the data was recorded.  These two dependent claims

8    are satisfied by the Samari reference in pages -- for

9    example, paragraph 63 and 64 talks about updating a database

10   with the patient study information of all patients on that CD

11   and the CD unique serial number and update that database at

12   98.

13             Paragraph 64 talks about how you can search

14   this database, and it has a simple query screen, allows for

15   querying the backup database using the patient name, patient

16   ID or the study date.

17             So, the database that's referred to in the

18   Samari reference has -- tracks the images as they're burned

19   by a unique serial number, serial number unique to the CD, as

20   well as patient name, patient ID, and date.  So, those

21   limitations in claims 12 and 13 are satisfied by the Samari

22   reference.

23             We'll also get -- this kind of gets into the

24   HIPAA patent, kind of similar claims in the HIPAA patent, but

25   I'll hold off on addressing the HIPAA patent for now.

1            The next reference was referred to as the

2    Ratib reference, and it's -- Exhibit 148, and it talks about

3    a system that Dr. Ratib developed when he was in Switzerland

4    and then brought over to UCLA when he was at UCLA.  And the

5    system allows -- it's very much like the MediaWriter and the

6    way the MediaWriter works.  It allows -- I have some blowups

7    of the screen shots.

8            They're -- on the screen now is the dialogue

9    box that the Ratib system utilizes where you can go to any --

10   you can pick a database, burn images, select image and

11   studies from the database, hit "burn CD" button, and the

12   images will burn to a CD.  But before they do that, they will

13   also, as described in the article, retrieve and match

14   corresponding data documents, reports, letters, the like.

15           So, whereas the patent neglected to mention

16   anything about data documents, the Ratib article clearly

17   calls for retrieving reports and letters as well as images,

18   and it also allows for burning the DICOM viewing software,

19   which he refers to as Cyrus.

20           So, much like the MediaWriter, the Ratib

21   article and the Ratib device that was actually used not only

22   allows the user to select images but also allows the user to

23   get those images -- or get the reports and burn the reports

24   and the images onto a CD with viewing software.

25           This is a copy of the CD that Dr. Ratib

```
 1    actually made using the system, has various images from
 2    various modalities listed at the bottom.  And the screen
 3    shot, once you open the CD and insert it, you get this image,
 4    which is also in the article, Exhibit 148, and you get
 5    images, you can click to view images or you can click on to
 6    review reports.
 7              So, that system, again, is very similar to
 8    the -- what's claimed in the sense that it has the ability to
 9    view multiple databases for multiple workstations and burn
10    selected and related images onto a CD.
11              The next device is the Heartlab device, and
12    as shown in this drawing, which is Exhibit 206, it includes
13    multiple workstations, multiple databases, multiple
14    modalities, allows the user to search multiple modalities and
15    multiple workstations for related and selected images.
16              This kind of gets back to Mr. Summers'
17    earlier argument on infringement that the selected images
18    could be downloaded simultaneously from multiple databases,
19    and that that -- and the way the MediaWriter does that
20    infringes the '597 patent.
21              Well, the Heartlab device works in much the
22    same way as shown here, which is on page 61, or actually
23    page 22 of the Heartlab document.  The user can select up
24    here in the left-hand corner any number of databases that it
25    wants to search and then can send the images to different
```

1     destination, which in this case could be a CD writer.

2               The selection process is shown in the middle

3     where you can select by patient name, patient ID; and then

4     once you initiate the search, by hitting "Show," the images,

5     all the images found will be displayed below, and then you

6     can hit "Copy Study," and those images will be burned again.

7               Again, this is Exhibit 202, the Heartlab user

8     manual.

9               So, not only can you get all images on the

10    database, which might be -- could include selected or

11    related, but you can also, as shown here, the Heartlab device

12    would allow for burning viewing software, and that's on

13    page 46, directly onto the CD to allow for viewing of the

14    images on any PC.  So, you don't need the specialized PC,

15    which, again, is part of the novelty that got the patent

16    allowed in the first place.

17              The other interesting thing that Heartlab did

18    was that using its system, this DICOM system station, it had

19    a customer, namely, Piedmont Hospital, that was interested in

20    mass producing CDs.  So, they said, Hey, we want to use a

21    bigger CD burn, a CD robot.  Can you help us?  And the guys

22    at Heartlab, back in 1998, shown on the screen, procured a

23    50-disc input tray CD burner, a CD robot.  And Mr. Petrocelli

24    (phonetically spelled) testified, as we identified in the, in

25    our papers, that they wrote the software to allow the CDs to

```
 1    be automatically made with any images that the user selected,

 2    selected images, related images, burned onto this CD with

 3    labeling features and the viewing software.

 4                    So, again, the Heartlab system essentially

 5    teaches all the limitations of the claims in the *search and*

 6    *burn* patents.

 7                    One of the other things, before I move on,

 8    that the Heartlab system allowed was allowed the user to

 9    modify the patient demographics, information relating to the

10    patient if they wanted to create a study that they wanted to

11    show at other hospitals, you would not want the patient's

12    name, you might want to create a new patient -- a different

13    patient's name for privacy reasons.

14                    This is referred to as the -- and this

15    relates to claim 10 of the '164 patent.  I believe there is a

16    claim in the '174 patent that has a claim 9 of the '174

17    patent, which allows the -- where it says input -- the system

18    is -- you're allowed to, through the system, to input

19    identifying information relating to the selected medical

20    image data.  The Heartlab system did just that.

21                    You could -- as it says here:  Pressing this

22    button will allow you to change the patient's name and date

23    of birth on the destination CD.  So --

24            (Brief pause in the proceedings.)

25                    MR. HOLBROW:  You also referenced -- there is also
```

1      a prior reference to the vPro, which is another system.

2      After a while all these dialogue boxes began to look at same.

3      They're -- as shown on the screen, which is page 12 of

4      Exhibit 241.  This is the dialogue box for the vPro product.

5                      Again, the prior art, the CD burning product

6      that allowed the user to burn selected and related images

7      onto a CD with viewing software.  The dialogue box is quite

8      similar to the MediaWriter, because it essentially is -- only

9      a limited number of ways you can present this information and

10     get the selected images that you want and burn them onto a

11     CD.

12                     The vPro product, as shown on page 23, of

13     Exhibit 241 allows you to select multiple archives and search

14     multiple archives for the images that you're looking for, and

15     you can -- and it also shows how you can filter the

16     information by asking for just CT scans or MRI scans, and it

17     also at page 26 talks about after successful copying, a

18     medium label is printed out for the name of the patient

19     study.  So, it also has a labeling feature included in the

20     system.

21                     Now, in anticipation of the potential

22     argument that, well, these systems, I don't think there is

23     going to be any dispute that these systems do allow for

24     searching multiple databases, images from multiple

25     modalities, whether the search or related data is based on

1    the search for the selected data is the issue that we expect

2    we might hear, and which I think was true until today,

3    Mr. Summers' argument on the '597 patent, which he said that

4    it didn't matter whether the secondary search for related

5    data was based on the search for selected data.

6              If that's the case, then all the prior art

7    references that we've just discussed which allow for

8    searching multiple databases in getting the images that can

9    be selected, that selecting images from these multiple

10   databases would render the claims of the '597 patent obvious,

11   if not anticipated.

12             But there are prior art that does teach

13   having a search based on selected data.  The first reference

14   that I'll discuss is the Exhibit 223, which is the patent

15   No. 5,903,889 issued to de la Huerga, and the de la Huerga

16   reference is a system that basically goes out, you type in

17   patient name, and it will go out to everywhere in the

18   hospital, find documents, images, data relating to the

19   patient, bring them back, convert them into a HTML format,

20   burn them onto a CD that can be read by any computer.  I'm

21   not sure if it was ever put into practice, but it's a pretty

22   large scale data collection system, especially designed for

23   hospitals, and title of it is system and method for

24   transmitting, collecting and archiving patient records.

25             And in column 4 --

```
 1                    THE COURT:  You have all this on your chart, don't

 2      you?

 3                    MR. HOLBROW:  Excuse me?

 4                    THE COURT:  You have all this on your chart.

 5                    MR. HOLBROW:  It's referenced on the chart.

 6                    THE COURT:  Yes.

 7                    MR. HOLBROW:  Yes.

 8                    THE COURT:  Yes, I think we should -- if you are

 9      willing to rely on the chart -- because this takes quite a

10      lot more comparison.

11                    MR. HOLBROW:  Okay.

12                    THE COURT:  Perhaps you can sum it up and let

13      it -- because he summed it up on a chart, too.

14                    MR. HOLBROW:  Who's --

15                    THE COURT:  The exhibit I have in front of me,

16      which he's going to use to oppose you, shows, refers to these

17      references.

18                    MR. HOLBROW:  Okay.  All right.  I haven't read

19      ahead on his --

20                    THE COURT:  No, no, I just want to say to you,

21      perhaps we can shorten it up.

22                    MR. HOLBROW:  Okay.  Yeah, I guess the only other,

23      the one that might take a little explanation, perhaps, and

24      this will be my final one.

25                    THE COURT:  Go ahead.
```

1          MR. HOLBROW:  Is the Seshadri reference, which is

2     Exhibit 230.  And if we look at the figure that's on the

3     screen, which is on page 361, it has multiple databases, it

4     has plurality of workstations, and it has a laser printer.

5               This was a 1993 article, which is based on

6     the 1996 article, one skilled in the art would obviously

7     decide to switch out a laser printer for a CD burner.  But

8     the interesting thing here is that it automatically searches,

9     automatically searches for related images based on input for

10    selected images.  And that's discussed here.

11              For example, assume that rule base has

12    composed a folder comprising of current examination E0, E1,

13    E2 and E3, if the workstation folder manager notices that the

14    user has called up E2, so, x-ray on some certain date, it

15    sends a notice back to the archive to another database asking

16    for the transfer of Exam 4, which wasn't on the local

17    database before.

18              So, this Seshadri article clearly shows a

19    system where a device is designed to search for related

20    images based on a search for the selected images, which

21    closes any loop in the invalidity argument that might relate

22    to how the search occurs, whether it's a search based on the

23    selected images or as Mr. Summers argued earlier, relating to

24    the '597 patent, that it doesn't have to be based on the

25    selected images.

```
 1              THE COURT:  All right.

 2                   Please.

 3              MR. HOLBROW:  Thank you, Your Honor.

 4              THE COURT:  Now, you've analyzed these in

 5    your figures.

 6                   I have your pages here in front of me that

 7    summarize what you have to say in response.

 8              MR. SUMMERS:  This is the PowerPoint booklet that

 9    we --

10              THE COURT:  Yes.

11              MR. SUMMERS:  Very good.  All right.  Well, let me

12    start with where Mr. Holbrow started.  He spent about five

13    minutes talking about the DICOM standard and then focused on

14    a Disc 96 article and a CD from -- that was displayed at the

15    American College of Radiology or Cardiology at a meeting.

16    None of that is relied upon to invalidate any claim that's

17    being asserted here.  There is no -- they never took the

18    position in this case, and they didn't in this motion, that

19    any claim is invalid based on the DICOM standard, Disc 96 or

20    anything that related to those items.

21                   You also heard argument that the inventor,

22    Ken Wright, did not write the software for his invention.

23    That's not true.  He will testify at trial that he did.  Yes,

24    he got software that assisted him with putting a viewer on a

25    disc, but substantial changes were made to that software.
```

1    And he wrote the software that runs the PACSCUBE invention

2    that his company makes and that is covered by the patent.

3                    You heard about E-film software that

4    Mr. Wright obtained to assist him in developing the

5    invention, and I think we heard about ten minutes of argument

6    on why Mr. Wright supposedly committed inequitable conduct by

7    allegedly not disclosing the concept of putting a viewer on a

8    disc.  We're not here to argue inequitable conduct.  Seems

9    like they're trying to smear Mr. Wright a little bit

10   inappropriately.

11                   THE COURT:  Leave it.  Leave that argument.

12                   MR. SUMMERS:  The last point on that E-film, Your

13   Honor, is, they're not relying on E-film for invalidity.

14   They're alleging it was withheld and it supports inequitable

15   conduct, but they're not relying on E-film on their motion or

16   in any invalidity contentions or ever in discovery to

17   invalidate any claim.  So, I think the first 15 minutes of

18   what you just heard is totally irrelevant to the decisions

19   the Court needs to make on the motions for invalidity.

20                   If I could ask the Court to refer to page 46

21   of our slides.  I'd like to really focus on what is being,

22   what you're being asked to decide.

23                   We heard a lot about the prior art, and, you

24   know, the claims in a vacuum and things like that; but we

25   didn't hear about, really, what these motions are directed

1    to.

2              DatCard has a motion on file for no

3    invalidity based on anticipation of the '174 patent, the '597

4    patent and the '164 patent.

5              PacsGear moved for summary judgment that the

6    claims of these patents -- let me strike.

7              We moved for summary judgment that there is

8    no infringement of anticipation of these patents based on

9    Mehta.  PacsGear agrees that Mehta does not anticipate any

10   claims in the '597 patent.  So, now we're just going to focus

11   on the Mehta reference and the other two *search and burn*

12   patents, '174 and '164.

13             Slide 47 shows Your Honor that Mehta was

14   already considered by the PTO when these claims were granted.

15   Mehta was before the PTO during reexamination of the '164

16   patent; and Mehta was before the PTO during the prosecution

17   of the '174 patent.

18             These claims are already allowed over this

19   reference.  PacsGear's heavy burden to prove anticipation by

20   clear and convincing evidence is even more difficult to carry

21   under these circumstances.

22             Slide 48 shows the limitations that are

23   missing in Mehta from claims 9 and 15 of the '164 patent and

24   claim 1 of the '174 patent.  I'm going to deal with the other

25   claim 8 from the '174 patent later, but for these three

1   claims in these two patents, these limitations aren't

2   present.

3                You heard about the AESD that was filed by

4   the applicant during examination of the '174 patent.  I'm

5   going to put that here on the screen, and this is document

6   77-21, and this is where when DatCard applied for the '174

7   patent.  They did it on an accelerated basis.  And in order

8   to do that, you have to analyze prior art, you have to do a

9   search, and you have to analyze the prior art, and make these

10  kinds of disclosures, you know, what's disclosed and what

11  isn't.  And here, with respect to Mehta, DatCard said that a

12  search module was disclosed to Mehta, and PacsGear is relying

13  very heavily on that.

14               But if we turn the page and we look at

15  claim 8 -- I apologize, Your Honor, I was reminded to read

16  the page into the record that I just looked at so it's clear.

17  It's document 77-21 at page 280.  This is where the applicant

18  showed that Mehta disclosed the search module.

19               In claim 1 which is the system claim, if we

20  turn the page to go to page 281, you see that we're still

21  discussing Mehta, but now we're talking about the method

22  claim.  The method claim has a counterpart limitation very

23  similar to the search module limitation.  It says:

24  *Automatically searching the database or related database*

25  *under the user selection.*

1          DatCard said that that limitation wasn't

2    present.

3          So, there is an inconsistency here.  On the

4    one hand DatCard said the search module was present in

5    claim 1, but the automatically searching step was not present

6    in Mehta claim 8.  So, it's clear that a mistake has been

7    made.  And if -- so, let's look at the document and see what

8    the document says, because that should really be what answers

9    the question, not what DatCard is doing to try to assist the

10   patent office in examining the patent application.

11          And, by the way, there is no case law that

12   says that statements like you just saw in an AESD constitute

13   admissions.  An AESD is just there to help the examiner

14   examine the patent application and try to get a handle on the

15   prior art and see what's the best prior art.  But the

16   examiner still does his or her own independent evaluation of

17   that prior art, and that's what we think should happen in

18   this case.

19          At page 49 of the slides you can see where

20   addressing Mehta, it's a very short two-and-a half page

21   article, it's attached as an exhibit to each side's motion.

22   In five minutes reviewing this article, it's very clear that

23   the limitations that we identified on the previous slide,

24   slide 48, are simply not present.

25          These are a plurality of browser terminals, a

1   search module and a production station.  Those limitations

2   are not present.  PacsGear's expert Dr. Horii says so, says

3   they are, but he does so without report -- support.

4             If we turn to slide 50, we can see that

5   during his deposition Dr. Horii agreed that Mehta did not

6   expressly disclose a plurality of browsing terminals.  Mehta

7   doesn't disclose any software that would enable a user to

8   connect to multiple browser terminals.  It's simply not

9   there.

10             And so what PacsGear does in its motion, in

11   opposing our motion for no anticipation based on Mehta, they

12   argued that these limitations are inherent, that the

13   plurality of browsing terminals and other things are

14   inherent.

15             But inherency is a very strict doctrine.  The

16   missing descriptive material must be necessarily present and

17   not merely "probably present" or "possibly present" in the

18   prior art.  It has to be there.  The mere fact that it may

19   result from a given set of circumstances is not enough.  And

20   we cited cases there on page 50 of our slides for the Court's

21   consideration.

22             So, no plurality of browsing terminals is

23   disclosed, and it's not inherent.

24             THE COURT:  All right.

25             MR. SUMMERS:  Slide 51, we go to the search

module.  Mehta does not disclose the concept of searching for any related images or other medical data that are related to the originally selected medical image data, and that's required by the claims.

All Mehta says is how all pertinent imaging studies are burned to a CD, and we quoted that for you on Slide 51.  It says, this is what Mehta says:  *Once requested, the operator is responsible for selecting the appropriate patient records from the department PACS and using the image library PC, using custom software, these images are recorded onto the CD ROM.  This CD ROM is then provided to the patient.*

There is no discussion of searching anywhere related to select -- anything that's selected, and, again, a search module is not inherit.

I've already addressed the AESD on that point and why that's just not binding, because there is an inconsistency and because Mehta just doesn't disclose it.

I think, you know, PacsGear will admit that there is no production station in Mehta under our construction.  And under their construction, you know, there appears to be a production station, which is just basically a conventional CD burner.

So, if the Court finds that a production station is a conventional CD burner, then it's probably

1    there.  But we -- for the reasons we explained in our

2    argument with you previously, last time we were here, we

3    explained why production stations should be construed as a

4    robotic disc burner.

5              And I suppose when we get a ruling from the

6    Court that that claim term will be decided or if it's

7    unnecessary to be decided, we'll find that out, too.

8              Now, I'd like to turn to claim 8 of the '174

9    patent, which we haven't discussed yet.  That's starting at

10   page 54 of our slides.  Claim 8 is directed to a method of

11   recording the medical image data and related data onto a data

12   storage medium.

13             The slide 54 outlines the four limitations of

14   this claim that are not present.  There is no automatically

15   searching of the database, as we've discussed previously;

16   there is no recording of selected medical image data for the

17   patient and the related data using a production station as

18   we've construed it.  These elements are not expressly or

19   inherently disclosed.

20             So, it's clear that limitations are missing

21   from Mehta, and we would ask the Court to enter summary

22   judgment of no anticipation based on Mehta with respect to

23   the '174 patent, the '597 patent, and the '164 patent.

24             THE COURT:  All right.

25             MR. SUMMERS:  That's all summarized on page 55.

```
 1                    THE COURT:  Yes, I see that.

 2                    MR. SUMMERS:  Okay, thank you.

 3                        I'd like to turn to obviousness, if I may.

 4                        As you know, Your Honor, obviousness is a

 5    question of law based on underlying factual determinations.

 6    And for the reasons we've expressed in our motion to exclude

 7    PacsGear's expert from testifying on the issue of

 8    obviousness.  The obviousness analysis they put forth in

 9    writing up to this point is fatally flawed.  There has not

10    been an accurate description of the content of the prior art,

11    which is grand factor 1.  There is no grand factor 2 analysis

12    at all, which is determining the differences between the

13    prior art and the claimed invention.

14                        There are no specific combinations of

15    references that had been identified to rely on an obviousness

16    argument.  It's like a shotgun approach.  There's --

17                    THE COURT:  You can leave obviousness.

18                    MR. SUMMERS:  I'm sorry?

19                    THE COURT:  You can leave obviousness.

20                    MR. SUMMERS:  You do not want me to talk about

21    obviousness any further?

22                    THE COURT:  No.

23                    MR. SUMMERS:  With respect to the search and burn

24    patents?

25                    THE COURT:  I don't think that's necessary.
```

1                  MR. SUMMERS:  Very good, Your Honor.  Then I will

2      not say anything further except, may I just point out one

3      thing?  Because this to me was a little troubling -- well,

4      no, I won't.  I'll leave it.

5                  THE COURT:  Go ahead.

6                  MR. SUMMERS:  Well, part of PacsGears' arguments

7      are that there was this Ratib device, and it was -- it did

8      this or did that.  Then there is the Ratib article.  But

9      they've referred to it as if it is one.  And each of those

10     pieces of prior art have to stand alone on their own footing,

11     the article and then this prototype device that Ratib made.

12                 I took his deposition.  He said there was no

13     searching for -- automatic searching for any related data.

14     That was done manually and put on the CD.  Those are just a

15     few things.

16                 And then you heard about this Heartlab

17     reference.  At one point you were given this exhibit, Your

18     Honor, 206, I have it on the Elmo right now.

19                 THE COURT:  Yes, I saw that.

20                 MR. SUMMERS:  It shows all these view stations.

21                 THE COURT:  Yes.

22                 MR. SUMMERS:  Okay?  And then the discussion

23     shifted to another document, which showed this screen shot.

24     This is from a totally different exhibit.  This is from

25     another exhibit, from Exhibit 202.  All these references have

```
1   to be considered individually, and whether a person of

2   ordinary skill in the art would have any reason to take all

3   these separate pieces, and I think we've probably got at

4   least a dozen now, separate obviousness references and put

5   them together.

6                  So we just -- I know you're very careful, but

7   I just wanted to point out that sometimes this prior art is

8   composed of multiple reference, and they can't just all be

9   combined and thrown together and be considered as one.  There

10  is no testimony to support that.

11                 And if you want to me to stop talking about

12  obviousness, I will.

13                 THE COURT:  I do.

14                 MR. SUMMERS:  Thank you, Your Honor.

15                 THE COURT:  Yes.

16                 MR. HOLBROW:  Real briefly, just to address some

17  of the points Mr. Summers made.  He ended with discussing the

18  Ratib article, which describes the system that select images

19  and reports and burn them all onto a CD --

20                 THE COURT:  Right.

21                 MR. HOLBROW:  I think in that search the reports

22  wasn't done -- was done manually.  But -- that's not exactly

23  accurate.  What -- the system was designed -- was a

24  prototype.  So, the reports -- well, initially found and --

25  manually and dragged onto -- into a file on the computer.
```

```
1    Once the system actually initiated, the system automatically
2    went to that file, grabbed the reports and burned them onto
3    CDs, burned them on the CDs with the images, and that's --
4    confirmed by Dr. Ratib's testimony here, which is -- he says:
5    This system as was designed had to have on the workstation
6    certain predefined subdirectories.  The directories would
7    contain material that would then burn on the CD such as
8    Cyrus, different documents and other things, and one
9    directory would allow to manually put some reports that will
10   match the images, and the user has to put those documents on
11   the directory before burning it to the CD, so, that was
12   separate.  But once the reports are on the CD -- on the
13   reports are in the directory, the system automatically went
14   there, grabbed them and burned them onto CD.
15             THE COURT:  All right.
16             MR. HOLBROW:  And in terms of the impact of the
17   AESD, I won't belabor the point --
18             THE COURT:  No, don't.
19             MR. HOLBROW:  We submitted the report on that.
20             THE COURT:  Yes.
21             MR. HOLBROW:  And in terms of the -- just two
22   quick things.  In terms of the plurality of workstations and
23   whether it's inherent or not, DatCard's own expert testified
24   that, in his report, the bottom of page 25 and onto the top
25   of page 26, and his report is Exhibit C, says:  It's
```

1    inconceivable that PacsGears' customers such as a hospital or

2    imaging center would lack a second browsing terminal, whether

3    located a PACS imaging modality or disc.

4                    So, essentially, he is conceding that it

5    would be inherent in these facilities for a plurality of

6    browsing terminals.

7                    THE COURT:  All right.

8                    MR. HOLBROW:  And, I guess, finally, just on the

9    point of whether searching one database is distinct from

10   searching two database, their own expert says that -- on

11   page 23 of his report, that:  It is my opinion that there are

12   insubstantial differences between the same database related

13   to the medical image data and searching another database to

14   relate medical image data.  So, one database is good as two

15   in Mr. Rowberg's opinion.

16                   And I guess, just finally, in terms of the

17   grand factors, I think we've covered that enough.

18                   THE COURT:  You have.

19                   MR. HOLBROW:  I don't think there is any reason to

20   belabor it.  All of the prior art reference that we cited

21   deal with searching medical data and would be well within

22   that grasp of the ones --

23                   So, that's all I have, thank you.

24                   MR. STEWART:  Your Honor, we'd like to move on now

25   to the '157 patent, if that's all right with the Court.

1          THE COURT:  Yes, that's all right with me.

2          MR. STEWART:  This begins on page 70 of the

3    presentation, and the '157 patent is what we at DatCard

4    referred to as the audit patent.  PacsGear has referred to it

5    as the HIPAA patent.  We don't think that's quite accurate

6    because the patent doesn't mention HIPAA.  It does mention

7    auditing, and quite a bit of -- describes in claims.  So, we

8    refer to it as the audit patent.

9               Turning to page 72, we've laid out what the

10   constructions are that the Court has recently issued on this

11   patent, and there really were two that were pertinent.  I'm

12   sure the Court is familiar already with the constructions.

13              The first one was, the first term at issue is

14   computer implemented interface configured to receive two or

15   more requests for production.  And the Court construed that

16   consistent with DatCard's position as a system configured to

17   receive two or more requests.  The claim doesn't refer to

18   user action; and in particular, there is no requirement that

19   the user record two searches of the same patient onto the

20   same disc.

21              The second construction was an identification

22   specific to the computer readable medium; and on this

23   construction the Court ruled that there has to be a unique

24   identifier for each individual CD, even if it's all -- so if

25   there is a job in which the image is spanned across two or

| | |
|---|---|
| 1 | more CDs, there needs to be an identifier of some sort |
| 2 | specific to each of those individual CDs within the job. |
| 3 | We think in light of these constructions, |
| 4 | summary judgment is still appropriate in favor of DatCard on |
| 5 | the issue of infringement.  As to the first limitation that |
| 6 | we just discussed, the MediaWriter is configured to receive |
| 7 | an unlimited number of search requests.  So, we think that's |
| 8 | pretty straightforward.  The first limitation construed by |
| 9 | the Court is satisfied. |
| 10 | As to the second limitation relating to the |
| 11 | unique identifier for versions 4.0 and earlier of the |
| 12 | MediaWriter, PacsGear concedes that the feature called disc |
| 13 | ID satisfies those limitations.  It was a unique disc-by-disc |
| 14 | identifier.  So, we think that the Court can and should grant |
| 15 | summary judgment as to versions 4.0 and earlier infringed the |
| 16 | '157 patent. |
| 17 | We also think that versions 4.01 and beyond |
| 18 | infringe the '157 patent, and we think the record is clear, |
| 19 | and the Court can grant that on summary judgment as well. |
| 20 | For versions -- for all versions including |
| 21 | those before and after 4.0, the MediaWriter includes a job ID |
| 22 | and also a timestamp. |
| 23 | The job ID identifies a specific job.  This |
| 24 | was discussed at some length in the briefs, and I'm sure the |
| 25 | Court is fairly familiar with it.  And the job ID -- if the |

1    job is only one disc, then the job ID is essentially the same

2    thing as the disc ID, and the job ID satisfies the claim

3    limitations.

4            But there will be, we concede, circumstances

5    where a job spans two or more disks.  And in that case the

6    job ID by itself does not uniquely identify the individual

7    disks within that job.

8            However, there is also a timestamp that's

9    applied to -- for each disc, there is a timestamp that is

10   transmitted to the audit database associated with each

11   individual disc, and that timestamp does uniquely identify

12   the disc; and you can look at it either in combination with

13   the job ID or, frankly, just standing alone on its own, the

14   timestamp by itself would satisfy the requirements of the

15   claim.

16           And this is illustrated on page 74, which is

17   a screen shot of the MediaWriter device, and you'll see the

18   arrow to the right is pointing at a column entitled Job/Disk

19   ID.  This is from an older version when they still had disc

20   ID, but what's shown here is the job ID.  And in this

21   particular instance, you'll see that every job ID number is

22   different because none of the jobs spanned multiple disks.

23           But you can imagine that some of the jobs

24   might span multiple disks.  And if that's the case, you can

25   go to the other large arrow we have in column 2, and there is

1    a timestamp that lists down to the minute and the second what

2    time the disc was created.  And that timestamp will uniquely

3    identify the disc.  And so we think that that timestamp by

4    itself or in combination with the job ID, either way,

5    satisfies the requirement of the claim as construed by the

6    Court.

7                    And if you turn to slide 75, you'll see that

8    this wasn't a new theory, this is something that our expert

9    has presented in his expert report that was submitted as

10   Exhibit 23 to document 66, where Dr. Alan Rowberg offered his

11   opinion that the combination of the job number and the

12   timestamp --

13                   THE COURT:  Yes, I've seen that.

14                   MR. STEWART:  Okay, very good, Your Honor.

15                   And I do want to point out also one thing

16   that we haven't mentioned is dependent claim 12 of the '157

17   patent specifically refers to the timestamp, the date and

18   timestamp, as being the type of data that can be transmitted

19   to the audit database as part of the audit records.  So, we

20   think that lends credence to the notion that the timestamp is

21   well within the scope of the claims.

22                   And on infringement, Your Honor, that

23   concludes my presentation.  I think we're going to follow the

24   same protocol and allow Mr. Holbrow to address *infringement*

25   first and then move on to *validity* and then I'll respond to

1    his *validity* arguments.

2              THE COURT:  No, I think I'm -- I'm looking at your

3    presentation here, and what I'm really interested in is the

4    timeout pad.

5              MR. STEWART:  Okay.  I can certainly move onto the

6    timeout pad, Your Honor.

7              THE COURT:  Do that.

8              MR. STEWART:  All right, should it be with

9    *infringement*, Your Honor?

10             THE COURT:  No.  Oh, you mean with the timeout?

11   Yes.

12             MR. STEWART:  Okay.  Yes, Your Honor.

13             Okay, that begins on page 83, Your Honor,

14   which is just the cover slide.

15             Page 84, we just -- and 85, we just list the

16   limitations that were construed by the Court, and the two

17   independent claims, one and eight, and I'm sure the Court

18   will recall that the limitation that was hotly contested by

19   the parties was detecting whether a server has changed within

20   a timeout period after receiving medical image data --

21             THE COURT:  Yes, I remember that very well.

22             MR. STEWART:  Yes, Your Honor.  And the Court

23   construed that limitation when we reproduced the construction

24   on slide 86.  The Court introduced what we think are very

25   helpful concepts of the timeout interval and the timeout

1    range or the time of detection and the range of detection,

2    and the Court held that at the time of detection -- the time

3    when detection occurs is after the timeout interval expires,

4    the range of detection is the period of time before the

5    timeout interval concludes.

6                    And turning to slide 87 accepting for the

7    moment -- the issue was:  How does the MediaWriter function?

8    We're here on an infringement motion, DatCard's motion for

9    summary judgment infringement -- excuse me, we're here on

10   PacsGears' motion for summary judgment of non-infringement of

11   '422.  And so, the question is:  How does the MediaWriter

12   function and then how does that compare to the claims?

13                    And to look at how the MediaWriter functions,

14   we looked first to the deposition testimony of Bryan

15   Cavanaugh who is the designated Rule 30(b)(6) witness for

16   PacsGear, and his description of the functioning of the

17   MediaWriter is exactly as described and claimed in the '422

18   patent.

19                    You have a timer that starts when an image is

20   received.  If a MediaWriter detects a second image of the

21   same patient within a 30-second period, the timer resets, but

22   if no image is detected and no image is received within that

23   30-second period, then the disc is burned.  And this is

24   precisely what is described in the '422 patent.

25                    And we think in light of that, the evidence

UNITED STATES DISTRICT COURT

1   is sufficiently clear that this Court could grant summary

2   judgment in favor of DatCard and against PacsGear on the

3   issue of infringement under the '422 patent.

4                    And on slide 88 we've listed a cite to the

5   Ninth Circuit's Cool Fuel decision discussing the propriety

6   of granting sua sponte summary judgment against the party

7   that is -- against the party that has moved for summary

8   judgment.  This can be done as long as PacsGear has had a

9   full and fair opportunity to present its evidence.

10                   And in this case we think that's exactly the

11  case.  PacsGear knew the *claim construction* that DatCard was

12  advocating, the Court adopted that construction, and PacsGear

13  had every opportunity to put forward its best evidence, and

14  it did put forward its best evidence.

15                   As long as you accept as true Mr. Cavanaugh's

16  description of the MediaWriter, there is no disputed issues

17  of fact here.  And we think it significantly -- PacsGear is

18  bound by the Rule 30(b)(6) testimony of Mr. Cavanaugh.

19  That's why we have Rule 30(b)(6) testimony.  And we have

20  cited a couple of cases for the Court, one from the Northern

21  District of California and one from the District of D.C.,

22  both holding that Rule 30(b)(6) testimony is binding on the

23  party that gave it.

24                   I did want to briefly cover what PacsGear has

25  described as the -- what PacsGear has described in its briefs

1    as the operation of the MediaWriter, which differs from what

2    Mr. Cavanaugh said in his deposition testimony, and we think

3    it flatly contradicts what was in the deposition testimony of

4    Mr. Cavanaugh.  But it's basically a five-step process.

5              You've got a timer that's initiated when the

6    MediaWriter was first turned on, and it counts from zero to

7    30 over and over and over again.  And this is on slide 89,

8    Your Honor.

9              Then the second step is that when an image is

10   received, the time of receipt is recorded within the

11   MediaWriter.  And when the timer expires, it's finished

12   counting from zero to 30, the MediaWriter checks to see if

13   the time of receipt of the latest image was more than 30

14   seconds ago.  And if it happens to be less than 30 seconds,

15   the timeout period is reset again to 30 seconds, a new clock

16   is set to march to zero to 30 and the process starts all over

17   again.  But if more than 30 seconds has elapsed since the

18   last image is received, the timeout period is again reset to

19   30 seconds, but this time a disc is burned.

20             So, turning to slide -- I think I want to

21   jump ahead to slide 91.  Effectively what we've got here is a

22   timer that's reset when a change is detected and a timer that

23   also resets when no change is detected.  The claim requires

24   the timer to restart when the change is detected.  We don't

25   think there is anything in the claim that excludes a system

1    where the timer restarts when there is no change that's

2    detected.  So, we think under either interpretation of how

3    the MediaWriter function, there is infringement.

4              But turning back just for a second to slide

5    90, we also think it's true that PacsGears' attorney's

6    argument in its briefs doesn't even raise a genuine issue of

7    fact as to how the MediaWriter functions.  And certainly,

8    since this is PacsGear's motion for summary judgment of

9    non-infringement, certainly it doesn't resolve the facts in

10   PacsGears' favor.

11             We have the testimony of Bryan Cavanaugh as

12   the Rule 30(b)(6) witness under oath, followed by the

13   attorney argument of PacsGear submitted on this summary

14   judgment motion, and we think that the way that gets weighted

15   is pretty clear under the law.

16             Now, PacsGear has argued that the source code

17   resolves this dispute, but it doesn't.  And there's two

18   reasons for that, one is that the source code isn't even

19   before the Court, so the Court has no basis to rely on

20   the source --

21             THE COURT:  I was about to say, I have not seen

22   any source code.

23             MR. STEWART:  What the Court does have is the

24   opinions of both parties' experts as to what the source code

25   means.  Not surprisingly, the experts are in disagreement

1    over what the source code means.  DatCard's expert believes

2    that the source code describes a system consistent with what

3    Mr. Cavanaugh testified during his deposition, and PacsGears'

4    expert, reading the same source code, has concluded that, no,

5    it's more consistent with what PacsGear is currently arguing.

6                    So, we think at best there is an issue of

7    fact there as to how the source code operates; but, really,

8    since what we're dealing with is 30(b)(6) testimony versus

9    attorney argument, there isn't a fact issue at all in the

10    30(b)(6) testimony, takes precedence, and infringement is

11    clear under Mr. Cavanaugh's testimony.

12                    THE COURT:  All right.

13                    MR. STEWART:  Very briefly on -- I did want to

14    address the Doctrine of Equivalents, if I could.

15                    THE COURT:  No.

16                    MR. STEWART:  Fair enough, Your Honor.

17                    Would you like me to move on to *invalidity* at

18    this point or would like Mr. Holbrow to --

19                    THE COURT:  Yes, tell me what you think about

20    *invalidity* here.

21                    MR. STEWART:  Certainly, Your Honor.

22                    THE COURT:  I've got to say, there is not very

23    much here, is there?

24                    MR. STEWART:  There is not very much here in terms

25    of the argument or in terms of the patents, themselves?

1              THE COURT:  In terms of the patent, itself.

2              MR. STEWART:  Well, I would disagree is with that,

3      Your Honor.  I think what the Court needs to do to start the

4      analysis of *obviousness* is to place itself --

5                      I'm sorry.  Go ahead, Your Honor.

6              THE COURT:  Let's not call it anything.  Let's not

7      call it *obviousness*.  Let's just look at what the patent --

8      the content of the patent.

9              MR. STEWART:  Yes, Your Honor.

10             THE COURT:  What about that?

11             MR. STEWART:  Well, the content of the patent is

12     in the context of an auto burn system where a modality is

13     directly sending an image to a medical disc publisher, which

14     is something that we believe Wright and LaGuardia invented

15     and shouldn't be used against them as the starting point of

16     the analysis.

17                 In that context, the invention then is to

18     determine whether or not all of the images from an image

19     set --

20             THE COURT:  I know what it's for.

21             MR. STEWART:  Okay, Your Honor.  I'm not following

22     then what the Court's question is.

23             THE COURT:  Well, is that a patentable concept?

24             MR. STEWART:  We think so, Your Honor.  And we

25     think partly because of what I was just saying, that, and if

```
 1    you'd -- this is what we have on slide 98.  We really think
 2    that the great bulk of the invention is being used against
 3    the inventors and as the starting point for the obviousness
 4    analysis.
 5              We think you've got to start with the
 6    assumption that nobody has ever even contemplated doing an
 7    auto burn process before, because that was part of their
 8    invention.  And in that context, we don't think that any of
 9    the concepts, any of the claim limitations in the patent
10    would have been obvious, and we certainly don't think that
11    any of the prior art that has been cited by PacsGear renders
12    the invention obvious.
13              And we do think, you know, gut instincts are
14    certainly very important.
15         THE COURT:  I'm not giving you my gut instinct,
16    because I agree that it is not -- that's not what you came to
17    argue.
18         MR. STEWART:  No, Your Honor.  What I was going to
19    say is that -- there is significance to the analysis that's
20    required --
21         THE COURT:  Oh, you mean, really, what you're
22    saying is that when taken altogether this patent fits in.
23    Yes?
24         MR. STEWART:  When taken altogether, we think this
25    patent very much fits in and survives the obviousness
```

```
 1    standard.

 2              THE COURT:  All right.

 3              MR. STEWART:  No doubt about it, Your Honor.

 4    That's our position.

 5                   And we think the analysis has to begin and

 6    end with the prior art that's been cited to the Court, and we

 7    just don't think that that prior art makes a case for

 8    obviousness.

 9              THE COURT:  Oh, well -- well, let me hear from

10    them, because I think I have heard enough on the arguments.

11              MR. STEWART:  Okay.  Thank you Your Honor.  And if

12    there is a particular prior art reference that the Court

13    would like us to comment on, we would be more than happy to

14    do so.

15              THE COURT:  All right, that's fine.

16              MR. HOLBROW:  Thank you, Your Honor.  The first

17    point I just wanted to address was this discussion on

18    Mr. Cavanaugh's testimony.  While it is true Mr. Cavanaugh

19    believed that the system worked one way and later found out

20    that it didn't --

21              THE COURT:  Yes.

22              MR. HOLBROW:  -- Mr. Stewart neglected to mention

23    that we served an errata clarifying testimony, correcting it,

24    and that both experts -- the source code is the source code.

25    I mean, it's not like Mr. Cavanaugh can make something up and
```

1    have it not be verified.

2                So, once we did receive one of the expert

3    reports, it appears that the source code was different than

4    what Mr. Cavanaugh believed, no one felt worse about it than

5    Mr. Cavanaugh, but we did correct it.  And the bottom line is

6    there is really no dispute over what the source code says.

7                Now, it's true, we didn't submit the ones and

8    zeros of the source code of the actual code that was written,

9    but what we did submit was a summary of the applicable

10   portions of the source code, which is Exhibit 158, and it was

11   reviewed by DatCard's expert, Mr. Goldberg, and at Exhibit K

12   went through with him the various entries in Exhibit 158.

13   And he confirmed that for all material parts of the

14   description in Exhibit 158, that they did accurately reflect

15   what the source code described.

16               Before I move on to that, one of the items in

17   the *claim construction* Order would refer to the timer.  He

18   did define the timeout period as a pre-configured period of

19   time, and -- but with the timer, DatCard proposed something,

20   it appeared that our proposed construction of timer didn't

21   come clear through the papers, but DatCard's product does use

22   a timer.

23               And a timer in computer speak and in the

24   context of this claim is basically a mechanism that counts up

25   to or down from a predesignated number and specified units.

1    So, it can go from 30 to zero or zero to 30, the timer counts

2    up or counts down.  Once it gets to the limit, it lapses and

3    something happens.

4              And the reason that's important is because

5    the timer that's used in the MediaWriter, and there is only

6    one that's really impacting this auto burn process, is

7    referred to as the MRX study timer.  What happens -- and

8    there is a declaration that we submitted from Bryan Cavanaugh

9    which explains that that timer comes on when the MediaWriter

10   turns on, and it just keeps cycling through, whatever the

11   time you want to set up at, zero to 30, it starts a

12   subroutine, regardless of what anything else is happening.

13             Now, what the subroutine does is it goes and

14   checks to see if any image data has come in, and that's an

15   entirely separate process, has nothing to do with the way the

16   timer works; but if an image comes in from a modality, it

17   will be date and time as well as the patient identification

18   information, will go in to what's referred to as a cache

19   table, and the cache table -- and they'll have a timestamp.

20             So, what the subroutine does, when the timer

21   goes off, it goes and checks the cache table and sees if

22   there is any data or images on there that have been in the

23   cache table for a preset period of time, say 30 seconds.  So,

24   if it goes over there, if there is images for 15 seconds,

25   nothing will happen, it will go back, and that's the routine

1    that is done.

2              Now, the next time the timer goes through and

3    elapses, it will send the subroutine over, the subroutine

4    will cause another surge through this cache table.  And if

5    there is images on there that have been on there for 35

6    seconds, and the max period of time has been set for 30

7    seconds, then the turkey is cooked, it's ready to move on.

8    All the passengers are on the train, and the train is ready

9    to leave the station.

10             So, the timer, the max time period are

11   entirely independent.  The max time period always stays

12   whatever it's set at.  So, if it's 30 seconds, it's always

13   going to be 30 seconds.

14             So, turning back to the relative, the

15   pertinent parts of the claim language, and I've -- both

16   claim 1 and claim 8 on the chart here.  The first limitation

17   requires the resetting the timeout period when the change is

18   detected.

19             The timeout period is that max period that is

20   set.  So, if you want to call it a timeout period.  It's not

21   technically often referred to as a timeout period.  But

22   assuming it is, that timeout period is never reset.  It's

23   always 30 seconds or whatever the number is set at, and the

24   timer never resets.  The timer just does its thing like a

25   timer does, counts from zero to 30, sends out the subroutine,

1    counts zero to 30, sends out a subroutine.

2              So, because the timeout period, there's --

3    the timeout period does not reset when any change is

4    detected, it can't satisfy the limitation, first limitation

5    of claim 1.

6              The second limitation of claim 1 also has a

7    requirement that selected medical image data and related data

8    be burned onto the CD, and for reasons that we've covered in

9    probably much more detail than anybody ever wanted in the

10   *search and burn* analysis, MediaWriter does not record related

11   data on the CD, it only records selected data onto the CD in

12   the standard medical imaging format.

13             Moving on to claim 8, claim 8 has various

14   limitations.  Again, focusing on the timer and the timeout

15   interval, and MediaWriter doesn't satisfy the first

16   limitation because the timer isn't initiated when a change is

17   detected.  The timer is initiated when the machine turns on,

18   and that's made clear in the declaration of Mr. Cavanaugh.

19             Also the timer doesn't reset when it detects

20   an additional change in the database before the timeout

21   interval lapses, the timer just cycles through, goes from

22   zero to 30, and independent of whether there is any detection

23   of material in the cache table.

24             And similarly the timer can't time out.  It

25   doesn't time out when the application server detects no

```
 1    additional changes in the database.  The timer just goes from
 2    zero to 30, sends off the subroutine, which searches through
 3    the -- searches the cache table to see if there is any images
 4    on there that have been on there for more than 30 seconds.
 5    If it has, then it sends those images to burn, and the timer
 6    starts all over again.
 7                  So, the timer is not connected at all to the
 8    detection -- whether there is a detection medical imaging
 9    data or not.  And we did provide some exhibits relating to
10    timers --
11              THE COURT:  Are you handing that up?
12              MR. HOLBROW:  Yes, Your Honor, I can hand that up.
13              THE COURT:  All right.
14              MR. HOLBROW:  Okay.  And the other part of the
15    infringement analysis kind of bleeds into the validity
16    aspect, and the Samari reference, which we spoke about
17    earlier in the context of the *search and burn* patents, also
18    teaches and pretty much is focused on the auto burn process,
19    that's what Samari is all about.  It has systems in place and
20    timers, and what they refer to as the max comparison step
21    that works pretty much the same way as the MediaWriter works.
22                  Specifically at paragraph 36, both -- Exhibit
23    256, it defines a timer; and for ease, I put it up on the
24    screen if that helps.
25              THE COURT:  What do you think about what opposing
```

```
 1    counsel said?

 2              MR. HOLBROW:  I disagree with everything he said.

 3                   What particular part.

 4              THE COURT:  No, no.  I mean -- and that's a good

 5    answer.  He said it was all, it was in the context of search

 6    and burn.  Which gives it a great deal more significance, I

 7    would say.

 8              MR. HOLBROW:  I'm not sure I heard that.

 9              THE COURT:  Isn't that what you said?

10              MR. STEWART:  Yes, Your Honor.  It's within the

11    context of the auto burn function.

12              THE COURT:  Yes.

13              MR. HOLBROW:  Right, the auto burn function.

14              THE COURT:  Yes.

15              MR. HOLBROW:  Right.  And I think --

16              THE COURT:  I misspoke, not he.

17              MR. HOLBROW:  Okay.  Yes, and the auto burn

18    function, that's what I was getting to with this Samari

19    reference, it does teach the auto burn function.

20              THE COURT:  It teaches that?

21              MR. HOLBROW:  Excuse me?

22              THE COURT:  It teaches that?

23              MR. HOLBROW:  Yes, yes, it has a -- it has --

24    appears on paragraph 36 on the screen.  It talks about a

25    timer responsible for checking for incoming new files.  The
```

1   new files are received, they're stored in a separate file

2   which would be the equivalent of the MediaWriter cache table

3   in a temporary directory.  It's programmed to check if in the

4   patient data timeout, which is the max time had occurred,

5   which is equivalent to the period in the MediaWriter.  We

6   have 30 seconds to see if everything's been -- anything has

7   been in the cache table for more than 30 he seconds --

8            THE COURT:  Yes.

9            MR. HOLBROW:  -- then it's sent over to be burned.

10  And then talks about once the timer goes off here, two

11  routines are called -- two subroutines are called, and the

12  subroutines go on to --

13           THE COURT:  Yes.

14           MR. HOLBROW:  -- describe the comparison step that

15  the MediaWriter uses.

16           THE COURT:  Yes.

17           MR. HOLBROW:  So, not only does Samari provide a

18  great reference for the auto burn function and use of timer

19  and timeout methodology, but it also highlights that the

20  MediaWriter operates the same way.  So, under the same theory

21  that what anticipates -- what infringes before anticipates

22  after, this would be anticipatory prior art.

23                Now, just to close the loop on the Samari

24  reference, the -- and this showed that MediaWriter doesn't

25  infringe the timeout patent, DatCard's expert, Mr. Goldberg,

1   reviewed Samari, and concluded that in his opinion Samari

2   didn't -- wasn't covered by the claims, and this is at page

3   13 of Exhibit 1 which is document entry 96-1, and it goes on

4   to page 14.

5            But on page 13, at the top, he states in

6   reviewing the Samari reference that the timeout period being

7   one second and then in accordance with Samari's description,

8   no resetting of one-second timeout period takes place when

9   the change is detected.  Similarly, if the opinion is based

10   on the timeout period being the max time, which is the

11   timeout interval, again, no resetting of the timeout period

12   takes place.

13            It's clear from the -- it goes on to say:

14   It's clear from the Samari publication that, for the case,

15   that the max time is 30 seconds, whether the incoming file

16   arrives after 2 seconds or 29 seconds, the timeout period is

17   not reset.

18            And that's the exact same argument I made in

19   connection with the way the MediaWriter works.

20            THE COURT:  Yes, yes.

21            MR. HOLBROW:  And I won't quote chapter and verse,

22   but on page 14 of the same exhibit, which is document entry

23   in the docket 96-1, he says that:  For the same reasons as

24   described above Timer No. 1 is not reset when the application

25   to deter -- additional change in the database.  It does not

1     reset before either timer 1 period or max time interval,

2     that -- discussed the labs, and he makes the same argument

3     for, which would be the fourth limitation of claim A which is

4     the timer doesn't -- the smart timer doesn't time out when

5     the application receiver detects no additional change,

6     instead the timer times out continuously once every timer

7     period, once every time period a check is performed, which

8     again is similar to the MediaWriter which cycles through.

9             THE COURT:  I see the point, yes.

10            MR. HOLBROW:  So, that's our primary position on

11    non-infringement.

12            In terms of *invalidity*, we've cited the

13    testimony of the inventor, we've cited the testimony of the

14    expert who both concluded that the only logical method to

15    make sure that all the passengers are on the train before it

16    leaves the station is a timer and a timeout methodology.

17    Mr. Rowberg testified that that would be the only logical --

18    Mr. Wright, the named inventor, said that he recognized the

19    problem instantly, came up with a solution.

20            It wasn't -- it was really no inventive --

21    invention at all, it was just merely applying known timer and

22    timeout methodology to this need, sending images to the film

23    station for modalities that have been happening forever, went

24    through the prior art with the *search and burn* patents where

25    images were sent directly from -- to CD burn as a viewing

UNITED STATES DISTRICT COURT

 1    software.

 2                   So, based on the stated prior art at the time

 3    of the invention, what Mr. Wright and Mr. LaGuardia claimed

 4    on this patent, in our opinion, would be, would have been

 5    quite obvious, especially under the current state of law and

 6    KSR.

 7                   THE COURT:  Now, you wanted to talk about

 8    *obviousness*.

 9                   MR. STEWART:  Certainly, Your Honor.  So, our

10    expert certainly disagrees with what --

11                   THE COURT:  Yes.

12                   MR. STEWART:  -- what Mr. Holbrow said.  We do

13    think that the Samari patent application describes the same

14    operation as the MediaWriter device, and that's document 96-1

15    at 11 to 13 is where that material is found from our expert.

16    It's also referenced, the citation is referenced on slide

17    104, but it's just a citation.

18                   And, you know, I don't understand Mr. Holbrow

19    to be saying that the Samari patent anticipates the '422

20    patent.  It does seem to be an *obviousness* argument.  That's

21    what was presented in the brief, and we don't see an analysis

22    of the differences between the claimed invention and the

23    prior art and how those differences are overcome to make a

24    case for *obviousness*.

25                   Again, I go back to the point I made earlier

1    that what we've got here is a collection of prior art, and

2    the question before the Court is, does that prior art render

3    the claim obvious?  It's not just a question of whether or

4    not common sense was put in the briefs or anything else

5    renders *obviousness*.  We really do have to look specifically

6    to the prior art.

7                THE COURT:  That's what I meant when I made the

8    comment about gut instinct.

9                MR. STEWART:  Yes, Your Honor, and I think I used

10   the wrong terminology when I said gut instinct.

11               THE COURT:  No, no, it's perfectly all right.

12               MR. STEWART:  I did have some responses to the

13   points of infringement that were made.  I don't know if the

14   Court is interested in that issue at this point or not.

15               THE COURT:  Umm -- wait just one minute.  I did

16   have one question.

17               MR. STEWART:  Certainly Your Honor.

18               THE COURT:  Oh, the word "resetting."

19               MR. STEWART:  Yes, Your Honor.  What about

20   resetting?

21               THE COURT:  The argument is that they don't do any

22   resetting.

23               MR. STEWART:  Well, I think, first of all, that

24   argument applies only to the second description of the

25   MediaWriter by PacsGear.  It doesn't apply to Mr. Cavanaugh's

1   sworn testimony.  But taking that at face value, we do think

2   there is resetting.  Every time the clock goes from zero to

3   30, it resets to zero and starts over again at zero, and that

4   we believe is a reset, Your Honor.

5           THE COURT:  I think that's it.

6           MR. STEWART:  Thank you very much, Your Honor.

7           MR. HOLBROW:  Real quickly, Your Honor, on the --

8   DatCard also submitted an accelerated examination and support

9   document in connection with the '422 patent, which is on the

10  screen here.  And page 7, this is a carry-over from page 6

11  where they're discussing Samari Kamari (phonetically

12  spelled), and they admit that Samari Kamari does teach the

13  third limitation, which is producing the CD with the selected

14  and related image data on it, and -- along with viewing

15  software.  The only one that they don't admit, that is -- the

16  only limitation they don't admit that's disclosed by Samari

17  is one that specifically refers to the detection and the

18  timer.

19           Similarly with claim 8, they admit that

20  limitations 1, 2, and 5 are satisfied by the Samari reference

21  including an application server coupled to a database and

22  configured to create a timestamp and the application is to

23  server detects a change in the database thereby initiating a

24  timer.

25           So, again, the only limitations that they

1  don't admit are found in the Samari reference just relate to

2  the timer.  And this is just a matter of design choice, and I

3  think we've -- the prior art that we've submitted shows the

4  timers and timeout methodologies are well known to those

5  skilled in the art.

6              And in combination with the testimony of the

7  inventor and DatCard's own expert, this was the only logical

8  choice that one skilled in the art would have made,

9  provides -- as well as the Samari reference which admits,

10  teaches many of the limitations provides substantial evidence

11  of *obviousness*, and the way one goes about fine tuning the

12  timer and timeout methodology might be a matter of design

13  choice, a matter of design choice doesn't -- isn't sufficient

14  to obtain patent infringement.

15              THE COURT:  All right.  So, now, is there anything

16  else on your agenda?

17              MR. HOLBROW:  It's the only thing you did stop

18  Mr. Stewart on the HIPAA patent --

19              THE COURT:  Yes, I did.

20              MR. HOLBROW:  -- on the -- and invalidity -- our

21  invalidity argument.

22              THE COURT:  I don't think I am interested in

23  hearing you argue that.

24              MR. HOLBROW:  Okay.

25              MR. SUMMERS:  I don't think we have anything

1    further from DatCard, Your Honor.

2              THE COURT:  All right.

3                   And from you?

4              MR. HOLBROW:  No, Your Honor.  I think --

5              THE COURT:  All right.  Then, let me finish this

6    off by reading you one part of the *claim construction* Order.

7    I think I have it here:  It's on page 10.  The part of it

8    that, perhaps, you, from the plaintiff's standpoint, didn't

9    quite understand is the part that -- begins on page 10 --

10   that begins:  "Under the Court's construction, the answer

11   depends on whether the reports are formatted in the standard

12   medical imaging format.  PacsGear asserts that such reports

13   are not in a standard medical imaging format.  The radiology

14   reports are in text format.  DatCard does not appear to take

15   a contrary position.  Related image data does not cover such

16   reports assuming that they're not formatted in standard

17   medical imaging format."

18             Now, the "assuming" part of that makes the

19   rest of it, according to what you said, ambiguous.  Is that

20   right?

21             MR. SUMMERS:  Let me see if I can respond to that.

22   The part that says DatCard doesn't appear to take a contrary

23   position.  We do take a contrary position.

24             THE COURT:  I know you do.

25             MR. SUMMERS:  So, I'm not sure -- I want to make

```
1   sure I answer your question.

2              THE COURT:  The last part of it made you think

3   that we agreed with you that reports were included, medical

4   reports.

5              MR. SUMMERS:  The way I read that --

6              THE COURT:  If they had been formatted properly.

7              MR. SUMMERS:  Assuming that they are -- I guess I

8   would say assuming they are formatted in the standard medical

9   imaging format --

10             THE COURT:  Then there is no problem at all.

11             MR. SUMMERS:  Yeah, then they are covered.

12             THE COURT:  Yes, but they're covered anyway.

13             MR. SUMMERS:  I'm not sure I follow.

14             THE COURT:  Well, did you -- let me put the

15  question to you directly.  When you read the *claim*

16  *construction*, did you believe -- did you feel prior to the

17  argument that the *claim construction* says that reports are

18  included?

19             MR. SUMMERS:  If recorded in the standard medical

20  imaging format.

21             THE COURT:  Ah, yes, yes.  Well, it doesn't say

22  that quite.  And perhaps you'd like to make it just a little

23  clearer.

24             MR. SUMMERS:  I think that would be helpful.

25             THE COURT:  All right.
```

1           MR. SUMMERS:  Because that's what we assume.  We

2     assume that if a diagnostic report was wrapped in the DICOM

3     format in a standard medical imaging format, we would -- we

4     were -- it was within the scope of the claim.

5           THE COURT:  Yes, yes.

6           MR. SUMMERS:  And you're telling me that we are

7     wrong about that.

8           THE COURT:  Right.

9           MR. SUMMERS:  Clarification on that would be

10    appreciated, Your Honor.

11          THE COURT:  And I understand your argument.

12          MR. SUMMERS:  Thank you.

13          THE COURT:  Thank you, both.

14          MR. HOLBROW:  Thank you, Your Honor.

15          THE COURT:  All right.

16          MR. HOLBROW:  There was just one brief -- trial

17    date.  I think it's currently set for December 10.

18          THE COURT:  Oh, well, you're not -- you can get a

19    trial.  Judge Carter had criminal cases, and we can try this

20    whenever you want to.

21          MR. HOLBROW:  Never would be the preference.

22          THE COURT:  I know.  We're not going to pick a

23    date.

24          MR. HOLBROW:  It was --

25          MR. SUMMERS:  I think I assumed, maybe

1    incorrectly, that when you took the case, all the dates we

2    had had been reset because we're going through this process

3    of summary judgment --

4                THE COURT:  It's somewhat differently than you

5    anticipated.  No, I won't do anything about setting dates

6    with you.  That is in any way that will disrupt your routine

7    at all.  We'll all consult together.

8                MR. SUMMERS:  Before we pick any pretrial

9    conference or trial dates?

10               THE COURT:  Yes, we'll do it conveniently.

11               MR. SUMMERS:  So, the existing dates that Judge

12   Carter had for trial and pretrial conference are vacated?

13               THE COURT:  Right.

14               MR. SUMMERS:  Thank you.

15               THE COURT:  We'll have to write something, which

16   may take a little bit, but it won't take as long as you've

17   waited for the argument.  So, we'll move along with it.

18               MR. SUMMERS:  I think it's pretty fast, Your

19   Honor.  I think Mr. Holbrow would agree.

20               THE COURT:  Well, that's why you were sent over

21   here.

22                    All right.  Thank you very much.

23               MR. SUMMERS:  Thank you.

24               MR. HOLBROW:  Thank you, Your Honor.

25               (Court adjourned.)

UNITED STATES DISTRICT COURT

1                   C E R T I F I C A T E

2    I hereby certify that the foregoing is a true and correct

3    transcript of the stenographically recorded proceedings in

4    the above matter.

5    Fees charged for this transcript, less any circuit fee

6    reduction and/or deposit, are in conformance with the

7    regulations of the judicial conference of the united states.

8

9    /S/ANNE KIELWASSER
     _____       11/15/2012
10   Anne Kielwasser, CSR, RPR      Date
     Official Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**'**

**'157** [5] - 86:25, 87:3,
88:16, 88:18, 90:16
**'164** [18] - 30:9, 37:3,
42:21, 47:17, 48:23,
59:16, 59:22, 59:23,
60:14, 64:12, 64:13,
65:1, 69:15, 76:4,
76:12, 76:15, 76:23,
81:23
**'174** [32] - 18:23, 20:8,
27:24, 29:9, 30:2,
30:5, 30:7, 31:3,
31:9, 31:12, 33:8,
35:19, 37:2, 37:13,
42:21, 43:1, 46:19,
47:21, 61:10, 61:25,
69:16, 76:3, 76:12,
76:17, 76:24, 76:25,
77:4, 77:6, 81:8,
81:23
**'178** [1] - 35:19
**'422** [6] - 92:11, 92:17,
92:24, 93:3, 109:19,
111:9
**'597** [22] - 29:10, 30:3,
30:9, 35:19, 37:13,
38:25, 42:12, 42:17,
42:20, 43:2, 43:17,
44:1, 45:18, 46:25,
47:10, 67:20, 71:3,
71:10, 73:24, 76:3,
76:10, 81:23
**'795** [1] - 58:7
**'80s** [1] - 51:11
**'90s** [3] - 51:12, 52:12

**/**

**/S/ANNE** [1] - 117:9

**1**

**1** [14] - 3:6, 31:12,
62:19, 76:24, 77:19,
78:5, 82:11, 102:16,
103:5, 103:6, 107:3,
107:24, 108:1,
111:20
**10** [10] - 8:6, 20:14,
34:20, 35:6, 35:12,
63:20, 69:15, 113:7,
113:9, 115:17
**10-1288MRP** [1] - 1:10
**10-CV-1288MRP** [1] -
3:6
**104** [1] - 109:17

**11** [1] - 109:15
**11/15/2012** [1] - 117:9
**11:00** [2] - 1:17, 3:1
**12** [11] - 20:17, 20:19,
34:21, 35:9, 45:16,
64:12, 64:25, 65:3,
65:21, 70:3, 90:16
**12400** [1] - 2:14
**13** [8] - 21:5, 64:13,
65:1, 65:6, 65:21,
107:3, 107:5, 109:15
**14** [2] - 107:4, 107:22
**148** [2] - 66:2, 67:4
**14th** [1] - 2:6
**15** [6] - 37:23, 49:3,
49:8, 75:17, 76:23,
101:24
**158** [3] - 100:10,
100:12, 100:14
**16** [3] - 21:12, 41:25,
49:3
**17** [2] - 21:20
**18** [1] - 22:4
**182** [1] - 41:3
**19** [5] - 22:18, 22:22,
33:3, 37:24, 58:5
**192.68** [1] - 41:2
**1993** [1] - 73:5
**1995** [3] - 52:20, 53:6,
53:10
**1996** [6] - 53:7, 53:9,
53:10, 53:17, 54:2,
73:6
**1998** [2] - 53:19, 68:22
**1999** [2] - 54:11, 55:9

**2**

**2** [10] - 18:18, 33:2,
37:23, 41:24, 41:25,
53:18, 82:11, 89:25,
107:16, 111:20
**2001** [1] - 54:3
**2007** [1] - 58:5
**2012** [2] - 1:18, 3:1
**202** [2] - 68:7, 83:25
**2040** [1] - 2:6
**206** [2] - 67:12, 83:18
**21** [2] - 22:25, 49:3
**213** [1] - 1:24
**217** [1] - 34:11
**22** [5] - 23:10, 23:11,
23:24, 26:4, 67:23
**223** [1] - 71:14
**224** [1] - 62:1
**23** [5] - 49:20, 49:25,
70:12, 86:11, 90:10
**230** [1] - 73:2
**24** [3] - 24:7, 24:9,

24:11
**241** [2] - 70:4, 70:13
**249** [1] - 60:17
**25** [2] - 25:4, 85:24
**256** [2] - 63:15, 104:23
**258** [1] - 32:1
**26** [3] - 25:4, 70:17,
85:25
**260** [3] - 32:10, 32:11,
38:5
**27** [1] - 25:7
**28** [1] - 25:18
**280** [1] - 77:17
**281** [1] - 77:20
**29** [2] - 27:6, 107:16

**3**

**30** [27] - 27:15, 28:1,
94:7, 94:12, 94:13,
94:14, 94:15, 94:16,
94:17, 94:19, 101:1,
101:11, 101:23,
102:6, 102:12,
102:13, 102:23,
102:25, 103:1,
103:22, 104:2,
104:4, 106:6, 106:7,
107:15, 111:3
**30(b)(6** [10] - 19:16,
20:13, 41:17, 92:15,
93:18, 93:19, 93:22,
95:12, 96:8, 96:10
**30-second** [2] - 92:21,
92:23
**31** [1] - 28:15
**310-207-3800** [1] -
2:15
**310-820-5988** [1] -
2:15
**312** [1] - 1:23
**32** [1] - 28:15
**33** [1] - 28:15
**34** [3] - 17:4, 38:24,
39:4
**35** [3] - 39:15, 39:17,
102:5
**36** [5] - 39:19, 39:24,
40:6, 104:22, 105:24
**361** [1] - 73:3
**37** [2] - 40:7, 49:25
**38** [1] - 41:10
**39** [2] - 41:16, 49:25

**4**

**4** [6] - 18:21, 20:11,
31:18, 58:14, 71:25,

73:16
**4.0** [3] - 88:11, 88:15,
88:21
**4.01** [1] - 88:17
**40** [1] - 42:11
**41** [1] - 42:23
**42** [2] - 41:25, 47:19
**43** [1] - 48:1
**432** [1] - 1:23
**44** [3] - 48:10, 48:23,
49:7
**46** [3] - 38:5, 68:13,
75:20
**47** [1] - 76:13
**48** [3] - 32:11, 76:22,
78:24
**49** [1] - 78:19

**5**

**5** [6] - 1:18, 3:1, 19:2,
57:15, 58:14, 111:20
**5,000** [1] - 52:24
**5,903,889** [1] - 71:15
**50** [3] - 14:6, 79:4,
79:20
**50-disc** [1] - 68:23
**51** [2] - 79:25, 80:7
**54** [2] - 81:10, 81:13
**55** [1] - 81:25

**6**

**6** [2] - 19:14, 111:10
**61** [1] - 67:22
**63** [1] - 65:9
**64** [2] - 65:9, 65:13
**66** [2] - 41:24, 90:10

**7**

**7** [2] - 19:19, 111:10
**70** [1] - 87:2
**700** [1] - 2:14
**72** [1] - 87:9
**74** [1] - 89:16
**75** [1] - 90:7
**76** [1] - 52:22
**77-21** [2] - 77:6, 77:17
**78** [1] - 56:6
**78-2** [1] - 49:8
**78-3** [1] - 49:18

**8**

**8** [10] - 19:24, 76:25,
77:15, 78:6, 81:8,

81:10, 102:16,
103:13, 111:19
**83** [1] - 91:13
**84** [1] - 91:15
**85** [1] - 91:15
**86** [1] - 91:24
**87** [1] - 92:6
**88** [1] - 93:4
**89** [3] - 33:2, 37:23,
94:7
**894-2969** [1] - 1:24

**9**

**9** [5] - 48:23, 49:4,
65:2, 69:16, 76:23
**90** [1] - 95:5
**90012** [1] - 1:24
**90025** [1] - 2:14
**91** [1] - 94:21
**92614** [1] - 2:7
**949-760-0404** [1] - 2:7
**949-760-9502** [1] - 2:8
**96** [3] - 56:1, 74:14,
74:19
**96-1** [2] - 107:3,
107:23, 109:14
**98** [2] - 65:12, 98:1

**A**

**A.M** [2] - 1:17, 3:1
**ability** [2] - 52:16, 67:8
**able** [3] - 11:21, 51:25,
57:24
**accelerate** [1] - 61:17
**accelerated** [3] -
51:11, 77:7, 111:8
**Accelerated** [1] -
61:14
**accept** [1] - 93:15
**accepting** [1] - 92:6
**accessible** [1] - 59:5
**accomplish** [1] - 44:2
**accordance** [1] -
107:7
**according** [1] - 113:19
**accurate** [3] - 82:10,
84:23, 87:5
**accurately** [1] -
100:14
**accused** [1] - 18:24
**accusing** [1] - 58:21
**achieve** [1] - 44:3
**acknowledge** [1] -
10:14
**acknowledges** [1] -
6:16

**acquired** [1] - 54:11
**Acrobat** [1] - 53:13
**acted** [1] - 14:24
**action** [1] - 87:18
**actions** - 34:6
**actual** [1] - 100:8
**add** [4] - 21:21, 26:14, 45:14, 50:20
**added** [2] - 31:16, 53:11
**addition** - 52:7, 58:17
**additional** [21] - 4:13, 7:3, 11:16, 12:2, 15:12, 15:15, 16:2, 16:10, 19:20, 20:12, 26:15, 28:23, 39:3, 39:11, 42:18, 47:22, 65:3, 103:20, 104:1, 107:25, 108:5
**address** [11] - 10:9, 21:23, 27:19, 29:10, 30:22, 41:2, 42:22, 84:16, 90:24, 96:14, 99:17
**addressed** [1] - 80:16
**addressing** [3] - 30:23, 65:25, 78:20
**adhere** [1] - 22:1
**adjourned** [1] - 116:25
**administrator** [14] - 4:23, 20:18, 20:20, 21:7, 21:17, 21:18, 21:21, 21:22, 22:4, 22:12, 23:19, 25:19, 40:12, 40:13
**admission** [1] - 11:2
**admissions** [1] - 78:13
**admit** [6] - 80:19, 111:12, 111:15, 111:16, 111:19, 112:1
**admits** [1] - 112:9
**Adobe** [1] - 53:13
**adopted** [3] - 4:10, 61:16, 93:12
**adventure** [1] - 56:18
**advocated** [2] - 4:1, 4:11
**advocating** [1] - 93:12
**AESD** [6] - 61:10, 77:3, 78:12, 78:13, 80:16, 85:17
**affect** [1] - 50:9
**affirmatively** [1] - 46:3
**affix** [1] - 50:11
**affixed** [1] - 48:5
**affixing** [3] - 47:22, 47:24, 48:8

**afforded** [1] - 56:25
**agenda** [1] - 112:16
**ago** [1] - 94:14
**agree** [6] - 3:24, 12:25, 14:19, 30:13, 98:16, 116:19
**agreed** [4] - 18:19, 62:6, 79:5, 114:3
**agrees** [1] - 76:9
**ahead** [9] - 4:2, 13:11, 38:22, 61:8, 72:19, 72:25, 83:5, 94:21, 97:5
**aKtranscripts.com** [1] - 1:25
**Alan** [1] - 90:10
**allegedly** [1] - 75:7
**alleging** [1] - 75:14
**allow** [11] - 14:15, 51:3, 52:5, 68:12, 68:13, 68:25, 69:22, 70:23, 71:7, 85:9, 90:24
**allowed** [13] - 15:7, 54:23, 56:2, 56:20, 59:4, 59:10, 68:16, 69:8, 69:18, 70:6, 72:1
**allows** [11] - 21:21, 61:16, 65:14, 66:5, 66:6, 66:18, 66:22, 67:14, 69:17, 70:13
**alluded** [4] - 30:11, 36:7, 37:2, 37:21, 38:11
**almost** [2] - 15:2, 52:14
**alone** [2] - 83:10, 89:13
**altogether** [2] - 98:22, 98:24
**ambiguous** [1] - 113:19
**amendment** [1] - 58:25
**American** [2] - 52:20, 74:15
**analogy** [3] - 26:11, 26:19, 35:2
**analysis** [16] - 43:21, 43:24, 44:14, 49:2, 49:5, 49:7, 82:8, 82:11, 97:4, 97:16, 98:4, 98:19, 99:5, 103:10, 104:15, 109:21
**analyze** [2] - 77:8, 77:9
**analyzed** [3] - 43:3, 48:23, 74:4

**Angeles** [3] - 1:17, 1:24, 2:14
**Anne** [1] - 117:10
**ANNE** [2] - 1:22, 2:5
**annekielwasser@ gmail.com** [1] - 1:25
**answer** [5] - 9:8, 19:18, 105:5, 113:10, 114:1
**answers** [1] - 78:8
**anticipate** [3] - 11:7, 11:15, 76:9
**anticipated** [2] - 71:11, 116:5
**anticipates** [1] - 106:21, 109:19
**anticipation** [6] - 70:21, 76:3, 76:8, 76:19, 79:11, 81:22
**anticipatory** [1] - 106:22
**anyway** [2] - 46:12, 114:12
**apologize** [3] - 8:16, 48:20, 77:15
**appear** [4] - 34:23, 40:17, 113:14, 113:22
**appearances** [1] - 3:8
**appeared** [1] - 100:20
**applicable** [2] - 59:3, 100:9
**applicant** [4] - 57:2, 61:19, 77:4, 77:17
**applicants** [1] - 61:16
**application** [13] - 57:14, 58:7, 59:1, 59:14, 63:15, 78:10, 78:14, 103:25, 107:24, 108:5, 109:13, 111:21, 111:22
**applied** [2] - 77:6, 89:9
**applies** [2] - 48:2, 110:24
**apply** [2] - 47:20, 110:25
**applying** [1] - 108:21
**appreciated** [1] - 115:10
**approach** [3] - 17:10, 38:19, 82:16
**appropriate** [2] - 80:8, 88:4
**archive** [2] - 37:11, 73:15
**archives** [2] - 70:13, 70:14
**archiving** [2] - 51:17,

71:24
**argue** [10] - 11:18, 12:23, 13:1, 13:6, 13:7, 15:5, 24:22, 75:8, 98:17, 112:23
**argued** [6] - 28:24, 63:7, 73:23, 79:12, 95:16
**arguing** [1] - 96:5
**argument** [30] - 12:3, 12:21, 14:14, 15:11, 42:4, 43:4, 44:23, 45:2, 67:17, 70:22, 71:3, 73:21, 74:21, 75:5, 75:11, 81:2, 82:16, 95:6, 95:13, 96:9, 96:25, 107:18, 108:2, 109:20, 110:21, 110:24, 112:21, 114:17, 115:11, 116:17
**arguments** [9] - 12:12, 15:16, 24:10, 28:16, 28:18, 47:19, 83:6, 91:1, 99:10
**arm** [1] - 51:19
**arrive** [1] - 24:19
**arrives** [1] - 107:16
**arrow** [9] - 21:9, 22:7, 22:10, 23:8, 23:16, 23:24, 41:2, 89:18, 89:25
**art** [46] - 45:3, 45:7, 56:19, 57:8, 57:17, 57:20, 57:23, 58:16, 59:13, 60:5, 60:7, 60:13, 60:16, 61:1, 63:13, 70:5, 71:6, 71:12, 73:6, 75:23, 77:8, 77:9, 78:15, 78:17, 79:18, 82:10, 82:13, 83:10, 84:2, 84:7, 86:20, 98:11, 99:6, 99:7, 99:12, 106:22, 108:24, 109:2, 109:23, 110:1, 110:2, 110:6, 112:3, 112:5, 112:8
**article** [17] - 53:9, 53:17, 62:2, 62:20, 66:13, 66:16, 66:21, 67:4, 73:5, 73:6, 73:18, 74:14, 78:21, 78:22, 83:8, 83:11, 84:18
**ASD** [1] - 61:25
**aspect** [1] - 104:16
**assembled** [1] - 50:7
**assert** [1] - 18:25
**asserted** [3] - 18:24,

59:20, 74:17
**asserts** [1] - 113:12
**assist** [2] - 75:4, 78:9
**assisted** [1] - 74:24
**associated** [1] - 89:10
**assume** [3] - 73:11, 115:1, 115:2
**assumed** [1] - 115:25
**assuming** [6] - 6:23, 102:22, 113:16, 113:18, 114:7, 114:8
**assumption** [1] - 98:6
**attached** [3] - 40:21, 45:25, 78:21
**attorney** [3] - 58:19, 95:13, 96:9
**attorney's** [1] - 95:5
**attorneys** [3] - 57:19, 58:22, 58:25
**audit** [8] - 64:10, 65:4, 65:6, 87:4, 87:8, 89:10, 90:19
**auditing** [1] - 87:7
**auto** [9] - 97:12, 98:7, 101:6, 104:18, 105:11, 105:13, 105:17, 105:19, 106:18
**automatic** [3] - 34:14, 44:3, 83:13
**automatically** [23] - 4:20, 15:24, 20:22, 22:5, 22:14, 22:17, 22:21, 25:17, 27:3, 34:3, 34:7, 35:18, 37:15, 47:13, 62:10, 69:1, 73:8, 73:9, 77:24, 78:5, 81:14, 85:1, 85:13
**available** [1] - 45:15
**aware** [5] - 56:1, 56:15, 56:16, 58:6, 59:12
**awfully** [1] - 13:13

**B**

**backup** [1] - 65:15
**base** [1] - 73:11
**based** [33] - 8:5, 16:7, 16:8, 25:11, 29:17, 30:19, 35:16, 42:19, 42:20, 45:20, 55:17, 56:18, 57:18, 59:21, 59:25, 60:11, 62:11, 70:25, 71:5, 71:13, 73:5, 73:9, 73:20, 73:22, 73:24, 74:19, 76:3, 76:8, 79:11,

81:22, 82:5, 107:9, 109:2

**basis** [3] - 25:5, 77:7, 95:19

**Bear** [1] - 2:6

**bear** [1] - 15:15

**become** [2] - 56:20, 61:6

**becomes** [2] - 45:2, 56:19

**beforehand** [1] - 10:13

**began** [2] - 54:12, 70:2

**begin** [3] - 17:16, 32:15, 99:5

**beginning** [1] - 42:3

**begins** [4] - 87:2, 91:13, 113:9, 113:10

**BEHALF** [2] - 2:3, 2:11

**beholder** [1] - 9:21

**belabor** [2] - 85:17, 86:20

**believes** [2] - 27:17, 96:1

**below** [6] - 20:3, 40:23, 41:4, 61:2, 68:5

**best** [4] - 78:15, 93:13, 93:14, 96:6

**bet** [1] - 15:20

**between** [12] - 17:18, 50:17, 52:3, 52:5, 52:16, 55:5, 55:10, 57:2, 59:18, 82:12, 86:12, 109:22

**beyond** [1] - 88:17

**big** [1] - 63:8

**bigger** [1] - 68:21

**bill** [1] - 3:13

**Bill_Holbrow@bstz. com** [1] - 2:16

**binding** [2] - 80:17, 93:22

**birth** [1] - 69:23

**bit** [7] - 17:17, 35:8, 53:7, 60:23, 75:9, 87:7, 116:16

**black** [1] - 18:15

**Blakely** [1] - 2:13

**blame** [1] - 7:17

**bleeds** [1] - 104:15

**blocking** [1] - 41:2

**blowups** [1] - 66:6

**body** [2] - 19:13, 42:10

**bolded** [1] - 41:25

**book** [1] - 4:21

**booklet** [1] - 74:8

**bottom** [8] - 22:10, 23:8, 23:24, 24:2,

28:1, 67:2, 85:24, 100:5

**Boulevard** [1] - 2:14

**bound** [1] - 93:18

**Box** [1] - 23:17

**box** [27] - 5:2, 19:25, 20:6, 20:10, 21:20, 22:9, 22:10, 22:14, 22:20, 23:4, 23:8, 23:11, 23:12, 26:22, 34:12, 34:22, 35:9, 35:15, 39:23, 40:4, 40:8, 41:10, 45:13, 45:14, 66:9, 70:4, 70:7

**boxes** [2] - 45:16, 70:2

**brain** [3] - 18:7, 19:13, 42:9

**break** [1] - 28:13

**Bridget** [1] - 3:12

**BRIDGET** [1] - 2:5

**brief** [5] - 49:8, 49:9, 59:17, 109:21, 115:16

**Brief** [7] - 7:22, 35:21, 35:24, 43:9, 50:23, 64:22, 69:24

**briefing** [1] - 11:16

**briefly** [5] - 3:17, 42:23, 84:16, 93:24, 96:13

**briefs** [5] - 14:16, 88:24, 93:25, 95:6, 110:4

**bring** [1] - 71:19

**broken** [1] - 51:19

**broker** [38] - 18:2, 19:17, 19:20, 19:22, 20:2, 20:7, 20:10, 21:21, 21:24, 22:9, 25:11, 25:15, 27:11, 27:17, 29:18, 30:13, 30:20, 30:22, 31:22, 31:25, 32:3, 32:5, 32:6, 32:9, 32:11, 36:10, 36:24, 37:5, 37:18, 37:19, 37:21, 37:25, 38:2, 38:4, 38:5, 38:13, 42:15

**brought** [3] - 46:8, 53:8, 66:4

**browser** [3] - 62:22, 78:25, 79:8

**browsing** [9] - 28:25, 51:4, 51:5, 62:9, 79:6, 79:13, 79:22, 86:2, 86:6

**Bryan** [4] - 32:1, 92:14, 95:11, 101:8

**built** [2] - 27:11, 48:3

**built-in** [2] - 27:11, 48:3

**bulk** [1] - 98:2

**bullet** [1] - 27:7

**burden** [6] - 43:18, 44:16, 46:7, 46:9, 46:12, 76:19

**burn** [60] - 4:5, 14:15, 17:13, 22:21, 22:24, 23:9, 24:1, 26:1, 26:2, 29:11, 33:9, 33:17, 35:8, 36:5, 41:18, 46:4, 50:18, 50:25, 51:1, 51:2, 51:6, 54:22, 54:24, 55:13, 55:15, 55:19, 56:15, 63:4, 63:11, 63:22, 64:9, 66:10, 66:11, 66:12, 66:23, 67:9, 68:21, 69:6, 70:6, 70:10, 71:20, 76:11, 82:23, 84:19, 85:7, 97:12, 98:7, 101:6, 103:10, 104:5, 104:17, 104:18, 105:6, 105:11, 105:13, 105:17, 105:19, 106:18, 108:24, 108:25

**Burn** [4] - 34:13, 35:6, 41:9

**burned** [33] - 25:2, 27:21, 27:22, 31:19, 31:22, 33:1, 33:13, 34:16, 35:1, 36:8, 36:12, 41:13, 41:15, 41:21, 45:5, 45:22, 46:2, 62:15, 62:21, 64:7, 64:11, 65:18, 68:6, 69:2, 80:6, 85:2, 85:3, 85:14, 92:23, 94:19, 103:8, 106:9

**burner** [10] - 62:14, 63:1, 63:3, 63:10, 64:6, 68:23, 73:7, 80:23, 80:25, 81:4

**burning** [14] - 23:1, 24:12, 25:22, 27:20, 46:19, 53:20, 56:3, 57:12, 57:21, 62:18, 66:18, 68:12, 70:5, 85:11

**burns** [4] - 24:4, 46:21, 63:1, 63:25

**button** [17] - 23:25, 25:14, 25:16, 25:20, 25:24, 25:25, 26:9, 26:25, 27:2, 34:13,

34:14, 34:25, 35:15, 41:9, 41:12, 66:11, 69:22

**buttons** [1] - 35:7

**buy** [1] - 26:13

## C

**CA** [2] - 2:7, 2:14

**cache** [9] - 101:18, 101:19, 101:21, 101:23, 102:4, 103:23, 104:3, 106:2, 106:7

**Calendar** [1] - 3:5

**CALIFORNIA** [1] - 1:2

**California** [3] - 1:17, 1:24, 93:21

**candidly** [1] - 61:22

**candidness** [2] - 57:1, 57:4

**cannot** [2] - 38:1, 48:4

**capability** [2] - 44:24, 57:12

**capable** [2] - 50:7, 64:6

**cardiology** [1] - 52:3

**Cardiology** [2] - 52:21, 74:15

**careful** [1] - 84:6

**carried** [1] - 44:16

**carry** [2] - 76:20, 111:10

**carry-over** [1] - 111:10

**cart** [6] - 26:14, 26:15, 26:16, 35:3, 35:10

**Carter** [2] - 12:16, 115:19, 116:12

**Case** [1] - 3:6

**case** [23] - 14:3, 15:1, 23:2, 23:5, 23:13, 34:9, 39:16, 39:20, 40:5, 40:13, 68:1, 71:6, 74:18, 78:11, 78:18, 89:5, 89:24, 93:10, 93:11, 99:7, 107:14, 109:24, 116:1

**cases** [3] - 79:20, 93:20, 115:19

**Cavanaugh** [13] - 32:1, 92:15, 93:18, 94:2, 94:4, 95:11, 96:3, 99:18, 99:25, 100:4, 100:5, 101:8, 103:18

**Cavanaugh's** [4] - 93:15, 96:11, 99:18, 110:25

**CD** [94] - 31:19, 31:23, 33:1, 34:16, 36:8, 36:12, 37:15, 37:22, 45:5, 45:22, 46:2, 46:5, 50:12, 51:6, 52:11, 52:12, 52:18, 52:23, 53:5, 53:8, 53:18, 53:19, 53:20, 53:23, 54:23, 54:24, 55:13, 55:14, 55:17, 55:19, 56:3, 56:11, 56:15, 57:13, 57:21, 57:22, 58:18, 59:2, 59:4, 62:14, 62:16, 62:18, 62:21, 62:22, 62:3, 63:3, 63:4, 63:8, 63:10, 63:11, 64:6, 65:10, 65:11, 65:19, 66:11, 66:12, 66:24, 66:25, 67:3, 67:10, 68:1, 68:13, 68:21, 68:23, 69:2, 69:23, 70:5, 70:7, 70:11, 71:20, 73:7, 74:14, 80:6, 80:11, 80:23, 80:25, 83:14, 84:19, 85:7, 85:11, 85:12, 85:14, 87:24, 103:8, 103:11, 108:25, 111:13

**CDs** [16] - 33:13, 48:5, 50:7, 51:10, 52:24, 53:1, 56:16, 59:12, 63:25, 64:6, 68:20, 68:25, 85:3, 88:1, 88:2

**center** [1] - 86:2

**CENTRAL** [1] - 1:2

**cents'** [1] - 13:23

**certain** [2] - 73:14, 85:6

**certainly** [13] - 10:22, 11:6, 17:11, 45:6, 91:5, 95:7, 95:9, 96:21, 98:10, 98:14, 109:9, 109:10, 110:17

**certify** [1] - 117:2

**change** [13] - 69:22, 94:22, 94:23, 94:24, 95:1, 102:17, 103:3, 103:16, 103:20, 107:9, 107:25, 108:5, 111:23

**changed** [6] - 13:7, 24:19, 25:1, 27:1, 61:14, 91:19

**changes** [2] - 74:25, 104:1

**channel** [1] - 37:9

**chapter** [1] - 107:21
**charged** [1] - 117:5
**chart** [11] - 37:18, 47:3, 60:17, 60:18, 61:9, 72:1, 72:4, 72:5, 72:9, 72:13, 102:16
**check** [3] - 26:21, 106:3, 108:7
**checked** [8] - 22:11, 23:13, 23:17, 23:21, 24:15, 25:21, 41:10, 47:7
**checking** [2] - 22:14, 105:25
**checkmark** [1] - 23:4
**checkout** [2] - 26:17, 26:24
**checks** [4] - 23:3, 94:12, 101:14, 101:21
**chest** [7] - 23:6, 23:13, 25:13, 25:15, 40:21, 40:22, 41:1
**choice** [4] - 112:2, 112:8, 112:13
**choose** [2] - 3:22, 35:3
**chosen** [2] - 26:1, 52:17
**CHRIS** [1] - 2:17
**Chris** [1] - 3:15
**circuit** [1] - 117:5
**Circuit's** [1] - 93:5
**circumstances** [3] - 76:21, 79:19, 89:4
**citation** [2] - 109:16, 109:17
**citations** [1] - 38:20
**cite** [3] - 27:6, 48:16, 93:4
**cited** [12] - 20:11, 57:16, 58:3, 61:23, 79:20, 86:20, 93:20, 98:11, 99:6, 108:12, 108:13
**Claim** [1] - 6:12
**claim** [93] - 3:21, 3:25, 4:13, 7:13, 8:4, 9:5, 9:16, 9:22, 12:7, 12:12, 12:14, 12:21, 12:23, 13:15, 13:21, 13:24, 14:21, 15:5, 16:7, 16:9, 16:14, 24:11, 25:5, 25:16, 27:18, 28:10, 29:2, 30:20, 30:21, 31:11, 31:12, 31:16, 33:7, 35:16, 37:19, 38:14, 47:23, 48:9, 48:23,

49:4, 59:1, 62:19, 63:6, 64:12, 64:13, 65:2, 65:3, 65:6, 69:15, 69:16, 74:16, 74:19, 75:17, 76:24, 76:25, 77:15, 77:19, 77:22, 78:5, 78:6, 81:6, 81:8, 81:10, 81:14, 87:17, 89:2, 89:15, 90:5, 90:16, 93:11, 94:23, 94:25, 98:9, 100:17, 100:24, 102:15, 102:16, 103:5, 103:6, 103:13, 108:3, 110:3, 111:19, 113:6, 114:15, 114:17, 115:4
**claimed** [7] - 52:15, 54:5, 67:8, 82:13, 92:17, 109:3, 109:22
**claims** [37] - 18:24, 27:23, 33:9, 35:17, 38:14, 45:18, 46:23, 48:25, 49:2, 54:1, 57:18, 59:3, 59:9, 59:20, 60:21, 61:7, 64:8, 64:25, 65:1, 65:7, 65:21, 65:24, 69:5, 71:10, 75:24, 76:6, 76:10, 76:14, 76:18, 76:23, 77:1, 80:4, 87:7, 90:21, 91:17, 92:12, 107:2
**clarification** [1] - 115:9
**clarify** [1] - 12:14
**clarifying** [2] - 45:8, 99:23
**Clark** [1] - 8:10
**class** [2] - 32:13, 32:24
**clear** [21] - 32:4, 41:6, 45:3, 56:23, 58:21, 60:3, 61:6, 64:19, 76:20, 77:16, 78:6, 78:22, 81:20, 88:18, 93:1, 95:15, 96:11, 100:21, 103:18, 107:13, 107:14
**clearer** [1] - 114:23
**clearly** [3] - 44:10, 66:16, 73:18
**CLERK** [1] - 3:5
**click** [3] - 40:16, 67:5
**clicked** [2] - 24:2, 25:25
**clicking** [3] - 24:5, 25:24, 34:12

**clicks** [4] - 21:14, 21:17, 23:8, 23:25
**clock** [2] - 94:15, 111:2
**close** [1] - 106:23
**closes** [1] - 73:21
**clothes** [1] - 26:15
**code** [16] - 95:16, 95:18, 95:22, 95:24, 96:1, 96:2, 96:4, 96:7, 99:24, 100:3, 100:6, 100:8, 100:10, 100:15
**collecting** [1] - 71:24
**collection** [2] - 71:22, 110:1
**College** [2] - 52:20, 74:15
**column** [5] - 61:11, 71:25, 89:18, 89:25
**combination** [4] - 89:12, 90:4, 90:11, 112:6
**combinations** [1] - 82:14
**combined** [3] - 36:4, 52:2, 84:9
**combining** [1] - 13:24
**coming** [2] - 5:2, 11:4
**comment** [2] - 99:13, 110:8
**committed** [1] - 75:6
**committee** [1] - 52:21
**common** [1] - 110:4
**communicate** [5] - 17:17, 20:4, 20:9, 51:24, 52:16
**communicated** [1] - 22:8
**communicates** [1] - 21:10
**communication** [6] - 21:11, 32:20, 51:17, 52:4, 52:5, 63:22
**communications** [1] - 17:20
**community** [4] - 52:3, 52:4, 52:12, 52:20
**companies** [1] - 51:24
**company** [1] - 75:2
**company's** [1] - 36:25
**compare** [1] - 92:12
**comparison** [3] - 72:10, 104:20, 106:14
**complete** [1] - 22:23
**completed** [1] - 26:9
**completely** [1] - 3:24
**complied** [1] - 19:22
**composed** [2] - 73:12,

84:8
**comprising** [1] - 73:12
**computer** [8] - 51:19, 57:23, 63:22, 71:20, 84:25, 87:14, 87:22, 100:23
**computers** [1] - 59:5
**concede** [1] - 89:4
**concedes** [1] - 88:12
**conceding** [1] - 86:4
**concept** [2] - 75:7, 80:1, 97:23
**concepts** [2] - 91:25, 98:9
**concluded** [3] - 96:4, 107:1, 108:14
**concludes** [1] - 29:9, 90:23, 92:5
**conclusory** [1] - 49:5
**conduct** [2] - 75:6, 75:8, 75:15
**conducted** [4] - 35:18, 41:14, 45:19
**conference** [3] - 116:9, 116:12, 117:7
**configure** [1] - 21:18
**configured** [16] - 24:9, 25:10, 27:5, 27:8, 28:2, 32:6, 58:8, 59:5, 62:8, 62:10, 65:4, 87:14, 87:16, 88:6, 100:18, 111:22
**configures** [2] - 21:7, 25:20
**confirm** [6] - 25:24, 26:23, 26:25, 35:9, 45:14, 45:16
**Confirm** [10] - 23:25, 24:2, 24:5, 25:14, 25:25, 26:9, 27:2, 34:25, 35:15, 41:12
**confirmed** [2] - 85:4, 100:13
**confirming** [1] - 25:24
**conflate** [1] - 34:5
**conformance** [4] - 32:12, 32:24, 38:4, 117:6
**confusion** [1] - 32:19
**connect** [4] - 29:6, 29:7, 42:13, 79:8
**connected** [5] - 8:23, 37:6, 40:18, 63:19, 104:7
**connection** [5] - 21:23, 44:24, 47:21, 107:19, 111:9
**connectivity** [1] - 37:9
**consider** [1] - 18:9
**consideration** [1] -

79:21
**considered** [6] - 5:23, 18:9, 19:9, 76:14, 84:1, 84:9
**consistent** [3] - 87:16, 96:2, 96:5
**constitute** [3] - 35:17, 36:11, 78:12
**Construction** [3] - 5:18, 6:12, 36:23
**construction** [54] - 3:21, 4:1, 4:9, 4:10, 4:11, 4:12, 4:14, 5:6, 7:13, 8:4, 9:5, 9:8, 9:17, 9:22, 11:8, 12:7, 12:12, 12:14, 12:21, 12:23, 13:15, 13:21, 13:25, 14:21, 15:5, 16:7, 16:9, 16:14, 19:5, 24:11, 25:5, 27:18, 29:2, 30:12, 30:20, 30:21, 31:11, 31:16, 35:16, 38:15, 63:6, 80:21, 87:21, 87:23, 91:23, 93:11, 93:12, 100:17, 100:20, 113:6, 113:10, 114:16, 114:17
**constructions** [3] - 87:10, 87:12, 88:3
**construed** [8] - 64:5, 81:3, 81:18, 87:15, 88:8, 90:5, 91:16, 91:23
**consult** [1] - 116:7
**contain** [2] - 38:1, 85:7
**contained** [1] - 53:1
**contains** [1] - 62:22
**contemplated** [1] - 98:6
**content** [3] - 82:10, 97:8, 97:11
**contentions** [1] - 75:16
**contested** [2] - 11:3, 91:18
**context** [4] - 33:1, 97:12, 97:17, 98:8, 100:24, 104:17, 105:5, 105:11
**continues** [1] - 5:22
**continuously** [1] - 108:6
**contradicts** [1] - 94:3
**contrary** [5] - 11:2, 38:14, 113:15, 113:22, 113:23
**contributory** [2] -

18:25, 28:16
**conveniently** [1] - 116:10
**convention** [3] - 52:21, 52:23, 53:8
**conventional** [2] - 80:23, 80:25
**conversant** [1] - 14:1
**convert** [1] - 71:19
**converted** [1] - 24:19
**convincing** [2] - 56:24, 76:20
**cooked** [1] - 102:7
**Cool** [1] - 93:5
**copies** [1] - 62:24
**Copy** [1] - 68:6
**copy** [3] - 62:22, 64:15, 66:25
**copying** [1] - 70:17
**corner** [4] - 21:15, 34:24, 40:2, 67:24
**correct** [7] - 31:10, 54:13, 54:21, 56:13, 59:24, 100:5, 117:2
**correcting** [1] - 99:23
**corresponding** [1] - 66:14
**Counsel** [1] - 3:8
**counsel** [2] - 59:18, 105:1
**counterpart** [1] - 77:22
**counting** [1] - 94:12
**counts** [6] - 94:6, 100:24, 101:1, 101:2, 102:25, 103:1
**couple** [1] - 93:20
**coupled** [1] - 111:21
**COURT** [231] - 1:1, 3:5, 3:16, 3:20, 4:2, 4:7, 4:15, 4:17, 4:21, 5:9, 5:13, 5:16, 6:3, 6:5, 6:10, 6:13, 6:18, 6:21, 7:4, 7:8, 7:11, 7:17, 7:21, 7:25, 8:2, 8:7, 8:13, 8:18, 8:20, 8:24, 9:1, 9:4, 9:11, 9:14, 9:20, 9:25, 10:3, 10:6, 10:15, 10:19, 11:20, 11:25, 12:5, 13:1, 13:4, 13:6, 13:11, 13:16, 13:19, 13:21, 14:4, 14:8, 14:10, 14:23, 14:25, 15:3, 15:13, 15:20, 16:4, 16:15, 16:20, 17:2, 17:5, 17:9, 17:11, 17:15, 17:22, 20:24, 22:2, 28:19, 28:22, 29:12,

29:20, 29:23, 30:4, 30:8, 30:17, 31:5, 31:7, 31:13, 34:4, 34:8, 34:17, 36:1, 36:16, 36:18, 36:20, 37:16, 38:7, 38:16, 38:20, 39:4, 39:6, 39:9, 39:13, 43:5, 43:14, 44:21, 46:6, 46:11, 46:24, 47:1, 47:5, 48:12, 48:14, 48:19, 49:11, 49:14, 49:16, 49:22, 50:1, 50:4, 50:14, 50:22, 51:15, 52:25, 55:24, 57:3, 57:5, 59:22, 60:14, 60:22, 60:24, 61:3, 61:8, 61:12, 62:4, 64:17, 64:19, 64:21, 64:24, 72:1, 72:4, 72:6, 72:8, 72:12, 72:15, 72:20, 72:25, 74:1, 74:4, 74:10, 75:11, 79:24, 81:24, 82:1, 82:17, 82:19, 82:22, 82:25, 83:5, 83:19, 83:21, 84:13, 84:15, 84:20, 85:15, 85:18, 85:20, 86:7, 86:18, 87:1, 90:13, 91:2, 91:7, 91:10, 91:21, 95:21, 96:9, 96:15, 96:19, 96:22, 97:1, 97:6, 97:10, 97:20, 97:23, 98:15, 98:21, 99:2, 99:9, 99:15, 99:21, 104:11, 104:13, 104:25, 105:4, 105:9, 105:12, 105:14, 105:16, 105:20, 105:22, 106:8, 106:13, 106:16, 107:20, 108:9, 109:7, 109:11, 110:7, 110:11, 110:15, 110:18, 110:21, 111:5, 112:15, 112:19, 112:22, 113:2, 113:5, 113:24, 114:2, 114:6, 114:10, 114:12, 114:14, 114:21, 114:25, 115:5, 115:8, 115:11, 115:13, 115:15, 115:18, 115:22, 116:4, 116:10, 116:13, 116:15, 116:20

**court** [3] - 11:2, 12:11, 12:17
**Court** [51] - 1:23, 3:21, 4:10, 5:3, 5:25, 6:16, 6:22, 11:7, 14:18, 15:9, 15:11, 18:23, 28:20, 42:24, 44:13, 47:23, 62:5, 75:19, 75:20, 80:24, 81:6, 81:21, 86:25, 87:10, 87:12, 87:15, 87:23, 88:9, 88:14, 88:19, 88:25, 90:6, 91:16, 91:17, 91:22, 91:24, 92:2, 93:1, 93:12, 93:20, 95:19, 95:23, 97:3, 99:6, 99:12, 110:2, 110:14, 116:25, 117:10
**Court's** [17] - 5:6, 8:4, 9:8, 16:19, 19:5, 24:11, 25:5, 27:18, 29:2, 30:12, 31:11, 31:16, 35:16, 36:23, 79:20, 97:22, 113:10
**cover** [6] - 6:23, 38:14, 52:23, 91:14, 93:24, 113:15
**covered** [10] - 16:13, 27:16, 27:23, 47:16, 75:2, 86:17, 103:8, 107:2, 114:11, 114:12
**covers** [1] - 9:7
**Craig** [1] - 3:10
**CRAIG** [1] - 2:4
**craig.summers@ kmob.com** [1] - 2:8
**create** [3] - 69:10, 69:12, 111:22
**created** [1] - 90:2
**creating** [1] - 64:9
**credence** [1] - 90:20
**credibly** [1] - 11:6
**criminal** [1] - 115:19
**critical** [1] - 14:5
**criticizing** [1] - 12:16
**CRR** [1] - 1:22
**CSR** [2] - 1:22, 117:10
**CT** [9] - 18:11, 23:15, 23:13, 25:13, 25:15, 40:21, 40:22, 41:1, 70:16
**cued** [1] - 34:16
**cumulative** [1] - 11:5
**current** [2] - 73:12, 109:5
**custom** [1] - 80:10
**customer** [1] - 68:19
**customers** [4] - 19:1,

28:17, 29:6, 86:1
**cycles** [2] - 103:21, 108:8
**cycling** [1] - 101:10
**Cyrus** [2] - 66:19, 85:8

# D

**D.C** [1] - 93:21
**data** [103] - 4:6, 5:7, 5:12, 5:14, 5:15, 5:16, 5:17, 5:20, 5:22, 5:25, 6:6, 6:20, 6:23, 7:14, 9:7, 11:10, 16:9, 16:10, 19:5, 20:23, 25:8, 25:11, 25:12, 26:7, 26:9, 27:8, 27:18, 28:2, 28:4, 28:6, 28:8, 28:9, 28:10, 28:11, 31:16, 31:25, 32:17, 33:11, 33:12, 33:21, 36:8, 36:22, 37:3, 37:4, 37:25, 38:2, 39:2, 39:3, 39:12, 42:9, 42:18, 42:19, 44:4, 44:25, 45:4, 47:12, 51:6, 53:2, 53:5, 58:9, 58:12, 62:8, 62:11, 65:5, 65:7, 66:14, 66:16, 69:20, 70:25, 71:1, 71:5, 71:13, 71:18, 71:22, 80:2, 80:3, 81:11, 81:16, 81:17, 83:13, 86:13, 86:14, 86:21, 90:18, 91:20, 101:14, 101:22, 103:7, 103:11, 104:9, 106:4, 111:14, 113:15
**database** [58] - 5:5, 17:18, 18:3, 20:2, 20:3, 20:8, 20:9, 20:11, 27:5, 27:7, 27:13, 29:2, 29:5, 29:7, 37:4, 37:6, 37:8, 37:9, 39:1, 39:3, 39:7, 39:10, 42:12, 44:9, 44:10, 45:6, 46:19, 47:15, 51:4, 52:1, 54:19, 62:8, 62:11, 65:9, 65:11, 65:14, 65:15, 65:17, 66:10, 66:11, 68:10, 73:15, 73:17, 77:24, 81:15, 86:9, 86:10, 86:12, 86:13, 86:14, 89:10, 90:19,

103:20, 104:1, 107:25, 111:21, 111:23
**databases** [29] - 19:24, 20:2, 20:4, 27:11, 29:3, 29:4, 37:8, 41:7, 41:13, 42:14, 44:5, 44:7, 44:8, 45:4, 45:6, 47:13, 47:14, 51:4, 52:6, 52:17, 67:9, 67:13, 67:18, 67:24, 70:24, 71:8, 71:10, 73:3
**DatCard** [21] - 3:6, 3:11, 4:12, 27:16, 59:18, 62:5, 76:2, 77:6, 77:11, 78:1, 78:4, 78:9, 87:3, 88:4, 93:2, 93:11, 100:19, 111:8, 113:1, 113:14, 113:22
**DATCARD** [1] - 1:8
**DatCard's** [14] - 26:8, 28:15, 33:19, 38:24, 42:11, 59:18, 85:23, 87:16, 92:8, 96:1, 100:11, 100:21, 106:25, 112:7
**date** [9] - 57:11, 65:16, 65:20, 69:22, 73:14, 90:17, 101:17, 115:17, 115:23
**Date** [1] - 117:10
**dates** [4] - 116:1, 116:5, 116:9, 116:11
**de** [2] - 71:15
**deal** [3] - 76:24, 86:21, 105:6
**dealing** [1] - 96:8
**December** [1] - 115:17
**decide** [7] - 26:16, 36:10, 44:20, 45:14, 48:7, 73:7, 75:22
**decided** [4] - 52:12, 60:2, 81:6, 81:7
**decides** [1] - 15:10
**decision** [2] - 11:9, 93:5
**decisions** [1] - 75:18
**declaration** [7] - 20:12, 32:1, 57:15, 58:3, 58:5, 101:8, 103:18
**Default** [1] - 22:11
**default** [5] - 22:13, 22:20, 23:21, 25:21, 47:7
**defeated** [1] - 11:1

**DEFENDANT** [1] - 2:11

**defendant** [2] - 1:13, 3:14

**define** [1] - 100:18

**defined** [3] - 11:10, 34:1, 64:1

**defines** [1] - 104:23

**definitions** [1] - 17:23

**delay** [1] - 64:23

**demographic** [1] - 16:12

**demographics** [2] - 5:24, 69:9

**demonstrated** [2] - 37:23, 59:12

**denied** [1] - 10:23

**DENNIS** [1] - 2:13

**Dennis** [1] - 3:15

**deny** [1] - 48:4

**department** [1] - 80:9

**dependent** [4] - 64:8, 65:1, 65:7, 90:16

**deposit** [1] - 117:6

**deposition** [11] - 11:21, 19:15, 41:16, 54:9, 56:6, 79:5, 83:12, 92:14, 94:2, 94:3, 96:3

**describe** [1] - 106:14

**described** [12] - 10:20, 33:23, 41:8, 44:7, 63:21, 66:13, 92:17, 92:24, 93:25, 100:15, 107:24

**describes** [5] - 32:11, 84:18, 87:7, 96:2, 109:13

**description** [6] - 82:10, 92:16, 93:16, 100:14, 107:7, 110:24

**descriptive** [1] - 79:16

**deselect** [1] - 47:8

**design** [4] - 54:7, 112:2, 112:12, 112:13

**designated** [1] - 92:15

**designed** [9] - 7:3, 32:16, 32:23, 57:24, 57:25, 71:22, 73:19, 84:23, 85:5

**destination** [2] - 68:1, 69:23

**detail** [2] - 32:3, 103:9

**details** [1] - 5:3

**detected** [9] - 92:22, 94:22, 94:23, 94:24, 95:2, 102:18, 103:4, 103:17, 107:9

**detecting** [1] - 91:19

**detection** [9] - 92:1, 92:2, 92:3, 92:4, 103:22, 104:8, 111:17

**detects** [5] - 92:20, 103:19, 103:25, 108:5, 111:23

**deter** [1] - 107:25

**determinations** [1] - 82:5

**determine** [1] - 97:18

**determining** [1] - 82:12

**developed** [1] - 66:3

**developing** [1] - 75:4

**device** [11] - 54:1, 66:21, 67:11, 67:21, 68:11, 73:19, 83:7, 83:11, 89:17, 109:14

**devices** [2] - 51:24, 63:23

**devise** [1] - 63:24

**diagnostic** [6] - 18:3, 19:11, 27:17, 30:15, 38:12, 115:2

**dialogue** [11] - 16:8, 26:22, 34:22, 35:9, 35:15, 39:23, 45:13, 66:8, 70:2, 70:4, 70:7

**DICOM** [54] - 6:6, 7:2, 7:5, 7:10, 7:15, 7:16, 9:23, 11:4, 17:17, 17:19, 17:24, 17:25, 18:4, 18:6, 18:8, 19:9, 19:13, 19:21, 19:22, 20:5, 20:9, 21:9, 21:11, 21:22, 21:23, 22:8, 24:14, 24:16, 24:20, 24:23, 24:25, 27:21, 32:20, 33:19, 33:22, 33:25, 41:21, 42:2, 42:5, 51:9, 52:2, 52:7, 52:12, 52:14, 52:21, 58:10, 63:23, 64:1, 66:18, 68:18, 74:13, 74:19, 115:2

**difference** [4] - 50:16, 53:10, 55:5, 55:10

**Differences** [1] - 43:13

**differences** [4] - 82:12, 86:12, 109:22, 109:23

**different** [19] - 7:18, 11:12, 44:20, 26:13, 41:13, 41:20, 42:21, 44:25, 45:25, 46:17, 50:19, 51:13, 53:4,

**detecting** [1] - 91:19

**detection** [9] - 92:1,
67:25, 69:12, 83:24, 85:8, 89:22, 100:3

**differently** [1] - 116:4

**differs** [1] - 94:1

**difficult** [1] - 76:20

**dig** [1] - 5:3

**digest** [1] - 14:19

**digital** [2] - 17:19, 52:9

**digitized** [2] - 51:17, 52:10

**direct** [2] - 19:1, 28:17

**directed** [4] - 4:13, 19:2, 75:25, 81:10

**direction** [1] - 26:3

**directly** [4] - 68:13, 97:13, 108:25, 114:15

**directories** [1] - 85:6

**directory** [4] - 85:9, 85:11, 85:13, 106:3

**disagree** [3] - 19:10, 97:2, 105:2

**disagreement** [1] - 95:25

**disagrees** [1] - 109:10

**Disc** [2] - 55:25, 74:14, 74:19

**disc** [39] - 24:1, 24:5, 24:6, 25:3, 25:22, 27:20, 27:21, 28:3, 28:10, 33:4, 33:5, 39:18, 41:15, 41:21, 48:3, 53:10, 53:11, 53:15, 74:25, 75:8, 81:4, 86:3, 87:20, 88:12, 88:13, 89:1, 89:2, 89:9, 89:11, 89:12, 89:19, 90:2, 90:3, 92:23, 94:19, 97:13

**disc-by-disc** [1] - 88:13

**disclose** [4] - 79:6, 79:7, 80:1, 80:18

**disclosed** [8] - 58:6, 61:23, 77:10, 77:12, 77:18, 79:23, 81:19, 111:16

**disclosing** [1] - 75:7

**disclosure** [1] - 7:6

**disclosures** [1] - 77:10

**discovered** [1] - 10:13

**discovery** [1] - 75:16

**discuss** [3] - 19:11, 19:21, 71:14

**discussed** [15] - 25:9, 33:15, 47:20, 51:2, 54:18, 59:17, 60:8,
60:9, 71:7, 73:10, 81:9, 81:15, 88:6, 88:24, 108:2

**discusses** [1] - 63:3

**discussing** [8] - 12:10, 33:19, 51:9, 60:12, 77:21, 84:17, 93:5, 111:11

**discussion** [7] - 14:6, 25:6, 34:2, 42:23, 80:13, 83:22, 99:17

**Discussion** [2] - 47:2, 64:20

**disks** [4] - 89:5, 89:7, 89:22, 89:24

**display** [2] - 7:3, 55:16

**displayed** [6] - 10:12, 20:19, 23:12, 26:21, 68:5, 74:14

**dispute** [8] - 6:16, 9:6, 32:25, 36:12, 50:6, 70:23, 95:17, 100:6

**disputed** [2] - 44:19, 93:16

**disrupt** [1] - 116:6

**distinct** [3] - 20:1, 42:15, 86:9

**distributed** [2] - 52:23, 52:24

**distribution** [1] - 58:11

**DISTRICT** [2] - 1:1, 1:2

**District** [2] - 93:21

**divided** [1] - 12:17

**Docket** [2] - 33:2, 37:23

**docket** [1] - 107:23

**Doctrine** [19] - 42:22, 42:25, 43:3, 43:10, 43:12, 43:19, 43:22, 43:23, 44:14, 44:17, 46:13, 48:11, 48:22, 48:24, 49:2, 49:4, 49:13, 50:15, 96:14

**doctrine** [1] - 79:15

**document** [14] - 33:23, 49:8, 61:15, 67:23, 77:5, 77:17, 78:7, 78:8, 83:23, 90:10, 107:3, 107:22, 109:14, 111:9

**Document** [1] - 41:24

**documents** [5] - 66:14, 66:16, 71:18, 85:8, 85:10

**done** [18] - 12:1, 12:15, 12:22, 21:4, 23:18, 25:17, 27:3, 29:25, 36:4, 39:25,
40:19, 47:8, 83:14, 84:22, 93:8, 102:1

**doubt** [2] - 48:6, 99:3

**Doug** [4] - 23:3, 25:13, 39:20, 40:19

**Douglas** [1] - 23:14

**down** [11] - 15:4, 21:15, 37:12, 40:16, 45:11, 46:11, 53:22, 90:1, 100:25, 101:2

**downloaded** [2] - 54:14, 67:18

**dozen** [1] - 84:4

**Dr** [9] - 48:14, 49:10, 51:8, 66:3, 66:25, 79:2, 79:5, 85:4, 90:10

**dragged** [1] - 84:25

**drawing** [1] - 67:12

**drop** [2] - 21:15, 40:16

**drop-down** [2] - 21:15, 40:16

**during** [14] - 21:10, 22:12, 22:14, 23:19, 25:21, 41:11, 57:14, 58:18, 59:19, 76:15, 76:16, 77:4, 79:5, 96:3

**dwell** [2] - 15:13, 18:20

**E**

**E-film** [21] - 54:15, 54:19, 54:23, 55:1, 55:4, 55:8, 55:10, 55:11, 55:12, 55:14, 55:18, 55:20, 56:12, 57:11, 58:19, 75:3, 75:12, 75:13, 75:15

**E0** [1] - 73:12

**E1** [1] - 73:12

**E2** [2] - 73:13, 73:14

**E3** [1] - 73:13

**early** [2] - 12:15, 52:12

**ease** [1] - 104:23

**easier** [2] - 18:16, 64:16

**easiest** [1] - 61:4

**easy** [1] - 52:5

**effectively** [1] - 94:21

**effort** [1] - 52:3

**eight** [1] - 91:17

**either** [10] - 3:23, 4:1, 11:18, 12:21, 33:16, 42:21, 89:12, 90:4, 95:2, 108:1

**elapsed** [1] - 94:17

**elapses** [1] - 102:3

electronic [1] - 41:1
element [2] - 28:25, 29:1
elements [3] - 33:20, 47:24, 81:18
Elmo [1] - 83:18
Email [2] - 2:8, 2:16
enable [1] - 79:7
encounter [1] - 56:8
end [4] - 10:5, 16:23, 30:12, 99:6
ended [1] - 84:17
enlargement [1] - 9:16
enter [4] - 10:14, 21:23, 23:1, 81:21
entered [1] - 40:16
entirely [5] - 29:17, 34:22, 46:22, 101:15, 102:11
entities [1] - 17:18
entitled [2] - 3:25, 89:18
entries [1] - 100:12
Entry [2] - 33:2, 37:23
entry [3] - 21:16, 107:3, 107:22
equally [1] - 12:17
equivalent [4] - 27:13, 53:13, 106:2, 106:5
equivalents [2] - 44:1, 44:18
Equivalents [19] - 42:23, 43:1, 43:3, 43:11, 43:13, 43:19, 43:22, 43:23, 44:15, 44:17, 46:14, 48:11, 48:22, 48:24, 49:3, 49:5, 49:13, 50:16, 96:14
errata [1] - 99:23
error [2] - 9:15, 9:18
escaped [1] - 35:23
especially [3] - 57:24, 71:22, 109:5
essential [1] - 11:9
essentially [10] - 51:3, 53:25, 55:18, 58:15, 59:8, 63:21, 69:4, 70:8, 86:4, 89:1
established [1] - 57:10
evaluation [1] - 78:16
everywhere [1] - 71:17
evidence [36] - 4:13, 4:15, 4:17, 4:18, 4:19, 7:3, 8:11, 10:10, 10:12, 10:16, 11:5, 11:17, 11:22, 12:2, 14:17, 15:8,

15:12, 15:15, 17:7, 19:14, 19:20, 27:6, 29:3, 29:17, 38:3, 48:2, 56:24, 76:20, 92:25, 93:9, 93:13, 93:14, 112:10
evidentiary [1] - 17:8
ex [2] - 10:22, 15:8
exact [1] - 107:18
exactly [3] - 84:22, 92:17, 93:10
exam [1] - 59:16, 59:19, 59:24
Exam [1] - 73:16
Examination [1] - 61:14
examination [3] - 73:12, 77:4, 111:8
examine [1] - 5:23, 78:14
examiner [6] - 56:21, 57:16, 59:20, 60:4, 78:13, 78:16
examining [1] - 78:10
example [11] - 17:18, 29:19, 41:14, 46:18, 57:9, 60:25, 61:11, 63:9, 64:12, 65:9, 73:11
examples [1] - 29:18
except [1] - 83:2
excerpt [2] - 22:18, 41:16
excerpts [1] - 19:21
exchanges [1] - 59:18
exclude [2] - 15:10, 82:6
excludes [1] - 94:25
excluding [1] - 19:6
excuse [5] - 43:7, 48:12, 72:3, 92:9, 105:21
Exhibit [37] - 20:11, 32:1, 32:10, 32:11, 33:2, 34:11, 37:23, 38:5, 41:24, 49:18, 49:20, 49:25, 51:8, 52:22, 56:6, 57:15, 58:14, 60:17, 62:1, 63:15, 66:2, 67:4, 67:12, 68:7, 70:4, 70:13, 71:14, 73:2, 83:25, 85:25, 90:10, 100:10, 100:11, 100:12, 100:14, 104:22, 107:3
exhibit [7] - 60:20, 72:15, 78:21, 83:17, 83:24, 83:25, 107:22
exhibits [1] - 104:9

exist [1] - 56:16
existing [2] - 58:7, 116:11
expect [2] - 17:12, 71:1
experience [1] - 53:3
expert [16] - 33:19, 79:2, 82:7, 85:23, 86:10, 90:8, 90:9, 96:1, 96:4, 100:2, 100:11, 106:25, 108:14, 109:10, 109:15, 112:7
experts [3] - 95:24, 95:25, 99:24
expires [2] - 92:3, 94:11
explain [4] - 10:13, 16:1, 40:7, 61:20
explained [2] - 32:2, 59:17, 81:1, 81:3
explains [3] - 37:18, 57:16, 101:9
explanation [1] - 72:23
explicitly [1] - 28:5
expressed [2] - 7:6, 82:6
expressly [2] - 79:6, 81:18
extent [2] - 49:7, 60:17
eye [1] - 9:21

## F

face [1] - 111:1
facilities [2] - 20:4, 86:5
fact [11] - 13:13, 21:5, 32:10, 44:18, 48:7, 62:17, 79:18, 93:17, 95:7, 96:7, 96:9
factor [2] - 82:11
factors [1] - 86:17
facts [1] - 95:9
factual [1] - 82:5
fair [6] - 14:19, 55:22, 55:23, 56:12, 93:9, 96:16
fairly [1] - 88:25
falls [1] - 21:15
familiar [2] - 87:12, 88:25
far [1] - 58:6
fast [3] - 21:25, 22:2, 116:18
fatally [1] - 82:9
favor [3] - 88:4, 93:2,

95:10
Fax [2] - 2:8, 2:15
feature [2] - 70:19, 88:12
features [1] - 69:3
Federal [1] - 1:23
fee [1] - 117:5
feelings [1] - 12:20
fees [1] - 117:5
felt [1] - 100:4
few [1] - 83:15
fictitious [2] - 8:21, 53:2
field [1] - 42:4
fighting [2] - 12:9
figure [2] - 14:20, 73:2
Figure [1] - 53:18
figures [1] - 74:5
file [7] - 17:23, 35:22, 76:2, 84:25, 85:2, 106:1, 107:15
filed [3] - 54:2, 59:14, 77:3
files [1] - 64:1, 105:25, 106:1
film [27] - 51:10, 51:12, 52:8, 53:21, 54:15, 54:19, 54:23, 55:1, 55:4, 55:8, 55:10, 55:11, 55:12, 55:14, 55:18, 55:20, 56:12, 57:11, 58:19, 75:3, 75:12, 75:13, 75:15, 108:22
films [1] - 51:13
filter [1] - 70:15
final [6] - 12:12, 13:22, 27:14, 47:17, 62:19, 72:24
finally [4] - 26:25, 48:10, 86:8, 86:16
fine [4] - 60:24, 64:19, 99:15, 112:11
fingerprints [1] - 48:17
finish [1] - 113:5
finished [3] - 30:2, 43:2, 94:11
first [31] - 3:20, 4:19, 18:22, 21:3, 22:25, 23:1, 26:2, 27:7, 30:25, 39:1, 39:10, 40:25, 54:5, 56:10, 61:5, 62:6, 68:16, 71:13, 75:17, 87:13, 88:5, 88:8, 90:25, 92:14, 94:6, 99:16, 102:16, 103:4, 103:15, 110:23
fits [2] - 98:22, 98:25

five [5] - 8:13, 40:23, 74:12, 78:22, 94:4
five-step [1] - 94:4
flatly [1] - 94:3
flawed [1] - 82:9
Floor [1] - 2:6
focus [2] - 75:21, 76:10
focused [2] - 74:13, 104:18
focusing [1] - 103:14
folder [2] - 73:12, 73:13
folks [1] - 52:21
follow [3] - 10:24, 90:23, 114:13
followed [1] - 95:12
following [2] - 28:2, 97:21
follows [1] - 23:8
footing [1] - 83:10
foregoing [1] - 117:2
forever [1] - 108:23
form [3] - 6:6, 7:5, 45:23
format [76] - 5:8, 5:21, 6:1, 6:24, 7:2, 7:10, 7:16, 9:10, 9:24, 11:11, 18:4, 18:6, 18:8, 19:4, 19:7, 19:9, 19:12, 19:21, 20:5, 24:20, 24:23, 24:25, 25:2, 27:21, 27:22, 28:5, 28:7, 28:12, 31:19, 31:20, 31:21, 31:23, 32:4, 32:7, 32:9, 32:14, 32:16, 32:18, 32:20, 32:22, 33:2, 33:6, 33:10, 33:11, 33:12, 33:14, 33:21, 33:22, 33:25, 36:9, 36:11, 36:13, 36:25, 37:7, 37:22, 38:4, 38:6, 41:19, 41:21, 58:10, 71:19, 103:12, 113:12, 113:13, 113:14, 113:17, 114:9, 114:20, 115:3
formats [1] - 17:23
formatted [16] - 5:7, 5:20, 6:1, 6:24, 7:1, 9:9, 17:24, 19:4, 19:12, 33:3, 42:2, 42:5, 113:11, 113:16, 114:6, 114:8
forth [5] - 5:24, 17:24, 19:10, 25:17, 82:8
forward [3] - 60:11, 93:13, 93:14

**fought** [1] - 57:19
**foundation** [2] - 21:2, 52:15
**four** [3] - 48:24, 62:6, 81:13
**fourth** [1] - 37:12, 38:9, 108:3
**frankly** [1] - 89:13
**free** [1] - 54:11
**front** [2] - 72:15, 74:6
**Fuel** [1] - 93:5
**Fuji** [1] - 51:23
**full** [2] - 49:6, 93:9
**fully** [1] - 59:12
**function** [13] - 43:4, 44:2, 49:6, 50:19, 54:17, 92:7, 92:12, 95:3, 105:11, 105:13, 105:18, 105:19, 106:18
**function-way-result** [3] - 43:4, 49:6, 50:19
**functioning** [1] - 92:16
**functions** [3] - 41:8, 92:13, 95:7
**future** [1] - 53:21

**G**

**game** [1] - 10:25
**GE** [2] - 51:23, 51:25
**generally** [2] - 13:12, 17:25
**generated** [1] - 27:8
**genuine** [2] - 8:5, 95:6
**given** [5] - 35:7, 45:12, 56:23, 79:19, 83:17
**Goldberg** [2] - 100:11, 106:25
**grabbed** [2] - 85:2, 85:14
**grabs** [1] - 24:3
**grand** [2] - 82:11, 86:17
**grant** [3] - 88:14, 88:19, 93:1
**granted** [1] - 76:14
**granting** [1] - 93:6
**graphics** [1] - 64:7
**grasp** [1] - 86:22
**great** [4] - 51:9, 98:2, 105:6, 106:18
**grounds** [1] - 50:17
**guess** [8] - 4:4, 30:23, 53:12, 63:5, 72:22, 86:8, 86:16, 114:7
**gut** [4] - 98:13, 98:15, 110:8, 110:10

**guys** [1] - 68:21

**H**

**half** [1] - 78:20
**hand** [4] - 21:15, 67:24, 78:4, 104:12
**handed** [2] - 53:4, 53:6, 53:15
**handing** [1] - 104:11
**handle** [1] - 78:14
**handling** [1] - 17:21
**handout** [2] - 18:14, 18:18
**happy** [1] - 99:13
**hard** [1] - 15:25
**header** [4] - 16:11, 16:24, 16:25, 40:2
**headers** [2] - 7:15, 30:15
**hear** [5] - 12:20, 30:7, 71:2, 75:25, 99:9
**heard** [10] - 29:16, 74:21, 75:3, 75:5, 75:18, 75:23, 77:3, 83:16, 99:10, 105:8
**HEARING** [2] - 1:16, 3:3
**hearing** [4] - 4:25, 11:23, 18:19, 112:23
**Heartlab** [11] - 67:11, 67:21, 67:23, 68:7, 68:11, 68:17, 68:22, 69:4, 69:8, 69:20, 83:16
**heavily** [1] - 77:13
**heavy** [1] - 76:19
**held** [1] - 92:2
**help** [2] - 68:21, 78:13
**helpful** [3] - 5:3, 91:25, 114:24
**helps** [2] - 11:18, 104:24
**Henderson** [1] - 3:15
**HENDERSON** [1] - 2:17
**hereby** [1] - 117:2
**highlighting** [1] - 58:23
**highlights** [1] - 106:19
**himself** [1] - 54:7
**HIPAA** [2] - 65:24, 65:25, 87:5, 87:6, 112:18
**history** [2] - 51:7, 51:10
**hit** [8] - 25:14, 26:25, 27:2, 34:25, 35:6, 41:12, 66:11, 68:6

**hits** [1] - 41:9
**hitting** [3] - 34:13, 35:15, 68:4
**HOLBROW** [92] - 2:12, 3:13, 16:6, 16:18, 16:21, 17:4, 17:6, 29:25, 30:10, 30:19, 31:6, 31:10, 31:15, 34:5, 34:9, 34:19, 35:22, 35:25, 36:2, 36:17, 36:19, 36:21, 37:17, 38:9, 38:18, 44:23, 46:7, 46:13, 46:25, 50:3, 50:5, 50:15, 50:24, 51:16, 53:1, 55:25, 57:4, 57:6, 59:23, 60:15, 60:23, 60:25, 61:4, 61:9, 61:13, 62:5, 64:18, 64:23, 64:25, 69:25, 72:3, 72:5, 72:7, 72:11, 72:14, 72:18, 72:22, 73:1, 74:3, 84:16, 84:21, 85:16, 85:19, 85:21, 86:8, 86:19, 99:16, 99:22, 104:12, 104:14, 105:2, 105:8, 105:13, 105:15, 105:17, 105:21, 105:23, 106:9, 106:14, 106:17, 107:21, 108:10, 111:7, 112:17, 112:20, 112:24, 113:4, 115:14, 115:16, 115:21, 115:24, 116:24
**Holbrow** [7] - 3:14, 74:12, 90:24, 96:18, 109:12, 109:18, 116:19
**hold** [4] - 14:15, 30:25, 58:17, 65:25
**holding** [1] - 93:22
**holds** [1] - 43:1
**home** [1] - 55:21
**Honor** [99] - 3:10, 3:13, 3:19, 3:25, 4:23, 6:8, 6:12, 7:20, 7:24, 8:15, 8:22, 9:3, 10:23, 11:10, 11:12, 15:21, 17:4, 17:10, 17:14, 18:14, 18:21, 19:15, 20:15, 21:5, 21:25, 22:10, 22:22, 26:5, 29:16, 30:10, 30:23, 31:2, 35:22, 35:25, 36:17, 38:18,

38:19, 38:23, 39:5, 39:8, 40:1, 42:4, 43:8, 47:18, 48:10, 48:17, 48:20, 49:17, 49:18, 49:20, 50:20, 50:24, 58:13, 60:15, 64:15, 64:23, 74:3, 75:13, 76:13, 77:15, 82:4, 83:1, 83:18, 84:14, 86:24, 90:14, 90:22, 91:6, 91:9, 91:12, 91:13, 91:22, 94:8, 96:16, 96:21, 97:3, 97:5, 97:9, 97:21, 97:24, 98:18, 99:3, 99:11, 99:16, 104:12, 105:10, 109:9, 110:9, 110:17, 110:19, 111:4, 111:6, 111:7, 113:1, 113:4, 115:10, 115:14, 116:19, 116:24
**HONORABLE** [1] - 1:4
**hope** [2] - 12:23, 13:1
**Horii** [4] - 49:10, 51:8, 79:2, 79:5
**Hospital** [1] - 68:19
**hospital** [3] - 51:12, 71:18, 86:1
**hospitals** [2] - 69:11, 71:23
**hotly** [1] - 91:18
**HTML** [8] - 25:2, 27:22, 33:1, 33:3, 36:13, 37:22, 46:22, 71:19
**Huerga** [2] - 71:15
**hurdle** [1] - 11:14
**hurt** [1] - 12:20

**I**

**ID** [17] - 65:16, 65:20, 68:3, 88:13, 88:21, 88:23, 88:25, 89:1, 89:2, 89:6, 89:13, 89:19, 89:20, 89:21, 90:4
**idea** [1] - 10:25
**identification** [3] - 10:2, 87:21, 101:17
**identifications** [1] - 8:9
**identified** [5] - 32:23, 50:17, 68:24, 78:23, 82:15
**identifier** [4] - 87:24, 88:1, 88:11, 88:14

**identifies** [3] - 38:5, 60:7, 88:23
**identify** [4] - 61:22, 89:6, 89:11, 90:3
**identifying** [3] - 5:16, 5:17, 69:19
**III** [1] - 2:12
**illustrated** [2] - 61:2, 89:16
**image** [69] - 4:5, 5:15, 6:23, 9:7, 16:9, 16:10, 16:11, 16:12, 16:13, 16:24, 17:1, 18:6, 18:9, 18:10, 23:5, 26:7, 26:9, 27:8, 28:4, 28:6, 33:20, 34:1, 36:22, 37:3, 37:8, 39:2, 42:19, 44:4, 51:6, 51:20, 53:2, 53:5, 54:23, 54:24, 55:19, 55:21, 58:9, 58:11, 62:7, 62:8, 65:5, 66:10, 67:3, 69:20, 80:3, 80:9, 81:11, 81:16, 86:13, 86:14, 87:25, 91:20, 92:19, 92:20, 92:22, 94:9, 94:13, 94:18, 97:13, 97:18, 101:14, 101:16, 103:7, 111:14, 113:15
**images** [126] - 5:5, 5:14, 5:24, 10:5, 10:7, 17:25, 18:1, 18:5, 19:9, 19:13, 24:1, 24:3, 24:4, 25:22, 25:23, 26:1, 30:14, 30:15, 31:17, 31:25, 32:8, 32:9, 32:15, 32:17, 32:22, 33:19, 33:22, 34:6, 34:12, 34:15, 34:25, 35:5, 35:6, 37:10, 37:11, 38:1, 38:2, 39:18, 39:22, 39:24, 41:7, 41:18, 41:20, 42:1, 42:6, 42:8, 44:9, 45:10, 45:21, 46:4, 46:20, 46:21, 47:14, 47:15, 51:18, 52:10, 53:23, 54:14, 54:20, 55:15, 55:16, 56:3, 57:12, 58:1, 59:7, 62:15, 62:18, 62:21, 62:22, 63:2, 63:11, 63:23, 63:25, 64:11, 65:18, 66:10, 66:12, 66:17, 66:22, 66:23, 66:24, 67:1,

67:5, 67:10, 67:15, 67:17, 67:25, 68:4, 68:5, 68:6, 68:9, 68:14, 69:1, 69:2, 70:6, 70:10, 70:14, 70:24, 71:8, 71:9, 71:18, 73:9, 73:10, 73:20, 73:23, 73:25, 80:2, 80:10, 84:18, 85:3, 85:10, 97:18, 101:22, 101:24, 102:5, 104:3, 104:5, 108:22, 108:25
**imagine** [1] - 89:23
**imaging** [53] - 5:7, 5:21, 6:1, 6:24, 7:2, 7:10, 9:10, 9:24, 11:11, 17:19, 17:21, 19:4, 19:7, 19:12, 27:9, 28:5, 28:7, 28:12, 31:18, 31:20, 31:23, 32:7, 32:14, 32:18, 32:22, 33:6, 33:12, 33:14, 33:21, 33:22, 33:25, 36:8, 36:11, 36:13, 36:24, 37:22, 38:4, 41:19, 58:10, 59:6, 62:24, 80:5, 86:2, 86:3, 103:12, 104:8, 113:12, 113:13, 113:17, 114:9, 114:20, 115:3
**impact** [1] - 85:16
**impacting** [1] - 101:6
**implemented** [1] - 87:14
**importance** [1] - 37:20
**important** [7] - 14:2, 20:8, 38:10, 41:25, 42:17, 98:14, 101:4
**impression** [2] - 3:21, 3:22
**inappropriately** [1] - 75:10
**INC** [2] - 1:8, 1:12
**Inc** [2] - 3:6, 3:7
**incentive** [1] - 11:15
**Include** [4] - 22:11, 23:17, 25:16, 25:20
**include** [12] - 5:22, 7:14, 7:15, 16:11, 22:5, 22:21, 30:14, 32:22, 39:22, 41:11, 68:10
**included** [5] - 22:20, 38:13, 70:19, 114:3, 114:18
**includes** [13] - 17:23, 22:12, 34:1, 41:10,

55:8, 62:7, 62:8, 62:9, 62:10, 62:24, 65:6, 67:12, 88:21
**including** [2] - 88:20, 111:21
**inclusive** [1] - 5:23
**incoming** [2] - 105:25, 107:15
**inconceivable** [1] - 86:1
**inconsistency** [2] - 78:3, 80:18
**incorrectly** [1] - 116:1
**independent** [6] - 33:9, 48:25, 78:16, 91:17, 102:11, 103:22
**individual** [4] - 87:24, 88:2, 89:6, 89:11
**individually** [1] - 84:1
**inequitable** [3] - 75:6, 75:8, 75:14
**information** [13] - 6:7, 10:2, 10:5, 16:12, 17:21, 42:8, 64:7, 65:10, 69:9, 69:19, 70:9, 70:16, 101:18
**infringe** [7] - 36:6, 46:10, 46:15, 46:16, 50:18, 88:18, 106:25
**infringed** [2] - 35:19, 88:15
**infringement** [35] - 13:25, 20:25, 21:2, 24:10, 24:24, 30:1, 42:24, 42:25, 43:12, 43:17, 43:18, 43:19, 43:21, 43:22, 43:25, 44:16, 46:9, 49:1, 67:17, 76:8, 88:5, 90:22, 90:24, 91:9, 92:8, 92:9, 92:10, 93:3, 95:3, 95:9, 96:10, 104:15, 108:11, 110:13, 112:14
**infringer** [2] - 18:25, 28:16
**infringers** [2] - 19:1, 28:17
**infringes** [3] - 36:3, 67:20, 106:21
**inherency** [1] - 79:15
**inherent** [5] - 79:12, 79:14, 79:23, 85:23, 86:5
**inherently** [1] - 81:19
**inherit** [1] - 80:15
**initial** [12] - 21:3, 21:11, 21:19, 22:12,

22:14, 22:22, 23:19, 25:21, 26:20, 34:19, 35:5, 41:11
**initiate** [1] - 68:4
**initiated** [4] - 85:1, 94:5, 103:16, 103:17
**initiating** [1] - 111:23
**ink** [1] - 50:12
**input** [4] - 68:23, 69:17, 69:18, 73:9
**insert** [1] - 67:3
**inserted** [2] - 31:3, 31:10
**inserting** [1] - 36:23
**installed** [4] - 53:14, 53:19, 59:2, 59:4
**instance** [1] - 89:21
**instantly** [1] - 108:6
**instead** [1] - 108:6
**instinct** [3] - 98:15, 110:8, 110:10
**instincts** [1] - 98:13
**instructions** [1] - 13:22
**Insubstantial** [1] - 43:13
**insubstantial** [1] - 86:12
**insufficient** [2] - 43:23, 44:15
**interested** [5] - 12:8, 68:19, 91:3, 110:14, 112:22
**interesting** [3] - 53:16, 68:17, 73:8
**interface** [1] - 87:14
**interpretation** [1] - 95:2
**interpreted** [1] - 16:18
**interval** [7] - 91:25, 92:3, 92:5, 103:15, 103:21, 107:11, 108:1
**intervention** [2] - 34:24, 35:17
**interview** [1] - 60:7
**interviews** [1] - 60:2
**intimately** [1] - 51:8
**intro** [1] - 62:21
**introduced** [1] - 91:24
**invalid** [1] - 74:19
**invalidate** [2] - 74:16, 75:17
**invalidity** [13] - 45:1, 51:1, 56:24, 73:21, 75:13, 75:16, 75:19, 76:3, 96:17, 96:20, 108:12, 112:20, 112:21
**Invalidity** [3] - 50:2,

50:21, 50:22
**invented** [1] - 97:14
**invention** [14] - 54:5, 57:11, 58:6, 74:22, 75:1, 75:5, 82:13, 97:17, 98:2, 98:8, 98:12, 108:21, 109:3, 109:22
**inventive** [2] - 54:3, 108:20
**inventor** [6] - 54:4, 56:1, 74:21, 108:13, 108:18, 112:7
**inventors** [2] - 54:10, 98:3
**involved** [1] - 51:8
**involves** [1] - 63:6
**irrelevant** [1] - 75:18
**Irvine** [1] - 2:7
**issue** [16] - 10:2, 10:10, 14:19, 63:5, 63:6, 64:4, 71:1, 82:7, 87:13, 88:5, 92:7, 93:3, 95:6, 96:6, 96:9, 110:14
**issued** [3] - 56:25, 71:15, 87:10
**issues** [3] - 15:23, 16:22, 93:16
**Item** [1] - 3:5
**items** [2] - 74:20, 100:16
**itself** [7] - 18:6, 52:14, 89:6, 89:14, 90:4, 97:1, 97:4

## J

**job** [18] - 51:9, 87:25, 88:2, 88:21, 88:23, 88:25, 89:1, 89:2, 89:5, 89:6, 89:7, 89:13, 89:20, 89:21, 90:4, 90:11
**Job/Disk** [1] - 89:18
**jobs** [3] - 22:21, 89:22, 89:23
**Judge** [4] - 12:16, 30:6, 115:19, 116:11
**judge** [2] - 12:11, 13:25
**JUDGE** [1] - 1:4
**judges** [1] - 12:7
**judgment** [16] - 43:16, 49:1, 76:5, 76:7, 81:22, 88:4, 88:15, 88:19, 92:9, 92:10, 93:2, 93:6, 93:8, 95:8, 95:14, 116:3

50:21, 50:22

**judicial** [1] - 117:7
**July** [1] - 58:5
**jump** [1] - 94:21
**jury** [4] - 13:22, 15:10, 44:20, 48:7

## K

**Kamani** [1] - 63:14
**Kamari** [2] - 111:11, 111:12
**keeps** [1] - 101:10
**Ken** [2] - 54:10, 74:22
**KIELWASSER** [2] - 1:22, 117:9
**Kielwasser** [1] - 117:10
**kind** [10] - 6:6, 6:7, 24:8, 45:25, 47:4, 64:18, 65:23, 65:24, 67:16, 104:15
**kinds** [4] - 19:6, 19:24, 26:13, 77:10
**Knobbe** [1] - 2:6
**knowledge** [1] - 45:7
**known** [3] - 59:13, 108:21, 112:4
**KSR** [1] - 109:6

## L

**label** [8] - 47:23, 47:24, 48:2, 48:3, 48:5, 50:9, 50:11, 70:18
**labeling** [2] - 69:3, 70:19
**labels** [3] - 50:10, 64:6, 64:7
**labs** [1] - 108:2
**lack** [1] - 86:2
**LaGuardia** [2] - 97:14, 109:3
**laid** [2] - 60:17, 87:9
**language** [3] - 13:13, 37:19, 102:15
**lapses** [2] - 101:2, 103:21
**large** [2] - 71:22, 89:25
**laser** [3] - 51:12, 73:4, 73:7
**last** [11] - 4:25, 18:23, 28:18, 28:24, 31:3, 31:8, 63:7, 75:12, 81:2, 94:18, 114:2
**late** [2] - 10:25, 11:5
**latest** [1] - 94:13

**law** [7] - 12:8, 14:1, 44:15, 78:11, 82:5, 95:15, 109:5
**lays** [1] - 60:18
**least** [2] - 44:17, 84:4
**leave** [7] - 11:25, 75:11, 82:17, 82:19, 83:4, 102:9
**leaves** [1] - 108:16
**left** [5] - 20:1, 20:2, 21:15, 23:25, 67:24
**left-hand** [2] - 21:15, 67:24
**lends** [1] - 90:20
**length** [1] - 88:24
**less** [2] - 94:14, 117:5
**letters** [2] - 66:14, 66:17
**library** [1] - 80:10
**light** [2] - 88:3, 92:25
**limit** [1] - 101:2
**limitation** [25] - 27:24, 31:18, 42:12, 43:11, 44:11, 44:13, 47:23, 62:19, 65:3, 77:22, 77:23, 78:1, 88:5, 88:8, 88:10, 91:18, 91:23, 102:16, 103:4, 103:6, 103:16, 108:3, 111:13, 111:16
**limitations** [29] - 31:3, 31:8, 31:11, 33:4, 33:16, 42:16, 60:19, 61:1, 61:7, 61:22, 62:6, 62:13, 65:21, 69:5, 76:22, 77:1, 78:23, 79:1, 79:12, 81:13, 81:20, 88:13, 89:3, 91:16, 98:9, 103:14, 111:20, 111:25, 112:10
**limited** [3] - 56:18, 58:11, 70:9
**limiting** [2] - 5:23, 9:24
**line** [1] - 100:5
**lines** [1] - 41:25
**list** [2] - 26:19, 91:15
**listed** [3] - 61:1, 67:2, 93:4
**listen** [1] - 15:15
**lists** [3] - 18:18, 23:12, 90:1
**Lite** [6] - 55:5, 55:8, 55:11, 55:12, 55:14, 55:20
**literal** [2] - 42:24, 43:18
**literally** [4] - 27:12,

**43**:11, 44:11, 44:13
**litigators** [1] - 13:24
**lives** [1] - 55:12
**LLP** [2] - 2:6, 2:13
**loaded** [1] - 45:25
**local** [1] - 73:16
**located** [1] - 86:3
**logical** [3] - 108:14, 108:17, 112:7
**logs** [1] - 20:18
**look** [13] - 8:13, 23:16, 40:1, 40:24, 63:14, 70:2, 73:2, 77:14, 78:7, 89:12, 92:13, 97:7, 110:5
**looked** [6] - 3:16, 6:10, 48:17, 60:4, 77:16, 92:14
**looking** [8] - 8:8, 8:11, 10:16, 30:25, 47:3, 51:7, 70:14, 91:2
**loop** [2] - 73:21, 106:23
**Los** [3] - 1:17, 1:24, 2:14
**lost** [1] - 7:23
**loud** [1] - 5:19

# M

**Mac** [1] - 55:17
**machine** [4] - 25:9, 40:13, 40:14, 103:17
**Main** [1] - 2:6
**maintain** [1] - 17:7
**manager** [1] - 73:13
**manner** [1] - 10:20
**manual** [6] - 22:19, 34:11, 34:20, 34:21, 45:16, 68:8
**manually** [4] - 83:14, 84:22, 84:25, 85:9
**march** [1] - 94:16
**MARIANA** [1] - 1:4
**MARKMAN** [2] - 1:16, 3:3
**Martens** [1] - 2:6
**Martin** [1] - 3:15
**MARTIN** [23] - 2:13, 9:18, 9:22, 10:1, 10:4, 10:8, 10:17, 10:22, 11:24, 12:4, 12:25, 13:3, 13:5, 13:9, 13:12, 13:17, 13:20, 13:23, 14:7, 14:9, 28:13, 29:15, 29:22
**Mary** [3] - 51:19, 51:20, 51:21

**mass** [1] - 68:20
**match** [3] - 24:15, 66:13, 85:10
**matching** [2] - 24:17, 39:21
**material** [5] - 79:16, 85:7, 100:13, 103:23, 109:15
**materials** [2] - 37:7, 62:23
**matter** [8] - 3:5, 35:10, 44:15, 71:4, 112:2, 112:12, 112:13, 117:4
**max** [9] - 102:6, 102:10, 102:11, 102:19, 104:20, 106:4, 107:10, 107:15, 108:1
**mean** [6] - 11:20, 12:9, 91:10, 98:21, 99:25, 105:4
**meaning** [1] - 48:8
**means** [2] - 95:25, 96:1
**meant** [2] - 8:4, 110:7
**meat** [1] - 12:2
**mechanism** [1] - 100:24
**MediaWriter** [110] - 4:19, 4:20, 4:24, 8:22, 15:24, 17:19, 18:4, 19:17, 19:25, 20:3, 20:9, 20:18, 20:21, 21:4, 21:8, 21:9, 21:18, 22:5, 22:9, 22:16, 22:19, 22:23, 23:3, 23:15, 24:2, 24:6, 24:12, 24:14, 24:16, 24:19, 24:25, 25:10, 25:14, 25:20, 26:1, 26:20, 29:5, 29:6, 29:7, 31:24, 32:2, 32:5, 32:17, 33:4, 33:15, 34:10, 34:12, 36:3, 37:14, 38:1, 39:16, 39:20, 40:8, 40:11, 40:18, 41:6, 41:8, 41:18, 41:22, 42:13, 44:1, 44:7, 44:24, 45:9, 46:10, 46:15, 46:20, 48:2, 48:4, 48:6, 50:6, 50:8, 50:11, 50:18, 66:5, 66:6, 66:20, 67:19, 70:8, 88:6, 88:12, 88:21, 89:17, 92:7, 92:11, 92:13, 92:17, 92:20, 93:16, 94:1,

94:6, 94:11, 94:12, 95:3, 95:7, 101:5, 101:9, 103:10, 103:15, 104:21, 106:2, 106:5, 106:15, 106:20, 106:24, 107:19, 108:8, 109:14, 110:25
**medical** [97] - 4:5, 5:7, 5:20, 5:21, 6:1, 6:20, 6:23, 6:24, 7:2, 7:10, 9:7, 9:10, 11:10, 11:11, 16:9, 16:10, 17:21, 19:4, 19:7, 19:12, 25:23, 26:1, 26:7, 26:9, 27:8, 28:4, 28:5, 28:6, 28:7, 28:12, 31:18, 31:20, 31:23, 32:7, 32:14, 32:18, 32:21, 33:6, 33:12, 33:13, 33:20, 33:21, 33:25, 36:8, 36:11, 36:13, 36:22, 36:24, 37:3, 37:22, 38:3, 39:1, 39:3, 39:12, 41:19, 42:18, 42:19, 47:12, 48:3, 51:23, 52:19, 53:2, 54:14, 54:20, 55:15, 56:2, 58:9, 58:11, 59:6, 62:7, 62:8, 63:23, 63:24, 64:1, 65:5, 65:9, 69:19, 80:2, 80:3, 81:11, 81:16, 86:13, 86:14, 86:21, 91:20, 97:13, 103:7, 103:12, 104:8, 113:12, 113:13, 113:17, 114:3, 114:8, 114:19, 115:3
**medicine** [1] - 17:20
**medium** [7] - 28:3, 28:10, 52:10, 52:18, 70:18, 81:12, 87:22
**meeting** [1] - 74:15
**Mehta** [30] - 61:11, 62:2, 62:3, 62:7, 62:17, 62:20, 63:12, 76:9, 76:11, 76:13, 76:15, 76:16, 76:23, 77:11, 77:12, 77:18, 77:21, 78:6, 78:20, 79:5, 79:6, 79:11, 80:1, 80:5, 80:7, 80:18, 80:20, 81:21, 81:22
**mention** [4] - 66:15, 87:6, 99:22

**mentioned** [1] - 90:16
**menu** [2] - 21:15, 40:16
**mere** [1] - 79:18
**merely** [3] - 50:12, 79:17, 108:19
**method** [5] - 71:23, 77:21, 77:22, 81:10, 108:14
**methodologies** [1] - 112:4
**methodology** [4] - 106:19, 108:16, 108:22, 112:12
**mid** [1] - 52:12
**middle** [1] - 68:2
**might** [13] - 11:7, 11:15, 14:4, 15:15, 51:25, 61:5, 68:10, 69:12, 71:2, 72:23, 73:21, 89:24, 112:12
**mind** [3] - 15:16, 48:17, 48:19
**mine** [2] - 31:6, 31:7
**minute** [7] - 11:22, 21:13, 31:13, 49:12, 60:22, 90:1, 110:15
**minutes** [6] - 8:13, 15:14, 74:13, 75:5, 75:17, 78:22
**missing** [5] - 28:25, 29:1, 76:23, 79:16, 81:20
**misspoke** [1] - 105:16
**mistake** [1] - 78:6
**Mitra** [53] - 18:2, 19:17, 19:20, 19:22, 20:2, 20:7, 20:10, 21:19, 21:21, 22:5, 22:7, 22:9, 22:13, 23:21, 23:23, 24:13, 25:11, 25:15, 25:22, 27:4, 27:11, 27:17, 29:18, 30:13, 30:20, 30:22, 31:22, 31:25, 32:3, 32:5, 32:6, 32:9, 32:11, 32:15, 32:21, 32:23, 32:24, 36:10, 36:23, 36:25, 37:5, 37:18, 37:21, 37:25, 38:2, 38:4, 38:5, 38:13, 41:11, 41:14
**modalities** [10] - 27:9, 52:16, 53:3, 53:4, 53:24, 67:2, 67:14, 70:25, 108:23
**modality** [4] - 63:18, 86:3, 97:12, 101:16
**mode** [1] - 52:13

**model** [2] - 36:22, 65:5
**modify** [1] - 69:9
**module** [10] - 36:14, 62:10, 65:4, 77:12, 77:18, 77:23, 78:4, 79:1, 80:1, 80:15
**moment** [4] - 7:20, 12:1, 26:5, 92:7
**MONDAY** [2] - 1:18, 3:1
**Monday** [1] - 14:22
**morning** [3] - 3:10, 3:13, 14:20
**most** [1] - 38:10
**motion** [16] - 13:2, 13:8, 18:22, 46:8, 74:18, 75:15, 76:2, 78:21, 79:10, 79:11, 82:6, 92:8, 92:10, 95:8, 95:14
**motions** [4] - 12:18, 15:6, 75:19, 75:25
**move** [12] - 21:5, 23:10, 50:21, 60:11, 69:7, 86:24, 90:25, 91:5, 96:17, 100:16, 102:7, 116:17
**moved** [3] - 76:5, 76:7, 93:7
**movement** [2] - 51:10, 53:20
**moving** [4] - 43:16, 51:10, 52:9, 103:13
**MR** [238] - 3:10, 3:13, 3:19, 3:24, 4:9, 4:16, 4:18, 5:12, 5:14, 5:17, 6:4, 6:8, 6:11, 6:22, 7:6, 7:9, 7:12, 7:20, 7:23, 8:1, 8:3, 8:12, 8:15, 8:19, 8:21, 8:25, 9:2, 9:5, 9:13, 9:18, 9:22, 10:1, 10:4, 10:8, 10:17, 10:22, 11:24, 12:4, 12:25, 13:3, 13:5, 13:9, 13:12, 13:17, 13:20, 13:23, 14:7, 14:9, 14:12, 14:24, 15:1, 15:7, 15:18, 15:21, 16:6, 16:18, 16:21, 17:4, 17:6, 17:10, 17:14, 17:16, 17:23, 21:1, 22:3, 28:13, 28:14, 28:20, 28:23, 29:15, 29:22, 29:25, 30:2, 30:6, 30:9, 30:10, 30:19, 31:6, 31:10, 31:15, 34:5, 34:9,

34:19, 35:22, 35:25, 36:17, 36:19, 36:21, 37:17, 38:9, 38:18, 38:23, 39:5, 39:7, 39:10, 39:14, 43:7, 43:10, 43:15, 44:23, 46:7, 46:13, 46:25, 47:3, 47:6, 48:13, 48:16, 48:20, 49:12, 49:15, 49:17, 49:23, 50:3, 50:5, 50:15, 50:24, 51:16, 53:1, 55:25, 57:4, 57:6, 59:23, 60:15, 60:23, 60:25, 61:4, 61:9, 61:13, 62:5, 64:18, 64:23, 64:25, 69:25, 72:3, 72:5, 72:7, 72:11, 72:14, 72:18, 72:22, 73:1, 74:3, 74:8, 74:11, 75:12, 79:25, 81:25, 82:2, 82:18, 82:20, 82:23, 83:1, 83:6, 83:20, 83:22, 84:14, 84:16, 84:21, 85:16, 85:19, 85:21, 86:8, 86:19, 86:24, 87:2, 90:14, 91:5, 91:8, 91:12, 91:22, 95:23, 96:13, 96:16, 96:21, 96:24, 97:2, 97:9, 97:11, 97:21, 97:24, 98:18, 98:24, 99:3, 99:11, 99:16, 99:22, 104:12, 104:14, 105:2, 105:8, 105:10, 105:13, 105:15, 105:17, 105:21, 105:23, 106:9, 106:14, 106:17, 107:21, 108:10, 109:9, 109:12, 110:9, 110:12, 110:17, 110:19, 110:23, 111:6, 111:7, 112:17, 112:20, 112:24, 112:25, 113:4, 113:21, 113:25, 114:5, 114:7, 114:11, 114:13, 114:19, 114:24, 115:1, 115:6, 115:9, 115:12, 115:14, 115:16, 115:21, 115:24, 115:25, 116:8, 116:11, 116:14, 116:18, 116:23, 116:24

**MRI** [1] - 70:16
**MRX** [1] - 101:7
**MS** [2] - 29:13, 49:25
**multiple** [34] - 40:12, 41:7, 42:14, 45:6, 45:10, 51:4, 51:5, 52:5, 52:16, 52:17, 55:2, 56:15, 56:21, 67:9, 67:13, 67:14, 67:15, 67:18, 70:13, 70:14, 70:24, 71:8, 71:9, 73:3, 79:8, 84:8, 89:22, 89:24
**must** [12] - 3:22, 5:7, 5:12, 28:11, 31:18, 31:19, 47:4, 61:19, 61:20, 61:21, 79:16

### N

**name** [15] - 8:20, 23:2, 39:17, 39:20, 45:20, 54:19, 65:15, 65:20, 68:3, 69:12, 69:13, 69:22, 70:18, 71:17
**named** [3] - 54:10, 56:1, 108:18
**namely** [2] - 60:1, 68:19
**names** [1] - 8:21
**narrowing** [2] - 59:1, 59:9
**necessarily** [2] - 34:1, 79:16
**necessary** [1] - 82:25
**need** [11] - 12:22, 14:17, 38:20, 47:6, 47:24, 53:12, 53:14, 57:7, 57:23, 68:14, 108:22
**needs** [5] - 4:12, 33:25, 75:19, 88:1, 97:3
**nefarious** [1] - 58:22
**neglected** [2] - 66:15, 99:22
**network** [1] - 63:23
**never** [6] - 48:19, 60:4, 74:17, 102:22, 102:24, 115:21
**new** [15] - 4:11, 4:12, 4:13, 5:6, 7:3, 11:1, 11:5, 14:17, 19:14, 35:4, 69:12, 90:8, 94:15, 105:25, 106:1
**next** [15] - 19:19, 23:4, 23:7, 23:11, 23:24, 25:6, 35:9, 36:14, 38:16, 41:2, 41:4,

47:1, 66:1, 67:1, 102:2
**Ninth** [1] - 93:5
**nobody** [1] - 98:6
**non** [8] - 5:15, 43:17, 43:22, 44:16, 49:1, 92:10, 95:9, 108:11
**non-image** [1] - 5:15
**non-infringement** [7] - 43:17, 43:22, 44:16, 49:1, 92:10, 95:9, 108:11
**none** [4] - 57:20, 58:16, 74:16, 89:22
**Nordstrom** [1] - 26:12
**North** [1] - 1:23
**Northern** [1] - 93:20
**note** [2] - 13:14, 42:17
**noted** [1] - 29:20
**notes** [1] - 18:16
**nothing** [4] - 8:1, 38:11, 101:15, 101:25
**notice** [2] - 16:21, 73:15
**notices** [1] - 73:13
**notion** [1] - 90:20
**novelty** [1] - 68:15
**NOVEMBER** [2] - 1:18, 3:1
**nowhere** [1] - 58:18
**nuances** [1] - 15:23
**number** [11] - 45:3, 65:11, 65:19, 67:24, 70:9, 88:7, 89:21, 90:11, 100:25, 102:23
**numerous** [1] - 59:18

### O

**oath** [1] - 95:12
**object** [1] - 18:9
**Object** [1] - 32:13
**objection** [3] - 17:8, 29:16, 29:21
**objects** [4] - 17:25, 42:2, 42:5, 42:7
**obstacle** [2] - 56:10, 56:11
**obstacles** [4] - 54:4, 56:4, 56:7, 56:8
**obtain** [1] - 112:14
**obtained** [2] - 44:4, 75:4
**obvious** [5] - 71:10, 98:10, 98:12, 109:5, 110:3
**obviously** [2] - 46:8,

73:6
**obviousness** [20] - 82:3, 82:4, 82:8, 82:15, 82:17, 82:19, 82:21, 84:4, 84:12, 97:4, 97:7, 98:3, 98:25, 99:8, 109:8, 109:20, 109:24, 110:5, 112:11
**occur** [4] - 22:13, 37:14, 37:15, 47:24
**occurred** [2] - 11:1, 106:4
**occurs** [3] - 24:12, 73:22, 92:3
**OF** [3] - 1:2, 2:3, 2:11
**offered** [1] - 90:10
**Office** [2] - 58:20, 59:19
**office** [6] - 57:2, 57:7, 57:9, 58:4, 58:16, 78:10
**offices** [1] - 51:14
**Official** [1] - 1:23
**official** [1] - 117:10
**often** [1] - 102:21
**older** [1] - 89:19
**Olson** [1] - 2:6
**ON** [2] - 2:3, 2:11
**once** [17] - 11:9, 11:14, 21:3, 26:16, 27:2, 35:11, 45:13, 67:3, 68:4, 80:7, 85:1, 85:12, 100:2, 101:2, 106:10, 108:6, 108:7
**one** [80] - 3:22, 4:4, 9:2, 12:5, 15:23, 16:2, 18:3, 21:10, 22:23, 24:8, 24:16, 27:14, 27:19, 28:3, 34:6, 35:22, 38:7, 38:9, 38:17, 39:11, 40:5, 40:8, 40:14, 43:3, 43:7, 43:24, 45:7, 45:21, 47:1, 47:14, 47:18, 48:10, 49:12, 50:3, 54:10, 55:1, 55:3, 56:4, 59:24, 59:25, 60:19, 60:22, 62:1, 63:25, 64:3, 69:7, 72:23, 72:24, 73:6, 78:4, 83:2, 83:9, 83:17, 84:9, 85:8, 86:9, 86:14, 87:13, 89:1, 90:15, 91:17, 93:20, 93:21, 95:18, 99:19, 100:2, 100:4, 100:16, 101:6,

107:7, 107:8, 110:15, 110:16, 111:15, 111:17, 112:8, 112:11, 113:6, 115:16
**one-second** [1] - 107:8
**one-sentence** [1] - 43:24
**one-time** [1] - 22:23
**ones** [4] - 4:7, 8:9, 86:22, 100:7
**online** [1] - 26:12
**open** [2] - 13:21, 67:3
**operates** [3] - 34:11, 96:7, 106:20
**operation** [2] - 94:1, 109:14
**operator** [1] - 80:8
**opinion** [6] - 86:11, 86:15, 90:11, 107:1, 107:9, 109:4
**opinions** [1] - 95:24
**opportunity** [3] - 4:12, 93:9, 93:13
**oppose** [2] - 14:17, 72:16
**opposed** [1] - 10:10
**opposing** [2] - 79:11, 104:25
**opposition** [3] - 29:24, 30:5, 30:7
**opted** [1] - 52:11
**option** [3] - 23:20, 45:12, 47:8
**Order** [14] - 5:15, 6:12, 6:15, 8:6, 9:6, 9:17, 13:14, 14:21, 16:19, 16:22, 17:6, 38:15, 100:17, 113:6
**order** [10] - 6:15, 29:6, 32:3, 34:21, 34:25, 35:13, 37:20, 54:5, 59:9, 77:7
**ordinary** [1] - 84:2
**original** [1] - 35:12
**originally** [2] - 59:25, 80:3
**outline** [1] - 18:18
**outlines** [1] - 81:13
**outside** [3] - 6:1, 30:21, 46:22
**overcome** [3] - 54:5, 58:3, 109:23
**overview** [1] - 18:22
**own** [16] - 3:25, 11:2, 32:12, 36:25, 37:5, 37:7, 38:6, 54:7, 61:19, 78:16, 83:10, 85:23, 86:10, 89:13,

112:7

**P**

**PACS** [32] - 17:18, 20:2, 20:7, 20:11, 21:8, 21:10, 27:5, 27:7, 27:10, 29:4, 37:11, 40:1, 40:4, 40:8, 40:11, 40:12, 40:14, 40:15, 40:17, 41:1, 41:5, 42:14, 42:15, 44:25, 45:10, 45:21, 51:16, 80:9, 86:3
**PACS'** [2] - 37:6, 37:8
**PACSCUBE** [1] - 75:1
**PACSCUBEJT** [4] - 40:4, 40:6, 40:9, 41:5
**PacsGear** [40] - 3:7, 3:14, 18:25, 19:8, 19:16, 24:18, 24:22, 25:7, 27:10, 28:16, 28:17, 29:2, 33:18, 43:2, 43:16, 43:21, 44:15, 48:4, 48:23, 76:5, 76:9, 77:12, 79:10, 80:19, 87:4, 88:12, 92:16, 93:2, 93:8, 93:11, 93:12, 93:17, 93:24, 93:25, 95:13, 95:16, 96:5, 98:11, 110:25, 113:12
**PACSGEAR** [1] - 1:12
**PacsGear's** [6] - 20:13, 41:17, 76:19, 79:2, 82:7, 95:8
**PacsGears'** [6] - 83:6, 86:1, 92:10, 95:5, 95:10, 96:3
**pad** [2] - 91:4, 91:6
**page** [63] - 8:6, 17:3, 17:4, 18:18, 18:21, 19:2, 19:14, 19:19, 19:24, 20:19, 21:20, 32:10, 33:2, 33:3, 34:19, 34:20, 34:21, 35:6, 35:9, 35:12, 38:5, 39:24, 40:9, 41:10, 41:25, 42:23, 45:16, 56:6, 67:22, 67:23, 68:13, 70:3, 70:12, 70:17, 73:3, 75:20, 77:14, 77:16, 77:17, 77:20, 78:19, 78:20, 79:20, 81:10, 81:25, 85:24, 85:25, 86:11, 87:2, 87:9,

89:16, 91:13, 91:15, 107:2, 107:4, 107:5, 107:22, 111:10, 113:7, 113:9
**pages** [5] - 37:23, 49:25, 54:9, 65:8, 74:6
**Pair** [1] - 32:13
**panel** [2] - 12:13, 60:4
**paper** [1] - 50:13
**papers** [3] - 51:8, 68:25, 100:21
**paragraph** [7] - 16:24, 58:14, 63:20, 65:9, 65:13, 104:22, 104:25
**Paralegal** [2] - 2:17, 3:15
**parenthetical** [1] - 16:23
**part** [27] - 8:5, 11:4, 12:18, 13:1, 13:7, 13:13, 19:19, 21:19, 23:2, 31:11, 41:2, 42:1, 42:9, 56:24, 57:21, 68:15, 83:6, 90:19, 98:7, 104:14, 105:3, 113:6, 113:7, 113:9, 113:18, 113:22, 114:2
**parte** [2] - 10:22, 15:8
**particular** [6] - 10:18, 62:25, 87:18, 89:21, 99:12, 105:3
**parties** [3] - 6:16, 14:16, 91:19
**parties'** [2] - 9:6, 95:24
**partly** [1] - 97:25
**parts** [2] - 100:13, 102:15
**party** [5] - 4:1, 4:11, 93:6, 93:7, 93:23
**passengers** [2] - 102:8, 108:15
**past** [1] - 52:8
**patent** [121] - 6:5, 6:7, 6:8, 7:4, 7:7, 7:19, 7:24, 12:8, 14:1, 16:17, 18:10, 18:23, 20:8, 27:24, 29:10, 29:11, 31:3, 34:1, 35:19, 37:3, 38:25, 39:7, 42:12, 42:17, 43:1, 43:17, 44:1, 45:18, 46:17, 46:18, 46:19, 46:20, 46:23, 47:10, 47:17, 47:20, 47:21, 48:24, 48:25, 50:9, 54:2, 56:19,

56:21, 57:2, 57:7, 57:8, 57:9, 58:4, 58:16, 58:17, 58:25, 59:16, 61:25, 63:15, 64:12, 64:13, 65:1, 65:24, 65:25, 66:15, 67:20, 68:15, 69:15, 69:16, 69:17, 71:3, 71:10, 71:14, 73:24, 75:2, 76:3, 76:4, 76:10, 76:16, 76:17, 76:23, 76:24, 76:25, 77:4, 77:7, 78:10, 78:14, 81:9, 81:23, 86:25, 87:3, 87:4, 87:5, 87:6, 87:8, 87:11, 88:16, 88:18, 90:17, 92:18, 92:24, 93:3, 97:1, 97:7, 97:8, 97:11, 98:9, 98:22, 98:25, 106:25, 109:4, 109:13, 109:19, 109:20, 111:9, 112:14, 112:18
**Patent** [2] - 58:20, 59:19
**patentable** [1] - 97:23
**patented** [2] - 53:25, 54:1
**patents** [27] - 4:5, 14:14, 14:15, 33:9, 33:17, 36:5, 36:6, 37:13, 42:21, 50:18, 50:25, 51:1, 51:3, 52:15, 57:1, 63:22, 64:9, 69:6, 76:6, 76:8, 76:12, 77:1, 82:24, 96:25, 104:17, 108:24
**patient** [33] - 5:24, 28:4, 39:2, 39:14, 39:21, 42:19, 45:20, 47:12, 53:2, 54:20, 62:25, 63:2, 65:10, 65:15, 65:20, 68:3, 69:9, 69:10, 69:12, 70:18, 71:17, 71:19, 71:24, 80:9, 80:12, 81:17, 87:19, 92:21, 101:17, 106:4
**patient's** [9] - 23:2, 39:17, 45:20, 54:18, 63:25, 69:11, 69:13, 69:22
**patients** [1] - 65:10
**PAUL** [1] - 2:5
**Paul** [1] - 3:12
**pause** [7] - 7:22, 35:21, 35:24, 43:9,

50:23, 64:22, 69:24
**pay** [1] - 26:24
**PC** [8] - 53:12, 55:17, 55:21, 55:22, 68:14, 80:10
**PDF** [1] - 53:13
**pend** [1] - 15:3
**pending** [4] - 15:1, 29:18, 50:25, 65:2
**people** [3] - 12:17, 18:9, 21:5
**per** [1] - 10:10
**perfectly** [2] - 58:21, 110:11
**performed** [1] - 108:7
**perhaps** [5] - 72:12, 72:21, 72:23, 113:8, 114:22
**period** [29] - 91:20, 92:4, 92:21, 92:23, 94:15, 94:18, 100:18, 101:23, 102:6, 102:10, 102:11, 102:17, 102:19, 102:20, 102:21, 102:22, 103:2, 103:3, 106:5, 107:6, 107:8, 107:10, 107:11, 107:16, 108:1, 108:7
**person** [2] - 23:5, 84:1
**pertinent** [4] - 62:24, 80:5, 87:11, 102:15
**Petrocelli** [1] - 68:23
**PFAELZER** [1] - 1:4
**Phillips** [2] - 51:23, 52:1
**phonetically** [4] - 60:1, 63:15, 68:24, 111:11
**phrase** [1] - 9:16
**phrases** [1] - 6:15
**pick** [4] - 35:2, 66:10, 115:22, 116:8
**picture** [2] - 42:9, 51:17
**piece** [3] - 50:13, 55:1, 55:3
**pieces** [6] - 55:2, 55:5, 57:17, 57:20, 83:10, 84:3
**Piedmont** [1] - 68:19
**place** [7] - 34:14, 59:16, 68:16, 97:4, 104:19, 107:8, 107:12
**placed** [1] - 10:4
**plaintiff** [2] - 1:10, 3:11
**plaintiff's** [2] - 46:9,

113:8
**PLAINTIFFS** [1] - 2:3
**plurality** [9] - 28:25, 62:9, 73:4, 78:25, 79:6, 79:13, 79:22, 85:22, 86:5
**point** [33] - 12:22, 16:16, 19:15, 24:11, 25:2, 26:2, 27:1, 27:7, 27:14, 27:19, 28:13, 28:23, 33:24, 43:20, 47:9, 48:11, 58:2, 75:12, 80:16, 82:9, 83:2, 83:17, 84:7, 85:17, 86:9, 90:15, 96:18, 97:15, 98:3, 99:17, 108:9, 109:25, 110:14
**pointing** [2] - 21:9, 89:18
**points** [5] - 12:6, 19:2, 30:24, 84:17, 110:13
**portability** [1] - 58:11
**portions** [1] - 100:10
**position** [14] - 6:25, 11:3, 26:8, 31:21, 42:11, 50:8, 63:9, 74:18, 87:16, 99:4, 108:10, 113:15, 113:23
**possibly** [1] - 79:17
**potential** [1] - 70:21
**potentially** [1] - 34:16
**PowerPoint** [2] - 18:15, 74:8
**practice** [1] - 71:21
**pre** [2] - 50:7, 100:18
**pre-assembled** [1] - 50:7
**pre-configured** [1] - 100:18
**precedence** [1] - 96:10
**precise** [1] - 13:13
**precisely** [2] - 11:13, 92:24
**predefined** [1] - 85:6
**predesignated** [1] - 100:25
**preference** [1] - 115:21
**prepared** [2] - 10:20, 29:10
**present** [14] - 43:12, 44:14, 70:9, 77:2, 78:2, 78:4, 78:5, 78:24, 79:2, 79:16, 79:17, 81:14, 93:9
**Present** [1] - 2:17
**presentation** [6] -

18:15, 29:9, 38:24, 87:3, 90:23, 91:3
**presented** [2] - 90:9, 109:21
**preset** [1] - 101:23
**PRESIDING** [1] - 1:4
**pressing** [2] - 34:13, 69:21
**presumption** [2] - 56:22, 56:25
**pretrial** [2] - 116:8, 116:12
**pretty** [8] - 10:25, 29:8, 71:21, 88:8, 95:15, 104:18, 104:21, 116:18
**previous** [4] - 23:13, 40:9, 44:8, 78:23
**previously** [7] - 30:11, 41:8, 50:17, 54:18, 59:11, 81:2, 81:15
**primary** [1] - 108:10
**print** [2] - 50:10, 64:17
**printed** [3] - 18:15, 48:5, 70:18
**printer** [5] - 48:4, 50:6, 50:13, 73:4, 73:7
**printing** [4] - 47:22, 47:24, 48:8, 64:6
**prints** [1] - 48:2
**privacy** [1] - 69:13
**private** [3] - 32:12, 32:24, 38:6
**privately** [1] - 32:15
**pro** [2] - 57:7, 61:18
**problem** [3] - 51:22, 108:19, 114:10
**procedural** [1] - 10:10
**proceed** [2] - 14:14, 26:17
**Proceedings** [1] - 1:16
**proceedings** [6] - 35:21, 35:24, 50:23, 64:22, 69:24, 117:3
**process** [16] - 51:9, 57:14, 57:21, 58:19, 58:23, 59:19, 61:15, 61:17, 68:2, 94:4, 94:16, 98:7, 101:6, 101:15, 104:18, 116:2
**processes** [2] - 24:13, 63:24
**procured** [1] - 68:22
**produced** [1] - 48:6
**producing** [2] - 68:20, 111:13
**product** [5] - 18:24, 70:4, 70:5, 70:12,

100:21
**production** [17] - 27:25, 28:1, 50:10, 50:11, 56:11, 62:14, 63:8, 63:10, 63:19, 64:4, 79:1, 80:20, 80:22, 80:24, 81:3, 81:17, 87:15
**Professor** [1] - 62:3
**program** [1] - 53:14
**programmed** [1] - 106:3
**progress** [1] - 51:11
**projection** [2] - 53:18
**promote** [1] - 56:1
**proof** [1] - 44:16
**properly** [1] - 114:6
**proposed** [2] - 100:19, 100:20
**propriety** [1] - 93:5
**prosecution** [2] - 61:17, 76:16
**protocol** [5] - 32:20, 52:4, 63:23, 64:2, 90:24
**prototype** [2] - 83:11, 84:24
**prove** [1] - 76:19
**provide** [6] - 29:3, 57:7, 57:9, 65:5, 104:9, 106:17
**provided** [2] - 35:8, 80:11
**provides** [3] - 32:11, 112:9, 112:10
**PTO** [4] - 61:15, 76:14, 76:15, 76:16
**publication** [1] - 107:14
**publisher** [1] - 97:13
**pulled** [1] - 23:4
**pulls** [4] - 24:6, 39:24, 44:9
**purchase** [1] - 20:21
**put** [18] - 10:24, 11:16, 14:15, 26:14, 31:2, 52:21, 71:21, 77:5, 82:8, 83:14, 84:4, 85:9, 85:10, 93:13, 93:14, 104:23, 110:4, 114:14
**puts** [2] - 32:13, 50:12
**putting** [3] - 35:10, 74:24, 75:7

## Q

**quandary** [1] - 14:7
**query** [1] - 65:14

**querying** [1] - 65:15
**questions** [1] - 5:1
**quick** [1] - 85:22
**quickly** [4] - 14:24, 18:14, 20:16, 111:7
**quid** [2] - 57:7, 61:18
**quite** [9] - 32:4, 35:1, 70:7, 72:9, 87:5, 87:7, 109:5, 113:9, 114:22
**quo** [2] - 57:7, 61:18
**quote** [3] - 33:18, 41:23, 107:21
**quoted** [2] - 49:6, 80:6
**quoting** [2] - 49:9, 49:10

## R

**radiological** [1] - 19:17
**radiologist's** [2] - 7:25, 9:7
**radiologists** [1] - 6:17
**radiologists'** [6] - 7:1, 7:5, 7:9, 7:15, 9:9, 19:3
**Radiology** [1] - 74:15
**radiology** [2] - 52:3, 113:13
**raise** [1] - 95:6
**raised** [2] - 34:3, 45:2
**ran** [1] - 51:22
**range** [3] - 92:1, 92:4
**rather** [2] - 29:18, 30:4
**Ratib** [11] - 66:2, 66:3, 66:9, 66:16, 66:20, 66:21, 66:25, 83:7, 83:8, 83:11, 84:18
**Ratib's** [1] - 85:4
**ray** [3] - 51:13, 51:20, 73:14
**re** [3] - 59:16, 59:19, 59:24
**RE** [2] - 1:16, 3:3
**re-exam** [3] - 59:16, 59:19, 59:24
**RE-HEARING** [2] - 1:16, 3:3
**reach** [1] - 53:18
**read** [16] - 5:18, 5:19, 7:18, 9:21, 11:21, 15:17, 41:23, 49:23, 56:7, 57:24, 57:25, 71:20, 72:18, 77:15, 114:5, 114:15
**readable** [1] - 87:22
**reading** [2] - 96:4, 113:6

**ready** [5] - 21:4, 22:23, 50:12, 102:7, 102:8
**ready-to-receive** [1] - 50:12
**real** [2] - 84:16, 111:7
**realize** [1] - 10:19
**really** [18] - 8:8, 10:1, 11:12, 24:7, 24:8, 47:10, 75:21, 75:25, 78:8, 87:11, 91:3, 96:7, 98:1, 98:21, 100:6, 101:6, 108:20, 110:5
**reason** [13] - 32:16, 35:20, 36:14, 36:21, 37:12, 45:2, 45:17, 56:14, 56:24, 59:10, 84:2, 86:19, 101:4
**reasons** [11] - 16:2, 33:15, 36:2, 46:14, 46:15, 69:13, 81:1, 82:6, 95:18, 103:8, 107:23
**receipt** [2] - 94:10, 94:13
**receive** [9] - 21:18, 32:5, 38:2, 50:7, 50:12, 87:14, 87:17, 88:6, 100:2
**received** [8] - 14:21, 24:25, 25:1, 92:20, 92:22, 94:10, 94:18, 106:1
**receiver** [1] - 108:5
**receives** [1] - 63:23
**receiving** [3] - 47:12, 50:8, 91:20
**recently** [1] - 87:10
**recital** [1] - 49:5
**recitation** [1] - 43:4
**recognize** [1] - 53:17
**recognized** [3] - 52:8, 53:19, 108:18
**record** [15] - 3:9, 14:13, 27:7, 28:2, 39:17, 41:24, 47:2, 49:24, 60:4, 64:20, 65:6, 77:16, 87:19, 88:18, 103:10
**recorded** [9] - 28:4, 28:6, 28:9, 33:21, 65:7, 80:10, 94:10, 114:19, 117:3
**recording** [4] - 28:11, 37:15, 52:18, 81:11, 81:16
**records** [5] - 28:3, 71:24, 80:9, 90:19, 103:11
**reduction** [1] - 117:6

**reexamination** [1] - 76:15
**refer** [6] - 63:16, 75:20, 87:8, 87:17, 100:17, 104:20
**reference** [36] - 55:4, 59:15, 60:1, 60:8, 60:9, 60:20, 61:10, 61:23, 61:24, 63:13, 63:16, 64:5, 65:8, 65:18, 65:22, 66:1, 66:2, 70:1, 71:13, 71:16, 73:1, 76:11, 76:19, 83:17, 84:8, 86:20, 99:12, 104:16, 105:19, 106:18, 106:24, 107:6, 111:20, 112:1, 112:9
**referenced** [5] - 53:8, 69:25, 72:5, 109:16
**references** [19] - 9:23, 38:8, 45:3, 57:17, 57:23, 58:16, 60:10, 60:13, 60:16, 60:21, 61:1, 61:5, 61:21, 62:1, 71:7, 72:17, 82:15, 83:25, 84:4
**referred** [10] - 9:23, 65:17, 66:1, 69:14, 83:9, 87:4, 101:7, 101:18, 102:21
**referring** [2] - 8:6, 64:25
**refers** [8] - 7:5, 61:13, 62:2, 62:14, 66:19, 72:16, 90:17, 111:17
**refinement** [1] - 13:18
**reflect** [1] - 100:14
**regard** [1] - 36:7
**regardless** [2] - 64:4, 101:12
**regulations** [1] - 117:7
**rejected** [4] - 56:20, 57:18, 59:20, 59:25
**rejections** [1] - 58:3
**relate** [6] - 24:4, 28:15, 61:6, 73:21, 86:14, 112:1
**related** [64] - 4:5, 5:6, 5:21, 6:6, 6:19, 6:22, 7:14, 9:6, 11:10, 16:9, 16:10, 19:5, 20:23, 25:8, 25:11, 25:12, 25:15, 27:18, 28:8, 28:9, 28:11, 31:15, 33:11, 33:12, 33:20, 36:7, 37:4, 39:2, 39:14, 42:18, 46:19, 47:12, 51:6,

51:21, 53:2, 53:5, 53:23, 54:20, 60:16, 62:11, 62:15, 63:2, 67:10, 67:15, 68:11, 69:2, 70:6, 70:25, 71:4, 73:9, 73:19, 74:20, 77:24, 80:2, 80:14, 81:11, 81:17, 83:13, 86:12, 103:7, 103:10, 111:14, 113:15
**relates** [2] - 5:4, 69:15
**relating** [8] - 16:12, 34:2, 69:9, 69:19, 71:18, 73:23, 88:10, 104:9
**relative** [1] - 102:14
**relevance** [2] - 3:18, 15:9
**relied** [1] - 74:16
**rely** [4] - 15:16, 72:9, 82:15, 95:19
**relying** [3] - 75:13, 75:15, 77:12
**remember** [3] - 4:25, 42:3, 91:21
**reminded** [1] - 77:15
**reminds** [1] - 18:23
**remove** [1] - 26:15
**render** [2] - 71:10, 110:2
**renders** [2] - 98:11, 110:5
**repeats** [1] - 25:5
**report** [19] - 5:10, 7:25, 16:13, 21:21, 21:24, 22:9, 32:13, 32:24, 36:25, 40:21, 42:15, 45:25, 79:3, 85:9, 85:24, 85:25, 86:11, 90:9, 115:2
**Reporter** [2] - 1:23, 117:10
**Reporter's** [1] - 1:16
**Reports** [2] - 23:17, 25:16, 25:20
**reports** [107] - 4:20, 5:5, 5:6, 6:17, 6:23, 7:1, 7:5, 7:9, 7:16, 9:7, 9:9, 11:4, 15:23, 18:2, 18:3, 19:4, 19:6, 19:8, 19:11, 19:17, 19:22, 20:7, 20:23, 21:12, 21:16, 21:19, 22:6, 22:8, 22:13, 22:17, 22:19, 22:21, 23:21, 23:23, 24:1, 24:4, 24:13, 24:15, 24:17, 24:18, 25:11, 25:15, 25:22,

26:2, 27:3, 27:4, 27:17, 27:20, 30:14, 30:16, 30:21, 30:22, 32:3, 32:5, 32:6, 32:21, 33:1, 33:3, 34:8, 34:9, 34:18, 34:20, 34:21, 35:1, 35:13, 36:11, 37:14, 37:21, 38:12, 39:18, 39:22, 39:24, 41:7, 41:11, 41:14, 41:19, 41:20, 42:1, 42:7, 44:10, 45:14, 46:4, 46:22, 47:16, 66:14, 66:17, 66:23, 67:6, 84:19, 84:21, 84:24, 85:2, 85:9, 85:12, 85:13, 100:3, 113:11, 113:12, 113:14, 113:16, 114:3, 114:4, 114:17
**representative** [2] - 33:8, 41:17
**representing** [2] - 3:11, 3:14
**reproduced** [1] - 91:23
**request** [2] - 42:20, 47:12
**requested** [1] - 80:7
**requests** [4] - 50:20, 87:15, 87:17, 88:7
**require** [1] - 35:18
**required** [3] - 58:7, 80:4, 98:20
**requirement** [6] - 33:10, 57:1, 57:4, 87:18, 90:5, 103:7
**requirements** [1] - 89:14
**requires** [6] - 25:23, 31:17, 39:1, 50:9, 94:23, 102:17
**requiring** [1] - 59:1
**reset** [5] - 94:15, 94:18, 94:22, 102:22, 103:3, 103:19, 107:17, 107:24, 108:1, 111:4, 116:2
**resets** [4] - 92:21, 94:23, 102:24, 111:3
**resetting** [7] - 102:17, 107:8, 107:11, 110:18, 110:20, 110:22, 111:2
**resolve** [1] - 95:9
**resolves** [1] - 95:17
**respect** [9] - 4:4, 17:7, 27:15, 27:20, 48:11,

48:22, 77:11, 81:22, 82:23
**respond** [2] - 90:25, 113:21
**response** [1] - 74:7
**responses** [1] - 110:12
**responsible** [2] - 80:8, 105:25
**rest** [2] - 24:2, 113:19
**restart** [1] - 94:24
**restarts** [1] - 95:1
**result** [7] - 11:15, 43:4, 44:3, 49:6, 50:19, 53:25, 79:19
**retread** [1] - 47:19
**retrieve** [2] - 24:17, 66:13
**retrieving** [2] - 38:12, 66:17
**return** [1] - 39:21
**returns** [1] - 23:3
**reverse** [1] - 37:20
**review** [2] - 52:9, 67:6
**reviewed** [2] - 100:11, 107:1
**reviewing** [2] - 78:22, 107:6
**Rimage** [3] - 56:11, 56:15, 63:9
**robot** [4] - 56:15, 63:8, 68:21, 68:23
**robotic** [2] - 64:5, 81:4
**ROM** [5] - 53:18, 53:19, 62:22, 80:11
**ROMs** [1] - 53:20
**Room** [1] - 1:23
**routine** [2] - 101:25, 116:6
**routines** [1] - 106:11
**Rowberg** [3] - 48:14, 90:10, 108:17
**Rowberg's** [1] - 86:15
**rows** [1] - 61:2
**RPR** [2] - 1:22, 117:10
**rule** [1] - 73:11
**Rule** [5] - 92:15, 93:18, 93:19, 93:22, 95:12
**ruled** [1] - 87:23
**ruling** [1] - 81:5
**runs** [2] - 38:14, 75:1

**S**

**SA** [1] - 3:6
**Samari** [2] - 63:14, 63:16, 64:5, 65:8, 65:18, 65:21,

104:16, 104:19, 105:18, 106:17, 106:23, 107:1, 107:6, 107:14, 109:13, 109:19, 111:11, 111:12, 111:16, 111:20, 112:1, 112:9
**Samari's** [1] - 107:7
**satisfied** [13] - 42:13, 42:16, 56:10, 56:12, 60:19, 60:20, 61:22, 62:6, 63:12, 65:8, 65:21, 88:9, 111:20
**satisfies** [6] - 44:11, 62:19, 64:3, 88:13, 89:2, 90:5
**satisfy** [7] - 33:16, 37:19, 45:17, 50:19, 89:14, 103:4, 103:15
**save** [1] - 41:23
**saw** [7] - 21:13, 24:15, 40:9, 52:25, 55:4, 78:12, 83:19
**scale** [1] - 71:22
**scan** [1] - 18:7
**scans** [3] - 18:11, 70:16
**scope** [6] - 6:2, 6:19, 16:14, 46:23, 90:21, 115:4
**screen** [35] - 4:22, 4:23, 8:16, 8:19, 10:17, 16:3, 20:19, 21:13, 31:2, 31:5, 35:5, 35:12, 40:2, 45:9, 45:11, 45:23, 51:21, 52:22, 58:13, 60:18, 63:14, 64:13, 65:14, 66:7, 66:8, 67:2, 68:22, 70:3, 73:3, 77:5, 83:23, 89:17, 104:24, 105:24, 111:10
**screens** [1] - 61:14
**se** [1] - 10:10
**search** [93] - 4:5, 4:20, 14:15, 17:13, 19:17, 20:22, 21:22, 23:21, 23:22, 24:14, 25:8, 25:10, 25:14, 25:17, 26:2, 26:20, 27:3, 29:10, 33:9, 33:17, 34:7, 34:14, 35:18, 36:5, 36:14, 36:15, 36:21, 36:22, 37:13, 37:14, 39:11, 39:25, 40:8, 40:12, 40:14, 40:15, 40:19, 41:7, 41:14, 42:13, 42:14,

42:18, 44:3, 44:7, 45:4, 45:5, 45:18, 45:19, 45:20, 50:18, 50:25, 51:1, 51:2, 51:3, 54:19, 61:19, 62:10, 62:11, 63:21, 64:8, 65:13, 67:14, 67:25, 68:4, 69:5, 70:13, 70:25, 71:1, 71:4, 71:5, 71:13, 73:19, 73:20, 73:22, 76:11, 77:9, 77:12, 77:18, 77:23, 78:4, 79:1, 79:25, 80:15, 82:23, 84:21, 88:7, 103:10, 104:17, 105:5, 108:24
**searched** [11] - 15:24, 19:8, 22:13, 22:17, 27:4, 31:17, 31:22, 33:10, 33:11, 36:24, 40:5
**searches** [10] - 24:12, 44:8, 45:21, 47:14, 47:15, 73:8, 73:9, 87:19, 104:2, 104:3
**searching** [21] - 27:15, 39:1, 39:2, 40:20, 45:10, 46:19, 47:13, 56:2, 70:24, 71:8, 77:24, 78:5, 80:1, 80:13, 81:15, 83:13, 86:9, 86:10, 86:13, 86:21
**second** [22] - 16:23, 24:24, 31:1, 34:7, 35:14, 36:21, 39:2, 39:11, 43:7, 50:3, 56:11, 86:2, 87:21, 88:10, 90:1, 92:20, 94:9, 95:4, 103:6, 107:7, 107:8, 110:24
**secondary** [1] - 71:4
**seconds** [18] - 94:14, 94:15, 94:17, 94:19, 101:23, 101:24, 102:6, 102:7, 102:12, 102:13, 102:23, 104:4, 106:6, 106:7, 107:15, 107:16
**see** [35] - 5:4, 8:24, 22:7, 22:10, 22:16, 23:11, 23:16, 39:19, 39:23, 40:2, 40:20, 40:25, 44:7, 49:12, 51:19, 61:9, 61:12, 62:5, 77:20, 78:7, 78:15, 78:19, 79:4, 82:1, 89:17, 89:21,

90:7, 94:12, 101:14, 104:3, 106:6, 108:9, 109:21, 113:21
**seeks** [1] - 32:17
**seem** [2] - 32:25, 109:20
**sees** [1] - 101:21
**select** [17] - 3:25, 22:20, 26:13, 34:12, 35:4, 35:6, 45:4, 45:12, 46:3, 47:9, 66:10, 66:22, 67:23, 68:3, 70:13, 80:14, 84:18
**selected** [47] - 5:21, 24:3, 25:16, 26:10, 28:4, 33:11, 33:13, 34:15, 34:23, 36:7, 37:3, 39:21, 42:19, 45:13, 45:22, 45:23, 46:20, 46:21, 51:5, 54:22, 54:24, 57:12, 62:15, 65:5, 67:10, 67:15, 67:17, 68:10, 69:1, 69:2, 69:19, 70:6, 70:10, 71:1, 71:5, 71:9, 71:13, 73:10, 73:20, 73:23, 73:25, 80:3, 80:14, 81:16, 103:7, 103:11, 111:13
**selecting** [3] - 25:23, 71:9, 80:8
**selection** [14] - 25:12, 25:13, 25:24, 26:3, 26:7, 26:8, 26:18, 26:25, 34:6, 47:4, 62:12, 68:2, 77:25
**selections** [2] - 45:15, 47:11
**selects** [1] - 46:2
**send** [2] - 67:25, 102:3
**sending** [2] - 50:13, 97:13, 108:22
**sends** [5] - 73:15, 102:25, 103:1, 104:2, 104:5
**sense** [5] - 18:5, 18:10, 42:20, 67:8, 110:4
**sent** [7] - 4:15, 18:3, 32:21, 37:25, 106:9, 108:25, 116:20
**sentence** [2] - 43:3, 43:24
**separate** [8] - 34:22, 37:5, 37:9, 84:3, 84:4, 85:12, 101:15, 106:1
**sequentially** [1] -

47:25
**serial** [3] - 65:11, 65:19
**served** [1] - 99:23
**server** [7] - 56:12, 62:7, 63:22, 91:19, 103:25, 111:21, 111:23
**Service** [1] - 32:13
**Seshadri** [2] - 73:1, 73:18
**set** [21] - 4:20, 19:10, 19:25, 20:5, 20:22, 21:8, 21:10, 23:15, 25:17, 38:1, 40:11, 40:14, 79:19, 94:16, 97:19, 101:11, 102:6, 102:12, 102:20, 102:23, 115:17
**sets** [3] - 4:24, 22:5, 40:13
**setting** [1] - 116:5
**settings** [1] - 21:14
**setup** [12] - 20:21, 21:3, 21:11, 21:19, 22:12, 22:14, 22:23, 23:19, 25:9, 25:21, 39:16, 41:11
**several** [2] - 4:4, 57:16
**shall** [1] - 30:3
**shifted** [1] - 83:23
**shipping** [1] - 51:13
**shoes** [3] - 26:13, 26:14, 26:15
**shopping** [6] - 26:12, 26:14, 26:16, 35:3, 35:10, 35:12
**short** [2] - 14:16, 78:20
**shorten** [1] - 72:21
**shorthand** [1] - 9:23
**shortly** [1] - 58:24
**shot** [7] - 40:2, 45:9, 45:11, 45:23, 67:3, 83:23, 89:17
**shotgun** [1] - 82:16
**shots** [7] - 4:22, 4:23, 8:16, 8:19, 10:17, 16:3, 66:7
**show** [8] - 4:17, 4:23, 22:15, 40:17, 43:18, 44:16, 46:9, 69:11
**Show** [1] - 68:4
**showed** [4] - 47:14, 77:18, 83:23, 106:24
**showing** [5] - 11:19, 31:6, 31:7, 34:23, 64:14
**shown** [17] - 15:14,

20:19, 21:8, 21:12, 27:25, 39:23, 45:11, 52:22, 60:18, 67:12, 67:22, 68:2, 68:11, 68:22, 70:3, 70:12, 89:20
**shows** [18] - 4:18, 4:19, 19:11, 19:20, 19:24, 20:1, 20:6, 21:20, 22:25, 27:7, 63:18, 70:15, 72:16, 73:18, 76:13, 76:22, 83:20, 112:3
**side** [2] - 3:22, 13:24
**side's** [1] - 78:21
**signed** [1] - 58:5
**significance** [2] - 98:19, 105:6
**significantly** [1] - 93:17
**similar** [6] - 54:17, 65:24, 67:7, 70:8, 77:23, 108:8
**similarly** [3] - 103:24, 107:9, 111:19
**simple** [2] - 63:10, 65:14
**simply** [2] - 78:24, 79:8
**simultaneously** [1] - 67:18
**single** [10] - 40:1, 45:6, 45:10, 45:11, 45:18, 45:19, 45:23, 51:3, 51:4
**site** [1] - 26:12
**sites** [1] - 6:4
**sitting** [1] - 51:18
**situation** [3] - 20:1, 20:6, 23:20
**six** [1] - 40:23
**skill** [1] - 84:2
**skilled** [4] - 45:7, 73:6, 112:5, 112:8
**skip** [2] - 20:15, 25:4
**Slide** [1] - 80:7
**slide** [55] - 20:14, 20:17, 21:5, 21:12, 21:20, 22:4, 22:18, 22:22, 22:25, 23:10, 23:11, 23:13, 23:24, 24:7, 24:9, 24:11, 25:7, 25:18, 26:4, 27:6, 27:14, 28:1, 38:24, 39:15, 39:17, 39:19, 39:23, 40:6, 40:7, 41:9, 41:16, 42:11, 47:19, 48:1, 48:10, 48:23, 49:7, 76:13, 76:22, 78:23,

78:24, 79:4, 79:25, 81:13, 90:7, 91:14, 91:24, 92:6, 93:4, 94:7, 94:20, 94:21, 95:4, 98:1, 109:16
**slides** [9] - 19:10, 25:4, 28:15, 44:8, 47:18, 75:21, 78:19, 79:20, 81:10
**smart** [2] - 15:21, 108:4
**smear** [1] - 75:9
**SMITH** [2] - 2:5, 49:25
**Smith** [8] - 3:12, 8:10, 8:25, 20:12, 49:23, 51:19, 51:20, 51:21
**software** [46] - 53:24, 54:6, 54:14, 54:15, 54:23, 55:1, 55:2, 55:3, 55:6, 55:12, 55:19, 55:25, 56:2, 56:3, 57:12, 57:13, 57:21, 57:25, 58:18, 58:20, 59:2, 59:4, 59:6, 59:11, 59:13, 60:3, 60:6, 62:23, 63:3, 63:11, 64:1, 66:18, 66:24, 68:12, 68:25, 69:3, 70:7, 74:22, 74:24, 74:25, 75:1, 75:3, 79:7, 80:10, 109:1, 111:15
**Sokoloff** [1] - 2:13
**solution** [1] - 108:19
**someone** [2] - 46:1, 51:18
**sometime** [1] - 54:11
**sometimes** [4] - 13:25, 18:6, 42:7, 84:7
**somewhat** [1] - 116:4
**somewhere** [2] - 10:4, 55:4
**SOP** [2] - 32:12, 32:24
**Sorry** [1] - 49:19
**sorry** [9] - 7:23, 35:22, 35:25, 40:11, 41:20, 43:5, 64:23, 82:18, 97:5
**sort** [3] - 52:10, 64:10, 88:1
**Source** [1] - 40:3
**source** [23] - 40:4, 40:8, 40:14, 40:25, 41:1, 41:5, 95:16, 95:18, 95:20, 95:22, 95:24, 96:1, 96:2, 96:4, 96:7, 99:24, 100:3, 100:6, 100:8, 100:10, 100:15

**sources** [6] - 21:10,
40:5, 40:12, 40:15,
40:17, 40:20
**span** [1] - 89:24
**spanned** [2] - 87:25,
89:22
**spans** [1] - 89:5
**speaking** [1] - 13:12
**specialized** [3] -
36:25, 53:14, 68:14
**specific** [4] - 82:14,
87:22, 88:2, 88:23
**specifically** [1] - 58:8,
59:5, 62:20, 90:17,
104:22, 110:5,
111:17
**specification** [2] -
7:13, 38:11
**specifics** [1] - 60:12
**specified** [1] - 100:25
**specify** [2] - 28:8,
28:10
**spelled** [4] - 60:1,
63:15, 68:24, 111:12
**spent** [1] - 74:12
**sponte** [1] - 93:6
**spot** [1] - 27:12
**Spring** [1] - 1:23
**stand** [2] - 17:20,
83:10
**standalone** [1] - 53:12
**standard** [47] - 5:7,
5:20, 6:1, 6:24, 7:1,
7:10, 9:10, 9:24,
11:11, 19:4, 19:7,
19:12, 19:23, 28:5,
28:6, 28:11, 31:18,
31:20, 31:23, 32:7,
32:14, 32:18, 32:21,
33:6, 33:13, 33:21,
33:22, 33:25, 36:8,
36:11, 36:13, 36:24,
37:22, 38:3, 41:19,
56:23, 59:6, 74:13,
74:19, 99:1, 103:12,
113:11, 113:13,
113:16, 114:8,
114:19, 115:3
**standardized** [1] -
58:9
**standing** [1] - 89:13
**standpoint** [1] - 113:8
**stands** [1] - 17:19
**start** [8] - 16:5, 17:12,
23:1, 30:23, 35:12,
74:12, 97:3, 98:5
**started** [1] - 74:12
**starting** [4] - 47:18,
81:9, 97:15, 98:3
**starts** [7] - 24:7, 24:9,

92:19, 94:16,
101:11, 104:6, 111:3
**state** [2] - 3:8, 109:5
**statement** [1] - 38:4
**statements** [1] - 78:12
**STATES** [1] - 1:1
**states** [2] - 107:5,
117:7
**station** [18] - 27:25,
28:1, 50:10, 50:11,
62:14, 63:8, 63:10,
63:19, 64:4, 68:18,
79:1, 80:20, 80:22,
80:25, 81:17, 102:9,
108:16, 108:23
**stations** [2] - 81:3,
83:20
**stay** [1] - 35:11
**stays** [1] - 102:11
**stenographically** [1] -
117:3
**step** [12] - 15:19, 23:7,
23:24, 26:3, 35:14,
54:4, 78:5, 94:4,
94:9, 104:20, 106:14
**STEWART** [31] - 2:5,
86:24, 87:2, 90:14,
91:5, 91:8, 91:12,
91:22, 95:23, 96:13,
96:16, 96:21, 96:24,
97:2, 97:9, 97:11,
97:21, 97:24, 98:18,
98:24, 99:3, 99:11,
105:10, 109:9,
109:12, 110:9,
110:12, 110:17,
110:19, 110:23,
111:6
**Stewart** [3] - 3:12,
99:22, 112:18
**still** [10] - 27:23, 35:7,
35:8, 42:24, 43:12,
60:14, 77:20, 78:16,
88:4, 89:19
**stop** [2] - 84:11,
112:17
**storage** [4] - 28:3,
28:10, 37:5, 81:12
**store** [5] - 27:8, 37:10,
37:11, 52:10, 62:8
**stored** [1] - 19:6,
37:21, 58:9, 106:1
**storing** [1] - 37:7
**straightforward** [1] -
88:8
**Street** [2] - 1:23, 2:6
**strict** [1] - 79:15
**strictest** [1] - 18:5
**strike** [2] - 20:14, 76:6
**structure** [1] - 37:1

**structured** [11] - 18:2,
32:16, 39:18, 39:22,
41:18, 41:20, 42:1,
42:6, 44:10, 45:24,
46:4
**studies** [17] - 22:24,
23:1, 23:4, 23:9,
23:12, 24:15, 25:15,
26:19, 26:20, 34:22,
39:21, 40:20, 40:24,
41:12, 62:24, 66:11,
80:6
**Studies** [1] - 34:13,
34:14, 35:6, 41:9
**Study** [1] - 68:6
**study** [12] - 23:5,
23:14, 25:15, 40:21,
40:22, 40:25, 41:4,
65:10, 65:16, 69:10,
70:19, 101:7
**sua** [1] - 93:6
**subdirectories** [1] -
85:6
**subject** [2] - 13:17,
23:14
**submit** [5] - 4:13,
14:16, 58:19, 100:7,
100:9
**submits** [1] - 58:2
**submitted** [15] - 8:10,
8:17, 15:8, 32:10,
57:15, 58:25, 60:5,
60:10, 60:13, 85:19,
90:9, 95:13, 101:8,
111:8, 112:3
**submitting** [1] - 15:12
**subroutine** [8] -
101:12, 101:13,
101:20, 102:3,
102:25, 103:1, 104:2
**subroutines** [2] -
106:11, 106:12
**substantial** [2] -
74:25, 112:10
**substantially** [3] -
46:17, 50:19, 58:10
**substituted** [1] - 31:15
**successful** [1] - 70:17
**sufficient** [1] - 112:13
**sufficiently** [1] - 93:1
**suggest** [2] - 11:25,
38:12
**suggestion** [2] -
10:24, 14:12
**suite** [1] - 55:7
**Suite** [1] - 2:14
**sum** [1] - 72:12
**summarize** [2] - 56:8,
74:7
**summarized** [1] -

81:25
**summary** [21] - 36:2,
43:16, 49:1, 55:22,
55:23, 56:12, 76:5,
76:7, 81:21, 88:4,
88:15, 88:19, 92:9,
92:10, 93:1, 93:6,
93:7, 95:8, 95:13,
100:9, 116:3
**summed** [1] - 72:13
**Summers** [10] - 3:11,
3:17, 30:13, 30:24,
34:3, 44:23, 56:22,
63:7, 73:23, 84:17
**summers** [4] - 16:8,
29:25, 35:2, 37:2
**SUMMERS** [102] - 2:4,
3:10, 3:19, 3:24, 4:3,
4:9, 4:16, 4:18, 4:22,
5:12, 5:14, 5:17, 6:4,
6:8, 6:11, 6:14, 6:19,
6:22, 7:6, 7:9, 7:12,
7:20, 7:23, 8:1, 8:3,
8:12, 8:15, 8:19,
8:21, 8:25, 9:2, 9:5,
9:13, 14:12, 14:24,
15:1, 15:7, 15:18,
15:21, 17:10, 17:14,
17:16, 17:23, 21:1,
22:3, 28:14, 28:20,
28:23, 29:13, 30:2,
30:6, 30:9, 38:23,
39:5, 39:7, 39:10,
39:14, 43:7, 43:10,
43:15, 47:3, 47:6,
48:13, 48:16, 48:20,
49:12, 49:15, 49:17,
49:23, 74:8, 74:11,
75:12, 79:25, 81:25,
82:2, 82:18, 82:20,
82:23, 83:1, 83:6,
83:20, 83:22, 84:14,
112:25, 113:21,
113:25, 114:5,
114:7, 114:11,
114:13, 114:19,
114:24, 115:1,
115:6, 115:9,
115:12, 115:25,
116:8, 116:11,
116:14, 116:18,
116:23
**summers'** [1] - 71:3
**Summers'** [1] - 67:16
**support** [4] - 20:10,
79:3, 84:10, 111:8
**Support** [1] - 61:15
**supported** [1] - 46:16
**supports** [2] - 38:12,
75:14

**suppose** [2] - 3:20,
81:5
**supposedly** [1] - 75:6
**surge** [1] - 102:4
**surprises** [1] - 46:3
**surprisingly** [1] -
95:25
**surrogate** [1] - 9:24
**survives** [1] - 98:25
**switch** [1] - 73:7
**Switzerland** [1] - 66:3
**sworn** [1] - 111:1
**SYSTEM** [1] - 1:8
**system** [33] - 50:10,
51:16, 51:17, 66:3,
66:5, 66:9, 67:1,
67:7, 68:18, 69:4,
69:8, 69:17, 69:18,
69:20, 70:1, 70:20,
71:16, 71:22, 71:23,
73:19, 77:19, 84:18,
84:23, 85:1, 85:5,
85:13, 87:16, 94:25,
96:2, 97:12, 99:19
**Systems** [2] - 3:6,
3:11
**systems** [5] - 51:12,
58:7, 70:22, 70:23,
104:19

**T**

**table** [11] - 16:22,
64:16, 101:19,
101:21, 101:23,
102:4, 103:23,
104:3, 106:2, 106:7
**talks** [11] - 6:9, 27:24,
47:11, 63:19, 64:5,
65:9, 65:13, 66:2,
70:17, 105:24,
106:10
**Taylor** [1] - 2:13
**teach** [8] - 57:20,
58:17, 60:3, 60:5,
62:17, 71:12,
105:19, 111:12
**teaches** [5] - 69:5,
104:18, 105:20,
105:22, 112:10
**technically** [1] -
102:21
**technology** [1] - 53:21
**telephone** [1] - 1:24
**temporary** [1] - 106:3
**ten** [1] - 75:5
**term** [3] - 47:22, 81:6,
87:13
**terminal** [2] - 51:5,

86:2
**terminals** [9] - 28:25,
51:5, 62:9, 78:25,
79:6, 79:8, 79:13,
79:22, 86:6
**terminology** [2] -
18:7, 110:10
**terms** [21] - 4:4, 4:5,
4:10, 6:2, 31:24,
45:8, 46:7, 46:13,
46:14, 50:15, 60:12,
60:16, 85:16, 85:21,
85:22, 86:16, 96:24,
96:25, 97:1, 108:12
**test** [5] - 9:7, 23:14,
43:13, 49:6, 50:20
**testified** [7] - 24:18,
27:10, 56:5, 68:24,
85:23, 96:3, 108:17
**testify** [1] - 74:23
**testifying** [1] - 82:7
**testimony** [21] - 20:12,
41:17, 54:10, 84:10,
85:4, 92:14, 93:18,
93:19, 93:22, 94:2,
94:3, 95:11, 96:8,
96:10, 96:11, 99:18,
99:23, 108:13,
111:1, 112:6
**text** [11] - 7:14, 11:4,
16:13, 16:17, 19:6,
19:9, 30:15, 31:25,
33:4, 42:9, 113:14
**textual** [1] - 25:1
**THE** [230] - 2:3, 2:11,
3:16, 3:20, 4:2, 4:7,
4:15, 4:17, 4:21, 5:9,
5:13, 5:16, 6:3, 6:5,
6:10, 6:13, 6:18,
6:21, 7:4, 7:8, 7:11,
7:17, 7:21, 7:25, 8:2,
8:7, 8:13, 8:18, 8:20,
8:24, 9:1, 9:4, 9:11,
9:14, 9:20, 9:25,
10:3, 10:6, 10:15,
10:19, 11:20, 11:25,
12:5, 13:1, 13:4,
13:6, 13:11, 13:16,
13:19, 13:21, 14:4,
14:8, 14:10, 14:23,
14:25, 15:3, 15:13,
15:20, 16:4, 16:15,
16:20, 17:2, 17:5,
17:9, 17:11, 17:15,
17:22, 20:24, 22:2,
28:19, 28:22, 29:12,
29:20, 29:23, 30:4,
30:8, 30:17, 31:5,
31:7, 31:13, 34:4,
34:8, 34:17, 36:1,

36:16, 36:18, 36:20,
37:16, 38:7, 38:16,
38:20, 39:4, 39:6,
39:9, 39:13, 43:5,
43:14, 44:21, 46:6,
46:11, 46:24, 47:1,
47:5, 48:12, 48:14,
48:19, 49:11, 49:14,
49:16, 49:22, 50:1,
50:4, 50:14, 50:22,
51:15, 52:25, 55:24,
57:3, 57:5, 59:22,
60:14, 60:22, 60:24,
61:3, 61:8, 61:12,
62:4, 64:17, 64:19,
64:21, 64:24, 72:1,
72:4, 72:6, 72:8,
72:12, 72:15, 72:20,
72:25, 74:1, 74:4,
74:10, 75:11, 79:24,
81:24, 82:1, 82:17,
82:19, 82:22, 82:25,
83:5, 83:19, 83:21,
84:13, 84:15, 84:20,
85:15, 85:18, 85:20,
86:7, 86:18, 87:1,
90:13, 91:2, 91:7,
91:10, 91:21, 95:21,
96:12, 96:15, 96:19,
97:1, 97:6, 97:10,
97:20, 97:23, 98:15,
98:21, 99:2, 99:9,
99:15, 99:21,
104:11, 104:13,
104:25, 105:4,
105:9, 105:12,
105:14, 105:16,
105:20, 105:22,
106:8, 106:13,
106:16, 107:20,
108:9, 109:7,
109:11, 110:7,
110:11, 110:15,
110:18, 110:21,
111:5, 112:15,
112:19, 112:22,
113:2, 113:5,
113:24, 114:2,
114:6, 114:10,
114:12, 114:14,
114:21, 114:25,
115:5, 115:8,
115:11, 115:13,
115:15, 115:18,
115:22, 116:4,
116:10, 116:13,
116:15, 116:20
**themselves** [1] - 96:25
**theory** [3] - 29:17,
90:8, 106:20
**thereafter** [1] - 58:24

**thereby** [2] - 62:18,
111:23
**therefore** [1] - 35:17
**they've** [2] - 11:19,
83:9
**third** [1] - 111:13
**thorough** [1] - 61:20
**three** [6] - 15:14,
33:20, 36:5, 47:18,
49:22, 76:25
**thrown** [1] - 84:9
**tied** [1] - 63:17
**timeout** [3] - 91:4,
91:6, 91:10, 91:20,
91:25, 92:3, 92:5,
94:15, 94:18,
100:18, 102:17,
102:19, 102:20,
102:21, 102:22,
103:2, 103:3,
103:14, 103:20,
106:4, 106:19,
106:25, 107:6,
107:8, 107:10,
107:11, 107:16,
108:16, 108:22,
112:4, 112:12
**Timer** [1] - 107:24
**timer** [48] - 92:19,
92:21, 94:5, 94:11,
94:22, 94:24, 95:1,
100:17, 100:19,
100:20, 100:22,
100:23, 101:1,
101:5, 101:7, 101:9,
101:16, 101:20,
102:2, 102:10,
102:24, 102:25,
103:14, 103:16,
103:17, 103:19,
103:21, 103:24,
104:1, 104:5, 104:7,
104:23, 105:25,
106:10, 106:18,
108:1, 108:4, 108:6,
108:16, 108:21,
111:18, 111:24,
112:2, 112:12
**timers** [3] - 104:10,
104:20, 112:4
**timestamp** [14] -
88:22, 89:8, 89:9,
89:11, 89:14, 90:1,
90:2, 90:3, 90:12,
90:17, 90:18, 90:20,
101:19, 111:22
**title** [1] - 71:23
**today** [2] - 14:14, 71:2
**today's** [1] - 18:19
**together** [5] - 36:5,

52:22, 84:5, 84:9,
116:7
**tongue** [1] - 63:17
**took** [5] - 13:17,
59:16, 74:17, 83:12,
116:1
**top** [4] - 40:22, 60:25,
85:24, 107:5
**totally** [3] - 3:25,
75:18, 83:24
**tracking** [1] - 64:10
**tracks** [1] - 65:18
**Trademark** [2] - 58:20,
59:19
**trail** [4] - 64:10, 65:5,
65:6
**train** [3] - 102:8,
108:15
**transcript** [2] - 117:3,
117:5
**Transcript** [1] - 1:16
**transfer** [3] - 52:5,
52:13, 73:16
**transmitted** [2] -
89:10, 90:18
**transmitting** [2] -
17:21, 71:24
**trap** [1] - 10:11
**tray** [1] - 68:23
**treated** [1] - 42:7
**trial** [6] - 15:10, 74:23,
115:16, 115:19,
116:9, 116:12
**troubling** [1] - 83:3
**true** [8] - 43:1, 71:2,
74:23, 93:15, 95:5,
99:18, 100:7, 117:2
**try** [5] - 14:20, 18:13,
78:9, 78:14, 115:19
**trying** [3] - 22:1, 34:5,
75:9
**tuning** [1] - 112:11
**turkey** [1] - 102:7
**turn** [9] - 20:14, 20:17,
34:20, 77:14, 77:20,
79:4, 81:8, 82:3,
90:7
**turned** [2] - 20:18,
94:6
**turning** [9] - 18:21,
34:2, 42:11, 48:1,
87:9, 92:6, 94:20,
95:4, 102:14
**turns** [2] - 101:10,
103:17
**tweaks** [1] - 13:10
**twenty** [1] - 49:22
**twenty-three** [1] -
49:22
**two** [36] - 13:23,

14:14, 15:2, 17:18,
20:1, 31:3, 31:8,
34:6, 39:7, 41:13,
41:19, 42:12, 44:4,
44:7, 44:8, 44:25,
45:21, 47:13, 55:5,
65:7, 76:11, 77:1,
78:20, 85:21, 86:10,
86:14, 87:11, 87:14,
87:17, 87:19, 87:25,
89:5, 91:16, 95:17,
106:10, 106:11
**two-and-a** [1] - 78:20
**two-database** [1] -
39:7
**type** [5] - 39:19, 51:20,
54:18, 71:16, 90:18
**types** [3] - 5:22, 5:25,
39:17
**typically** [1] - 19:25
**typo** [1] - 16:25

---

**U**

**UCLA** [2] - 66:4
**ultimately** [3] - 46:8,
60:1, 64:4
**umm** [1] - 110:15
**uncertain** [1] - 10:16
**under** [30] - 4:11, 9:8,
19:5, 24:10, 27:18,
42:25, 43:10, 43:12,
43:13, 43:19, 43:21,
43:22, 44:1, 44:14,
44:17, 48:24, 49:2,
49:4, 76:21, 77:25,
80:20, 80:21, 93:3,
95:2, 95:12, 95:15,
96:11, 106:20,
109:5, 113:10
**underlying** [2] - 42:8,
82:5
**underneath** [1] - 40:3
**understood** [1] - 7:13
**unique** [6] - 65:11,
65:19, 87:23, 88:11,
88:13
**uniquely** [3] - 89:6,
89:11, 90:2
**unit** [1] - 56:11
**united** [1] - 117:7
**UNITED** [1] - 1:1
**units** [2] - 53:19,
100:25
**unless** [2] - 19:6,
28:20
**unlimited** [1] - 88:7
**unnecessary** [1] -
81:7

**unresolved** [1] - 63:6
**unselected** [1] - 44:4
**up** [43] - 4:20, 4:24, 10:11, 10:23, 11:5, 11:7, 12:22, 19:25, 20:5, 20:22, 21:8, 21:10, 21:20, 23:4, 23:16, 26:19, 27:1, 34:16, 38:1, 39:24, 40:12, 40:13, 40:14, 44:9, 51:21, 52:4, 54:7, 58:17, 67:23, 72:12, 72:13, 72:21, 73:14, 82:9, 99:25, 100:24, 101:2, 101:11, 104:11, 104:12, 104:23, 108:19
**update** [1] - 65:11
**updating** [1] - 65:9
**upgraded** [1] - 53:7
**upper** [3] - 21:14, 34:24, 40:2
**usable** [1] - 29:8
**user** [46] - 4:24, 21:14, 22:16, 22:24, 22:25, 23:7, 23:10, 23:18, 23:22, 23:25, 24:5, 25:12, 26:3, 26:6, 26:21, 34:11, 34:20, 34:24, 35:17, 39:17, 40:4, 41:9, 41:12, 42:20, 45:12, 45:19, 46:1, 47:4, 51:3, 53:3, 62:11, 66:22, 67:14, 67:23, 68:7, 69:1, 69:8, 70:6, 73:14, 77:25, 79:7, 85:10, 87:18, 87:19
**user's** [3] - 22:19, 34:21, 45:16
**uses** [9] - 4:24, 19:20, 22:16, 24:14, 24:16, 32:5, 32:9, 32:12, 106:15
**usual** [1] - 10:11
**utilizes** [1] - 66:9

**V**

**vacated** [1] - 116:12
**vacuum** [1] - 75:24
**validity** [6] - 50:25, 56:23, 56:25, 90:25, 91:1, 104:15
**value** [1] - 111:1
**various** [8] - 16:11, 30:24, 53:3, 53:24, 67:1, 67:2, 100:12,

103:13
**varying** [1] - 12:6
**verified** [1] - 100:1
**verse** [1] - 107:21
**version** [1] - 89:19
**versions** [5] - 88:11, 88:15, 88:17, 88:20
**versus** [3] - 3:7, 53:10, 96:8
**via** [1] - 20:9
**view** [13] - 12:6, 14:13, 19:3, 19:5, 29:1, 53:13, 55:21, 58:1, 58:9, 62:22, 67:5, 67:9, 83:20
**viewed** [2] - 53:11, 57:23
**viewer** [3] - 53:11, 74:24, 75:7
**viewing** [27] - 53:4, 53:14, 53:24, 55:12, 56:3, 57:13, 57:21, 58:8, 58:18, 59:2, 59:6, 59:11, 59:13, 60:3, 60:6, 62:23, 63:3, 63:11, 64:1, 66:18, 66:24, 68:12, 68:13, 69:3, 70:7, 108:25, 111:14
**vPro** [4] - 61:11, 70:1, 70:4, 70:12
**vS** [1] - 1:11

**W**

**wait** [3] - 31:13, 60:22, 110:15
**waited** [1] - 116:17
**walks** [1] - 24:5
**Wang** [3] - 60:1, 60:2, 60:9
**wants** [3] - 22:24, 46:1, 67:25
**ways** [1] - 70:9
**web** [3] - 25:2, 26:12, 27:22
**weighted** [1] - 95:14
**whereas** [2] - 37:10, 66:15
**white** [1] - 18:16
**whole** [1] - 56:7
**widely** [1] - 59:5
**willing** [1] - 72:9
**WILLMORE** [1] - 2:12
**Wilshire** [1] - 2:14
**Windows** [1] - 55:17
**Windows-based** [1] - 55:17
**withheld** [1] - 75:14

**witness** [3] - 20:13, 92:15, 95:12
**witnesses** [1] - 19:16
**word** [2] - 52:19, 110:18
**words** [3] - 40:15, 57:22, 57:25
**works** [14] - 5:4, 24:8, 31:24, 32:2, 34:10, 45:9, 50:6, 63:20, 66:6, 67:21, 101:16, 104:21, 107:19
**workstation** [8] - 51:25, 54:15, 54:19, 55:8, 63:19, 73:13, 85:5
**workstations** [7] - 52:17, 58:8, 67:9, 67:13, 67:15, 73:4, 85:22
**worse** [1] - 100:4
**worth** [1] - 13:23
**wrapped** [2] - 18:5, 115:2
**Wright** [17] - 54:10, 56:5, 57:10, 57:15, 57:19, 58:2, 58:5, 58:15, 58:19, 59:12, 74:22, 75:4, 75:6, 75:9, 97:14, 108:18, 109:3
**Wright's** [2] - 58:21, 58:25
**write** [2] - 74:22, 116:15
**writer** [1] - 68:1
**writing** [1] - 82:9
**written** [5] - 15:6, 33:4, 33:5, 62:2, 100:8
**wrote** [2] - 68:25, 75:1

**X**

**x-ray** [3] - 51:13, 51:20, 73:14

**Y**

**year** [1] - 53:19
**years** [1] - 15:2
**yourself** [1] - 54:12

**Z**

**Zafman** [1] - 2:13
**zero** [13] - 94:6, 94:12, 94:16, 101:1,

101:11, 102:25, 103:1, 103:22, 104:2, 111:2, 111:3
**zeros** [1] - 100:8
**zoom** [1] - 60:23